2024-1268

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

GUJARAT FLUOROCHEMICALS LTD.,

*Plaintiff-Appellee,*

v.

UNITED STATES,

*Defendant,*

DAIKIN AMERICA, INC.,

*Defendant-Appellant.*

---

Appeal from The United States Court of International Trade in
Case No. 1:22-cv-00120-TCS, Judge Timothy C. Stanceu

---

## OPENING BRIEF OF
## DEFENDANT-APPELLANT DAIKIN AMERICA, INC.

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
Elizabeth J. Drake, Esq.
SCHAGRIN ASSOCIATES
900 7th Street NW #500
Washington, DC 20001
(202) 223-1700

*Counsel to Daikin America, Inc.*

Dated: February 16, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 24-1268 |
| **Short Case Caption** | Gujarat Fluorochemicals Ltd. v. US |
| **Filing Party/Entity** | Daikin America, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/16/2024

Signature:  /s/ Luke A. Meisner

Name:  Luke A. Meisner

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| | ☑ None/Not Applicable | ☐ None/Not Applicable |
| Daikin America, Inc. | | Daikin America, Inc. is a subsidiary of Daikin Industries Ltd. which has a greater than 10% ownership in the entity. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| Benjamin Bay, no longer employed by Schagrin Associates | Joseph Laroski, appearance withdrawn Feb. 15, 2024 | |
| Kelsey Rule, no longer employed by Schagrin Associates | | |
| Justin Neuman, not yet admitted to the CAFC | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................1

II.    STATEMENT OF RELATED CASES...........................................1

III.   STATEMENT OF JURISDICTION ..............................................1

IV.   STATEMENT OF ISSUES ...........................................................2

V.    STATEMENT OF THE CASE ......................................................3

VI.   STATEMENT OF FACTS.............................................................4

VII.  SUMMARY OF THE ARGUMENT .............................................8

VIII. ARGUMENT...............................................................................11

        A.   The standard of review ......................................................11

        B.   The text, structure, history, and purpose of the regulation demonstrate it unambiguously applied to this investigation .....................................................................13

               1.   The text of the regulation………………………………..14

               2.   The structure of the regulation………………………..18

               3.   The history and purpose of the regulation……………………20

               4.   The regulation within the broader statutory scheme…………..25

               5.   Conclusion……………………………………………………30

# TABLE OF CONTENTS, cont.

C.    At a minimum, the regulation did not unambiguously
foreclose Commerce's interpretation as a matter of law.....................31

1.    The examples in the *CVD Preamble* are illustrative,
not exhaustive……………………………………………..33

2.    The purpose of the attribution rule is consistent with
a broad interpretation and application of the rule……………...35

3.    The examples in the *CVD Preamble* are not as restrictive
as the CIT presumed………………………………………….38

4.    Conclusion…………………………………………………….39

D.    To the extent the regulation was ambiguous, Commerce's
interpretation was reasonable and should have been
upheld ........................................................................................40

1.    The character and context of Commerce's interpretation
warrant deference…………………………………………….41

2.    Commerce's interpretation was reasonable and within
the zone of ambiguity…………………………………………44

IX.    CONCLUSION..........................................................................46

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003) .....................12

*Auer v. Robbins*, 519 U.S. 452 (1997) ....................................................................13

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 636 F. Supp. 961 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987)........................................................12

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984) 12

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014).29

*Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018)................16

*Gujarat Fluorochemicals Limited v. United States*, 617 F.Supp.3d 1328 (Ct. Int'l Trade 2023)........................................................................................... passim

*Gujarat Fluorochemicals Limited v. United States*, 662 F.Supp.3d 1371 (Ct. Int'l Trade 2023)............................................................................................ 1, 4, 8

*Gujarat Fluorochemicals Limited v. United States*, 78 F.Supp.3d 1346 (Ct. Int'l Trade 2022).......................................................................................................3

*Kisor v. Wilkie*, 588 U.S. ___, 139 S.Ct. 2400, 204 L.Ed.2d 841 (2019)........ passim

*NMB Singapore Ltd. v. US*, 557 F.3d 1316 (Fed. Cir. 2009) ..................................43

*Nucor Corporation v. United States*, 600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022)43

*Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396 (Fed. Cir. 2014) ...12

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001) ...............................................................................................................................12

*Res-Care, Inc. v. United States*, 735 F.3d 1384 (Fed. Cir. 2013)...........................17

*Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) ....................................16

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ...........................16

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998) ...........................12

**Statutes**

1 U.S.C. § 1 .............................................................................................................15

19 U.S.C. § 1516a  ..................................................................................................12

19 U.S.C. § 1671 ........................................................................................... 25, 27, 29

19 U.S.C. § 1677(5)(A).................................................................................... passim

# <u>TABLE OF AUTHORITIES, cont.</u>

**Stautes, cont.**

19 U.S.C. § 1677-1.................................................................................28

28 U.S.C. § 1295....................................................................................1

**Rules**

Federal Circuit Rule 28 ...........................................................................1

Federal Circuit Rule 47.5 ........................................................................1

Federal Rule of Appellate Procedure 28 .................................................1

**Regulations**

19 C.F.R. § 351.102(b)(12)............................................................... 19, 33

19 C.F.R. § 351.525(b)(5)(ii)..................................................................22

19 C.F.R. §§ 351.106(c)(2), 351.107(a)-(c), 351.202(b)(4)-(9), 351.203(c), (e), & (f), 351.204(c) & (e), 351.206(g) & (h), 351.207(b)(2), 351.208(c)-(e)..............17

19 C.F.R. § 351.525(b)(1)........................................................................30

19 C.F.R. § 351.525(b)(6)(iv) ........................................................... passim

**Administrative Determinations**

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,400 (Dep't Commerce Nov. 25, 1998)..................................................................21

*Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce August 16, 2006) .................... 16, 24, 39

*Final Affirmative Countervailing Duty Determination: Certain Pasta ("Pasta") From Italy*, 61 Fed. Reg. 30,288 (Dep't Commerce June 14, 1996) ..................23

*Final Affirmative Countervailing Duty Determination: Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570 (Dep't Commerce May 28, 1992) .................................................................................................. passim

# TABLE OF AUTHORITIES, cont.

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round
  Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994)............................... 26, 28

United States-Canada Free Trade Agreement, Article 1904 Binational Panel
  Review, *In the Matter Certain Softwood Lumber Products From Canada,
  Decision of the Panel*, U.S.A.-92-1904-01 (May 6, 1993) ..................................26

*Dedicated*, Merriam-Webster.com, https://www.merriam-
  webster.com/dictionary/dedicated (last visited Feb. 15, 2024)............................17

*Primarily*, Merriam-Webster.com, https://www.merriam-
  webster.com/dictionary/primarily#dictionary-entry-1 (last visited Feb. 15, 2024)
  ....................................................................................................................17

*With respect to*, Merriam-Webster.com, https://www.merriam-
  webster.com/dictionary/with%20respect%20to (last visited Feb. 15, 2024).......27

## I.    **INTRODUCTION**

On behalf of Defendant-Appellant Daikin America, Inc. ("Defendant-Appellant" or "Daikin"), we respectfully submit this opening brief in accordance with Federal Rule of Appellate Procedure 28 and Federal Circuit Rule 28.

## II.    **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, counsel for Defendant-Appellant is unaware of any other appeal in or from the same civil action in the U.S. Court of International Trade ("CIT") that was previously before this Court or any other appellate court. Counsel is not aware of any other case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## III.    **STATEMENT OF JURISDICTION**

Pursuant to 28 U.S.C. § 1295(a)(5), this Court possesses subject matter jurisdiction over the appeal from the final judgment of the CIT entered on October 13, 2023. *Gujarat Fluorochemicals Limited v. United States*, 662 F.Supp.3d 1371 (Ct. Int'l Trade 2023) ("*Gujarat III*"). Appx00003-00008.[1] On December 12, 2023, Defendant-Appellant Wheatland timely filed a notice of appeal. Appx00046.

---

[1] "Appx__" refers to pages of the Joint Appendix.

## IV.   **STATEMENT OF ISSUES**

1. In countervailing duty ("CVD") proceedings, does 19 C.F.R.

   § 351.525(b)(6)(iv), the rule governing the attribution of subsidies to

   cross-owned input suppliers, unambiguously allow the U.S. Department

   of Commerce ("Commerce") to treat a situation where all of a cross-

   owned input supplier's electricity production is consumed in the

   production of the downstream product as a situation in which "production

   of the input product is primarily dedicated to production of the

   downstream product"?

2. If not, was it proper for the CIT to accord no deference to Commerce's

   interpretation of its own rule and conclude that the cross-owned input

   supplier regulation unambiguously prohibits Commerce as a matter of

   law from treating a situation where <u>all</u> of a cross-owned input supplier's

   electricity production is consumed in the production of the downstream

   product as a situation in which "production of the input product is

   primarily dedicated to production of the downstream product"?

3. If the regulation is ambiguous, should the CIT have deferred to

   Commerce's reasonable interpretation that the regulation applies to a

   situation where all of a cross-owned input supplier's electricity

   production is consumed in the production of the downstream product?

2

## V.    STATEMENT OF THE CASE

In a CVD investigation on imports of Granular Polytetrafluoroethylene Resin ("PTFE") from India, Commerce determined that the responding Indian PTFE producer, Gujarat Fluorochemicals Limited ("GFCL"), benefitted from certain countervailable subsidies. At issue in this appeal is Commerce's determination regarding a land subsidy that was provided by the Government of India's State Industrial Development Corporation ("SIDC") to GFCL's cross-owned input suppler, Inox Wind Limited ("IWL"). Commerce determined that the subsidy to IWL was attributable to GFCL pursuant to Commerce's cross-owned input supplier regulation at 19 C.F.R. § 351.525(b)(6)(iv). Commerce found that the regulation applied to the facts of this case, because: (1) IWL and GFCL were cross-owned; and (2) all of the electricity produced by IWL was consumed in the production of downstream products by GFCL.

GFCL appealed. After briefing, oral argument, and supplemental briefs, the CIT remanded to Commerce. *See Gujarat Fluorochemicals Limited v. United States*, 617 F.Supp.3d 1328, 1342 (Ct. Int'l Trade 2023) ("*Gujarat II*"). Appx00026-00038.[2] The CIT did not find any error in Commerce's determinations

_____

[2] The CIT denied a motion for a preliminary injunction to lower the cash deposit rate that was filed by GFCL while the appeal was pending. *See Gujarat Fluorochemicals Limited v. United States*, 78 F.Supp.3d 1346 (Ct. Int'l Trade

that: (1) the SIDC provided a subsidy that conferred a benefit on IWL; (2) IWL was cross-owned with GFCL; and (3) all of the electricity produced by IWL was provided to GFCL for the production of downstream products. *See id*. The CIT concluded, however, that Commerce's inclusion of the subsidy to IWL in GFCL's subsidy rate pursuant to the agency's cross-owned input supplier regulation was contrary to law. *See id*. at 1341, 1342. On remand, the CIT directed Commerce – without any opportunity to reconsider or explain the agency's original determination – to "delete from the overall {subsidy} rate" the amount related to the subsidy conferred on IWL. *Id*. at 1342.

On remand, Commerce complied with this aspect of the CIT's order under respectful protest, and the agency deleted the contested amount from GFCL's subsidy rate. *See* Final Results of Redetermination Pursuant to Court Remand (Feb. 23, 2023) ("Remand Results") at 2, Appx00012. The CIT upheld Commerce's Remand Determination. *See Gujarat III*. This appeal followed.

## VI.    <u>STATEMENT OF FACTS</u>

In the investigation below, Commerce found that IWL received a subsidy from the SIDC, IWL was cross-owned with GFCL, and all of the electricity IWL produced was supplied to GFCL for the production of downstream products. *See*

---

2022) ("*Gujarat I*"). Appx00039-00048. The denial of the preliminary injunction is not at issue in this appeal.

*Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 86 Fed. Reg. 35,479 (Dep't Commerce July 6, 2021), and accompanying Preliminary Decision Memorandum ("PDM") at 8. Appx01014. *See also* Memorandum to Christian Marsh, Acting Assistant Secretary for Enforcement and Compliance, "Post-Preliminary Analysis of Countervailing Duty Investigation: Granular Polytetrafluoroethylene Resin from India" (Oct. 1, 2021) ("Post-Prelim Analysis") at 12-13. Appx01049-01050. *See also Granular Polytetrafluoroethylene Resin From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 3,765 (Dep't Commerce Jan. 25, 2022), and accompanying Issues and Decision Memorandum ("Final IDM") at Comment 1. Appx01065-01069. GFCL did not contest these basic facts below. *See id*.[3]

------

[3] GFCL did contest certain other aspects of Commerce's determination regarding the subsidy to IWL, which were addressed in Commerce's final determination. *See* Final IDM at Comments 1 – 4. Primarily, GFCL argued that the amount of electricity IWL supplied was small, the downstream products using the electricity encompassed non-subject merchandise, and different land benchmarks should have been used. *See id*. GFCL repeated these arguments on appeal, but the CIT did not rule based on these specific arguments. Instead, as explained below, the CIT found that as a matter of law the regulation could not apply where the input was not physically incorporated into the downstream product. *See Gujarat II* at 1331-1341.

Based on these facts, Commerce concluded that the subsidy received by IWL should be attributed to GFCL under Commerce's cross-owned input supplier regulation, 19 C.F.R. § 351.525(b)(6)(iv). *Id*. Commerce reasoned that the regulation applied because IWL "produced an input product" (*i.e.*, electricity), that was "primarily dedicated to production of the downstream product …." (*i.e.*, the downstream products produced by GFCL). *See id*. *See also* 19 C.F.R. § 351.525(b)(6)(iv).

When these conditions are met, Commerce's regulation states that Commerce "will attribute subsidies received by the input producer to the combined sales of the input and downstream products …." *Id*. Commerce followed these instructions in the investigation below, dividing the benefit of the subsidy received by IWL by the combined sales of the input and downstream products produced by IWL and GFCL (excluding intercompany sales) to derive the applicable subsidy rate. Post-Prelim Analysis at 13. Other than disagreements regarding the land benchmarks Commerce selected, no party contested the particulars of the calculation method that Commerce used to attribute the subsidy to IWL to the combined sales of the input and downstream products under the cross-owned input supplier regulation. *See* Final IDM at Comments 1 – 4.

On appeal, GFCL did not contest Commerce's basic findings that: (1) IWL received a subsidy from the SIDC; (2) IWL was cross-owned with GFCL; and (3)

6

all of the electricity IWL produced was supplied to GFCL for the production of downstream products. *See generally Gujarat II*. The CIT thus did not find fault with any of these factual findings. *See id*. Instead, the CIT concluded that Commerce's application of the agency's cross-owned input supplier regulation was contrary to law. *See id*. at 1331-1341.

This conclusion was based on the CIT's own reasoning that Commerce's cross-owned input regulation may only apply if the input in question is a "link in the overall production chain" of the downstream product and bears a "physical relationship" with the downstream product – requirements the CIT concluded were not met here. *Id*. at 1337-38. Because the precise reasoning adopted by the CIT was not raised by GFCL at the agency or at the CIT, Commerce did not have an opportunity to address these specific arguments either in the agency proceeding below or before the CIT. Nonetheless, the CIT did not remand the determination to Commerce for reconsideration or further explanation. *Id*. at 1342. Instead, the CIT directed Commerce to "delete from the overall {subsidy} rate" the amount related to the subsidy the SIDC provided to IWL. *Id*.

On remand, Commerce complied with this aspect of the CIT's remand order under respectful protest, deleting the contested amount from GFCL's subsidy rate. *See* Remand Results at 2. Daikin submitted comments opposing Commerce's deletion of the subsidy rate related to the land subsidy from the SIDC to IWL. *See*

*Gujarat III* at 1373-1377. The CIT rejected these arguments and upheld Commerce's Remand Results. *See id*. This appeal followed.

## VII.   <u>SUMMARY OF THE ARGUMENT</u>

The CIT erred by substituting its own preferred interpretation of Commerce's regulation for the permissible interpretation that Commerce itself employed. Specifically, the CIT accorded no deference to Commerce's own interpretation, even though the regulation at issue either unambiguously permitted the interpretation Commerce adopted or, at a minimum, did not unambiguously prohibit that interpretation. Instead, the CIT seized on certain aspects of a few illustrative examples cited in the preamble to the regulation to impermissibly circumscribe the scope of the rule's plain language. The CIT thus elevated its own views regarding examples designed to illuminate agency intent in promulgating a regulation over the language of the regulation itself, as reasonably interpreted by Commerce. Moreover, by limiting the application of the regulation to the illustrative examples cited in the regulatory preamble, the CIT undermined the ultimate purpose of the regulation, which was to prevent circumvention of the subsidy disciplines enacted by Congress and implemented by the agency.

Specifically, Commerce's cross-owned input regulation requires Commerce to attribute subsidies conferred on a cross-owned input supplier to the combined sales of the input and downstream products, if, *inter alia*: "production of the input

product is primarily dedicated to production of the downstream product ….” 19 C.F.R. § 351.525(b)(6)(iv). In this case, Commerce applied the regulation to attribute subsidies received by IWL to the combined sales of IWL's input product and GFCL's downstream products. According to Commerce, the regulation applied because: (1) IWL and GFCL were cross-owned; (2) IWL produced electricity, which was “the input product;” (3) the electricity IWL produced was used to produce goods produced by GFCL, which were “the downstream product;” and (4) all of IWL's electricity was used exclusively to produce the downstream product by GFCL, and it was thus “primarily dedicated” to production of the downstream product. *See* Final IDM at Comment 1. *See also* PDM at 8 and Post-Prelim Analysis at 12 – 13.

The CIT found Commerce's interpretation of its regulation was impermissible as a matter of law. *Gujarat II* at 1342.[4] In so finding, the CIT stated that it accorded no deference to Commerce's interpretation of its own regulation. *Id.* at 1340 (“The court does not agree that deference is owed to the interpretation that Commerce applied ….”). Instead, the CIT determined that any ambiguity regarding the phrase “primarily dedicated to production of the downstream product” could be resolved by the CIT based on its own interpretation of the

---

[4] The case did not challenge the regulation's consistency with the statute. *See Gujarat II* at 1335.

regulatory preamble. *Id*. Based on its reading of illustrative examples in the preamble, the CIT concluded:

> … a determination of whether an input is "primarily dedicated to the production of the downstream product" does not hinge on whether the input is primarily sold to the producer of that product and depends instead on the role the input performs as a "link" in the production chain.

*Id*. at 1336. Therefore, the CIT found that Commerce erred in treating electricity as an input primarily dedicated to downstream production, because Commerce allegedly "overlook{ed} the type of physical relationship the regulation requires between the input and the particular downstream product …." *Id*. at 1338.

The CIT's approach and conclusions were in error.

First, the regulation unambiguously applies to situations in which a cross-owned company provides all of the electricity it produces to production of the downstream product. The text, structure, history, and purpose of the regulation all support Commerce's reading of the regulation's unambiguous meaning. Commerce's application of the rule should therefore have been upheld.

Second, at a minimum, the regulation does not explicitly prohibit its application to the facts of this case. The CIT overreached by using certain illustrative examples cited in the regulatory preamble to circumscribe the language of the regulation itself. The CIT's reading of the preamble was overly narrow, ignored the rule's full history and purpose, and was contrary to Congressional and

agency intent. The CIT therefore erred in ruling that Commerce was prohibited from applying the regulation to this case as a matter of law and ordering a directed remand on that basis.

Third, to the extent there was any ambiguity in the regulation, Commerce's interpretation was reasonable and therefore should have been upheld by the CIT. The regulation does not require that the input in question be a tangible good that bears a close physical relationship to the downstream product nor that the input be a mere link in the production chain, and Commerce was not bound to interpret the regulation in such a limited manner. Moreover, Commerce's interpretation was consistent not only with the language and structure of the statute and the regulation, but also with the history of the cross-owned input supplier regulation and its role in effectuating the statutory scheme.

For all of these reasons, this Court should find that Commerce's interpretation of its own regulation was permissible and reverse the CIT's determination.

## VIII. <u>ARGUMENT</u>

### A. The standard of review

This Court will "review a decision of the Court of International Trade evaluating an antidumping {or countervailing} duty determination by Commerce by reapplying the statutory standard of review that the Court of International Trade

applied in reviewing the administrative record." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014). "Thus, without affording any deference to the Court of International Trade, this court reassesses the administrative record for 'substantial evidence' and for consistency 'with law.'" *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036 (Fed. Cir. 2003); 19 U.S.C. § 1516a(b)(1)(B)(i).

In determining whether Commerce's interpretation and application of the trade remedy statute is in accordance with law, the Court applies the two-step analysis articulated in *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001)). Under *Chevron*, the Court "must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable," examining the statute's text and applying traditional tools of statutory construction. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998). Only if Congress's intent is not apparent or is ambiguous will the Court evaluate whether the agency's interpretation is a "reasonable means of effectuating the statutory purpose." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

A similar standard applies with regard to an agency's interpretation of its own regulations. Under *Auer*, an agency's interpretation of its own regulation is controlling unless "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotations and citations omitted). The Supreme Court explained the bounds within which *Auer* deference applies in *Kisor v. Wilkie*: (1) the regulation in question must be "genuinely ambiguous;" (2) the agency's reading must be "reasonable," falling within the "zone of ambiguity" identified by the Court;[5] and (3) the character and context in which the interpretation was issued must be such that the interpretation was actually made by the agency itself, implicates the agency's expertise, and reflects the agency's fair and considered judgment rather than a *post hoc* rationalization or an unfair departure from past interpretations. *Kisor v. Wilkie*, 588 U.S. ___, 139 S.Ct. 2400, 2415-2418, 204 L.Ed.2d 841 (2019).

### B. The text, structure, history, and purpose of the regulation demonstrate it unambiguously applied to this investigation

In *Kisor*, the Supreme Court explained that a court reviewing an agency's interpretation of its own regulations must first "exhaust all the traditional tools of

---

[5]  In this regard, the Supreme Court clarified that the level of deference accorded to agency interpretations of regulations is similar to that accorded to statutory interpretations under *Chevron*. *Kisor v. Wilkie*, 588 U.S. ___, 139 S.Ct. 2400, 2416, 204 L.Ed.2d 841 (2019).

construction" before concluding that a rule is "genuinely ambiguous." *Kisor*, 139 S.Ct. at 2415 (internal quotes and citation omitted). In doing so, the court must "carefully consider the text, structure, history, and purpose of a regulation." *Id*. (internal quotes and citation omitted).

1.    The text of the regulation

The text of Commerce's cross-owned input supplier regulation reads as follows:

> (b) *Attribution of subsidies*—(1) *In general*. In attributing a subsidy to one or more products, the Secretary will apply the rules set forth in paragraphs (b)(2) through (b)(7) of this section.
>
> \*    \*    \*
>
> (6) *Corporations with cross-ownership*.
>
> \*    \*    \*
>
> (iv) *Input suppliers*. If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv).

By its plain terms, the text of the regulation requires Commerce to attribute subsidies received by an input producer to the combined sales of the input and

downstream products when two criteria are met: (1) there is cross-ownership between an input supplier and a downstream producer; and (2) production of the input product is "primarily dedicated" to production of the downstream product. The text of the regulation does not impose any limits on the types of input suppliers, inputs, downstream producers, and downstream products that are covered by its terms. Nor does the text of the regulation impose any additional conditions or thresholds that limit the situations that may satisfy the requirement that the production of the input product be "primarily dedicated" to the production of the downstream product.

Additional tools of construction confirm the breadth of the terms used in the text of the rule.

First, the text of the regulation uses the terms "the downstream product" and "downstream products" interchangeably, indicating that the singular term includes the plural and the plural includes the singular. In addition, the singular term "input product" is not further limited within the text of the regulation. It is a well-accepted canon of construction that "words importing the singular include and apply to several persons, parties, or things;" and "words importing the plural include the singular." 1 U.S.C. § 1.[6]

---

[6] "When construing an agency regulation as a matter of law," the Court must use "the same rules as {it} would use in construing a statute …." *Glycine & More, Inc.*

This Court and Commerce have both previously found terms including the singular word "product" to be capable of encompassing numerous products. *See, e.g.*, *SKF USA Inc. v. United States*, 263 F.3d 1369, 1380, n.13 (Fed. Cir. 2001) ("{t}he use of the modifier 'a' tells us nothing about what is included within the term 'foreign like product,'" citing 1 U.S.C. § 1). *See also Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce August 16, 2006) and accompanying Issues and Decision Memorandum ("*Lined Paper IDM*") at Comment 3 (the singular word product "does not have a standard meaning that indicates exactly how similar goods must be to fall under the definition of a product," citing as examples of a "product" motor vehicles, cars, Ford cars, and specific models of Ford cars).

Second, traditional canons of construction teach that the terms "the downstream product" and "downstream products" should not be read overly narrowly, particularly so narrowly as to be defined as equivalent to the different term "subject merchandise." A well-accepted canon of statutory construction is the presumption that Congress's use of different terms within related statutes generally implies that different meanings were intended. *See Res-Care, Inc. v. United States*,

---

*v. United States*, 880 F.3d 1335, 1344 (Fed. Cir. 2018) (quoting *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006)).

735 F.3d 1384, 1389 (Fed. Cir. 2013). The same canon applies to the construction

of Commerce's regulations. When Commerce has meant to say "subject

merchandise" in its regulations, it has done so. *See, e.g.*, 19 C.F.R.

§§ 351.106(c)(2), 351.107(a)-(c), 351.202(b)(4)-(9), 351.203(c), (e), & (f),

351.204(c) & (e), 351.206(g) & (h), 351.207(b)(2), 351.208(c)-(e). The fact that

Commerce did not use the term "subject merchandise" when promulgating 19

C.F.R. § 351.525(b)(6)(iv) supports a determination that the terms "the

downstream product" and "downstream products" have a broader meaning than

"subject merchandise."

Third, the term "primarily dedicated" is sufficiently broad to encompass

situations in which all of the input produced by the cross-owned supplier is used in

the production of the downstream product. The lead definition of "primarily" is

"chiefly." *Primarily*, Merriam-Webster.com, https://www.merriam-

webster.com/dictionary/primarily#dictionary-entry-1 (last visited Feb. 15, 2024).

Definitions of "dedicated" include "devoted to a cause, ideal, or purpose" and

"given over to a particular purpose." *Dedicated*, Merriam-Webster.com,

https://www.merriam-webster.com/dictionary/dedicated (last visited Feb. 15,

2024). Thus, an input is "primarily dedicated" to production of the downstream

product where that input is chiefly devoted or given over to the purpose of

producing the downstream product. Here, the input produced by the cross-owned

supplier – electricity produced by IWL – was fully devoted to the purpose of producing downstream products by GFCL. The terms of the regulation thus unambiguously applied to the facts of the case.

In sum, the text of the regulation requires Commerce to attribute input subsidies where cross-ownership exists and the input produced by the cross-owned supplier is primarily dedicated to production of the downstream product, without limitation as to the types of input product, downstream product, or input producers and downstream producers that are covered. The text of the regulation also does not set any precise limits on the extent to which, or manner in which, the input is primarily dedicated to production of the downstream product. All of these considerations demonstrate that the regulation unambiguously applies to an input producer that supplies all of the electricity it produces to the production of downstream products by a cross-owned downstream producer.

### 2.    The structure of the regulation

The structure of the regulation also supports the conclusion that it unambiguously applies to the circumstances of the case below.

First, while the term "input product" is not defined within 19 C.F.R. § 351.525(b)(6)(iv), Commerce does define the term "consumed in the production process" with regard to various inputs in the definitions section of its regulations. That section states: "Inputs 'consumed in the production process' are inputs

physically incorporated, energy, fuels and oil used in the production process and
catalysts which are consumed in the course of their use to obtain the product." 19
C.F.R. § 351.102(b)(12). The fact that Commerce defines energy used in the
production process as one of the inputs that is consumed in the production process
for the purpose of its general definitions indicates that energy used in the
production process is also unambiguously a type of "input product" that may be
"primarily dedicated to production of the downstream product" for the purposes of
the cross-owned input supplier regulation.

 Second, the structure of the regulation also supports a coherent reading of
"the downstream product" in the dependent clause and "downstream products" in
the independent clause to encompass in both cases all downstream products that
are produced by a downstream producer using the input in question. The
independent clause of the regulation states that when the rule applies, Commerce
"will attribute subsidies received by the input producer to the combined sales of the
input and downstream products produced by both corporations (excluding the sales
between the two corporations)." 19 C.F.R. § 351.525(b)(6)(iv). The use of the
plural "downstream products" in the independent clause requires Commerce to
include all downstream products produced using the input product in the
denominator of the benefit calculation. It therefore makes sense that this same
group of downstream products should form the basis of Commerce's determination

regarding the primary dedication of the input product. If an input had to be

primarily dedicated only to subject merchandise, or some other narrow product

definition, but all downstream products were included in the denominator, it would

improperly dilute the benefit calculation and create a mismatch between the group

of products benefitting from the subsidy in the dependent clause and the group of

products included in the benefit calculation in the independent clause. Commerce's

reading of the regulation avoided such an absurd result by ensuring the benefit is

attributed to all downstream products to which the input product is primarily

dedicated, *i.e.*, all products that benefit from the input subsidy.

Thus, the structure of the regulation also demonstrates that it unambiguously

applies to an input producer that supplies all of the electricity it produces to the

production of downstream products by a cross-owned downstream producer, and

that all of the downstream products made with the use of that electricity are

included within the definitions of both "the downstream product" and

"downstream products."

> 3.   The history and purpose of the regulation

The history and purpose of the regulation further confirm that it

unambiguously applied to the facts of this case. As explained in more detail below,

the reason Commerce promulgated the cross-owned input supplier regulation was

to prevent respondents from evading CVD discipline by spinning off the

production of certain inputs that are subsidized by the government into separate corporate entities, while still using those subsidized inputs to produce their downstream products. This rule was also appropriate to effectuate the remedial purpose of the CVD statute, as clarified in the Uruguay Round, which is to remedy both direct and indirect subsidies and to ensure that Commerce is not prevented from imposing effective remedies by overly formulaic effects tests.

Commerce originally proposed that subsidies to an input product would only be attributable to sales of both the input and the downstream products if the input was produced in the same corporation as the downstream products. *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,400 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*"). In response to numerous comments, Commerce expanded this rule in the final regulations to also require attribution where the input producer and the downstream producer are not part of the same corporate entity but are cross-owned. *Id.* at 65,401. Commerce explained the concerns the new rule sought to address as follows:

> These commenters suggested that the rule creates a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input. In their opinion, where there is cross-ownership between the input supplier and the downstream product, subsidies to the input supplier should be automatically attributed to the downstream product.

*Id*. Commerce also stated that in situations where an input producer's production is "dedicated almost exclusively to the production of a higher value added product …. the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *Id*.

It thus serves the anti-circumvention purpose of the cross-owned input supplier regulation to apply it in any situation in which the attribution regulation for input subsidies within the same company would otherwise apply, as long as the input is dedicated "almost exclusively" to the production of downstream products in the downstream company. The input subsidy attribution regulation for integrated producers states: "If a subsidy is tied to production of an input product, then the Secretary will attribute the subsidy to both the input and downstream products produced by a corporation." 19 C.F.R. § 351.525(b)(5)(ii). If the scope of the regulation for cross-owned companies is interpreted to be much narrower than the scope of the regulation for integrated producers – more narrowly than the requirement that the input be used "almost exclusively" in the production of the downstream products – the goal of preventing circumvention cannot be achieved. The history and purpose of the regulation therefore support the conclusion that it unambiguously applied to electricity used exclusively to produce downstream products.

In addition, the illustrative examples cited by Commerce in the *Preamble* support, rather than preclude, the conclusion that the regulation unambiguously applied in this case. *See CVD Preamble*, 63 Fed. Reg. at 65,401 (citing *Softwood Lumber from Canada* and *Pasta from Italy*). In the *Pasta from Italy* case, it is not clear whether semolina was solely incorporated into a single downstream product consisting of in-scope pasta or to pasta in general, including non-subject merchandise. *See Final Affirmative Countervailing Duty Determination: Certain Pasta ("Pasta") From Italy*, 61 Fed. Reg. 30,288, 30,289 (Dep't Commerce June 14, 1996) (stating that semolina is "a primary input in the manufacture of pasta"). We note, however, that the scope of that case was limited to "certain" pasta in packages of five pounds or less and excluding organic pasta. *Id*. at 30,288. Presumably pasta in larger packages and organic pasta are also produced with semolina.

Regardless, the other illustrative case cited in the *CVD Preamble*, *Softwood Lumber from Canada*, clearly supports Commerce's interpretation. In that case, Commerce explained that stumpage subsidies were "not tied to specific products produced during the lumber production process," which included not only timber but also "chips or other by-products." *Final Affirmative Countervailing Duty Determination: Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,576 (Dep't Commerce May 28, 1992). Commerce explained that "all

23

products produced during the lumber production process receive the benefit" of the stumpage subsidies. *Id*. Thus, Commerce continued, "the only appropriate way to allocate the benefit is to divide by shipment values of all products produced during the lumber production process." *Id*. Commerce therefore included in the denominator not just lumber sales but sales of "commercial products produced by mills other than lumber, including chips, sawdust, and shavings." *Id*. Indeed, timber is also capable of being used in making many additional products besides lumber, such as pulp for papermaking. *See, e.g.*, *Lined Paper IDM* at Comment 3.

In short, one of the key cases that Commerce cited as illustrative of the concerns it was trying to address with the new cross-owned input supplier rule was a case in which the input was used to produce both a specific downstream product that was subject merchandise (lumber) and other downstream products (chips, sawdust, and shavings). In the next sentence after citing this case, Commerce explained that "in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *CVD Preamble*, 63 Fed. Reg. at 65,401. These examples support the conclusion that the regulation unambiguously encompasses situations in which the electricity supplied by an input supplier is used entirely in the production of downstream products by the downstream producer.

4.    <u>The regulation within the broader statutory scheme</u>

Finally, Commerce's interpretation should be upheld because it is consistent with the purpose and history of the statute. The statute requires Commerce to impose a countervailing duty where it determines that a government or public entity "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States …." 19 U.S.C. § 1671(a)(1).[7] A countervailable subsidy, in turn, is defined as a situation in which an authority provides a financial contribution "to a person and a benefit is thereby conferred," and the subsidy is specific. 19 U.S.C. § 1677(5)(A) & (B). Commerce must determine whether this definition of a subsidy is met "without regard to whether the subsidy is provided directly or indirectly," and Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists …." 19 U.S.C. § 1677(5)(C).

Importantly, this final language regarding the effects of subsidies was added by Congress to correct an erroneous binational panel decision that faulted the very same *Softwood Lumber from Canada* decision cited by Commerce in promulgating the cross-owned input supplier regulation. *See* Statement of Administrative Action

---

[7]  For imports from Subsidies Agreement countries an affirmative injury finding is also required for countervailing duties to be imposed. 19 U.S.C. § 1671(a)(2).

Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994) at 926 ("SAA"). In that case, a majority of the binational panel ruled that Commerce was required to show that the stumpage subsidies had a distorting effect on the market in Canada. United States-Canada Free Trade Agreement, Article 1904 Binational Panel Review, *In the Matter Certain Softwood Lumber Products From Canada, Decision of the Panel*, U.S.A.-92-1904-01 (May 6, 1993) at 52 and 59-60.[8] Congress rejected this approach, explaining that "the new definition of subsidy does not require that Commerce consider or analyze the effect (including whether there is any effect at all) of a government action on the price or output of the class or kind of merchandise under investigation or review." SAA at 926. Thus, Congress made clear that no effects analysis was required, specifically citing the type of input subsidies that were the chief concern prompting Commerce's promulgation of the cross-owned input supplier regulation.

Application of the cross-owned input supplier regulation to this case is consistent with this statutory scheme. By providing a subsidy to the electricity input used to produce subject merchandise and other downstream products, the government is "providing, directly or indirectly, a countervailable subsidy with

---

[8] The SAA appears to erroneously cite the binational panel decision regarding the International Trade Commission's determination on softwood lumber, USA-92-1904-02, whereas the panel determination containing the erroneous findings regarding Commerce's obligations is USA-92-1904-01. SAA at 926.

respect to the manufacture" of subject merchandise. 19 U.S.C. § 1671(a)(1). The subsidized input, electricity, is used to manufacture the subject merchandise (as well as other downstream products). Final IDM at 11. The subsidy is thus being provided "with respect to the manufacture" of the merchandise. Merriam-Webster defines "with respect to" as "with reference to : in relation to." *With respect to*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/with%20respect%20to (last visited Feb. 15, 2024). Because the subsidized electricity is used to manufacture subject merchandise and other products, it is reasonable to find that the subsidy is provided "with respect to," and "in relation to," subject merchandise.

In addition, "a benefit is thereby conferred" through the provision of the subsidy to the cross-owned input supplier, as required by 19 U.S.C. § 1677(5)(B). Commerce explained that its attribution regulations are consistent with the concept of benefit. *CVD Preamble*, 63 Fed. Reg. at 65,400. With regard to the cross-owned input supplier regulation in particular, Commerce explained that in situations such as the *Softwood Lumber from Canada* case, "the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *Id*. at 65,401. The benefit to the input product is thus conferred to all of the downstream products to which the input is primarily dedicated, which is why all of those downstream products are included in the denominator of the benefit

27

calculation. *See* 19 C.F.R. § 351.525(b)(6)(iv). The application of the rule to electricity that is used exclusively in the production of downstream products is also consistent with instructions from Congress that Commerce is not required to analyze the effect of a subsidy, including an input subsidy, when making its determinations. *See* 19 U.S.C. § 1677(5)(C); SAA at 926.

The fact that there is no effects test or other external thresholds for the application of the cross-owned input supplier rule is only further underscored by the counterfactual situation, where a subsidized input is provided by a company that is not cross-owned. Commerce explained that in such cases it is not appropriate to attribute the benefit of the input subsidies to downstream sales unless the upstream subsidy provisions apply. *CVD Preamble*, 63 Fed. Reg. at 65,401. Those provisions require Commerce to determine that the upstream subsidy bestows a competitive benefit and has a significant effect on the cost of manufacturing. *See* 19 U.S.C. § 1677-1. No such requirement applies when the input supplier and downstream producer are cross-owned. It is reasonable for such an effects test to apply to companies that are not cross-owned while it does not apply to cross-owned companies, as cross-owned companies' interests "have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same ways it can use its own assets (or subsidy benefits)." *CVD Preamble*, 63 Fed. Reg. at 65,401.

Finally, Commerce's application of the regulation in this case was consistent with the fact that the regulation itself as well as the CVD statute is mandatory, not discretionary. The statute states that when a countervailable subsidy is being provided directly or indirectly with respect to the manufacture of subject merchandise, "there <u>shall</u> be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671(a) (emphasis added). Citing the same statute, the Federal Circuit has explained:

> The CVD statute is a remedial measure that provides relief to domestic manufacturers by imposing duties on imports of comparable foreign products that have the benefit of a subsidy from the foreign government ….The statute <u>mandates</u> that if the government of a country or any public entity within the territory of a country is providing a countervailable subsidy with respect to the production or exportation of specific merchandise, then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy.

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (quotations and citations omitted, emphasis added). Thus, once a subsidy was found to exist, Commerce was required by law to impose a duty equal to the amount of that subsidy.

Nor does Commerce have the discretion not to apply its attribution regulations based on the type of input concerned, as the CIT erroneously found

29

below. Commerce's regulations state that, in attributing a subsidy to one or more products, Commerce "<u>will</u> apply the <u>rules</u> set forth in paragraphs (b)(2) and (b)(7)" of the attribution regulation. 19 C.F.R. § 351.525(b)(1) (emphasis added). The cross-owned input supplier regulation also states that where the primary dedication standard is met Commerce "<u>will</u> attribute subsidies" to the combined sales of the input and downstream products (excluding intercompany sales). 19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).

In short, there is no latitude in the statute or regulations for Commerce to exempt GFCL from countervailing duties once the required elements of a countervailable subsidy and attributable benefit have been found. In this case, once Commerce found that the elements of a subsidy existed and the benefit was attributable to subject merchandise, the agency had a duty to impose countervailing duties, and it was entirely correct to do so.

### 5. Conclusion

In sum, all of the traditional tools of construction demonstrate that Commerce's regulation unambiguously applies when an input supplier provides all of the electricity it produces for production of the downstream product by its cross-owned downstream producer. The text, structure, history, and purpose of the regulation, as well as the broader statutory scheme, all support: (1) a definition of the term "input product" that includes electricity; (2) a harmonious definition of

"the downstream product" and "downstream products" that is not limited to subject merchandise or some other narrow subset of the products that are made using the input in question; and (3) an interpretation of the phrase "production of the input product is primarily dedicated to production of the downstream product" that encompasses the situation in which all of the production of the input product concerned is consumed in the production of the downstream product. As such, Commerce's application of the regulation to the facts of this case was fully consistent with the unambiguous meaning of the regulation itself, and that application should have thus been upheld by the CIT.

### C. At a minimum, the regulation did not unambiguously foreclose Commerce's interpretation as a matter of law

Even if the CIT did not agree that the regulation unambiguously applied to the provision of electricity, at a minimum, the regulation did not unambiguously foreclose such an application. Indeed, the CIT did not rely on the text or the structure of the regulation itself to conclude that the term "input product" unambiguously excluded electricity or that the terms "the downstream product" or "downstream products" were unambiguously limited to subject merchandise or any subset of products narrower than those that were produced from the input at issue. To the contrary, the CIT conceded that the "electricity used to power GFCL's manufacturing facilities might be described as an 'input,' …." *Gujarat II* at 1337. In addition, the CIT found that it was "unnecessary for the court to decide whether

31

the term 'the downstream product' as used in the regulation plausibly could refer to a group consisting of all downstream products made by the producer." *Id*. at 1336.

Instead, the CIT's determination rested on its interpretation of the requirement that the input in question be "primarily dedicated to production of the downstream product." The CIT did not delve into the definitions of the words "primarily dedicated to production of the downstream product" nor the structure of the regulation itself to determine the term's meaning. Based on its interpretation of illustrative examples in the *CVD Preamble*, however, the CIT concluded that Commerce was unambiguously precluded from applying the regulation in this case:

> … a determination of whether an input is "primarily dedicated to the production of the downstream product" does not hinge on whether the input is primarily sold to the producer of that product and depends instead on the role the input performs as a "link" in the production chain.

*Id*. at 1336. The CIT further concluded based on the *CVD Preamble* that the regulation requires a "type of physical relationship … between the input and the particular downstream product …." *Id*. at 1338.

It is worth noting that nothing in the text of the regulation itself requires that the input in question be a tangible good, constitute a "link" in the production chain, or bear a "physical relationship" to the downstream product. *See* 19 C.F.R. § 351.525(b)(6)(iv). Moreover, the CIT did not consider Commerce's own

definition of the term "consumed in the production process," which includes "energy, fuels and oil used in the production process." 19 C.F.R. § 351.102(b)(12). The CIT also did not give weight to the fact that both the singular and plural forms of "downstream product" were used in the regulation.

Rather than focus on the language and structure of the regulation itself, the CIT relied solely on the illustrative examples cited in the *CVD Preamble* to reach its conclusion. While the *Preamble* is a valuable tool for interpreting the history and purpose of the regulation, the CIT's reading of the illustrative examples in the *Preamble* was deeply flawed and contrary to the *Preamble* as a whole. The CIT's constrained interpretation of the regulation is also contrary to the rule's larger history and purpose, as well as the history and purpose of the CVD statute.

For all of these reasons, it was incorrect for the CIT to determine that its interpretation was the only correct reading of the regulation. It was also therefore incorrect for the CIT to rule that the regulation unambiguously could not apply to the case below as a matter of law, and to order a directed remand on that basis.

1.     The examples in the *CVD Preamble* are illustrative, not exhaustive

First, the illustrative examples cited in the *CVD Preamble* are just examples – they do not define the outer limits of the application of the rule itself. It was therefore improper for the CIT to rely on these examples to unduly limit Commerce's authority to implement the attribution regulation.

33

The *CVD Preamble* made clear that the attribution regulations being promulgated "set forth general rules of attribution that the Secretary will apply to a given factual situation." *CVD Preamble*, 63 Fed. Reg. at 65,399. Moreover, the *CVD Preamble* states: "If we tried to account for all the possible permutations {of attribution situations} in advance, the result would be an extremely lengthy set of rules that might prove unduly rigid." *Id*. Nonetheless, Commerce noted the rules were helpful in providing "a certain degree of predictability" and a "reasonable degree of certainty" regarding the attribution of subsidies. *Id*. at 65,399-65,400. While Commerce intended to apply the rules as harmoniously as possible, it also recognized that "unique and unforeseen factual situations may make complete harmony among these rules impossible." *Id*. at 65,400. Thus, the *CVD Preamble* itself made abundantly clear that the attribution rules and the examples provided to illustrate the rules could not account for all of the factual scenarios affecting the attribution of subsidies.

In addition, to the extent Commerce recognized some attribution scenarios might not fit precisely within the rules as promulgated, Commerce did not suggest that it would exempt imports from countervailing duties in such scenarios. *Id*. at 65,400. Quite the opposite. Commerce made clear that its overarching goal of preventing circumvention of the CVD laws would remain paramount.

> We recognize that there may be many scenarios where
> these attribution rules do not fit precisely the facts of a

> particular case. Furthermore, we are extremely sensitive
> to potential circumvention of the countervailing duty law.
> We intend to examine all tying claims closely to ensure
> that the attribution rules are not manipulated to reduce
> countervailing duties.

*Id*. The *CVD Preamble* was thus abundantly clear that the rules themselves and any

examples illustrating the application of those rules in no way limited Commerce's

ability to effectively enforce the CVD laws by attributing subsidies in order to

capture the benefit they confer. Indeed, the *CVD Preamble* explicitly warned

against attempts to "manipulate{}" the attribution rules based on unanticipated

factual scenarios in order to "reduce countervailing duties." *Id*. The CIT's reliance

on these examples to limit Commerce's attribution authority was thus improper.

> 2.      The purpose of the attribution rule is consistent with a broad
> interpretation and application of the rule

In addition to the excerpts cited above, other portions of the *CVD Preamble*

confirm that the purpose of the rule was to avoid circumvention and counteract

subsidy benefits when they flow to products and firms other than the original

recipient. This intent is consistent with the interpretation adopted by Commerce in

this case, and it is inconsistent with the CIT's narrow reading that limits the

regulation to the incorporation of tangible goods that are a mere link in the

production chain and bear a close physical resemblance to the downstream

product.

Commerce explained that its attribution rules are consistent with the concept of a benefit under 19 C.F.R. § 351.503:[9]

> … a benefit generally is conferred when a firm pays less than it otherwise would pay in the absence of the government-provided input or when a firm receives more revenue than it otherwise would earn. In light of this, subsidies are by these rules attributed, to the extent possible, to the sales for which costs are reduced (or revenues increased). For example, an export subsidy reduces the costs of a firm's exports and is, therefore, attributed only to export sales. Similarly, a subsidy provided by a government for a specific product is attributed only to sales of that product for which the subsidy was provided (<u>and any downstream products produced from that product</u>), as it reduces the costs of a firm's sales of those products.

*CVD Preamble* at 65,400 (emphasis added). Significantly, Commerce explained that it was important to attribute subsidies to "any downstream products produced from" the subsidized product in order to capture the full benefit conferred by a subsidy. This is exactly what Commerce achieved in this case by attributing the subsidy benefit for IWL to "any downstream products produced from" the electricity provided by IWL. The CIT's overly narrow reading of the regulation

---

[9] Similarly, the CVD statute defines a countervailable subsidy as existing where an authority provides a financial contribution to a person and "a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). A subsidy must also be specific to be countervailed. 19 U.S.C. § 1677(5)(A).

prevented Commerce from achieving the goals articulated in the *CVD Preamble* itself.

Similarly, as noted above, the reason Commerce changed its proposed regulations to include the cross-owned input supplier rule in its final regulations was to avoid creating a "loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input." *CVD Preamble* at 65,401. The overarching goal of the regulation was thus to avoid circumvention of CVD disciplines. This was also necessary to effectuate the statutory mandate to countervail subsidies whether provided directly or indirectly, and regardless of their effects. This circumvention concern applies equally where a downstream producer spins off its cross-owned supplier of physical inputs as well as a cross-owned supplier of other key inputs such as electricity. In both cases, the subsidy to the upstream input producer – regardless of the form of the input – would escape discipline if the cross-owned input regulation did not apply. Yet this is exactly the result the CIT mandated by finding that the regulation could not apply to the electricity input in this case.

The CIT's decision to limit the application of the regulation to only limited circumstances identical to those exemplified in the *CVD Preamble*'s illustrative

examples thus conflicted with the purpose and history of the regulation as articulated in the *Preamble* itself.

> 3. The examples in the *CVD Preamble* are not as restrictive as the CIT presumed

Finally, even taking the illustrative examples cited in the *CVD Preamble* into account, they did not dictate the restrictive result reached by the CIT. The illustrative examples were cited in the following paragraph of the *CVD Preamble*:

> The main concern we have tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain. This was the case with stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production. (*See Certain Softwood Lumber Products from Canada*, 57 FR 22570, 22578 (May 28, 1992) and *Certain Pasta from Italy*, 61 FR 30287–309 (June 14, 1996).) We believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products. Accordingly, where the input and downstream production takes place in separately incorporated companies with cross-ownership … and the production of the input product is primarily dedicated to the production of the downstream product, paragraph (b)(6)(iv) requires the Department to attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the two corporations).

*CVD Preamble*, 63 Fed. Reg. at 65,401.

As noted above, the semolina in *Pasta from Italy* was at a minimum capable of being used to produce various downstream products, and the timber in *Softwood Lumber* was in fact used to make various products, including lumber, chips, sawdust, and shavings.[10] Thus, in both cases, the inquiry was not whether the input itself was incapable of being used to make more products than those in fact produced by the downstream producer. Rather, the inquiry was whether the input was in fact used exclusively or almost exclusively by the cross-owned company to make downstream products. That is the exact fact pattern that presented itself in this case. All of the electricity produced by IWL was supplied to GFCL, and all of the electricity produced by IWL was then used by GFCL to produce downstream products. The CIT was thus incorrect to conclude that these illustrative examples unambiguously foreclosed application of the regulation to the facts of this case.

4.    Conclusion

In sum, the CIT erred in determining that the cross-owned input supplier regulation unambiguously could not apply to electricity used exclusively in the production of the downstream product. The CIT's reading was not supported by the text and structure of the regulation itself. Moreover, the CIT's reliance on the illustrative examples in the *CVD Preamble* contradicted the *Preamble*'s explicit

---

[10] Of course, timber may also be used to make many other products, including pulp for paper. *See, e.g.*, *Lined Paper IDM* at Comment 3.

acknowledgement that it did not describe all factual scenarios in which subsidies would be attributed, and it ignored the anti-circumvention history and purpose of the rule. Even the illustrative examples cited in the *Preamble* did not conclusively support the CIT's narrow reading of the rule. The CIT's conclusion that Commerce was unambiguously precluded from applying the rule in this case was thus in error and should be reversed.

### D. To the extent the regulation was ambiguous, Commerce's interpretation was reasonable and should have been upheld

As reviewed in section VIII.B, above, the cross-owned input regulation unambiguously applies to a cross-owned input producer that supplies all of the electricity it produces to production of the downstream product. In the alternative, as reviewed in section VIII.C, above, the regulation at a minimum does not unambiguously prohibit Commerce from attributing subsidies to such a cross-owned input supplier to the combined sales of the input and downstream product. Thus, to the extent there is no single correct answer to this interpretative question, the regulation was "genuinely ambiguous," and the CIT should have deferred to any reasonable agency interpretation that was within the zone of ambiguity. *See Kisor*, 139 S.Ct. at 2415-2416. This section of Defendant-Appellant's brief proceeds in two parts. First, we review the character and context of the agency interpretation to demonstrate that it is entitled to *Auer* deference under *Kisor*. Second, we examine the agency interpretation to show that it was reasonable and

within the zone of ambiguity and therefore should have been given controlling

weight by the CIT.

1.    The character and context of Commerce's interpretation
     warrant deference

As noted above, one factor that should be considered in reviewing

Commerce's interpretation of its own regulation is the character and context in

which the interpretation was issued, including whether the interpretation was

actually made by the agency itself, implicates the agency's expertise, and reflects

the agency's fair and considered judgment rather than a *post hoc* rationalization or

an unfair departure from past interpretations. *Kisor*, 139 S.Ct. at 2416-2418. As

explained below, each of these factors support deference to Commerce's

interpretation in this case.

First, the interpretation was issued by the agency itself in the course of its

CVD investigation, a core area of the agency's expertise. *See* Final IDM at

Comment 1. The interpretation at issue was thus an "authoritative" and "official

position" issued by agency actors authorized to make the determination at issue,

and not an informal act such as a speech or telephone conversation. *See Kisor*, 139

S.Ct. at 2416-2417. The underlying determination also implicated Commerce's

substantive expertise in applying the CVD law. *See id*. at 2417. Indeed, the

preference for deferring to agency interpretations "may be strongest when the

interpretive issue arises in the context of a complex and highly technical regulatory

program." *See id*. at 2413-2414 (internal quotes and citation omitted). The

administration and enforcement of the CVD law is just such a regulatory program.

Second, the determination reflects the agency's fair and considered

judgment. Commerce announced its position on attributing subsidies in the

underlying case in its preliminary results, *see* PDM at 6-8, and a post-preliminary

memorandum, *see* Post-Prelim Analysis at 12-13, accepted case and rebuttal briefs

from the parties regarding the issue, and addressed all issues raised by the parties

in its final decision memorandum. *See* Final IDM at Comment 1. The agency's

interpretation was not first announced as a *post hoc* rationalization. *See Kisor*, 139

S.C. at 2417.

To the extent Commerce could not address in detail the specific objections

first raised by the CIT in its remand opinion, this is a function of the fact that those

specific arguments were never raised below at the agency level nor challenged by

GFCL itself on appeal. The objections were only first articulated by the CIT itself.

*See* Statement of Facts, *supra*. Due to the CIT's order to delete the subsidy rate as

contrary to law, Commerce was also deprived of the opportunity to offer further

explanation in response to the CIT's reasoning on remand. Regardless,

Commerce's original determination that the regulation did apply to the facts of this

case was a fair and considered determination made in the course of its regular

duties to administer the CVD law.

Third, the agency's interpretation that the cross-owned input supplier regulation applies in this case was not an "unfair surprise" or an unjustified departure from prior practice. In the past, the CIT has recognized "that decisions regarding attribution are fact specific and Commerce may reach different conclusions in different cases in relation to the same input," so long as it explains the basis of its decisions. *Nucor Corporation v. United States*, 600 F. Supp. 3d 1225, 1238 (Ct. Int'l Trade 2022) (citing *NMB Singapore Ltd. v. US*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("{W}hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to the reviewing court.")). Commerce's interpretation of its regulation was based on the facts of this case, and Commerce provided a well-reasoned explanation for its conclusion, warranting deference from the CIT.

Despite these facts, the CIT suggested that Commerce's interpretation in this case was not entitled to deference because it was inconsistent with the interpretation of the rule contained in the *CVD Preamble*. *Gujarat II* at 1340 (citing *Kisor*, 139 S.Ct. at 2418). The cited passage from *Kisor* states that courts will rarely give deference to an interpretation that "conflict{s}" with a prior one, citing concerns regarding "unfair surprise," a lack of "fair warning," and the upsetting of reliance interests. *Kisor*, 139 S.Ct. at 2418 (internal quotes and citations omitted).

43

Contrary to the CIT's suggestion, Commerce's interpretation did not conflict with the *CVD Preamble* and thus constitute unfair surprise in this case. As reviewed above, Commerce's interpretation in this case was consistent with the illustrative examples cited in the *CVD Preamble*. Moreover, those illustrative examples were just that – examples. Commerce explicitly stated in the *CVD Preamble* that it could not predict every possible permutation of attribution situations in advance, and it pledged to examine such unanticipated scenarios closely "to ensure that the attribution rules are not manipulated to reduce countervailing duties." *CVD Preamble* at 65,399-65,400. These statements provided more than fair warning that Commerce intended to apply its attribution rules based on the facts of each case to serve the overarching anti-circumvention purpose of the regulation. That is exactly what the agency did in this case.

The character and context of Commerce's interpretation in this case thus demonstrate that the interpretation is entitled to deference under *Kisor*.

> 2.    Commerce's interpretation was reasonable and within the zone of ambiguity

Finally, Commerce's interpretation of the regulation as applying in this case was reasonable and within the zone of whatever ambiguity existed, and therefore its interpretation should have been upheld. As reviewed in more detail in section VIII.B, above, application of the rule to a situation in which all of the input supplier's electricity production is completely consumed in the production of

44

downstream products by the downstream producer was fully supported by the text,

structure, history, and purpose of the regulation as well as the regulation's role in

the broader statutory scheme. If the regulation did not unambiguously apply to this

case, it was at the very least reasonable to apply the regulation in this case.

- It was reasonable for Commerce to interpret the term "input product" to include electricity, particularly in light of the fact that energy was included as one of the products "consumed in the production process" under Commerce's definition regulations.

- It was reasonable to define "the downstream product" and "downstream products" harmoniously to encompass all of the products produced by the downstream producer using the input in question.

- It was reasonable to define situations in which "production of the input product is primarily dedicated to production of the downstream product" to include the situation in which all of the production of the electricity input is consumed in the production of the downstream product.

Moreover, it was reasonable to employ these definitions to fulfill the anti-

circumvention purpose and history of the regulation. Otherwise, Commerce would

have created an arbitrary distinction between energy and other intangible inputs, on

the one hand, and tangible, physical inputs, on the other. This would create an

incentive to conceal subsidies to the former types of inputs by separately

incorporating the entities that produce them, where they would remain fully

insulated from the discipline of the CVD laws, even though these inputs are still

primarily dedicated to downstream products just as physical inputs are. It was reasonable for Commerce to avoid this absurd result.

It was also reasonable for Commerce to apply the regulation in this case to effectuate the statutory scheme. As reviewed above, the CVD statute mandates that Commerce countervail subsidies regardless of whether those subsidies are provided directly or indirectly and without regard to the effects of those subsidies. *See* 19 U.S.C. § 1677(5)(C). Refusing to apply the regulation in this case would have deviated from this duty, based solely on a formalistic distinction between intangible inputs such as electricity and tangible goods such as semolina and timber. It was entirely reasonable for Commerce to reject such a meaningless distinction when subsidies to both tangible and intangible inputs that are used exclusively in downstream production provide a benefit to those downstream products.

In sum, if the regulation was genuinely ambiguous, Commerce reasonably interpreted the regulation and applied it in this case. The CIT should have thus deferred to Commerce's reasonable interpretation of its regulation and upheld Commerce's determination.

## IX.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant-Appellant requests that this Court reverse the judgment of the CIT that prohibited Commerce from applying its cross-

owned input regulation to include subsidies received by IWL in GFCL's subsidy rate. Commerce's determination was unambiguously supported by the regulation, or at a minimum was not explicitly barred by the regulation. To the extent the regulation is ambiguous, Commerce's interpretation was reasonable. The CIT's decision to the contrary impermissibly substituted the CIT's judgment for agency's own, and the CIT's interpretation contradicted the regulation's text, structure, purpose, and history. This Court should thus reverse the CIT and hold that Commerce's interpretation of its rule was permissible.

Respectfully submitted:

*/s/* Luke A. Meisner, Esq.
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
Elizabeth J. Drake, Esq.
SCHAGRIN ASSOCIATES
900 7th Street NW #500
Washington, DC 20001
(202) 223-1700

*Counsel to Daikin America, Inc.*

Dated: February 16, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>24-1268</u>

**Short Case Caption:** <u>Gujarat Fluorochemicals Ltd. v. US</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>10,597</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>02/16/2024</u>

Signature: <u>/s/ Luke A. Meisner</u>

Name: <u>Luke A. Meisner</u>

Save for Filing

# Addenda

# Addendum 1

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **GUJARAT FLUOROCHEMICALS LIMITED,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**DAIKIN AMERICA, INC.,**<br><br>Defendant-Intervenor. |

**Before:  Timothy C. Stanceu, Judge**

**Court No. 22-00120**

### JUDGMENT

Before the court are the Final Results of Redetermination Pursuant to Court Remand (Feb. 23, 2023), ECF No. 63 (the "Remand Redetermination"), submitted to the court by the International Trade Administration, U.S. Department of Commerce ("Commerce" or "the Department") in response to the court's Opinion and Order in *Gujarat Fluorochemicals Limited v. United States*, 47 CIT __, 617 F. Supp. 3d 1328 (2023) ("*Gujarat I*").

The court determines that the Remand Redetermination complies with the court's decision in *Gujarat I* requiring Commerce to delete, from the overall subsidy rate of plaintiff Gujarat Fluorochemicals Limited ("Gujarat Fluorochemicals"), the 26.50%

estimated subsidy rate for the provision of land by the State Industrial Development

Corporation to Gujarat Fluorochemicals's affiliate Inox Wind Limited.  The court

further determines that the Remand Redetermination complies with the court's decision

in *Gujarat I* directing Commerce to reconsider the inclusion of an estimated 0.12%

subsidy rate for the provision of land by the Gujarat Industrial Development

Corporation to Gujarat Fluorochemicals.

Plaintiff Gujarat Fluorochemicals and defendant-intervenor Daikin America, Inc.

submitted comments on the Remand Redetermination, and defendant United States

responded to those comments.  The court has addressed those comments in a

concurrent Opinion.

Upon consideration of the Remand Redetermination, all filings and proceedings

had herein, in conformance with the Opinion issued this day, and upon due

deliberation, it is hereby

**ORDERED** that the Remand Redetermination be, and hereby is, sustained.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: October 13, 2023
        New York, New York

# Addendum 2

🚩 KeyCite Blue Flag – Appeal Notification

Appeal Filed by GUJARAT FLUOROCHEMICALS LTD. v. US, Fed.Cir., December 18, 2023

662 F.Supp.3d 1371
United States Court of International Trade.

GUJARAT FLUOROCHEMICALS LIMITED, Plaintiff,

v.

UNITED STATES, Defendant,

and

Daikin America, Inc., Defendant-Intervenor.

Slip Op. 23-151
|
Court No. 22-00120
|
October 13, 2023

**Synopsis**

**Background:** Foreign producer brought action contesting determination of Department of Commerce in countervailing duty (CVD) investigation of imported granular polytetrafluoroethylene (PTFE) from India, finding that producer received countervailable subsidies from ten Indian government programs and assigned producer an estimated total countervailable subsidy rate of 31.89%. The Court of International Trade, 617 F.Supp.3d 1328, Timothy C. Stanceu, J., held Department was not authorized to include 26.50% estimated subsidy rate for 30-year land lease from governmental entity to producer's affiliate, and remanded. Foreign producer contested new subsidy rate of 5.39% set forth in Department's remand redetermination.

**Holdings:** The Court of International Trade, Stanceu, J., held that:

[1] in connection with ruling that Department's 26.50% estimated subsidy rate was not authorized by regulation, Court of International Trade was not required to remand to Department for further consideration, and

[2] foreign producer waived objection to Department's continued inclusion of 0.12% subsidy rate.

Remand redetermination sustained.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (3)

**[1]    Customs Duties** 🔑 Scope of inquiry or review

"Substantial evidence," as required to support a decision by the Department of Commerce in a countervailing duty (CVD) investigation, refers to such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a(b)(1).

**[2]    Customs Duties** 🔑 Determination, Judgment, and Relief; Summary Judgment

Having produced a final determination that was contrary to law, specifically, including a 26.50% estimated subsidy rate based on a 30-year lease of tract of land by governmental entity to foreign producer's affiliate that was not authorized by regulation, Department of Commerce was not entitled to an opportunity to redo its countervailing duty (CVD) investigation in foreign producer's action contesting Department's determination in investigation of imported granular polytetrafluoroethylene (PTFE) from India, and thus Court of International Trade was not required to remand to Department for further consideration; no authority would have allowed CVD for land lease to affiliate, and remand for further consideration would have unnecessarily delayed case and burdened parties and the court. Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a; 🚩 19 U.S.C.A. § 1671d(a)(1); 🚩 19 C.F.R. § 351.525(b)(6)(iv).

**[3]    Customs Duties** 🔑 Court of International Trade (Formerly Customs Court) and Proceedings Therein

Foreign producer waived objection to Department of Commerce's continued inclusion

of 0.12% subsidy rate in producer's overall subsidy rate in Department's countervailing duty (CVD) redetermination following remand in producer's action contesting subsidy rate in CVD investigation of imported granular polytetrafluoroethylene (PTFE) from India; producer objected to Department's inclusion of subsidy rate, but then noted it had decided not to pursue the argument and that it would not request a second remand to Department on the issue.

**Attorneys and Law Firms**

**\*1372** John M. Gurley, ArentFox Schiff LLP, of Washington, D.C., for plaintiff. With him on the briefs were Diana Dimitriuc-Quaia and Jessica R. DiPietro.

Daniel F. Roland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States. With him on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Assistant Director. Of counsel on the briefs was Paul K. Keith, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Elizabeth J. Drake, Schagrin Associates, of Washington, D.C., for defendant-intervenor. With her on the briefs were Roger B. Schagrin, Luke A. Meisner, and Justin M. Neuman.

**OPINION**

Stanceu, Judge:

Plaintiff brought this action to contest a determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in a countervailing duty ("CVD") investigation of imported granular polytetrafluoroethylene ("PTFE") resin from India. In the contested decision (the "Final Determination"), Commerce concluded that plaintiff Gujarat Fluorochemicals Limited ("Gujarat Fluorochemicals" or "GFCL") received countervailable subsidies from ten Indian government programs and assigned Gujarat Fluorochemicals an estimated total countervailable subsidy rate of 31.89%.

Gujarat Fluorochemicals challenged the Department's findings involving two of the ten government programs. Principally, GFCL contested the Department's including in the 31.89% total subsidy rate a rate of 26.50% for what Commerce considered to be a countervailable subsidy stemming from a 30-year lease of land to a GFCL affiliate, Inox Wind Limited ("IWL"), by the State Industrial Development Corporation ("SIDC"). Gujarat Fluorochemicals also contested the inclusion of a subsidy rate of 0.12% for land Gujarat Fluorochemicals obtained from the Gujarat Industrial Development Corporation ("GIDC").

Before the court is the Department's "Remand Redetermination," issued in response to the court's opinion and order in *Gujarat Fluorochemicals Limited v. United States*, 47 CIT ——, 617 F. Supp. 3d 1328 (2023) ("*Gujarat I*"). Final Results of Redetermination Pursuant to Court Remand (Feb. 23, 2023), ECF No. 63 ("*Remand Redetermination*"). Commerce, under protest, excluded from GFCL's overall subsidy rate the 26.50% subsidy rate pertaining to the SIDC's lease of land to Inox Wind Limited. Also in response to the court's order, Commerce reconsidered its inclusion of a subsidy rate pertaining to the GIDC, concluding again that the inclusion of the 0.12% rate was appropriate. Based on those changes, Commerce determined a new subsidy rate of 5.39% for Gujarat Fluorochemicals and assigned that same rate as the "all others" rate for the investigation. The court sustains the Remand Redetermination.

**\*1373 I. BACKGROUND**

Background on this case is presented in the court's prior opinion and is briefly summarized and supplemented herein. *Id.*, 47 CIT at ——, 617 F. Supp. 3d at 1330–31. Commerce published the contested "Final Determination" as *Granular Polytetrafluoroethylene Resin From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 3,765 (Int'l Trade Admin. Jan. 25, 2022). Commerce incorporated by reference an explanatory document, the "Final Issues and Decision Memorandum." *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India* (Int'l Trade Admin. Jan. 18, 2022), P.R. 248. [1]

Commerce filed the Remand Redetermination on February 23, 2023. Plaintiff Gujarat Fluorochemicals and defendant-

intervenor Daikin America, Inc. ("Daikin") submitted comments on the Remand Redetermination. Comments on Remand Results of Def.-Int. Daikin America Inc. (Mar. 9, 2023), ECF No. 64 ("Def.-Int.'s Comments"); Pl.'s Comments on the Department of Commerce's Remand Redetermination (Mar. 9, 2023), ECF No. 66 ("Pl.'s Comments"). Defendant United States submitted responses to those comments. Def.'s Resp. to Comments on Remand Results (Mar. 16, 2023), ECF No. 67 ("Def.'s Resp.").

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), [2] pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"), *as amended*, 19 U.S.C. § 1516a, including an action contesting a final affirmative determination by Commerce of whether or not a countervailable subsidy is being provided with respect to merchandise subject to a countervailing duty investigation. *See id.* §§ 1516a(a)(2)(B)(i), 1671d(a)(1).

[1] In reviewing an agency determination, the court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* § 1516a(b)(1). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

### B. Daikin's Comments in Response to the Remand Redetermination

In their comment submissions, Daikin and Gujarat Fluorochemicals raised arguments in opposition to aspects of the Remand Redetermination, even though advocating also that the court sustain the Remand Redetermination. Def.-Int.'s Comments 6; Pl.'s Comments 7. Defendant argues that the court should sustain the Remand Redetermination, which it describes as "supported by substantial evidence." Def.'s Resp. 3. The court has considered the objections Daikin and GFCL have raised to the Remand Redetermination and concludes, for the reasons **\*1374** stated herein, that they do not merit reconsideration of the decision the court reached in *Gujarat I*.

[2] In its comments to the Remand Redetermination, defendant-intervenor Daikin raises a new objection to the court's opinion and order in *Gujarat I*, specifically taking issue with the court's order therein directing Commerce to delete from GFCL's overall rate the 26.50% subsidy rate for the lease of land by the SIDC to Inox Wind Limited. Daikin now argues that:

> Daikin is concerned that the *Remand Opinion* [*Gujarat I*] misapplied the standard of review for antidumping and countervailing duty determinations by directing Commerce to delete the subsidy margin for this program and not allowing Commerce to reconsider or more fully explain its original determination.... [B]ecause the Court directed a particular outcome on remand regarding the provision of land by the SIDC and because Commerce refused to consider any comments on this aspect of its redetermination, Daikin is limited in these comments to reiterating its position supporting Commerce's original determination in the underlying investigation and noting its disagreement with the substance and form of the Court's *Remand Opinion* on this issue.

Def.-Int.'s Comments 5–6. Daikin argues that "[t]he Federal Circuit has explained that the statute permits the Court of International Trade to remand an agency decision for further consideration consistent with its decision, but *the statute does not permit the Court of International Trade to 'outright revers[e] a decision by Commerce....'* " *Id.* at 5 (emphasis added) (quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1383 (Fed. Cir. 2008) ("*Ad*

**Appx00005**

*Hoc Shrimp*") and citing 19 U.S.C. § 1516a(c)(3)). Daikin maintains that the court impermissibly directed Commerce, upon remand, to "outright reverse" the decision the agency reached on the land lease to Inox Wind Limited.

Daikin is not correct in asserting that the court was required to issue another remand order to allow Commerce to "reconsider or more fully explain its original determination." *Id.* As the court explains below, a second remand could not have produced an outcome as to the lease of land by the SIDC to Inox Wind Limited differing from the one the court ordered. Accordingly, the course of action Daikin advocates would have delayed this litigation, imposed unnecessary burdens on the parties, and been unfair to plaintiff as to the claim on which it prevailed.

Because the decision to impose a countervailing duty for the land lease to Inox Wind Limited resulted entirely from the Department's erroneous interpretation of its own regulation, another remand to the agency could not have produced a different result, i.e., a result in which a countervailable subsidy for the lease of land by the SIDC to IWL would have been legally permissible. Specifically, the court in *Gujarat I* concluded that the regulation involved, 19 C.F.R. § 351.525(b)(6)(iv), which was "part of a comprehensive revision of countervailing duty regulations following enactment of the Uruguay Round Agreements Act," was intended to address "the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain." *Id.*, 47 CIT at ——, 617 F. Supp. 3d at 1336 (quoting *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Int'l Trade Admin. Nov. 25, 1998)). The court noted that the preamble to the 1998 promulgation of the regulation **\*1375** provided "three examples that illustrate the intended meaning of the term 'primarily dedicated to the production of the downstream product,' " which "clarify that the term pertains to the role the input performed, in the physical sense, in the production of the downstream product rather than whether the input was provided 'primarily' to the producer of that product." *Id.* Thus, the court found that "[e]lectricity used to power an entire production plant," like the electricity provided by Inox Wind Limited to GFCL, "cannot fairly be characterized as 'merely a link in the overall production chain' of the finished products that are made there." *Id.*, 47 CIT at ——, 617 F. Supp. 3d at 1337 (citation omitted). Electricity "is energy, and, being of universal

application, is not remotely describable as an upstream product that is 'primarily dedicated to the production of the downstream product' as is required by § 351.525(b)(6)(iv)." *Id.* Thus, the court concluded, "electricity cannot be shown on this record to be 'primarily dedicated' either to Gujarat Fluorochemicals's PTFE resin or to the production of any other (unidentified) products made at GFCL's facilities, when the term 'primarily dedicated' is given its correct meaning." *Id.*, 47 CIT at ——, 617 F. Supp. 3d at 1340.

The regulation aside, no authority available to Commerce would have allowed imposition of a countervailing duty for the land lease to Inox Wind Limited. As the court noted, "Commerce did not conduct an upstream subsidy investigation" as defined in Section 771A of the Tariff Act, 19 U.S.C. § 1677-1. *Id.*, 47 CIT at ——, 617 F. Supp. 3d at 1334. Had Commerce attempted to conduct such an upstream subsidy investigation, it would have had to disregard uncontradicted record evidence that "only approximately 0.07% of the electricity" used by GFCL was "supplied by IWL" and "went to the production of the merchandise subject to the investigation." *Id.*, 47 CIT at ——, 617 F. Supp. 3d at 1334–35 (citing 19 U.S.C. § 1677-1a(3) (allowing an upstream subsidy where the input product "has a significant effect on the cost of manufacturing or producing the merchandise.")). The court explained that the "error in the interpretation of § 351.525(b)(6)(iv) led Commerce to the wrong conclusion," *id.*, 47 CIT at ——, 617 F. Supp. 3d at 1337, and that the proper interpretation of the regulation, as informed by its history and purpose, rendered "the inclusion of the 26.50% estimated subsidy rate ... contrary to law," *id.*, 47 CIT at ——, 617 F. Supp. 3d at 1341. The court held, accordingly, that the only lawful action that Commerce could take upon remand would be to delete the 26.50% rate from the overall subsidy rate. *Id.*

The court concluded in *Gujarat I*, and reiterates here in response to defendant-intervenor's comments, that the Department's interpretation of the regulation was not owed deference. *See* Def.-Int.'s Comments 5 (citing *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) and *Kisor v. Wilkie*, —— U.S. ——, 139 S.Ct. 2400, 2415–2418, 204 L.Ed.2d 841 (2019)); *see also* Suppl. Br. of Def.-Int. Daikin America Inc. (Jan. 20, 2023), ECF No. 58. Further, the court explained, and restates here, that "[t]he countervailing duty investigation is completed and its outcome reviewed judicially as a final

determination on the agency record." *Gujarat I*, 47 CIT at ——, 617 F. Supp. 3d at 1341. Having produced a Final Determination that was contrary to law, Commerce was not entitled, in the circumstance presented, to an opportunity to redo its investigation, and no principle of law now requires the court to provide such an opportunity, contrary to what defendant-intervenor posits. Def.-Int.'s Comments 5 (expressing concern that the court in *Gujarat I* "misapplied **\*1376** the standard of review" by "not allowing Commerce to reconsider or more fully explain its original determination"). [3] This Court, like any Article III court, must have the ability to decide whether an agency has or has not correctly interpreted its own regulation. Where, as here, a judicial decision on the validity of the agency's legal interpretation is controlling on the issue presented by plaintiff's claim, this Court must have the ability to order the remedy compelled by the court's decision on the legal question presented. *See* 28 U.S.C. § 1585 (granting the Court of International Trade all the powers in law and equity of a district court).

Daikin's argument is unpersuasive for another reason: a precedent upon which it relies, *Ad Hoc Shrimp,* is not on point. Daikin cites that decision in support of a blanket proposition that 19 U.S.C. § 1516a does not permit the Court of International Trade to "outright reverse a decision by Commerce." Def.-Int.'s Comments 5 (quoting *Ad Hoc Shrimp,* 515 F.3d at 1383). However, the facts, and therefore the holding, of *Ad Hoc Shrimp* are readily distinguished from this case. In *Ad Hoc Shrimp*, plaintiffs-appellants contested a final antidumping duty determination issued by Commerce, which excluded certain products from the scope of the investigation; plaintiffs in that case requested that this Court remand the determination to Commerce with instructions to amend the antidumping duty order to include those excluded products. This Court dismissed the plaintiffs' challenge on the grounds that (i) it lacked the authority to amend the antidumping order itself, and (ii) it lacked jurisdiction to remand the determination back to Commerce, reasoning that because the U.S. International Trade Commission ("ITC") had already made its final injury determination based on the Department's findings (including determinations on scope), a decision that did not appeal, such a remand would be futile. *Ad Hoc Shrimp Trade Action Comm. v. United States,* 31 C.I.T. 102, 112–116, 473 F. Supp. 2d 1336, 1345–48 (2007). The Court of

Appeals for the Federal Circuit, although affirming on the first ground, reversed on the second ground, concluding that the contested decision should have been remanded to Commerce even though "ITC action will also be necessary before the antidumping order itself can be amended." *Ad Hoc Shrimp,* 515 F.3d at 1383. In contrast to the unusual circumstance presented in *Ad Hoc Shrimp,* the land lease to Inox Wind Limited presented a straightforward issue of regulatory interpretation that was controlling on the validity of plaintiff's claim.

Another important consideration is that a second remand unnecessarily would have delayed the proceeding, required additional briefing under USCIT Rule 56.2, and burdened the parties and the court, all for no purpose. *See* USCIT Rules 1, 56.2. A second remand would have been particularly burdensome and unfair to the plaintiff, **\*1377** which successfully contested the inclusion of a subsidy rate for the SIDC's lease of land to Inox Wind Limited and is entitled to a remedy that excludes that rate from the overall subsidy rate. Daikin's argument disregards the court's obligation to order the remedy for which plaintiff has qualified and to apply USCIT Rule 56.2 "to secure the just, speedy, and inexpensive determination" of this action. USCIT R. 1.

### C. Gujarat Fluorochemicals's Comments in Response to the Remand Redetermination

[3] In its comments on the Remand Redetermination, plaintiff GFCL expressed support for the Remand Redetermination with respect to the removal of the 26.50% subsidy rate. Pl.'s Comments 4. However, Gujarat Fluorochemicals objected to the Department's determination concerning the continued inclusion of the 0.12% subsidy rate in GFCL's overall rate, arguing that "Commerce's benefit calculation and benchmark determination for the GIDC's provision of land remain unsupported by the record evidence and contrary to law." *Id.* at 2. Nonetheless, GFCL noted that it "has decided not to pursue this argument," *id.*, and "will not request a second remand to the agency on the this [sic] issue," *id.* at 7, thereby foregoing its right to appeal this issue further in the interest of obtaining "expeditious corrective action," *id.* at 2. GFCL thus has waived the very objection it lodges against the Remand Redetermination.

### III. CONCLUSION

For the foregoing reasons, the court finds Daikin's and Gujarat Fluorochemicals's new arguments unavailing and will enter judgment sustaining the Remand Redetermination.

**All Citations**

662 F.Supp.3d 1371

## Footnotes

1    Documents in the Joint Appendix (Nov. 4, 2022), ECF Nos. 52 (Conf.), 53 (Public) are cited as "P.R. ___."

2    All citations herein to the United States Code are to the 2018 edition. All citations to the Code of Federal Regulations are to the 2022 edition.

3    During oral argument, defendant-intervenor did not dispute that the 26.50% subsidy rate must be deleted from Gujarat Fluorochemicals's overall subsidy rate if the regulation, 19 C.F.R. § 351.525(b)(6)(iv), is determined to be inapplicable to the facts of this case:

> The court: So, in other words, you agree with the plaintiff on at least one thing. If the reg[ulation] doesn't apply, there's no 26.5 [percent]. In fact, there's nothing.

> Defendant-Intervenor's counsel: If the regulation does not apply, if the words "downstream product" in fact mean "subject merchandise," then Commerce would have a problem.

> The court: You'd agree with me there'd be no countervailing duty?

> Defendant-Intervenor's counsel: If it had to be primarily dedicated to "subject merchandise" versus "downstream product."

> Oral Argument at 2:21:02.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Addendum 3

617 F.Supp.3d 1328
United States Court of International Trade.

GUJARAT FLUOROCHEMICALS LIMITED, Plaintiff,

v.

UNITED STATES, Defendant,

and

Daikin America, Inc., Defendant-Intervenor.

Slip Op. No. 23-9
|
Court No. 22-00120
|
January 24, 2023

**Synopsis**

**Background:** Foreign producer filed suit challenging final determination of Department of Commerce in countervailing duty (CVD) investigation of imports of granular polytetrafluoroethylene (PTFE) resin from India. Domestic producer intervened as a defendant. Foreign producer moved for judgment on agency record.

**Holdings:** The Court of International Trade, Timothy C. Stanceu, J., held that:

[1] commerce's inclusion of 26.50% estimated subsidy rate in total subsidy rate based on 30-year lease of tract of land by governmental entity to affiliate of foreign producer was not authorized by regulation, and

[2] Commerce's inclusion of 0.12% estimated subsidy rate in total subsidy rate based on lease of land by governmental entity to foreign producer was unsupported by record evidence.

Motion granted in part; remanded in part.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Judgment on Administrative Record.

West Headnotes (5)

**[1]    Customs Duties    🖝    Scope of inquiry or review**

"Substantial evidence," as required to support a decision by the Department of Commerce in a countervailing duty investigation, refers to such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a(b)(1).

**[2]    Customs Duties    🖝    Bounties or grants**

Department of Commerce's inclusion of 26.50% estimated subsidy rate, based on 30-year lease of tract of land by governmental entity to affiliate of foreign producer to affiliate of foreign producer in total subsidy rate in countervailing duty investigation of imports of granular polytetrafluoroethylene (PTFE) resin from India was not authorized by regulation permitting Commerce to attribute upstream subsidies received by input producer to combined sales of input and downstream products; regulation required that production of input product be primarily dedicated to production of downstream product, affiliate's upstream product was electricity, and electricity, as form of energy with universal application, lacked any specific relationship with downstream products. Tariff Act of 1930 §§ 516A, 701, 🚩 19 U.S.C.A. §§ 1516a, 🚩 1671(a), 🚩 1671(e); 🚩 19 C.F.R. § 351.525(b)(6)(iv).

1 Case that cites this headnote

**[3]    Customs Duties    🖝    Bounties or grants**

A determination of whether an input is "primarily dedicated to the production of the downstream product" when there is a cross-ownership between an input supplier and a downstream producer, as required for the Department of Commerce to attribute countervailable subsidies received by the input supplier to the combined sales of input and downstream products, does not hinge on whether the input is primarily sold to the producer of that product and depends instead on the role the input performs as a link in the production chain. Tariff

Act of 1930 § 701, 🚩 19 U.S.C.A. § 1671(e);
🚩 19 C.F.R. § 351.525(b)(6)(iv).

1 Case that cites this headnote

**[4]     Administrative Law and
Procedure** 🔑 Consistent or longstanding
construction

An agency's interpretation of a regulation
inconsistent with a prior one ordinarily will not
be accorded deference upon judicial review.

**[5]     Customs Duties** 🔑 Proceedings

Department of Commerce's inclusion of 0.12%
estimated subsidy rate, based on lease of land by
governmental entity to foreign producer, in total
subsidy rate in countervailing duty investigation
of imports of granular polytetrafluoroethylene
(PTFE) resin from India was unsupported
by record evidence; Commerce failed to
determine in preliminary, post-preliminary, or
final decisions that provision of land for
purported less than adequate remuneration
(LTAR) constituted financial contribution or
was specific, and Commerce's discussion in
its final issues and decision memorandum was
inadequate to explain an LTAR and failed to
state critical findings on which it could have
been based, including findings associated with a
benchmark analysis. Tariff Act of 1930 §§ 516A,
701, 771, 🚩 19 U.S.C.A. §§ 1516a, 🚩 1671(a),
🚩 1671(e), 🚩 1677(5)(A), 🚩 1677(5)(E)(iv).

**Attorneys and Law Firms**

**\*1330** John M. Gurley and Diana Dimitriuc-Quaia,
ArentFox Schiff LLP, of Washington, D.C., argued for
plaintiff. With them on the briefs was Jessica R. DiPietro.

Daniel F. Roland, Trial Attorney, Commercial Litigation
Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., argued for defendant United States. With
him on the briefs were Brian M. Boynton, Principal Deputy

Assistant Attorney General, Patricia M. McCarthy, Director,
and Claudia Burke, Assistant Director. Of counsel on the
briefs was Paul K. Keith, Assistant Chief Counsel, Office of
the Chief Counsel for Trade Enforcement & Compliance, U.S.
Department of Commerce.

Elizabeth J. Drake, Shagrin Associates, of Washington, D.C.,
argued for defendant-intervenor. With her on the briefs were
Roger B. Shagrin, Luke A. Meisner, and Justin M. Neuman.

## OPINION AND ORDER

Timothy C. Stanceu, Judge

Plaintiff Gujarat Fluorochemicals Limited ("Gujarat
Fluorochemicals" or "GFCL"), an Indian producer of
granular polytetrafluoroethylene ("PTFE") resin, brought this
action to contest a final affirmative countervailing duty
("CVD") determination (the "Final Determination") issued
by the International Trade Administration, U.S. Department
of Commerce ("Commerce" or the "Department").
Concluding that the Final Determination is contrary to law,
the court remands the decision to Commerce for expeditious
corrective action.

### I. BACKGROUND

#### A. The Contested Determination

Commerce published the Final Determination as *Granular
Polytetrafluoroethylene Resin From India: Final Affirmative
Countervailing Duty Determination and Final Affirmative
Critical Circumstances Determination,* 87 Fed. Reg. 3,765
(Int'l Trade Admin. Jan. 25, 2022), in which Commerce
determined for GFCL an estimated total countervailable
subsidy rate of 31.89%. The estimated total countervailable
subsidy rate was the sum of ten individual estimated
countervailable subsidy rates, which Commerce described
in the "Final Issues and Decision Memorandum" and
incorporated into the Final Determination by reference.
*Issues and Decision Memorandum for the Final Affirmative
Determination of the Countervailing Duty Investigation of
Granular Polytetrafluoroethylene Resin from India* (Int'l
Trade Admin. Jan. 18, 2022), P.R. 248 ("*Final I&D Mem.*"). [1]

## B. The Parties

Plaintiff is an Indian producer and exporter of PTFE resin. Defendant is the United States. Defendant intervenor Daikin America, Inc. ("Daikin") is a U.S. domestic producer of PTFE resin that was the petitioner in the countervailing duty investigation.

## C. Proceedings before Commerce

On January 27, 2021, Daikin filed antidumping and countervailing duty petitions on imports of granular PTFE resin from India and Russia. *Daikin Antidumping* **\*1331** *and Countervailing Duty Petitions*, P.R. 1. On February 23, 2021, Commerce initiated a countervailing duty investigation of imports of this product during a time period (the "period of investigation" or "POI") of April 1, 2019 through March 31, 2020. *Granular Polytetrafluoroethylene Resin From India and the Russian Federation: Initiation of Countervailing Duty Investigations*, 86 Fed. Reg. 10,931. Gujarat Fluorochemicals was selected as the sole mandatory respondent in this investigation with respect to imports of granular PTFE from India (the "subject merchandise"). *Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India: Respondent Selection* at 4 (Int'l Trade Admin. March 9, 2021), P.R. 42.

Commerce issued a "Preliminary Determination" for the investigation on July 6, 2021. *Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 86 Fed. Reg. 35,479. The Preliminary Determination incorporated by reference a "Preliminary Decision Memorandum." *Decision Memorandum for the Preliminary Determination of the Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India* (Int'l Trade Admin. June 28, 2021), P.R. 173 ("*Prelim. Decision Mem.*").

After issuing the Final Determination, Commerce made no change in the 31.89% estimated countervailing duty rate when, following an affirmative injury determination of the U.S. International Trade Commission (the "Commission"), Commerce issued a countervailing duty order on PTFE resin from India. *Granular Polytetrafluoroethylene Resin From India and the Russian Federation: Countervailing Duty Orders*, 87 Fed. Reg. 14,509 (Int'l Trade Admin. Mar. 15, 2022).

## D. Proceedings before the Court

Plaintiff brought this action on April 12, 2022. Summons, ECF No. 1; Compl., ECF No. 6. Plaintiff filed under USCIT Rule 56.2 the motion now before the court, which is a motion for judgment on the agency record. Pl.'s Rule 56.2 Mot. for J. on the Agency R. (July 21, 2022), ECF Nos. 38 (conf.), 39 (public) ("Pl.'s Mot."); Pl.'s Mem. of Law in Supp. of its Mot. for J. on the Agency R. (July 21, 2022), ECF Nos. 38-1 (conf.), 39-1 (public) ("Pl.'s Br."). Defendant and defendant-intervenor responded. Def.'s Resp. in Partial Opp'n to Pl.'s Mot. for J. on the Agency R. (Sept. 30, 2022), ECF No. 46 ("Def.'s Resp."); Resp. in Opp'n to Pl. Gujarat Fluorochemicals Limited's Rule 56.2 Mot. for J. on the Agency R. of Def.-Int. Daikin America Inc. (Sept. 30, 2022), ECF Nos. 47 (conf.), 48 (public) ("Def.-Int.'s Resp."). Plaintiff filed a brief in reply. Pl. Gujarat Fluorochemicals Limited's Reply Br. (Oct. 28, 2022), ECF No. 51 ("Pl.'s Reply").

The court held oral argument on January 11, 2023. In response to defendant-intervenor's motion, the court allowed additional briefing on the proper interpretation of a provision in the Department's regulations, 19 C.F.R. § 351.525(b)(6)(iv), which the parties submitted on January 20, 2023. Suppl. Br. of Def.-Int. Daikin America Inc., ECF No. 58 ("Def.-Int.'s Suppl. Br."); Def.'s Suppl. Br. on the Interpretation of 19 C.F.R. § 351.525(b)(6)(iv), ECF No. 59 ("Def.'s Suppl. Br."); Pl. Gujarat Fluorochemicals Limited's Suppl. Br. on the Interpretation of Regulation 351.525(b)(6)(iv), ECF No. 60.

## II. DISCUSSION

## A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts **\*1332** Act of 1980, 28 U.S.C. § 1581(c),[2] pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930, *as amended* ("Tariff Act"), 19 U.S.C. § 1516a, including

an action contesting a final affirmative determination by Commerce of whether or not a countervailable subsidy is being provided with respect to merchandise subject to a countervailing duty investigation. *See* *id.* §§ 1516a(a)(2)(B)(i), 1671d(a)(1).

[1]   In reviewing an agency determination, the court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* § 1516a(b)(1). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

### B. Countervailing Duties under the Tariff Act

When certain conditions are met, the Tariff Act provides for a countervailing duty to be imposed on imported merchandise to redress the effect of a subsidy provided by the government of the exporting country. Section 701(a) of the Tariff Act, 19 U.S.C. § 1671(a), directs generally that Commerce is to impose a countervailing duty if: (1) Commerce determines that an "authority," defined as either the government of a country or any public entity within the territory of the country, *id.* § 1677(5)(B), "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the Commission determines that an industry in the United States is materially injured or threatened with material injury by reason of the subsidized imports.

A "countervailable subsidy" exists, generally, where an authority provides a financial contribution to a "person" and a "benefit is thereby conferred" and where the subsidy meets the requirement of "specificity," as determined according to various rules set forth in the statute. *Id.* §§ 1677(5), (5A). When subsidies consist of the provision of goods or services rather than the provision of monies directly, a benefit is conferred if those goods or services are provided for "less than adequate remuneration" ("LTAR"). *Id.* § 1677(5)(E)(iv).

### C. Estimated Subsidy Rates in the Final Determination

For the Final Determination, Commerce calculated the 31.89% estimated total subsidy rate by combining the individual estimated subsidy rates it determined for ten government programs in India, two of which plaintiff is contesting before the court. Plaintiff contests the Department's including in the total a 26.50% subsidy rate based on a 30-year lease of a tract of land by a governmental entity, the State Industrial Development Corporation ("SIDC"), to Inox Wind Limited ("IWL"), an affiliate of Gujarat Fluorochemicals. Plaintiff also contests the Department's including a 0.12% subsidy rate for the provision of land to GFCL by another government entity, the Gujarat Industrial Development Corporation. [3]

### *1333   D. Inclusion of a Subsidy Rate for the Lease of Land by the State Industrial Development Corporation

[2]   Commerce determined the 26.50% SIDC estimated subsidy rate by attributing to Gujarat Fluorochemicals what Commerce considered to be a subsidy to IWL, an Indian producer of wind turbines. Several findings resulted in this determination.

Commerce found that the 30-year lease, which dated back to 2015 and pertained to land to be used for the construction of manufacturing facilities, was for less than adequate remuneration. Gujarat Fluorochemicals contests the finding that the lease was for LTAR, arguing, in effect, that no subsidy or financial benefit was provided to IWL. Plaintiff argues that Commerce arrived at the LTAR conclusion by valuing the land according to "benchmark" prices that were far higher than the value of the leased tract. Gujarat Fluorochemicals maintains that the record evidence shows that these benchmarks were not comparable to that tract because, *inter alia*, they pertained to parcels of urban land located in the centers of the Indian cities of Mumbai and Ahmedabad. *See* Pl.'s Br. 31–48.

Commerce found, further, that GFCL and IWL not only were affiliated but were "cross-owned" within the meaning of § 351.525(b)(6)(vi) of the Department's regulations. [4] Before the court, plaintiff does not contest the Department's determination of cross-ownership.

Commerce included the 26.50% estimated subsidy rate upon finding that during the period of investigation, IWL sold electrical power to GFCL, and exclusively to GFCL, and that this electricity was used as an input for all products GFCL manufactured at its industrial complex, including PTFE resin. Commerce concluded from these factual findings, which plaintiff does not contest, that what Commerce considered to be a subsidy to IWL should be attributed to the combined sales of the downstream products of both corporations, according to an "attribution of subsidies" provision set forth in its regulations. 19 C.F.R. § 351.525(b)(6)(iv). While not contesting that IWL sold electrical power to GFCL, and only GFCL, during the period of investigation, and while not contesting that the power was used in producing the downstream products at GFCL's production facility (which included numerous products other than PTFE resin), plaintiff argues that this regulation does not apply in the situation presented. The court agrees.

### 1. The Department's Conclusion that 19 C.F.R. § 351.525(b)(6)(iv) Applied with Respect to the SIDC Land Lease

The court's analysis begins with the statute. Section 701(a) of the Tariff Act requires "the administering authority," i.e., Commerce, to impose a countervailing **\*1334** duty if a governmental entity "is providing, directly or *indirectly*, a countervailable subsidy *with respect to the manufacture*, *production*, or export of a class or kind of merchandise [i.e., the merchandise subject to the investigation] imported, or sold (or likely to be sold) for importation, into the United States" and the Commission reaches an affirmative determination of injury or threat to the domestic industry by reason of sales of that merchandise." 19 U.S.C. § 1671(a) (emphasis added). Here, what Commerce identified as a subsidy was a domestic, not export, subsidy, and it was provided to IWL, not GFCL, the producer of the subject merchandise. Thus, any subsidy was provided, if at all, only "indirectly" with respect to the manufacture of the imported PTFE resin.

Section 701(e) of the Tariff Act provides, further, that "[w]henever the administering authority has reasonable grounds to believe or suspect that an upstream subsidy, as defined in section 771A(a)(1), is being paid or bestowed, the administering authority shall investigate whether an upstream subsidy has in fact been paid or bestowed, and if so, shall include the amount of the upstream subsidy as provided in

section 771A(a)(3)." 19 U.S.C. § 1671(e). In pertinent part, section 771A(a) defines an "upstream subsidy" as a countervailable subsidy other than an export subsidy that "is paid or bestowed by an authority ... with respect to a product (hereafter in this section referred to as an 'input product') that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding," that "bestows a competitive benefit on the merchandise," and that "has a significant effect on the cost of manufacturing or producing the merchandise." *Id.* § 1677-1(a).

Commerce did not conduct an upstream subsidy investigation of the electricity input. Certain record evidence would have been relevant had it done so. This includes evidence that during the period of investigation, Inox Wind Limited sold to Gujarat Fluorochemicals only the electricity produced by two wind turbines that were being tested prior to GFCL's purchase of these two wind turbines during the last month of the POI, March 2020. *Questionnaire Response to Section III Identifying Affiliated Companies of Gujarat Fluorochemicals Limited* at 8, J.A. at 31 (Mar. 26, 2021), P.R. 52. Measured by kilowatt hours, the electrical power so provided, which was commingled with other power supplied on the grid to GFCL's production facilities, was 1.03% of the total power consumed by those facilities during the period of investigation. *See Section III Questionnaire Response (Part I) of Inox Wind Limited* at 6, J.A. at 508 (May 24, 2021), P.R. 121. Plaintiff estimated that 7.44% of the total power supplied to the facilities was used to produce granular PTFE resin (one of a number of products GFCL made there), *id.* at 7 (citing *Supplemental Questionnaire Response to Section III Identifying Affiliated Companies (Questions 3–7) of Gujarat Fluorochemicals Limited* at Ex. S-5b, J.A. at 392 (Apr. 15, 2021), P.R. 84), such that only approximately 0.07% of the electricity supplied by IWL went to the production of the merchandise subject to the investigation. [5] *See* **\*1335** 19 U.S.C. § 1677-1(a)(3) (requiring for a finding of an upstream subsidy that the input product "has a significant effect on the cost of manufacturing or producing the merchandise"). There is also uncontradicted record evidence that IWL sold the electrical power to GFCL at market prices and at arm's length. *Questionnaire Response to Section III* at 7, J.A. at 30 (Mar. 26, 2021), P.R. 52 (reporting that "IWL has sold power to GFCL at market rates" and that "these transactions were at 'arm's length.' "). *See* 19 U.S.C. § 1677-1(b)(1) (providing generally that "a competitive benefit has been bestowed when the price for the input product ... is lower than the price that the

manufacturer or producer of merchandise which is the subject of a countervailing duty proceeding would otherwise pay for the product in obtaining it from another seller in an arms-length transaction.").

Commerce declined to conduct an upstream subsidy investigation even though Section 701(e) provides that Commerce "*shall* investigate whether an upstream subsidy is being paid or bestowed" when it "has reasonable grounds to believe or suspect" that such a subsidy is being provided. 19 U.S.C. § 1671(e) (emphasis added). Instead, Commerce resorted to an alternate methodology when it included, in the overall estimated subsidy rate, a rate for IWL's provision of the electrical power input to Gujarat Fluorochemicals. This alternate methodology, set forth in 19 C.F.R. § 351.525(b)(6)(iv), is not mentioned in the Tariff Act and thus is entirely a creation of the Department's regulations.

This case does not present the issue of whether § 351.525(b)(6)(iv) accords with the statute. Plaintiff does not make a facial challenge to this regulation and instead claims that the regulation was impermissibly applied in the CVD investigation. The regulation at issue in this case consists of a single sentence, as follows:

> *Input suppliers.* If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv). The question this case presents, then, is whether Commerce correctly interpreted its regulation to conclude that the condition precedent for invoking the procedure in the regulation existed here, i.e., whether "production of the input product is primarily dedicated to production of the downstream product." *Id.* Commerce concluded that the condition was satisfied because

IWL did not provide electrical power to any persons other than GFCL during the period of investigation, with the result that all of the electricity IWL supplied was used in powering the Dahej industrial facilities, the location of the production of the PTFE resin and the other products that GFCL manufactured there. *Final I & D Mem.* at 12 ("... IWL did not have any other energy customers and ... all wind power generated at IWL's wind farm was to be used in GFCL's production facilities in Dahej.").

As discussed earlier, there is record evidence that only 0.07% of the electricity IWL provided was used in producing the subject merchandise, granular PTFE resin, which was only one of a number of products that Gujarat Fluorochemicals made at the Dahej industrial facilities. Commerce reasoned that "[t]he regulations do not specify whether the downstream product must be subject or non-subject merchandise," *Final I & D Mem.* **\*1336** at 11, but there is also the issue of whether the regulation requires "the downstream product" to be a specific, identified product. That is at least an implication from the use of the term "*the* downstream product." In this instance, Commerce interpreted the term "the downstream product" not to refer to any downstream product in particular but instead to refer to all of the products GFCL made at those facilities (which, other than granular PTFE resin, Commerce did not identify or analyze). The use of the particularized, singular reference to "the downstream product" calls the Department's interpretation into question. Nevertheless, it is unnecessary for the court to decide whether the term "the downstream product" as used in the regulation plausibly could refer to a group consisting of all downstream products made by the producer. For even if it were assumed, *arguendo*, that the term may be interpreted so broadly in some context, the court still could not agree with the Department's conclusion that the "primarily dedicated" standard is satisfied here.

**[3]** Commerce relied on the fact that Gujarat Fluorochemicals was the only customer to whom Inox Wind Limited sold power during the POI, but that is not sufficient to meet the "primarily dedicated" standard imposed by the regulation. As the court will explain, a determination of whether an input is "primarily dedicated to the production of the downstream product" does not hinge on whether the input is primarily sold to the producer of that product and depends instead on the role the input performs as a "link" in the production chain.

Commerce promulgated 19 C.F.R. § 351.525(b)(6)(iv) in 1998 as part of a comprehensive revision of countervailing duty regulations following enactment of the Uruguay Round Agreements Act. The preamble to the 1998 promulgation ("Preamble") identified as the main concern addressed in § 351.525(b)(6)(iv) "the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product —the type of input product that is merely a link in the overall production chain." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Int'l Trade Admin. Nov. 25, 1998). Commerce explained that "[w]e believe that in situations such as these, the purpose of the subsidy provided to the input producer is to benefit the production of both the input and downstream products." *Id.* Commerce summarized the discussion as follows:

> Accordingly, where the input and downstream production takes place in separately incorporated companies with cross-ownership ... and the production of the input product is primarily dedicated to the production of the downstream product, paragraph (b)(6)(iv) requires the Department to attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the two corporations).

*Id.* The Preamble provided three examples that illustrate the intended meaning of the term "primarily dedicated to the production of the downstream product" as used in § 351.525(b)(6)(iv). Together, they clarify that the term pertains to the role the input performed, in the physical sense, in the production of the downstream product rather than whether the input was provided "primarily" to the producer of that product.

As examples of products that are merely links "in the overall production chain," Commerce identified "stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production." *Id.* (citing **\*1337** *Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,578

(Int'l Trade Admin. May 28, 1992) and *Certain Pasta from Italy*, 61 Fed. Reg. 30,287–309 (Int'l Trade Admin. June 14, 1996)). In both of these examples, the input was an upstream product that bore a close physical relationship to the downstream product. As an example of an input that Commerce considered not to be primarily dedicated to the production of the downstream product, Commerce explained as follows:

> Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product. For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles. Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer.

*Id.* The three examples show that Commerce considered the universal role of plastics in the manufacturing of different downstream products as reason enough to conclude that plastics are not "primarily dedicated" to the production of automobiles or appliances in the way timber is primarily dedicated to lumber production and semolina is primarily dedicated to making pasta. Both the timber and the semolina are dedicated in the production chain to production of a related, higher value-added product. Notably, in all three examples "the downstream product" is a specific, individually-identified product, and nowhere in the three examples does Commerce mention, as a pertinent factor in determining whether the input is "primarily dedicated," whether the producer is the sole or primary purchaser of the upstream product.

The electricity used to power GFCL's manufacturing facilities might be described as an "input," but its role in the manufacturing of the finished products at the GFCL facilities

is not analogous to the role timber performed in producing lumber or the role semolina performed in pasta making. Electricity used to power an entire production plant cannot fairly be characterized as "merely a link in the overall production chain" of the finished products that are made there. *Id.* It is energy, and, being of universal application, is not remotely describable as an upstream product that is "primarily dedicated to the production of the downstream product" as is required by 🚩 § 351.525(b)(6)(iv). Ignoring the distinction the Preamble draws between an upstream product that is merely a link in the production chain of a higher value-added product and one that is not, Commerce mistakenly thought it sufficient that "IWL's wind energy generation during the POI was provided expressly for the purpose of providing electrical energy to GFCL and had no other purpose outside of GFCL's overall production chain." *Final I & D Mem.* at 12. That error in the interpretation of 🚩 § 351.525(b)(6)(iv) led Commerce to the wrong conclusion.

The distinction the Preamble draws in discussing the plastics example is particularly instructive in this case. Commerce stated that where the input is not "primarily dedicated" to the production of the downstream product, it will not invoke 🚩 19 C.F.R. § 351.525(b)(6)(iv) and instead "will rely on the upstream subsidy provision of the statute to capture" any benefits provided to the input "which are passed to the downstream producer." *Countervailing Duties*, 63 Fed. Reg. at 65,401. In the investigation at issue, Commerce decided not to do so and instead relied exclusively **\*1338** on 🚩 § 351.525(b)(6)(iv) in attributing to Gujarat Fluorochemicals what it considered to be a subsidy to Inox Wind Limited.

The plastics example in the Preamble language instructs, further, that Commerce will apply 🚩 19 C.F.R. § 351.525(b) (6)(iv), as opposed to an upstream subsidy analysis, when the physical relationship between the input and the downstream product makes it "reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product." *Id.* Because electricity could not have been found on this record to be "dedicated to the production" of any downstream product in the way the regulation contemplates, that condition is missing from the factual scenario in this case.

In summary, Commerce applied 🚩 § 351.525(b)(6)(iv) contrary to the intent of the term "primarily dedicated to the production of the downstream product." By overlooking the type of physical relationship the regulation requires between the input and the particular downstream product in the production chain, and by defining the term as satisfied because the input is not sold to persons other than the producer of the subject merchandise, Commerce assigned the term a different meaning and purpose than those intended for this regulation.

## 2. Defendant's and Defendant-Intervenor's Arguments that Commerce Reasonably Applied 🚩 19 C.F.R. § 351.525(b)(6)(iv) in the Investigation

Defendant and defendant-intervenor offer various arguments on why the court should conclude that the Department's interpretation of 🚩 § 351.525(b)(6)(iv) was reasonable. But in none of their arguments do they confront the basic flaw affecting that interpretation, which is that electricity cannot plausibly be said to have been "primarily dedicated to the production of the downstream product" in the sense in which Commerce intended that term to be interpreted when promulgating the regulation.

Defendant advances three arguments in its supplemental brief. It argues, first, that "the term 'downstream product' should not be strictly construed to mean 'subject merchandise' but instead should be interpreted to include both subject and non-subject merchandise" and that "Commerce has long applied the regulation" in this way. Def.'s Suppl. Br. 2. Defendant followed this argument with a discussion of how Commerce has interpreted the term to mean both subject and non-subject merchandise in other administrative decisions. *Id.* at 2–5.

Defendant's argument, even if presumed, *arguendo*, to be correct, is unavailing as to whether Commerce permissibly applied its regulation in the CVD investigation. As the Preamble examples show, typically "the downstream product" will be the merchandise under investigation, but the court need not presume that such is necessarily the case. The salient point is that there is no indication on the record of this investigation, and nothing in the Department's analysis, to support a notion that electricity was "primarily dedicated"—in the sense in which that term was intended in 🚩 § 351.525(b)(6)(iv)—to the "production" of any specific "downstream product" Gujarat Fluorochemicals made at its facilities, or even to all of the downstream products considered collectively.

Defendant argues, next, that "Commerce's interpretation of the regulation is consistent with the *CVD Preamble*," maintaining that Commerce did not intend for the terms "downstream product(s)" and "subject merchandise" to be interchangeable. *Id.* at 5. This argument also misses the mark.

**\*1339**  The Department's interpretation of the regulation is *not* consistent with the Preamble in the sense that matters: the meaning of the term "primarily dedicated." For the reasons the court has explained, the meaning the Preamble gives to this term is not the one Commerce attributed to it in this CVD investigation.

Defendant's third argument is that "Commerce's interpretation of the regulation is consistent with the principle in ⚑ 19 U.S.C. § 1671(a) that any countervailable subsidy be provided 'with respect to ... the manufacture, production, or export' of the subject merchandise." *Id.* at 6. According to defendant, plaintiff's view of the statute and regulation would undermine the goals served by the statute and the regulation, referring, as to the statute, to the offsetting of the unfair competitive advantage foreign producers otherwise would enjoy from government subsidies and, as to the regulation, to recognizing that "benefits provided to upstream input suppliers benefit *all downstream products* in the line of production." *Id.* (citations omitted). Defendant further argues:

> Accepting the narrow reading proffered by GFCL would undermine these goals by allowing companies to avoid countervailing-duty exposure merely by dedicating the input product to something in addition to subject merchandise, or, like here, commingling the input product (wind power) with other resources such that its use cannot be linked solely to subject merchandise.

*Id.* Defendant adds, "[t]hat is not the outcome Commerce envisioned when declaring that it is 'extremely sensitive to potential circumvention of the countervailing duty law.' " *Id.* at 6–7 (quoting *Countervailing Duties*, 63 Fed. Reg. at 65,400).

By speaking only in generalities, and engaging in discussion as to "circumvention" that is irrelevant to the record facts of this case, defendant's third argument fails to take into account how the statute and ⚑ § 351.525(b)(6)(iv) address the particular situation presented by the electrical energy input provided to GFCL by Inox Wind Limited. In ⚑ 19 U.S.C. § 1671(e), the statute addresses upstream subsidies by directing Commerce to perform an upstream subsidy analysis when there is reason to believe or suspect that an upstream subsidy is being provided. The plastics example in the Preamble, which illustrates the limitations under which Commerce will resort to ⚑ § 351.525(b)(6)(iv), recognizes that the regulation is an exception to the general statutory rule. Defendant's argument overlooks the pertinent discussion in the Preamble clarifying that where, as here, the input is not primarily dedicated to the production of the downstream product, Commerce "will rely on the upstream subsidy provision in the statute" to capture any benefits that are passed to the downstream producer. *Countervailing Duties*, 63 Fed. Reg. at 65,401.

Defendant-intervenor's arguments are also misguided. Daikin relies upon a decision of this Court, ⚑ *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 45 CIT ——, 498 F. Supp. 3d 1345 (2021) (" ⚑ *Icdas*"), to support its position that the Department's interpretation of ⚑ 19 C.F.R. § 351.525(b)(6)(iv) was permissible. Def.-Int.'s Resp. 15–16; Def.-Int.'s Suppl. Br. 13. This case is not on point. In ⚑ *Icdas*, this Court sustained a factual finding that the input supplied by a cross-owned affiliate (scrap) was "primarily dedicated" to the production of the subject merchandise (steel rebar). ⚑ *Icdas*, 45 CIT at ——, 498 F. Supp. 3d at 1363. An analogous finding was not made, and on the record evidence could not have been made, with respect to the electricity input in the investigation at issue here.

**\*1340**  Defendant-intervenor argues that the terms "downstream product" and "downstream products" as used in ⚑ § 351.525(b)(6)(iv) "should be interpreted to be interchangeable, with the singular term including the plural and the plural including the singular." Def.-Int.'s Suppl. Br. 3. Daikin makes the related argument that had Commerce intended for "the downstream product" to refer only to subject merchandise, it would have so provided. *Id.* at 5.

Neither of these arguments is convincing. For the reasons the court has explained, they do not address the central problem with the action Commerce took in this case, which stemmed from a misinterpretation of the regulation. The reference in the regulation to "the downstream *product*" is not only singular, it is also a reference to a *specific* product. Daikin seems to acknowledge this point in stating that "[w]hile the 'downstream product' may be 'subject merchandise' based on the facts in some cases, it may be defined more broadly than 'subject merchandise' in others." *Id.* The point is, "the downstream product" has to be "defined" by Commerce in some way so that the "link in the overall production chain" analysis directed by the Preamble can be performed. In this case, the Department's interpretation of 📁 § 351.525(b)(6)(iv) failed to identify any specific downstream product and thus failed to consider the role electricity performed in the production of such a product. Daikin discusses the Preamble examples on lumber and pasta, *id.* at 8–9, but its discussion misses the essential problem by failing to address the lack of any specific relationship between electricity and the downstream product (whatever Commerce considered it to be) in the production chain. In summary, the problem is that electricity cannot be shown on this record to be "primarily dedicated" either to Gujarat Fluorochemicals's PTFE resin or to the production of any of the other (unidentified) products made at GFCL's facilities, when the term "primarily dedicated" is given its correct meaning.

Defendant-intervenor argues, further, that the court should defer to the Department's interpretation of an ambiguous regulation. *Id.* at 1–2, 14 (citing 📁 *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) and 📁 *Kisor v. Wilkie*, ––– U.S. ––––, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019)). The court does not agree that deference is owed to the interpretation Commerce applied to § 351.525(b)(6)(iv) in the investigation.

 [4]   Ambiguity concerning the intended meaning of the term "primarily dedicated to the production of the downstream product" is resolved by the detailed discussion in the Preamble, which as a statement of general applicability must be regarded as the interpretation that is "the agency's authoritative or official position." 📁 *Kisor*, 139 S. Ct. at 2406 (2019). An interpretation inconsistent with a prior one ordinarily will not be accorded deference upon judicial review. *See* 📁 *id.* at 2418 (citing 📁 *Thomas Jefferson Univ.*

*v. Shalala*, 512 U.S. 504, 515, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)).

Daikin's final point is that on the record before it, Commerce did not have the discretion to refuse to apply a countervailing duty with respect to the SIDC land lease. Def.-Int.'s Suppl. Br. 17 ("In short, there is no latitude in the statute or regulations for Commerce to exempt GFCL from countervailing duties once the required elements of a countervailable subsidy and attributable benefit have been found."). This argument wrongly presumes that Commerce validly attributed to Gujarat Fluorochemicals any "benefit" that may have been provided to Inox Wind Limited by the SIDC land lease. The statute provides an **\*1341** "upstream subsidy" procedure, which Commerce declined to follow, and the procedure in 📁 § 351.525(b)(6)(iv), which is separate from the statutory procedure, had no application in this case due to the absence of the type of physical relationship between electricity and the production chain for the downstream product that the regulation requires for attribution.

### 3. The Inclusion of the 26.50% Estimated Subsidy Rate with Respect to the SIDC Land Lease Was Unlawful

In summary, the inclusion of the 26.50% estimated subsidy rate was unauthorized by 📁 19 C.F.R. § 351.525(b)(6)(iv) and therefore contrary to law. The countervailing duty investigation is completed and its outcome reviewed judicially as a final determination on the agency record. [6] Moreover, the 26.50% estimated subsidy rate is being collected contrary to law, with prejudice to this plaintiff, and must cease. In the remand it is ordering, the court will direct Commerce to delete the 26.50% estimated subsidy rate from the overall estimated subsidy rate in the redetermination it files in this case.

### E. Inclusion of a 0.12% Estimated Subsidy Rate for the Provision of Land by the Gujarat Industrial Development Corporation

 [5]   In the Preliminary Decision Memorandum, Commerce stated a preliminary finding with respect to three leases of land to Gujarat Fluorochemicals from the Gujarat Industrial Development Corporation ("GIDC") used for manufacturing facilities. Commerce stated that "[w]e preliminarily determined that the following program did not

confer a measurable benefit during the POI. Therefore, we do not reach a preliminary determination as to whether there is a financial contribution or specificity for this program: 1. GIDC's Provision of Land for LTAR." *Prelim. Decision Mem.* at 26. Commerce made no mention of a countervailable subsidy for land leased to Gujarat Fluorochemicals by GIDC in a post-preliminary analysis. Nor is there any mention of it in the published Final Determination, which does not address the individual estimated countervailable subsidy rates.

In the Final Issues and Decision Memorandum, under a heading titled "*GIDC's Provision of Land for LTAR,*" Commerce stated that it "corrected the unit price for the land transaction in Ahmedabad Gujarat. The final subsidy rate for this program is 0.12 percent *ad valorem* for GFCL." *Final I & D Mem.* at 7. The reference to "the land transaction in Ahmedabad Gujarat" is a reference to a benchmark value Commerce used with respect to the land leased by the GIDC. *Id.* at 20–22.

The Final Issues and Decision Memorandum contains no analysis of a "financial benefit" or "specificity" for the 0.12% estimated subsidy rate. Defendant concedes this point: "In the Final Determination, as in the PDM [Preliminary Decision Memorandum] and post-preliminary analysis, Commerce did not determine that the GIDC's provision of land for LTAR constitutes a financial contribution or is specific." Def.'s Resp. 29. From the reference to the Ahmedabad Gujarat benchmark, the court can surmise that for the Preliminary Determination Commerce did not find a financial contribution but impliedly presumed one after it performed a revised benchmark analysis.

In its response to GFCL's Rule 56.2 motion, "[d]efendant respectfully requests a voluntary remand of the final determination so that Commerce may consider further **\*1342** its analysis with respect to the GIDC's provision of land for LTAR." *Id.* Plaintiff does not oppose a remand on that issue but states that "[t]his Court should not delay its opinion on the merits with respect to Commerce's benchmark and attribution determinations." Pl.'s Reply 23 (citation omitted). Plaintiff's claim, summarily stated, is that Commerce reached an erroneous determination of less than adequate remuneration based on a flawed analysis of benchmark data.

The court does not agree with defendant that the court should order a "remand of the final determination so that Commerce may consider further its analysis with respect to

the GIDC's provision of land for LTAR." This formulation of the issue might be interpreted to presume that the land leases by GIDC were for less than adequate remuneration, a determination plaintiff is contesting. The court notes, further, that the discussion of this issue in the Final Issues and Decision Memorandum is inadequate to explain an LTAR and subsidy determination and fails to state critical findings on which it could have been based, including findings associated with a benchmark analysis. The court, therefore, will order Commerce to reconsider in the entirety the decision to include the 0.12% estimated subsidy rate on the GIDC issue.

The court recognizes plaintiff's concern with possible delay. At oral argument, defendant informed the court that Commerce would require 30 days to submit a redetermination in response to its request. The court will allow only this limited time period for Commerce to submit a new determination and will grant no extension of the deadline absent extraordinary and compelling circumstances. To further expedite this case, the court will allow only brief time periods for comments following submission of the remand redetermination.

### III. CONCLUSION AND ORDER

In its motion for judgment on the agency record, plaintiff moves this Court to hold the Final Determination contrary to law, remand the Final Determination to Commerce to recalculate the estimated subsidy rate, and grant such additional relief as is just and proper. Pl.'s Mot. 5. As discussed above, Commerce upon remand must delete the 26.50% estimated subsidy rate for the provision of SIDC land from the estimated total countervailable subsidy rate. Commerce also must reconsider imposing an estimated subsidy rate for the provision of the GIDC land.

Upon consideration of plaintiff's motion for judgment on the agency record, upon consideration of all papers and proceedings had herein, and with due deliberation, it is hereby

**ORDERED** that plaintiff's Rule 56.2 motion for judgment on the agency record be, and hereby is, granted; it is further

**ORDERED** that the Final Determination be, and hereby is, ruled to be contrary to law with respect to the inclusion of a 26.50% estimated subsidy rate for the provision of land by the SIDC; it is further

Appx00036

**ORDERED** that Commerce shall submit a new determination (the "Remand Redetermination") consistent with this Opinion and Order within 30 days of the date of issuance of this Opinion and Order; it is further

**ORDERED** that in the Remand Redetermination Commerce shall delete from the overall rate the 26.50% estimated subsidy rate for the provision of land by the SIDC; it is further

**ORDERED** that Commerce shall reconsider its inclusion of an estimated 0.12% subsidy rate for the provision of land by the GIDC; it is further

**\*1343  ORDERED** that plaintiff and defendant-intervenor may submit comments on the Remand Redetermination within 14 days of the filing of the Remand Redetermination; and it is further

**ORDERED** that defendant may file a response to the comments on the Remand Redetermination within 7 days of the filing of the last comment submission.

**All Citations**

617 F.Supp.3d 1328

## Footnotes

1    Documents in the Joint Appendix are cited as "P.R. ___."

2    All citations herein to the United States Code are to the 2018 edition. All citations to the Code of Federal Regulations are to the 2022 edition.

3    The other eight subsidy programs and rates were as follows: Export Promotion of Capital Goods Scheme, 0.09%; Advanced Authorization Program, 2.76%; Duty Drawback Program, 0.17%; Status Holders Incentive Scrip, 0.07%; Merchandise Export from India Scheme, 0.46%; Renewable Energy Certificate, 0.41%; GDIC Preferential Water Rates, 0.60%; and State Government of Gujarat Exemption from Electricity Duty, 0.71%. *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India* at 6–7 (Int'l Trade Admin. Jan. 18, 2022), P.R. 248.

4    Per the regulations:

Cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. Normally, this standard will be met where there is a majority voting ownership interest between the two corporations or through common ownership of two (or more) corporations.

🚩 19 C.F.R. § 351.525(b)(6)(vi).

5    The court has used only public record information throughout this Opinion and Order. At oral argument, plaintiff waived a previous claim of confidentiality for the data appearing in this paragraph. *See* Oral Argument at 9:46 (waiving confidentiality for the 1.03% figure), 13:38 (waiving confidentiality for the 7.44% figure); *see also* Gujarat Fluorochemicals Limited's Suppl. Br. on the Interpretation of Regulation 351.525(b)(6)(iv) 17, ECF No. 60 (disclosing both the 1.03% and 7.44% figures publicly).

6    Defendant has not requested that the court grant the agency the opportunity to conduct an upstream subsidy analysis or to reopen the record for this purpose.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Appx00038**

# Addendum 4

578 F.Supp.3d 1346
United States Court of International Trade.

GUJARAT FLUOROCHEMICALS LIMITED, Plaintiff,
v.
UNITED STATES, Defendant,
and
Daikin America, Inc., Defendant-intervenor.

Slip Op. No. 22-63
|
Court No. 22-00120
|
June 9, 2022

**Synopsis**

**Background:** Foreign producer filed suit challenging final determination of Department of Commerce in countervailing duty (CVD) investigation of imports of granular polytetrafluoroethylene (PTFE) resin from India. Producer moved for preliminary injunction to lower cash deposit rate and statutory injunction to prohibit liquidation of entries during pendency of litigation.

**Holdings:** The Court of International Trade, Timothy C. Stanceu, J., held that:

[1] preliminary injunction to lower cash deposit rate was not warranted, and

[2] producer failed to submit draft order for statutory injunction in correct form.

Motion denied.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (10)

**[1]    Customs Duties** 🔑 Countervailing or Dumping Duties

**Customs Duties** 🔑 Determination, Judgment, and Relief;  Summary Judgment

Any preliminary injunction is an extraordinary remedy, but that is particularly the case where ordering the requested relief would depart from the ordinary cash deposit procedure Congress established under the Tariff Act; under that ordinary procedure, it is Department of Commerce, not Court of International Trade, that determines the rate of deposits of estimated countervailing duties pending judicial review following a countervailing duty investigation. Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a(c)(2).

**[2]    Customs Duties** 🔑 Determination, Judgment, and Relief;  Summary Judgment

The Tariff Act does not prohibit a preliminary injunction directed to a cash deposit rate, which would depend upon the exercise of the Court of International Trade's general authority to order any form of relief that is appropriate in a civil action. Tariff Act of 1930 § 705, 🚩 19 U.S.C.A. § 1671d(c)(1)(B)(i)(I);  28 U.S.C.A. § 2643(c)(1).

**[3]    Customs Duties** 🔑 Determination, Judgment, and Relief;  Summary Judgment

A circumstance necessitating a preliminary injunction directed to a cash deposit rate could arise, but plaintiff faces a particularly heavy burden in demonstrating a need for a remedy beyond those routinely available under the Tariff Act upon adjudication of the merits of its claims, in other words, a remand order and refund of cash deposits. Tariff Act of 1930 § 705, 🚩 19 U.S.C.A. § 1671d(c)(1)(B)(i)(I).

**[4]    Customs Duties** 🔑 Determination, Judgment, and Relief;  Summary Judgment

To obtain any preliminary injunction from the Court of International Trade, plaintiff must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities is in its favor, and that an injunction is in the public interest.

**[5]** **Customs Duties** 🔑 Determination, Judgment, and Relief; Summary Judgment

A showing of likelihood of irreparable harm in the absence of the relief sought is a necessary prerequisite to a preliminary injunction granted by the Court of International Trade.

**[6]** **Customs Duties** 🔑 Determination, Judgment, and Relief; Summary Judgment

Foreign producer would not likely suffer irreparable harm and had ordinary remedies available under Tariff Act in absence of preliminary injunction lowering its cash deposit rate imposed by Department of Commerce in countervailing duty (CVD) investigation of imports of granular polytetrafluoroethylene (PTFE) resin from India; producer's allegations of lost business opportunities, inability to pass on costs and attendant threat of lost revenues, business uncertainty, and decreased demand were types of harm not unlike those that reasonably could be expected to occur in typical CVD investigation involving similar cash deposit rate, and prospect of future refunds of excess cash deposits, along with lower deposit rate at that time, would be adequate remedy under statutory scheme. Tariff Act of 1930 § 705, 🚩 19 U.S.C.A. § 1671d(c)(1)(B)(i)(I); 28 U.S.C.A. § 2643(c)(1).

**[7]** **Customs Duties** 🔑 Determination, Judgment, and Relief; Summary Judgment

The purpose of a statutory injunction, under the Tariff Act, is to preserve the Court of International Trade's ability to provide relief should the movant prevail on the merits. Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a(c)(2).

**[8]** **Customs Duties** 🔑 Determination, Judgment, and Relief; Summary Judgment

Statutory injunctions are not extraordinary and routinely are granted in cases seeking judicial review under the Tariff Act. Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a(c)(2).

**[9]** **Customs Duties** 🔑 Determination, Judgment, and Relief; Summary Judgment

In the absence of a statutory injunction in some form, the attachment of finality to the liquidation of the entries of merchandise covered by the contested countervailing duty determination may place those entries beyond the reach of a remedy ordered by the Court of International Trade and imposed at the conclusion of the litigation, and may deny the plaintiff the opportunity to obtain meaningful judicial review of the contested agency action. Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a(c)(2).

**[10]** **Customs Duties** 🔑 Determination, Judgment, and Relief; Summary Judgment

Statutory injunction was not warranted to prohibit liquidation of foreign producer's entries during pendency of litigation challenging final determination of Department of Commerce in countervailing duty (CVD) investigation of imports of granular polytetrafluoroethylene (PTFE) resin from India, since foreign producer failed to submit draft order in technical form that Court of International Trade could issue. Tariff Act of 1930 § 516A, 🚩 19 U.S.C.A. § 1516a(c)(2).

**Attorneys and Law Firms**

**\*1347** John M. Gurley, ArentFox Schiff LLP, of Washington, D.C., for plaintiff. With him on the submissions were Diana Dimitriuc Quaia and Jessica R. DiPietro. Also appearing are Matthew M. Nolan and Wendy Qiu.

Daniel F. Roland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the response were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Assistant Director. Of counsel on the response was Paul K. Keith, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Luke A. Meisner, Schagrin Associates, of Washington, D.C., for defendant-intervenor. Appearing with him are Roger B. Schagrin, Benjamin J. Bay, Christopher T. Cloutier, Elizabeth J. Drake, Jeffrey D. Gerrish, Joseph A. Laroski, Jr., Kelsey M. Rule, Michelle R. Avrutin, Nicholas J. Birch, Saad Y. Chalchal, and William A. Fennell.

## OPINION AND ORDER

Stanceu, Judge:

**\*1348** Plaintiff Gujarat Fluorochemicals Limited ("GFCL" or "GFL") is an Indian producer of granular polytetrafluoroethylene ("PTFE"). GFCL brought this action to contest a decision (the "Final Determination") of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in a countervailing duty ("CVD") investigation of imports of granular PTFE resin from India and has filed a motion for injunctions. The court denies plaintiff's motion as it applies to a preliminary injunction that plaintiff seeks to lower the rate of cash deposits, holding that plaintiff has not shown the likelihood of irreparable harm in the absence of such a preliminary injunction. The court also denies, without prejudice, plaintiff's motion as to an injunction to prohibit liquidation of entries during the pendency of this litigation, concluding that GFCL has failed to propose an injunction in a technical form that the court may issue.

## I. BACKGROUND

Plaintiff brought this action on April 12, 2022, asserting subject matter jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), according to which the court reviews actions commenced under 🚩 19 U.S.C. § 1516a.[1] Summons, ECF No. 1; Compl. ¶¶ 5–6, ECF No. 6. The next day, plaintiff filed the instant motion for injunctive

relief and accompanying brief. Pl.'s Mem. of Law in Supp. of Its Mot. for a Prelim. Inj. (Apr. 13, 2022), ECF Nos. 9 (conf.), 10 (public) ("Pl.'s Br."); Pl.'s Mot for a Prelim. Inj. (Apr. 13, 2022), ECF Nos. 9-3 (conf.), 10-1 (public) ("Pl.'s Mot.").[2]

The decision contested in this litigation, the "Final Determination," was published as *Granular Polytetrafluoroethylene Resin From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 3,765 (Int'l Trade Admin. Jan. 25, 2022) ("*Final Determination*"). Following an affirmative determination of material injury to a U.S. domestic industry by the U.S. International Trade Commission ("Commission" or "ITC"), the Final Determination culminated in the Department's issuing a countervailing duty order ("CVD Order") on PTFE from India. *See Granular Polytetrafluoroethylene (PTFE) Resin from India and Russia; Determinations*, 87 Fed. Reg. 14,038 (Int'l Trade Comm'n Mar. 11, 2022); *see also* **\*1349** *Granular Polytetrafluoroethylene Resin from India and the Russian Federation: Countervailing Duty Orders*, 87 Fed. Reg. 14,509 (Int'l Trade Admin. Mar. 15, 2022) ("*CVD Order*").

Plaintiff seeks an injunction that would prohibit, during the pendency of this litigation (including any remands and appeals), the collection of cash deposits on entries of PTFE resin produced by GFCL at the 31.89% subsidy rate Commerce calculated for GFCL in the Final Determination. *See Final Determination*, 87 Fed. Reg. at 3,766. The injunction it seeks would direct, instead, the collection of cash deposits at the 4.75% subsidy rate Commerce calculated in its preliminary determination. *See Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 86 Fed. Reg. 35,479, 35,480 (Int'l Trade Admin. July 6, 2021) ("*Preliminary Determination*"). Plaintiff also seeks a "statutory" injunction under section 516A(c)(2) of the Tariff Act of 1930, *as amended*, 🚩 19 U.S.C. § 1516a(c)(2) ("Tariff Act"), to prohibit liquidation of its entries that are subject to the CVD Order. Pl.'s Br. 2.

Defendant opposes plaintiff's motion as to the rate of cash deposit collection, arguing that under "well settled law" plaintiff fails to establish the necessary factors to obtain the "rare and extreme relief it seeks." Def.'s Partial Opp'n to Pl.'s Mot. for a Prelim. Inj. 2–3 (May 4, 2022), ECF

Nos. 13 (public), 14 (conf.) ("Def.'s Resp."). With respect to the requested injunction against liquidation, "Commerce consents to a limited statutory injunction with a finite end date at the end of the first review period" as opposed to "the open-ended scope of GFL's request—relief GFL does not meaningfully attempt to demonstrate is warranted." *Id.* at 3.

Defendant-intervenor Daikin America, Inc. has not taken a position on plaintiff's motion. *See* Order (May 11, 2022), ECF No. 23 (granting consent motion of Daikin America, Inc. (May 11, 2022), ECF No. 16, to intervene as of right pursuant to 28 U.S.C. § 2631(j)(1)(B)).

## II. DISCUSSION

### A. GFCL's Preliminary Injunction Motion Regarding Cash Deposits

If Commerce determines that "a countervailable subsidy is being provided with respect to the subject merchandise," 19 U.S.C. § 1671d(a)(1), it is required by the Tariff Act to "determine an estimated individual countervailable subsidy rate for each exporter and producer individually investigated," *id.* § 1671d(c)(1)(B)(i)(I). The Tariff Act directs, further, that:

> Within 7 days after being notified by the Commission of an affirmative determination under section 1671d(b) of this title, the administering authority [i.e., Commerce] shall publish a countervailing duty order which— ... requires the deposit of estimated countervailing duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

*Id.* § 1671e(a)(3). In implementing these statutory provisions, the CVD Order provided that "[o]n or after the date of publication of the ITC's final injury determinations in the **Federal Register**, [U.S. Customs and Border Protection] must require, at the same time as importers would normally

deposit estimated duties on this merchandise, a cash deposit equal to the rates noted below." *CVD Order*, 87 Fed. Reg. at 14,510. The CVD Order **\*1350** specified a deposit rate of 31.89% for GFCL. *Id.*

**[1]**  When an interested party contests a final countervailing duty determination that Commerce reached under 19 U.S.C. § 1671d, as plaintiff contests here, this Court "may enjoin the liquidation of some or all entries of merchandise covered by a determination of the Secretary, the administering authority, or the Commission, upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances." 19 U.S.C. § 1516a(c)(2). Plaintiff seeks such an injunction, but the other injunction sought in plaintiff's motion, which is a preliminary injunction directed to the collection of cash deposits, is of a type not specifically provided for in the Tariff Act, or customary in international trade law. To the contrary, the Tariff Act, in 19 U.S.C. § 1671e(a)(3), directs Commerce to order the "deposit of estimated countervailing duties" that it determines for an exporter or producer in a final affirmative countervailing duty determination made according to § 1671d(c)(1)(B)(i)(I). Any preliminary injunction is an "extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citations omitted), but that is particularly the case where, as here, ordering the requested relief would depart from the ordinary procedure Congress established. Under that ordinary procedure, it is Commerce, not this Court, that determines the rate of deposits of estimated countervailing duties pending judicial review following a CVD investigation.

**[2]**  **[3]**  Still, the Tariff Act does not prohibit a preliminary injunction directed to a cash deposit rate, which would depend upon the exercise of the court's general authority (with exceptions not here relevant) to order any "form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition." 28 U.S.C. § 2643(c)(1). The court does not imply that a circumstance necessitating a preliminary injunction directed to a cash deposit rate could never arise. But a plaintiff faces a particularly heavy burden in demonstrating a need for a remedy beyond those routinely available under the Tariff Act upon adjudication of the merits of its claims, i.e., a remand order and refund of cash deposits.

[4]    [5]    To obtain any preliminary injunction, GFCL must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities is in its favor, and that an injunction is in the public interest. 🚩 *Winter*, 555 U.S. at 20, 129 S.Ct. 365 (citations omitted). While plaintiff contends that no one factor is determinative, 🚩 *Winter* instructs that a showing of likelihood of irreparable harm in the absence of the relief sought is a necessary prerequisite to a preliminary injunction. 🚩 *Id.* at 22, 129 S.Ct. 365.

Plaintiff contends that absent a preliminary injunction to lower its cash deposit rate, it will suffer irreparable reputational and economic harm pending a decision on the merits. Pl.'s Br. 44. It alleges that "GFCL has contractual commitments to deliver granular PTFE resin to U.S. customers on the basis of annual contracts and other contracts that will [be] fulfilled at a loss to GFCL." *Id.* at 45. Plaintiff also alleges that "[d]ue to the significant duty increases caused by the final CVD rates, GFCL has been forced to reach out to all of its existing customers to mitigate and renegotiate its contracts with them." *Id.* at 46. GFCL asserts, further, that "this effort by GFCL will have long lasting negative consequences on its good will, reputation **\*1351** and brand in the United States" and that "[c]ustomers will remember that GFCL asked to renegotiate contract terms and push on price increases resulting in business uncertainty and loss of customers." *Id.* It adds that "[e]ventually, these customers will be pushed to work with GFCL's competitors, leaving GFCL with no avenue to reestablish these lost relationships" and that "[d]ue to the high rates established by the *Final Determination*, GFCL will also have to adjust its business plans and behaviors, resulting in lost business opportunities, and a reduction in available granular PTFE resin for the U.S. market." *Id.* (citation omitted). Plaintiff summarizes these points as follows:

> Because of the increased CVD cash deposits that will be due on GFCL's exports to U.S. customers and GFCL's inability to pass on these duty increases to U.S. customers with whom it has contractual obligations, the threat of lost revenues on U.S. sales through the next year is immediate and not speculative. Not only will U.S. customers look elsewhere for supply but they will also look for processing of PTFE resin outside the United States, resulting in business uncertainty and in decreased demand for granular PTFE resin in the U.S. market. If these trends take hold, they will be nearly irreversible.

*Id.* at 47. To support its assertions, plaintiff relies on an affidavit submitted by Kapil Malhotra, the Global Business Unit Head-Fluoropolymers of GFCL. *See* Pl.'s Br., Exh. 20. In relevant part, the affidavit includes a chart titled "Gujarat Fluorochemicals Limited Estimated Loss of Revenue and Cost Increases on Exports of Granular PTFE Resin, Due to Final CVD Duty Rate." *Id.* at 4. These estimations are described as based, in part, on the "customer's reactions thus far." *Id.* at 3

[6]    For the purpose of ruling on plaintiff's motion for an injunction on the cash deposit rate, the court presumes that the consequences plaintiff alleges—e.g., "lost business opportunities," inability to pass on costs and the attendant "threat of lost revenues on U.S. sales through the next year," "business uncertainty," and "decreased demand"—are true. Pl.'s Br. 46–47. But even upon doing so, the court must conclude that plaintiff has not made allegations of likely harm sufficient to entitle it to the preliminary injunction it seeks.[3] The types of harm plaintiff alleges are not unlike those that reasonably could be expected to occur in a typical countervailing duty investigation involving a similar cash deposit rate. Plaintiff has not put forth allegations sufficient to cause the court to conclude that the prospect of future refunds of excess cash deposits for importers of record, along with a lower deposit rate at that time, will be an inadequate remedy under the statutory scheme.

Plaintiff alleges, further, that it "will suffer significant financial harm as a consequence of the sudden increase in the CVD rate and having to post large CVD cash deposits." *Id.* at 46. This allegation is difficult to comprehend. In the standing section of its complaint, Compl. ¶ 7, GFCL describes itself as an exporter and producer of the subject merchandise, not as an importer of record that would be required to post cash deposits upon making entry. Nor does it state that it is speaking on behalf of an affiliated importer that would have "to post large CVD cash deposits." Pl.'s Br. 46. But even were plaintiff presumed to incur the expense of cash deposits until

such time as refunds may be **\*1352** available, its allegations would not support the extraordinary remedy being sought.

In summary, plaintiff has not alleged facts sufficient to show that the current cash deposit rate is likely to cause it serious, irreparable harm, nor has it shown that the ordinary remedies available under the Tariff Act upon judicial review are likely to be inadequate. GFCL having failed to meet an essential prerequisite for a preliminary injunction as established in *Winter*, 555 U.S. at 22, 129 S.Ct. 365, the court will deny plaintiff's motion as it pertains to a preliminary injunction to lower the current cash deposit rate.

### B. Injunction to Prevent the Liquidation of Entries Affected by this Litigation

GFCL seeks an injunction under 19 U.S.C. § 1516a(c)(2) to prohibit the government from "issuing instructions to liquidate or making or permitting liquidation of Plaintiff's unliquidated entries subject to the Order" that would "expire upon entry of a final and conclusive court decision in this litigation, including all appeals, as provided in 19 U.S.C. § 1516a(e)." Pl.'s Mot. 2; Pl.'s Mot., Draft Order 2. Defendant responds that this court should "deny GFL's request for an injunction against liquidation with an indeterminate scope and instead issue a limited injunction consistent with Form 24 that would end on February 28, 2023—the end of the first review period." Def.'s Resp. 1. Defendant "consents to a limited statutory injunction consistent with the terms of Form 24 but opposes the indeterminate aspect of GFL's requested relief as to entries that will be made after February 28, 2023 (the 'Disputed Entries')." *Id.* at 20. Defendant argues that "GFL has not shown entitlement to an injunction against liquidation with an indeterminate scope," adding that "GFL largely ignores that it seeks an injunction against liquidation, and it makes no effort to address the duration of its proposed relief." *Id.*

**[7]** **[8]** **[9]** The purpose of an injunction entered under § 1516a(c)(2) (often referred to as a "statutory" injunction) is to preserve the court's ability to provide relief should the movant prevail on the merits. *Ugine & Alz Belg. v. United States*, 452 F.3d 1289, 1297 (Fed. Cir. 2006). Injunctions under 19 U.S.C. § 1516a(c)(2) are not "extraordinary" and routinely are granted in cases seeking judicial review under

the Section 516A of the Tariff Act, 19 U.S.C. § 1516a. *See Husteel Co., Ltd. v. United States*, 38 CIT ——, ——, 34 F. Supp.3d 1355, 1359 (2014) ("Because of the unique nature of antidumping and countervailing duty challenges, the court routinely enjoins liquidation to prevent irreparable harm to a party challenging the antidumping or countervailing duty rate." (citing *Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014))). In the absence of an injunction in some form, the attachment of finality to the liquidation of the entries of merchandise covered by the contested determination, 19 U.S.C. § 1516a(c)(2), may place those entries beyond the reach of a court-ordered remedy imposed at the conclusion of the litigation and may deny the plaintiff the opportunity to obtain meaningful judicial review of the contested agency action. *See Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983). The prospect of this type of harm to plaintiff is present in this litigation.

**[10]** Parties to an action brought under Section 516A may agree upon the terms of a statutory injunction according to 19 U.S.C. § 1516a(c)(2) by submission of an executed USCIT Form 24. In this case, the parties have not done so. Moreover, plaintiff's draft order informs the court only that plaintiff seeks an injunction against "liquidation of Plaintiff's unliquidated entries **\*1353** subject to the [CVD] *Order*," Pl.'s Mot., Draft Order 2, and offers no additional details. It is not clear what is meant by "Plaintiff's unliquidated entries": it is not apparent that plaintiff could have its own entries, and the reference might mean either entries of merchandise produced by plaintiff, or of merchandise exported by plaintiff. There is no attempt to specify the technical parameters that are addressed in USCIT Form 24. *See, e.g.*, *Mosaic Co. v. United States*, 45 CIT ——, ——, 540 F. Supp.3d 1330, 1337–38 (2021); *see also* USCIT Rules, Appendix of Forms, Specific Instructions - Form 24. Beyond the stated, and inadequate, terms of its draft order, plaintiff leaves it to the court to develop an order of injunction that would satisfy the multiple requirements of a statutory injunction in an action contesting the final determination in a countervailing duty investigation. This the court declines to do.

Defendant has submitted a draft order of injunction that addresses details that plaintiff's draft order does not. *See* Def.'s Resp., Draft Order. Since the filing of this document, plaintiff has made no submissions, and the court, therefore, has not been informed as to whether plaintiff consents to

a statutory injunction entered according to 🚩 19 U.S.C. § 1516a(c)(2) on the terms defendant proposes.

### III. CONCLUSION AND ORDER

In conclusion, plaintiff has not alleged sufficient facts to establish that it is likely to suffer irreparable harm in the absence of preliminary relief regarding its payment of cash deposits at the CVD rate established in the Final Determination, and, accordingly, is not entitled to the preliminary injunction it seeks.

While the circumstances of this litigation warrant the issuance of a statutory injunction, in some form, under 🚩 19 U.S.C. § 1516a(c)(2), plaintiff has not placed before the court a draft order in a form that the court may issue.

Upon consideration of plaintiff's motion for a preliminary injunction, Mot. for Prelim. Inj. (Apr. 13, 2022), ECFs Nos. 9-3 (conf.), 10-1 (public), plaintiff's brief in support of its motion, Pl.'s Mem. of Law in Supp. of Its Mot. for a Prelim. Inj. (Apr. 13, 2022), ECF Nos. 9 (conf.), 10 (public), defendant's response, Def.'s Partial Opp'n to Pl.'s Mot. for a Prelim. Inj. (May 4, 2022), ECF Nos. 13 (public), 14 (conf.), and all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that plaintiff's motion for a preliminary injunction directed to the cash deposit rate be, and hereby is, denied; it is further

**ORDERED** that plaintiff's motion for an injunction under 🚩 19 U.S.C. § 1516a(c)(2) is denied without prejudice for plaintiff's failure to provide the court a draft order in a satisfactory form; it is further

**ORDERED** that plaintiff shall have 30 days from the date of this Opinion and Order in which to renew its motion for an injunction under 🚩 19 U.S.C. § 1516a(c)(2) and inform the court whether plaintiff consents to an injunction under 🚩 19 U.S.C. § 1516a(c)(2) in the form of defendant's draft order (May 4, 2022), ECF Nos. 13 (public), 14 (conf.), and if it does not so consent, to submit its own draft order and the reasons for its objections to defendant's draft order; and it is further

**ORDERED** that defendant-intervenor, should it so choose, may submit comments to the court on defendant's draft order within 30 days of the date of this Opinion and Order.

### All Citations

578 F.Supp.3d 1346

---

### Footnotes

1    All citations to the United States Code herein are to the 2018 edition.

2    All citations in this Opinion and Order are to public documents.

3    Because the court presumes plaintiff's allegations to be true for purposes of ruling on its motion for a preliminary injunction, the court has not conducted an evidentiary hearing on the issue of the likelihood of irreparable harm.

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Addendum 5

**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

February 23, 2023

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:     Redetermination Pursuant to Court Remand Order in *Gujarat Fluorochemicals Limited v. United States*, Court No. 22-00120

Dear Mr. Toscano:

Pursuant to the Court's order of January 24, 2023, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action. The remand redetermination is a public document.

In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover. Should you have any questions concerning the matter, please contact me at (202) 482-1767.

Respectfully submitted,

/s Paul K. Keith
Paul K. Keith
Assistant Chief Counsel
Office of the Chief Counsel
    for Trade Enforcement & Compliance

Attachment

Mr. Mario Toscano
February 23, 2023
Page 2

cc:

**John Marshall Gurley**
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Email: john.gurley@afslaw.com

**Daniel Francis Roland**
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email: daniel.f.roland@usdoj.gov

**Luke Anthony Meisner**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
Email: lmeisner@schagrinassociates.com

C-533-900
Remand
Slip Op. 23-9
POI:  04/01/2019 – 03/31/2020
**Public Document**
E&C/OVIII:  JCM

***Gujarat Fluorochemicals Limited v. United States***
**Court No. 22-00120, Slip Op. 23-9 (CIT January 24, 2023)**
**Granular Polytetrafluoroethylene Resin from India**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.  SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT),

issued on January 24, 2023, in *Gujarat Fluorochemicals Limited v. United States*, Court No. 22-

00120, Slip Op. 23-9 (CIT January 24, 2023) (*Remand Order*).  These final results concern the

final determination of the countervailing duty investigation on granular polytetrafluoroethylene

resin from India.[1]  The period of investigation (POI) is April 1, 2019, through March 31, 2020.

On remand, the CIT ordered that:  (1) Commerce shall delete from the overall rate the

26.50 percent estimated subsidy rate for the provision of land by the State Industrial

Development Corporation (SIDC); and (2) Commerce shall reconsider its inclusion of an

estimated 0.12 percent subsidy rate for the provision of land by the Gujarat Industrial

Development Corporation (GIDC).[2]

---

[1] *See Granular Polytetrafluoroethylene Resin from India:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 FR 3765 (January 25, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order* at 30.

On February 10, 2023, Commerce released its Draft Results of Redetermination on the two issues identified above.[3]  In the Draft Results of Redetermination, we stated that interested parties may submit comments only on Commerce's findings regarding the GIDC's provision of land issue.[4]  Because the CIT ordered Commerce to delete the subsidy rate for the SIDC's provision of land and given the short amount of time provided to complete the remand redetermination, we stated that we would not consider comments regarding the SIDC's provision of land or Commerce's primarily dedicated analysis.[5]  On February 14, 2023, Daikin America, Inc. (the petitioner) and Gujarat Fluorochemicals Limited (GFL) submitted timely comments on the Draft Results of Redetermination.[6]

In accordance with the *Remand Order*, Commerce has deleted the 26.50 percent estimated subsidy rate for the SIDC's provision of land from GFL's overall subsidy rate, under respectful protest.  Additionally, Commerce has reconsidered the inclusion of the estimated 0.12 percent subsidy rate for the GIDC's provision of land.  Specifically, Commerce finds that the GIDC's provision of land constitutes a financial contribution from an authority and is specific.  Moreover, Commerce has further explained its "findings associated with a benchmark analysis," consistent with the *Remand Order*.  Accordingly, Commerce has made no changes to the 0.12 percent estimated subsidy rate for the GIDC's provision of land.  Finally, Commerce has revised the all-others rate, which was based on GFL's rate.  In the "Interested Party Comments" section

---

[3] *See* Draft Results of Redetermination Pursuant to Court Remand, *Gujarat Fluorochemicals Limited v. United States*, Court No. 22-00120, Slip Op. 23-9 (CIT January 24, 2023), dated February 10, 2023 (Draft Results of Redetermination).
[4] *Id.* at 9.
[5] *Id.* at 9-10.
[6] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated February 14, 2023 (Petitioner's Draft Remand Comments); *see also* GFL's Letter, "Gujarat Fluorochemicals Ltd.'s Comments on the Draft Remand Redetermination in Court No. 22-00120 (Slip Op. 23-9)," dated February 14, 2023 (GFL's Draft Remand Comments).

below, we have addressed the petitioner's and GFL's comments on the Draft Results of Redetermination.

## II.   BACKGROUND

### A. SIDC's Provision of Land to Inox Wind Limited

In the *Final Determination*, Commerce found that wind energy supplied to respondent GFL by its cross-owned affiliate, Inox Wind Limited (IWL), was primarily dedicated to GFL's downstream production because:  the entire amount of power generated by IWL is sold to GFL, IWL contracts directly with GFL to provide wind power, and IWL's wind energy generation during the POI was provided expressly for the purpose of providing electricity to GFL and had no purpose outside of GFL's overall production chain.[7]  Accordingly, Commerce attributed the subsidy received by IWL, the SIDC's provision of land for less than adequate remuneration (LTAR), to the combined sales of the input and downstream products produced by both IWL and GFL, excluding intercompany sales, pursuant to 19 CFR 351.525(b)(6)(iv).

In its opinion, the CIT disagreed with Commerce's analysis, stating that "{e}lectricity used to power an entire production plant cannot fairly be characterized as 'merely a link in the overall production chain' of the finished products that are made there."[8]  The CIT further stated, "{i}t is energy, and, being of universal application, is not remotely describable as an upstream product that is 'primarily dedicated to the production of the downstream product' as is required by {19 CFR} 351.525(b)(6)(iv)."[9]  The CIT explained that Commerce's reasoning "overlook{ed} the type of physical relationship the regulation requires between the input and the particular downstream product in the production chain{.}"[10]  Having found Commerce's

---

[7] *See Final Determination* IDM at 11-12.
[8] *See Remand Order* at 18.
[9] *Id.*
[10] *Id.*

inclusion of the 26.50 percent estimated subsidy rate for the provision of land by the SIDC
contrary to law, the CIT ordered that Commerce "shall delete from the overall rate the 26.50%
estimated subsidy rate for the provision of land by the SIDC{.}"[11]

### B. GIDC's Provision of Land for LTAR

In the *Preliminary Determination*, Commerce determined that the GIDC's provision of
land did not confer a measurable benefit during the POI.  Therefore, Commerce did not reach a
preliminary determination of financial contribution or specificity for the program.[12]

In the *Final Determination*, Commerce explained that it had not used the land benchmark
in its preliminary calculations that it had intended to use.  Specifically, Commerce stated in the
*Preliminary Determination* that, among the possible sources to use to calculate a land benchmark
for land provided by the GIDC, "the private land transaction in Ahmadabad, Gujarat, represents
the best comparable land value on the record to use as a benchmark."[13]  The unit cost for the
private land transaction in Ahmadabad was 31,700 Indian rupees (INR) per square meter, but
Commerce used 115.77 INR per square meter in its preliminary calculations.  Therefore, in the
*Final Determination*, Commerce explained, "{t}o correct these errors, we are using the
Ahmedabad, Gujarat, land benchmark with a unit cost of 31,700 INR per square meter for the
Gujarati benchmark{.}"[14]  The change in the land benchmark resulted in a benefit for the
GIDC's provision of land, but Commerce did not revise its *Preliminary Determination* with
respect to the this program and make the requisite financial contribution or specificity findings in
the *Final Determination*.

---

[11] *Id.* at 30.
[12] *See Granular Polytetrafluoroethylene Resin from India:  Preliminary Affirmative Countervailing Duty
Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final
Determination With Final Antidumping Duty Determination*, 86 FR 35479 (July 6, 2021) (*Preliminary
Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 26.
[13] *Id.* at 10-11.
[14] *See Final Determination* IDM at 21.

**Appx00014**

Because the record lacked the financial contribution and specificity findings required for a countervailable subsidy, Commerce requested a voluntary remand from the CIT so that Commerce could address financial contribution and specificity. Although the CIT remanded the issue, it disagreed with Commerce's formulation of the issue, *i.e.*, "that the court should order a 'remand of the final determination so that Commerce may consider further its analysis with respect to the GIDC's provision of land for LTAR.'"[15] The CIT explained that Commerce's formulation "might be interpreted to presume that the land leases by GIDC were for less than adequate remuneration, a determination plaintiff is contesting."[16] The CIT further noted "that the discussion of this issue in the {*Final Determination* IDM} is inadequate to explain an LTAR and subsidy determination and fails to state critical findings on which it could have been based, including findings associated with a benchmark analysis." For these reasons, the CIT stated that it would "order Commerce to reconsider in the entirety the decision to include the 0.12% estimated subsidy rate on the GIDC issue."[17]

## III.   ANALYSIS

### A.  SIDC's Provision of Land to Inox Wind Limited

We respectfully disagree with the *Remand Order* concerning our analysis of whether the energy supplied by IWL was primarily dedicated to GFL's production of the downstream product. Additionally, we disagree with the CIT's decision to direct Commerce to reach a particular outcome on this issue, *i.e.*, to delete the 26.50 percent estimated subsidy rate from the overall rate. Notably, the U.S. Court of Appeals for the Federal Circuit "generally disfavor{s} limited remands that restrict Commerce's ability to collect and fully analyze data on a contested

---

[15] *See Remand Order* at 28.
[16] *Id.* at 28-29.
[17] *Id*. at 29.

issue."[18]  Nevertheless, the CIT has specifically ordered that Commerce delete the 26.50 percent estimated subsidy rate for the provision of land by the SIDC from the overall subsidy rate. Therefore, in compliance with the CIT's order, and under respectful protest,[19] we are removing the 26.50 percent estimated subsidy rate from GFL's overall rate.

## B.  GIDC's Provision of Land for LTAR

Consistent with the *Remand Order*, Commerce is reconsidering in the entirety the inclusion of the 0.12 percent estimated subsidy rate for the GIDC's provision of land.  As explained above, Commerce did not make financial contribution or specificity findings in the investigation.  Therefore, Commerce is examining whether the GIDC's provision of land constitutes a financial contribution from an authority and is specific.

The GIDC is the agency of the State Government of Gujarat (SGOG) responsible for providing businesses with land and other basic infrastructure.[20]  The GIDC establishes industry-ready land with basic infrastructure, such as roads, water, and power availability, which is then leased to manufacturers.[21]  The GIDC is a statutory body that functions in accordance with SGOG statutes and regulations.[22]  To apply for an allotted plot in a GIDC estate, a company must provide information about the project, area of land required, and employment.[23] According

---

[18] *See Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1375 (Fed. Cir. 2012); *see also American Silicon Technologies v. United States*, 334 F.3d 1033, 1039 (Fed. Circ. 2003) ("By sharply limiting Commerce's inquiry, the trial court's remand actually prevented Commerce from undertaking a fully balanced examination that might have produced more accurate results.").

[19] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

[20] *See* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India:  Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated June 24, 2021 (GOI SQR2), at 14.

[21] *Id.*

[22] *Id.* at 16.

[23] *Id.* at 21-22; *see also* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India:  Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated May 21, 2021 (GOI SQR1), at Exhibit-12.

to the Government of India (GOI), the GIDC then provides long-term leases to industrial users at fair value, under the Gujarat Industrial Development Act 1962.[24]

Both the GOI and GFL reported that the company's Dahej plants are located in the GIDC area and that GFL has a long-term lease from the GIDC.[25] The GOI explained that the GIDC acquires the land or gets the land transferred from the government for the industrial development in the state, then develops basic infrastructure facilities like roads, power, water, "social and commercial infrastructure," and "environment management infrastructure."[26]

Accordingly, Commerce finds that the GIDC is an "authority" under section 771(5)(B) of the Tariff Act of 1930, as amended (the Act) and that the GIDC's long-term lease of land to GFL constitutes a financial contribution under section 771(5)(D)(iii) of the Act.

Regarding specificity, the SGOG establishes industry-ready land within designated GIDC areas, which is leased out to eligible manufacturers.[27] Therefore, Commerce finds that the program is only available in areas designated as industrial estates inside the SGOG's jurisdiction and, thus, is regionally specific under section 771(5A)(D)(iv) of the Act.

Next, because Commerce is reconsidering in the entirety the decision to include the 0.12 percent rate under this program, pursuant to the *Remand Order*, we are also examining our benefit calculation finding. To calculate the benefit, Commerce considered all the record information in selecting an appropriate benchmark for the GIDC's provision of land for LTAR. Specifically, we compared the private land transaction benchmark with the prices at which GFL

---

[24] *See* GOI SQR2 at 16.
[25] *See* GFL's Letter, "Granular Polytetrafluoroethylene Resin from India; Gujarat Fluorochemicals Limited's Section III Questionnaire Response," dated May 6, 2021 (GFL IQR), at 78-81 and Exhibits 16(a) and 16(b); *see also* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India: Initial Questionnaire Response to Section-II on behalf of Government of India," dated April 16, 2021, at 141; and GOI SQR1 at Exhibit-12.
[26] *See* GOI SQR2 at 15-16.
[27] *Id.* at 15-16 (describing various GIDC estates, including sector-specific estates for electronics, apparel, chemicals, engineering, brass parts, *etc.*).

leased land from the GIDC. As stated in the *Preliminary Determination*, we selected benchmarks for determining the benefit from the provision of land for LTAR in accordance with 19 CFR 351.511.[28] Section 351.511(a)(2) of Commerce's regulations sets forth the basis for identifying comparative benchmarks for determining whether a government good or service is provided for LTAR. These potential benchmarks are listed in hierarchical order by preference: (1) market prices from actual transactions within the country under investigation (*e.g.*, actual transactions between private parties, actual imports, or actual sales from competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).

Regarding land purchases from the GIDC, both the petitioner and GFL submitted tier one benchmark information. In its questionnaire response, GFL reported two agricultural land purchases from private parties in Ranjitnagar and Mahidad, as well as land purchased from the GIDC by another entity.[29] Because the land purchased from the GIDC was not a private transaction, we did not include this transaction in the benchmark. While the Ranjitnagar and Mahidad land transactions did involve private sellers, upon examination of the deeds and purchase documents, we found that these land parcels were not comparable to the industry-ready land that the GIDC provides.[30] Therefore, we also excluded these transactions from the benchmark. In its benchmark submission, the petitioner provided information on a private auction of industry-ready land in Ahmedabad, Gujarat.[31]

---

[28] *See Preliminary Determination* PDM at 10-11.
[29] *See* GFL IQR at 79 and Exhibits 16(f) and 16(g).
[30] *Id*. at Exhibit 16(g); *see also* GFL SQR2 at Exhibits S2-5(b) and (e).
[31] *See* Petitioner's Letter, "Benchmark Data Submission," dated June 1, 2021 (Petitioner's June Benchmarks), at Exhibit 6.

Both GFL and the petitioner provided market value rates for land determined by the

Stamp Duty Valuation Organization (SDVO) and the Superintendent of Stamps and Valuation

Department (SSVD) in Gujarat, both of which are government organizations.[32]  GFL further

noted that the "valuation of land to determine collection of revenue is carried out by state

governments."[33]  However, these land value rates were not generated by an independent third

party and are not transaction-specific.  Furthermore, the land rates determined by the SDVO and

the SSVD were not actual transactions but, rather, a price valuation of the land based on zoning,

building structures, purpose for the land, and any amenities.  As a result, we found that we could

not rely on these rates to determine whether land was provided for LTAR.  This determination is

consistent with our practice.[34]

As noted above, it is Commerce's preference to use a transaction-specific, or tier one,

benchmark derived from the country under investigation.  Therefore, based upon the record

evidence, we determined that the private land transaction in Ahmedabad, Gujarat, represented

the best comparable land value on the record to use as a benchmark.  This transaction contains a

rate for industry-ready land obtained within India (*i.e.*, in the state of Gujarat) and is, therefore,

comparable, geographically proximate, and privately purchased.

We conducted the "0.5 percent test," as instructed by 19 CFR 351.524(b)(2), for the year

of the relevant GFL lease by dividing the total unallocated benefit for the tract of land for the

corresponding year by the appropriate sales denominator.  We found that the benefits were

greater than 0.5 percent of the relevant sales for that particular year; therefore, we allocated these

---

[32] *Id.*; *see also* GFL's Letter, "Gujarat Fluorochemicals Limited's Benchmark Submission," dated June 15, 2021 (GFL's Benchmark Submission), at Exhibits 1 and 2.
[33] *See* GFL's Benchmark Submission at 2.
[34] *See Polytetrafluoroethylene Resin from India:  Preliminary Affirmative Countervailing Duty Determination*, 83 FR 9842 (March 8, 2018), and accompanying PDM at 20-21, unchanged in *Polytetrafluoroethylene Resin from India:  Final Affirmative Countervailing Duty Determination*, 83 FR 23422 (May 21, 2018).

benefits over the average useful life to determine the amount attributable to the POI.

Accordingly, we calculated an estimated subsidy rate of 0.12 percent for the GIDC's provision of

land for LTAR.[35]

## IV.    INTERESTED PARTY COMMENTS

### A.  SIDC's Provision of Land to Inox Wind Limited

*GFL's Comments*

- Removal of the 26.5 percent subsidy rate from GFL's total subsidy rate in the Draft Results of Redetermination was correct, and Commerce should make no changes in the final results of redetermination.[36]

No other interested party commented on this issue.

**Commerce's Position:**

As noted above in the "Summary" section, we stated in the Draft Results of

Redetermination that we would not consider comments regarding the SIDC's provision of land

or Commerce's primarily dedicated analysis.[37]  Accordingly, we are not addressing GFL's

comments on this issue for these final results of redetermination.

### B.  GIDC's Provision of Land for LTAR

*Petitioner's Comments*

- As Commerce explained in the Draft Results of Redetermination, the provision of land by the GIDC confers a financial contribution because the GIDC is an agency of the SGOG. Thus, the GIDC is an authority pursuant to section 771(5)(B) of the Act.  Further, the provision of land is the provision of a good pursuant to section 771(5)(D)(iii) of the Act.[38]
- As Commerce also explained in the Draft Results of Redetermination, the provision of land by the GIDC is *de facto* specific in accordance with section 771(5A)(D)(iv) of the

---

[35] *See* Memorandum, "Final Determination Calculations for Gujarat Fluorochemicals Limited," dated January 18, 2022.
[36] *See* GFL's Draft Remand Comments at 5.
[37] *See* Draft Results of Redetermination at 9-10.
[38] *See* Petitioner's Draft Remand Comments at 2.

Act because it is limited to industries in designated geographical regions within the SGOG's jurisdiction.[39]

- Commerce correctly relied on a private auction of industry-ready land in Ahmedabad, Gujarat as the benchmark for calculating GFL's benefit. Unlike the other benchmarks submitted on the record, the Ahmedabad benchmark is for a transaction between private parties, is in the same state as the land from the GIDC, and involves industry-ready land comparable to the land provided by the GIDC.[40]
- Commerce clearly stated that it was relying on the Ahmedabad benchmark in the *Preliminary Determination*, and GFL did not challenge Commerce's selection of this benchmark in its case brief.[41]

*GFL's Comments*

- Commerce's rejection of GFL's private land transactions in favor of the Ahmedabad benchmark is illogical. The record clearly demonstrates that the land parcels identified in GFL's deeds and purchase documents were explicitly purchased for GFL's industrial use.[42]
- GFL's Ranjitnagar and Mahidad land transactions involved private sellers and were actual transactions, consistent with the requirements for benchmarks in Commerce's regulations.[43]
- The Ahmedabad benchmark is not usable under Commerce's regulations. No record evidence demonstrates that the land bid was between private parties, was ever finalized, or was an actual transaction reflecting market principles.[44]
- Commerce did not address GFL's detailed arguments against the use of the Ahmedabad benchmark, including the notion that GFL would or could legally build a petrochemical factory in the middle of a walled city in Ahmedabad.[45]

**Commerce's Position:**

As an initial matter, the petitioner supports Commerce's findings from the Draft Results of Redetermination that the GIDC's provision of land constitutes a financial contribution from an authority and is specific. GFL did not comment on these findings. Therefore, for the reasons explained in the "Analysis" section, above, we continue to find that the GIDC's provision of land constitutes a financial contribution from an authority and is specific.

---

[39] *Id.*
[40] *Id.*
[41] *Id.* at 2-3.
[42] *See* GFL's Draft Remand Comments at 6.
[43] *Id.*
[44] *Id.* at 6-7.
[45] *Id.* at 7.

Regarding the selection of the Ahmedabad benchmark, Commerce agrees with the petitioner and continues to find that the Ahmedabad benchmark is the best available benchmark source on the record for the industry-ready land that the GIDC provides.

GFL argues that Commerce should, instead, rely on its preferred benchmarks, GFL's own purchases of land in Ranjitnagar and Mahidad. As explained above, however, the Ranjitnagar and Mahidad land is not comparable to the industry-ready land provided by the GIDC. Specifically, the Ranjitnagar and Mahidad land is agricultural land. Although GFL argues that it purchased the Ranjitnagar and Mahidad land to use as industrial land, this does not mean that the land had industry-ready infrastructure when GFL purchased it such that the purchase price would reflect industry-ready land. Instead, the record shows that the land was used for farming before GFL purchased it.[46] The GIDC, by contrast, provides land with basic infrastructure facilities like roads, power, water, "social and commercial infrastructure," and "environment management infrastructure."[47] GFL does not argue that the Ranjitnagar and Mahidad land had comparable infrastructure when it was purchased – only that it was purchased for *future* industrial use. Thus, because the record demonstrates that the land did not have industry-ready infrastructure at the time of the transactions, only that it may have such infrastructure in the future, Commerce continues to find that the Ranjitnagar and Mahidad land is not comparable to the GIDC land.

GFL next argues that the Ahmedabad benchmark is not usable under Commerce's regulations. Specifically, GFL argues that there is "some record evidence that this auction *did not* result in an actual transaction." GFL's only support for its argument, however, is that the article detailing the auction states that the Gujarat High Court "decided to retain the Earnest Money Deposit (EMD) of Bahubali, in case the top bidder backs out," and that the highest bidder

---

[46] *See* GFL IQR at Exhibits 16(f) and 16(g).
[47] *See* GOI SQR2 at 15-16.

was asked to "pay the amount within three months."  As GFL acknowledges, however, the article states that the purchase bid was "finalized."[48]  Moreover, the articled describes a "winning bidder," "34 rounds of bidding," and at least eight bidders (the winning bidder, the second highest bidder, and "six other bidders, whose EMD amounts were returned").[49]  Therefore, the record demonstrates that this was a competitively run auction that resulted in an actual transaction.  GFL also states that there is no evidence in the article that the auction was between private parties.  However, the article identifies Siddhi Corporation as the winning bidder with no indication that Siddhi Corporation, or any of the other auction participants, is not a private party.[50]

GFL asserts that because the Ahmedabad land is within a walled city in Ahmedabad, GFL could not build a petrochemical factory there.  The map cited by GFL, however, neither explains whether it reflects zoning restrictions nor specifies whether the land-use type for the walled city is residential, commercial, or industrial.[51]  Moreover, the maps reflect only an inventory of *public* lands and, therefore, the maps do not purport to cover land use for non-public lands in Ahmedabad.[52]  In short, neither the article detailing the auction nor the inventory of public lands contain evidence that industry within the walled city would be prohibited or impracticable.  Commerce's analysis is limited to record information.  Although it is possible that the walled city in Ahmedabad is not a suitable location for a petrochemical factory, the record does not contain sufficient evidence about the walled city to draw that conclusion.  Instead, record evidence demonstrates that the former use of the Ahmedabad land was as a textile

---

[48] *See* GFL's Draft Remand Comments at 7.
[49] *See* Petitioner's June Benchmarks.
[50] *Id*.
[51] *Id.*
[52] *Id.*

mill, *i.e.*, industrial. GFL argues that Commerce did not address whether an area in the middle of the walled city of Ahmedabad could be assumed to have industrial infrastructure, given that the former textile mill closed in 1989. Again, Commerce's analysis is limited to record information. The record indicates that the Ahmedabad land was formerly a textile mill, which would have necessarily had at least basic industrial infrastructure.[53] The record does not indicate that any infrastructure had been removed or was otherwise derelict. Moreover, as explained above, the infrastructure provided on GIDC land includes roads, power, water, and other basic industrial infrastructure. GFL cannot have it both ways – arguing that the land is inappropriate for industry because it is in the middle of a city, and also that the land lacks basic infrastructure like roads, power, and water.

In sum, we are limited to an analysis of the record, which indicates that the Ahmedabad land was once a textile mill. As such, the land was at least at one time a suitable site for industrial use and would have had the necessary infrastructure for such use. There is no record information to suggest that the land is no longer suitable for industrial use or that it lacks basic industrial infrastructure. Therefore, we continue to find, based on record evidence, that the Ahmedabad land is the most comparable to the industry-ready land provided by the GIDC and, as such, is the best available benchmark on the record for calculating GFL's benefit under the GIDC provision of land for LTAR program.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the CIT's *Remand Order*, Commerce has deleted the 26.50 percent estimated subsidy rate for the SIDC's provision of land from GFL's overall subsidy rate, under respectful protest. Additionally, Commerce has reconsidered the inclusion of the estimated 0.12 percent

---

[53] *Id.*

subsidy rate for the GIDC's provision of land. Specifically, Commerce finds that the GIDC's provision of land constitutes a financial contribution from an authority and is specific. Moreover, Commerce has further explained its "findings associated with a benchmark analysis," consistent with the *Remand Order*. Accordingly, Commerce has made no changes to the 0.12 percent estimated subsidy rate for the GIDC's provision of land. Finally, Commerce has revised the all-others rate, which was based on GFL's rate.

As a result of this final redetermination pursuant to remand, GFL's updated *ad valorem* subsidy rate is 5.39 percent. Additionally, because the all-others rate was based on GFL's rate, Commerce is also updating the all-others rate to 5.39 percent.

2/23/2023

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

# Addendum 6

Barcode:4203113-02 C-533-900 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-533-900
Investigation
**Public Document**
E&C/VIII: JCM/JS

January 18, 2022

**MEMORANDUM TO:**    Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

**FROM:**    James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:**    Issues and Decision Memorandum for the Final Affirmative
Determination of the Countervailing Duty Investigation of
Granular Polytetrafluoroethylene Resin from India

## I.    SUMMARY

The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of granular polytetrafluoroethylene (PTFE) resin from India, as provided in section 705 of the Tariff Act of 1930, as amended (the Act). Below is the complete list of issues in this investigation for which we received comments from interested parties.

Comment 1:    Whether Production of Wind Energy Supplied by Inox Wind Limited (IWL) Is Primarily Dedicated

Comment 2:    Whether the Mumbai Benchmark Is Comparable in Calculating State Industrial Development Corporation's (SIDC's) Provision of Land for Less Than Adequate Remuneration (LTAR) Benefits

Comment 3:    Whether the Mumbai Benchmark Is Aberrational in Calculating SIDC's Provision of Land for LTAR Benefits

Comment 4:    Whether Commerce Should Correct Its Land Benefit Calculations

Comment 5:    Whether Commerce Should Apply Adverse Facts Available (AFA) to the Programs Under the State Government of Madhya Pradesh (SGOMP) Industrial Promotion Act and the Merchandise Export from India Scheme (MEIS) Program

Comment 6:    Whether the Advanced Authorization Program (AAP) and Duty Drawback (DDB) Programs Are Countervailable

Comment 7:    Whether Renewable Energy Certificates (RECs) Provide a Financial Contribution

Comment 8:    Whether Commerce Should Correct Its Electricity Duty Exemption Calculations



INTERNATIONAL
T R A D E
ADMINISTRATION

Barcode:4203113-02 C-533-900 INV - Investigation -

## II.　　BACKGROUND

### A.　　Case History

On July 6, 2021, Commerce published its *Preliminary Determination*.[1]　The selected mandatory respondent in this investigation is Gujarat Fluorochemicals Limited (GFCL).　On October 1, 2021, Commerce released its Post-Preliminary Analysis.[2]

During the course of this investigation, travel restrictions were imposed that prevented Commerce personnel from conducting on-site verification.　On October 21, 2021, Commerce issued to GFCL a questionnaire in lieu of performing an on-site verification to collect additional or supporting documentation related to information the company had submitted to the record.[3] On October 29, 2021, GFCL submitted a complete response to our in-lieu of on-site verification (ILOV) questionnaire.[4]　We used the ILOV questionnaire response to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Act.

On November 2, 2021, we invited parties to comment on the *Preliminary Determination*, Post-Preliminary Analysis, and the ILOV questionnaire response.[5]　On November 18, 2021, interested parties timely submitted case briefs concerning case-specific issues.[6]　On December 1, 2021, GFCL and the petitioner submitted rebuttal briefs.[7]　On December 16, 2021, Commerce held a public hearing.[8]

### B.　　Period of Investigation

The period of investigation (POI) is April 1, 2019, through March 31, 2020, reflecting the most recently completed Indian fiscal year.[9]

---

[1] *See Granular Polytetrafluoroethylene Resin from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 86 FR 35479 (July 6, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Memorandum, "Post-Preliminary Analysis of Countervailing Duty Investigation," dated October 1, 2021 (Post-Preliminary Analysis).

[3] *See* Letter to GFCL, dated October 21, 2021.

[4] *See* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Response to Questionnaire In-Lieu of On-Site Verification," dated October 29, 2021.

[5] *See* Commerce's Letter, dated November 2, 2021.

[6] *See* GOI's Letter, "Case brief on behalf of Government of India," dated November 18, 2021 (GOI's Case Brief); *see also* Petitioner's Letter, "Petitioner's Case Brief," dated November 18, 2021 (Petitioner's Case Brief); and GFCL's Letter, "Gujarat Fluorochemicals Limited's Case Brief," dated November 18, 2021 (GFCL's Case Brief).

[7] *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's Rebuttal Brief," dated December 1, 2021 (GFCL's Rebuttal Brief); *see also* Petitioner's Letter, "Petitioner's Rebuttal Brief," dated December 1, 2021 (Petitioner's Rebuttal Brief).

[8] *See* Commerce's Letter, "Scheduling of Public Hearing," dated December 7, 2021.

[9] *See* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Request to Change the Period of Investigation," dated March 11, 2021; *see also* Memorandum, "Period of Investigation Change," dated March 15, 2021.

2

Barcode:4203113-02 C-533-900 INV - Investigation  -

### III.    USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

Section 776(a) of the Act provides that, subject to section 782(d) of the Act, Commerce shall rely on "facts otherwise available" if:  (1) necessary information is not on the record; or (2) an interested party or any other person (A) withholds information that has been requested, (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act, (C) significantly impedes a proceeding, or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency.  If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in selecting from the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In doing so, Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[10]  Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the countervailing duty investigation, a previous administrative review, or other information placed on the record.[11]

Section 776(c) of the Act provides that, in general, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.[12]  Secondary information is defined as information derived from the petition that gave rise to the investigation, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[13]

Finally, under section 776(d) of the Act, when using an adverse inference when selecting from the facts otherwise available, Commerce may use a countervailable subsidy rate applied for the same or similar program in a countervailing duty (CVD) proceeding involving the same country, or if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that Commerce considers reasonable to use.[14]  The statute also makes clear that, when selecting from the facts otherwise available with an adverse inference, Commerce is not required to estimate what the countervailable subsidy rate would have been if the interested

---

[10] *See* section 776(b)(1)(B) of the Act.
[11] *See* 19 CFR 351.308(c).
[12] *See* 19 CFR 351.308(d).
[13] *See* Statement of Administrative Action, H.R. Doc. No. 316, 103rd Congress, 2d Session (1994) (SAA) at 870.
[14] *See* section 776(d)(1) of the Act.

Barcode:4203113-02 C-533-900 INV - Investigation  -

party failing to cooperate had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[15]

Commerce relied on facts available and AFA for several findings in the *Preliminary Determination* and the Post-Preliminary Analysis. For a description of these decisions, *see* the *Preliminary Determination* and the Post-Preliminary Analysis.[16] For the final determination, Commerce has made no changes from its preliminary decisions regarding the use of facts otherwise available and AFA. For further discussion of the AFA determination regarding the Merchandise Export from India Scheme (MEIS) program and programs related to the State Government of Madhya Pradesh Industrial Promotion Act, *see* Comment 5 in section VII below.

## IV.    FINAL DETERMINATION OF CRITICAL CIRCUMSTANCES

Section 705(a)(2) of the Act provides that Commerce will determine that critical circumstances exist if: (1) the alleged countervailable subsidy is inconsistent with the World Trade Organization (WTO) Agreement on Subsidies and Countervailing Measures (SCM Agreement),[17] and (2) there have been massive imports of the subject merchandise over a relatively short period. A final determination with respect to critical circumstances may be affirmative even if critical circumstances were found not to exist in the preliminary determination.[18] In determining whether there are "massive imports" over a "relatively short period," pursuant to section 705(a)(2)(B) of the Act and 19 CFR 351.206(h) and (i), Commerce normally compares the import volumes of the subject merchandise for at least three months immediately preceding the filing of the petition (*i.e.*, the base period) to a comparable period of at least three months following the filing of the petition (*i.e.*, the comparison period). However, the regulations also provide that if Commerce finds that importers, or exporters or producers, had reason to believe, at some time prior to the beginning of the proceeding, that a proceeding was likely, Commerce may consider a period of not less than three months from the earlier time.[19] Imports must increase by at least 15 percent during the comparison period to be considered massive.[20]

As explained in the *Preliminary Determination*, we determined that GFCL received countervailable subsidies under certain programs that are contingent upon export performance.[21] Therefore, for this final determination, we continue to find that there is a reasonable basis to believe or suspect that there are programs in this CVD investigation that are inconsistent with the

---

[15] *See* section 776(d)(3) of the Act.
[16] *See Preliminary Determination* PDM at 11-15; *see also* Post-Preliminary Analysis at 4-11.
[17] Commerce limits its critical circumstances findings to those subsidies contingent upon export performance or use of domestic over imported goods (*i.e.*, those prohibited under Article 3 of the SCM Agreement). *See, e.g.*, *Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Carbon and Certain Alloy Steel Wire from Germany*, 67 FR 55808, 55809-10 (August 30, 2002).
[18] *See* section 705(a)(2) of the Act.
[19] *See* 19 CFR 351.206(i).
[20] *See* 19 CFR 351.206(h)(2).
[21] *See Preliminary Determination* PDM at 16 and 20.

Barcode:4203113-02 C-533-900 INV - Investigation -

SCM Agreement.  Use of an export subsidy program is sufficient to meet the inconsistent-with-the-SCM-Agreement criterion under section 703(e)(1)(A) of the Act.[22]

On August 5, 2021, GFCL submitted additional import information, allowing us to expand the base and comparison periods in our analysis.[23]  For this final determination, Commerce analyzed the now five-month base period of September 2020 to January 2021, compared to February 2021 through June 2021.[24]  Based on this extended base and comparison period import information, we continue to find that GFCL's shipments increased by more than 15 percent over a "relatively short period."[25]  Therefore, we determine that the requirements of section 703(e)(1)(B) of the Act have been satisfied, and that critical circumstances exist as to GFCL.

Moreover, for "all other" producers and exporters of granular PTFE resin from India, we obtained additional Global Trade Atlas import information, which likewise expanded the time periods available for analysis, and similarly compared this information for the base and comparison periods, excluding shipments for these time periods as reported by GFCL.  Based on this analysis we continue to determine that all other producers and exporters of granular PTFE resin from India had massive imports over a relatively short period.[26]  As a result, we continue to determine that critical circumstances exist for all other producers and exporters of granular PTFE resin from India.

## V.    SUBSIDIES VALUATION

### A.    Allocation Period

Commerce made no changes to the allocation period, ten years, and the allocation methodology used in the *Preliminary Determination*.[27]

### B.    Attribution of Subsidies

Commerce made no changes to the methodologies used in the *Preliminary Determination* for attributing subsidies.[28]

---

[22] *See, e.g.*, *Certain Quartz Surface Products from the Republic of Turkey:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 84 FR 54841 (October 11, 2019), and accompanying PDM at 5-7, unchanged in *Certain Quartz Surface Products from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 FR 25400 (May 1, 2020), and accompanying IDM at 2-3.

[23] *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's Response to Request for Additional Monthly Quantity and Value Shipment Data," dated August 5, 2021.

[24] *See* Memorandum, "Monthly Shipment Quantity and Value Analysis for Critical Circumstances," dated concurrently with this memorandum (Final Critical Circumstances Memorandum).

[25] *Id.*

[26] *Id.*

[27] *See Preliminary Determination* PDM at 29-30.

[28] *Id.* at 30-31.

Barcode:4203113-02 C-533-900 INV - Investigation -

### C.    Denominators

Commerce made no changes to the denominators used in the *Preliminary Determination* to calculate subsidy rates.[29]

### D.    Loan Interest Rate Benchmarks and Discount Rates

Commerce made no changes to the interest rates used in the calculation of loans and non-recurring subsidies approved during the POI.[30]

### E.    Land Benchmark

Commerce revised its land benchmark calculations by using the unit price for a reported land transaction in Ahmedabad, Gujarat, as intended in the *Preliminary Determination.  See* Comment 4 of Section IV below.[31]  Commerce otherwise made no changes to its methodology of averaging the Ahmedabad and Mumbai land prices in calculating a benchmark for IWL's land purchase in Madhya Pradesh.  *See* Comments 2 and 3 in Section IV below.

## VI.    Analysis of Programs

### A.    Programs Determined to Be Countervailable[32]

We made no changes from our *Preliminary Determination* and Post-Preliminary Analysis with respect to the methodology used to calculate the subsidy rates for the following programs, except where noted in section VII below.  For descriptions, analyses, and calculation methodologies for these programs, *see* the *Preliminary Determination* and the Post-Preliminary Analysis.  Except where noted below, the parties raised no issues in their case briefs regarding these programs. The final program rates are as follows:

*1.    Export Promotion of Capital Goods Scheme (EPCGS)*

The final subsidy rate for this program is 0.09 percent *ad valorem* for GFCL.

*2.    Advanced Authorization Program (AAP)*

The final subsidy rate for this program is 2.76 percent *ad valorem* for GFCL.  For further discussion, *see* Comment 6.

---

[29] *Id.* at 9.
[30] *See Preliminary Determination* PDM at 9-10.
[31] *Id.* at 10-11.
[32] *See* Memorandum, "GFCL Calculations for the Final Determination," dated concurrently with this memorandum (Final Calculation Memorandum).

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

Barcode:4203113-02 C-533-900 INV - Investigation  -

*3.     Duty Drawback* (*DDB*) *Program*

The final subsidy rate for this program is 0.17 percent *ad valorem* for GFCL.  For further discussion, *see* Comment 6.

*4.     Status Holders Incentive Scrip (SHIS)*

The final subsidy rate for this program is 0.07 percent *ad valorem* for GFCL.

*5.     MEIS*

The final subsidy rate for this program is 0.46 percent *ad valorem* for GFCL.  For further discussion, *see* Comment 5.

*6.     Renewable Energy Certificate*

The final subsidy rate for this program is 0.41 percent *ad valorem* for GFCL.  For further discussion, *see* Comment 7.

*7.     Gujarat Development Industrial Corporation* (*GIDC*)'s *Preferential Water Rates*

The final subsidy rate for this program is 0.60 percent *ad valorem* for GFCL.

*8.     State Government of Gujarat* (*SGOG*) *Exemption from Electricity Duty*

We adjusted our benefit calculations under this program to incorporate revised information regarding electricity duty exemptions for wind power consumption.  *See* Comment 8 below.  The final subsidy rate for this program is 0.71 percent *ad valorem* for GFCL.

*9.     GIDC's Provision of Land for LTAR*

As discussed in the "Land Benchmark" section above, we corrected the unit price for the land transaction in Ahmedabad Gujarat.  The final subsidy rate for this program is 0.12 percent *ad valorem* for GFCL.  For further discussion, *see* Comment 4.

*10.    State Industrial Development's* (*SIDC*) *Provision of Land for LTAR*

As discussed in the "Land Benchmark" section above, we corrected the unit price for the land transaction in Ahmedabad, Gujarat.  We also corrected the start date of IWL's land allocation. The final subsidy rate for this program is 26.50 percent *ad valorem* for GFCL.  For further discussion, *see* Comment 4.

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

### B.    Programs Determined Not to Have Been Used by GFCL or IWL during the POI

Commerce made no changes to its *Preliminary Determination* with regard to programs determined not used during the POI.[33]

1.    Duty Free Import Authorization
2.    Income Tax Exemption for Infrastructure Development Scheme
3.    Provision of Coal for LTAR

Subsidies for Export-Oriented Units

4.    Duty-Free Import of Goods, Including Capital Goods and Raw Materials
5.    Reimbursement of CST Paid on Goods Manufactured in India
6.    Exemption from Payment of Central Excise Duty on Goods Manufactured in India and Procured from a Domestic Tariff Area

GOI and SGOG Benefits to Companies Located within Special Economic Zones (SEZs)

7.    Duty Free Importation of Capital Goods and Raw Materials, Components, Consumables, Intermediates, Spare Parts and Packing Materials
8.    Exemption from Payment of CST on Purchases of Capital Goods and Raw Materials, Components, Consumables, Intermediates, Spare Parts, and Packing Material
9.    Exemption from Electricity Duty and Cess on the Sale or Supply of Electricity to the SEZ Unit
10.    SEZ Income Tax Exemption Provision (Section 10AA)
11.    SEZ Act: Service Tax Exemption
12.    Exemption from Payment of State Government Taxes and Duties

## VII.    ANALYSIS OF COMMENTS

## Comment 1:  Whether Production of Wind Energy Supplied by IWL Is Primarily Dedicated

### *GFCL's Case Brief*:[34]

- It is arbitrary and capricious for Commerce to depart from its determination in the first investigation of granular PTFE resin from India, where the facts were substantially the same.[35]  Commerce cannot apply inconsistent treatment of administrative law.
- IWL is primarily a producer of wind turbine generators; therefore, its production cannot be "dedicated almost exclusively" to the production of the subject merchandise.  Furthermore,

---

[33] *See Preliminary Determination* PDM at 26-27; *see also* Post-Preliminary Analysis at 14-15.
[34] *See* GFCL Case Brief at 2-11.
[35] *Id.* at 3 (citing *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)).

8

Barcode:4203113-02 C-533-900 INV - Investigation -

granular PTFE resin uses a small percentage of the total energy provided to the Dahej plant, and IWL only provided enough electricity to meet a small percentage of GFCL's total power consumption.[36]

- The power produced by IWL cannot be considered "dedicated almost exclusively to the production of" granular PTFE resin in the same way as timber to lumber or semolina to pasta, both of which go to the core of the downstream product.[37] A minute amount of electricity from a common pool goes to numerous IWL products, and a small fraction of that electricity goes to the subject merchandise.

- GFCL has no way of knowing which electricity it is using when it powers its plants, and IWL is not its primary power source.

- Commerce's analysis of whether the power supplied by IWL can be attributed to the downstream *products*, rather than the downstream *product* (*i.e.*, subject merchandise), is not in accordance with law. Granular PTFE resin is the product under investigation, not the myriad of products produced at the Dahej plant.

- According to the *CVD Preamble*, if the input is not primarily dedicated to the production of downstream products, "it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product."[38]

- This section of the *CVD Preamble* describes "a situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value-added product."[39] The higher value product in this case is granular PTFE resin.

- In *Bottom Mount Fridges from Korea*, Commerce determined that inputs provided by cross-owned affiliates were not primarily dedicated to merchandise because: 1) the input supplier provided a small amount of inputs to the respondent; (2) the vast majority of the input supplier's sales were to companies other than the respondent; (3) the input provided to the respondent was used in the production of many products.[40]

- In *Cold-Rolled Steel from Korea*, Commerce found that certain inputs were not primarily dedicated because they were used in "a typical manufacturing process and not in a way that they are primarily and/or exclusively dedicated to the production of the downstream product."[41] IWL only provides electricity to a common pool of the Dahej unit, which produces both subject and non-subject merchandise.

- Commerce must not deviate from its prior decision in the 2017 investigation of PTFE Resin from India and determine that IWL does not provide an input primarily dedicated to the production of subject merchandise.

---

[36] Id. at 2 (citing GFCL's Letter, "Inox Wind Limited's Section III Questionnaire Response (Part I)," dated May 24, 2021 at 6).

[37] *Id*. at 5 (citing *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38361 (June 26, 2020) (*Cold-Rolled Steel from Korea*), and accompanying IDM at Comment 2).

[38] *Id*. at 4 (citing *Countervailing Duties; Final Rule*, 63 FR 6538 (November 25, 1998) (*CVD Preamble*) at 63 FR at 6538, 65401).

[39] *Id*. at 5 (citing *CVD Preamble*, 63 FR at 65401).

[40] *Id*. at 6 (citing *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 26, 2012) (*Bottom Mount Fridges from Korea*), and accompanying IDM at 2-3).

[41] *Id*. at 8 (citing *Cold-Rolled Steel from Korea* IDM at Comment 2).

Barcode:4203113-02 C-533-900 INV - Investigation  -

**Petitioner's Rebuttal Brief:**[42]

- GFCL points to *PTFE from India*, in which Commerce did not investigate IWL's subsidies as a cross-owned input supplier; however, GFCL acknowledges that such prior determinations are not binding precedent and that the record of each proceeding is distinct.
- The basis for Commerce's prior determination is not clear from the materials that are publicly available, and the issue was not briefed by the parties in that investigation.
- While GFCL asserts the facts "are substantially the same in all respects" in both proceedings, it cites to no record evidence supporting that characterization.
- As Commerce noted in the *Preliminary Determination*, the U.S. Court of International Trade (CIT) has confirmed that Commerce is not obligated to measure the impact of an input supplier's contributions when deciding whether to attribute those subsidies to the downstream product.[43] Furthermore, Commerce is not required to determine how significant the sales of the input in question are in relation to the input provider's sales of other, distinct products.
- Regarding the attribution rule specified in 19 CFR 351.525(b)(6)(iv), the terms "downstream product" and "downstream products" are not the same as "subject merchandise," and GFCL too casually substitutes one for the other.
- The *CVD Preamble* and Commerce's practice make clear that the downstream product or products to which input subsidies may be attributed may include both subject and non-subject merchandise.
- Pursuant to 19 CFR 351.525(b)(3), Commerce attributes domestic subsidies "to all products sold by a firm," not just subject merchandise.
- Where a cross-owned input supplier provides an input that is primarily dedicated to one or more downstream products of a downstream producer, sales of all of those downstream products are included in the denominator of the benefit calculation.[44]
- GFCL argues that Commerce needs to determine that inputs of wind energy from IWL are tied solely to subject merchandise under 19 CFR 351.525(b)(5)(i) to determine whether wind energy is primarily dedicated to the production of subject merchandise, but GFCL repeatedly notes that it cannot distinguish how much wind energy goes into the production of subject or non-subject merchandise.
- GFCL mischaracterizes or misunderstands Commerce's determination in *Bottom Mount Fridges from Korea*. In that case, Commerce found the inputs were not primarily dedicated to the production of downstream products because most of the input suppliers' sales of the input were to companies other than the cross-owned downstream producer.[45] In this case, all of IWL's wind power is sold to GFCL.

---

[42] *See* Petitioner's Rebuttal Brief at 2-8.
[43] *Id*. at 4-5 (citing *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F.Supp.3d 1345, 1364 (Ct. Int'l Trade 2021)).
[44] *Id*. at 6 (citing *CVD Preamble*, 63 FR at 65402).
[45] *Id*. at 7 (citing *Bottom Mount Fridges from Korea* IDM at 3).

- In *Cold-Rolled Steel from Brazil*, Commerce confirmed that input subsidies can be attributed to downstream producers even when those inputs are dedicated to an array of downstream products, including subject and non-subject merchandise.[46]
- The CIT has confirmed that when there is a group of downstream products a company makes with a certain input, all of those downstream products – including subject and non-subject merchandise – should be included in the sales denominator.[47]

**Commerce's Position:** GFCL's arguments that IWL's wind energy generation is not primarily dedicated to downstream production are unconvincing. As an initial matter, Commerce's regulations state the following:

> "If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)."[48]

As stated above, the regulation addresses attribution in cases where a cross-owned company's production of an input is primarily dedicated to downstream production. The regulations do not specify whether the downstream product must be subject or non-subject merchandise. Furthermore, the attribution rule directs Commerce to attribute subsidies received by the producer of the primarily dedicated input to the sales of that input and the sales of the downstream product. The issue of whether production of the input product is primarily dedicated to production of the downstream product depends on the specific factual situations presented to Commerce because the nature of input and downstream products and production processes vary among cases.

GFCL reported that it received wind power from IWL to manufacture "all merchandise" produced at GFCL's Dahej unit.[49] During the course of this investigation, Commerce sought information from GFCL and IWL to determine whether IWL's production of wind energy is primarily dedicated to GFCL's downstream production. On April 9, 2021, Commerce requested that GFCL provide "the quantity of all power generated by the company during the POI and the quantity of power that IWL provided to GFCL during the POI."[50] In response to our request, GFCL reported that "the entire amount of power generated by IWL is sold to GFCL."[51] GFCL also reported that IWL contracts directly with GFCL to provide wind power through its own

---

[46] *Id.* (citing *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38361 (June 26, 2020) (*Cold-Rolled Steel from Brazil*) and accompanying IDM at Comment 2).

[47] *Id.* at 8 (citing *TMK IPSCO v. United States*, 222 F.Supp.3d 1306, 1323 – 1325 (Ct. Int'l Trade 2017))

[48] See 19 CFR 351.525(b)(6)(iv)

[49] *See* GFCL's Letter, "Gujarat Fluourochemicals Limited's Questionnaire Response to Section III (Identifying Affiliated Companies)," dated March 26, 2021 (GFCL AQR) at 7.

[50] *See* Commerce's Letter, "Supplemental Questions on Affiliation," dated April 9, 2021.

[51] *See* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Supplemental Questionnaire Response to Section III Identifying Affiliated Companies (Questions 3-7)," dated April 15, 2021 at 5.

Barcode:4203113-02 C-533-900 INV - Investigation  -

wind farm and that the wind power is sent to the substation closest to GFCL.[52]  GFCL also provided the power purchase agreements demonstrating that IWL agreed to supply power to GFCL.[53]

While GFCL reported that the wind energy supplied by IWL is a small amount of GFCL's cost of production and total power consumption,[54] the evidence on the record demonstrates that IWL did not have any other energy customers and that all wind power generated at IWL's wind farm was to be used in GFCL's production facilities in Dahej.  Furthermore, notwithstanding GFCL's arguments that IWL's wind energy was sent to an electrical grid and not directly to GFCL's manufacturing facilities, IWL's power purchase agreement was made with GFCL, not the administrator of the power grid.  This fact indicates that IWL's production of this wind energy, the "input product" at issue, was primarily dedicated to GFCL's downstream production during the POI.

While GFCL points to *Bottom Mount Fridges from Korea*, where Commerce determined that inputs provided by several cross-owned affiliates were not primarily dedicated,[55] the facts underlying that decision did not demonstrate that the input production of the downstream producer's affiliates was devoted, largely or exclusively, to supplying the input to the downstream producer.  On the contrary, as the petitioner notes, Commerce's decision rested partly on the fact that one input producer cut and shaped its products to the specifications of its other customers, not just its affiliated customer.[56]  Therefore, we do not find *Bottom Mount Fridges from Korea* to be instructive for this case.

Also, GFCL's citation to *Cold-Rolled Steel from Korea* misses the point of why the inputs were not found to be primarily dedicated in that case.  Commerce's decision rested partly on whether the inputs (*i.e.*, scrap by-product and services) were dedicated almost exclusively to the production of downstream product and whether these are the type of input products that are merely a link in the overall production chain.[57]  In this case, IWL's wind energy generation during the POI was provided expressly for the purpose of providing electricity to GFCL and had no other purpose outside of GFCL's overall production chain.

Based on the record information and for the reasons stated above, Commerce continues to find that IWL's production of wind energy was primarily dedicated to GFCL's downstream production and that Commerce should continue to countervail subsidies received by IWL.

---

[52] *See* GFCL's Letter, "Inox Wind Limited's Second Supplemental Questionnaire Response," dated June 21, 2021 at 1-2.
[53] *See* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Fourth Supplemental Questionnaire Response," dated August 13, 2021 at Exhibits S4-1(a) and Exhibit S4-1(b).
[54] See GFCL AQR at 7.
[55] *Id*. at 6 (citing *Bottom Mount Fridges from Korea* IDM at 2-3).
[56] *See* Memorandum, "Post-Preliminary Analysis of Cross-Ownership," dated December 11, 2011.
[57] *See Cold-Rolled Steel from Korea* IDM at 30.

Barcode:4203113-02 C-533-900 INV - Investigation  -

**Comment 2:   Whether the Mumbai Benchmark Is Comparable in Calculating SIDC's Provision of Land for LTAR Benefits**

*GOI's Case Brief:*[58]

- Commerce determined in its Post-Preliminary Analysis that the only transactions on the record suitable for benchmarking purposes occurred in Maharashtra (490,075 INR (Indian Rupee) per square meter) and Gujarat (115 INR per square meter).
- In accepting the Maharashtra transaction, Commerce ignored that:  (1) the transaction pertained to proposed use of the land for residential and commercial activities; (2) the land was bought by a real estate firm; (3) a substantial period of time has passed since the land was used for industrial purposes; and (4) the transaction was for residential and commercial purposes.
- It is Commerce's practice to consider future use of land as the 'most relevant factor' for its analysis in selecting a land benchmark as affirmed in *HWR Pipes and Tubes from Turkey, Wind Towers from India,* and *Yarn from India.*[59]
- Only the future use for which the land was purchased is relevant.  Therefore, Commerce should not use the petitioner's proposed benchmark (*i.e.*, the Maharashtra transaction bought for residential use) because these land prices were incomparable to the land at issue.[60]  As such, the only benchmark available on record is the Gujarat benchmark which Commerce should use as the most comparable benchmark price in its final determination.[61]

*GFCL's Case Brief:*[62]

- IWL is leasing land for industrial purposes in an industrial area, which is not like land in the center of a metropolis sold to a realty firm.
- IWL's leased land is located in Relwa Khurd, which does not even rank within Madhya Pradesh's top five cities.  Of the 28 states in India, Madhya Pradesh has the 10th largest economy and the 26th highest per-capita income.  Meanwhile, Mumbai (Maharashtra) has land prices higher than any state in India.[63]
- Commerce's practice requires that it take proximity into consideration when choosing a tier-one land benchmark.[64]  Mumbai is almost 400 miles from the Madhya Pradesh border, while Dahej in Gujarat is roughly 200 miles from Madhya Pradesh.  Furthermore, there are six transmission lines between Madhya Pradesh and Gujarat, and four between Maharashtra and Gujarat.

---

[58] *See* GOI's Case Brief at 10-15.
[59] *Id* at 13-14 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination*, 81 FR 47349 (July 21, 2016) (*HWR Pipes and Tubes from Turkey*), and accompanying IDM at Comment 2; and *Utility Scale Wind Towers from India:  Final Affirmative Countervailing Duty Determination*, 86 FR 56896 (October 13, 2021) (*Wind Towers from India*), and accompanying IDM at 43-44; and *Polyester Textured Yarn from India:  Final Affirmative Countervailing Duty Determination*, 84 FR 63848 (November 19, 2019) (*Yarn from India Final*), and accompanying IDM at 7).
[60] *Id*. at 14.
[61] *Id*. at 14-15.
[62] *See* GFCL's Case Brief at 16-22.
[63] *Id*. at 17 (citing *Wind Towers from India* IDM at 42).
[64] *Id*. (citing *Wind Towers from India* IDM at 44).

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

Barcode:4203113-02 C-533-900 INV - Investigation  -

- Commerce has previously considered the purpose of the land and whether it was rented when determining suitable land benchmarks.[65]  IWL is leasing the land, whereas the Mumbai transaction is for the outright purchase of land.  The purchase of land provides ownership stake for the buyer, while a lessee gets nothing at the end of the lease.  The purchaser of the Mumbai property is now the owner of "prime" real estate in a metropolis, while IWL is renting an industrial space that was previously agricultural land.
- The Mumbai transaction was awarded after three days of intense bidding, which is not how IWL's transaction transpired.
- The land transaction in Mumbai creates a "benefit" of more than 100 percent of IWL's revenue in the awarded year.
- In *Wind Towers from India*, Commerce acknowledged that prices in Mumbai are higher than in any other Indian state and that the respondent was not located in a metropolitan city.[66]  In that case, Commerce also reasoned that land purchased in Mumbai was not comparable to land leased from the GIDC.
- It is Commerce's practice to consider the future use, not the previous use, of the land when considering whether a transaction is suitable as a benchmark.[67]  Therefore, Commerce's explanation that it selected land previously used for industrial purposes is astounding.  The land in Mumbai was purchased by a financial and realty firm and is, therefore, not comparable to land leased by IWL for industrial purposes.

***Petitioner's Rebuttal Brief:***[68]

- It is appropriate for Commerce to rely on the Mumbai transaction even though it is in a different state, as there are no useable benchmarks from within the state of Madhya Pradesh on the record.
- Both Gujarat and Maharashtra border Madhya Pradesh, and the respondents have pointed to no meaningful differences between these two bordering states that would justify accepting one benchmark but not the other based on proximity.
- Though the respondents claim that the Mumbai transaction involved bidding and was sold to a realty firm, these facts also do not establish that the land is not comparable to IWL's land.  Furthermore, the fact that IWL did not engage in competitive bidding for its government-provided land only underscores the need for such a commercial benchmark.
- Though Commerce did reject a Mumbai land benchmark in *Wind Towers from India*, that was because Commerce had useable benchmarks from Gujarat, the same state in which the land in question had been acquired.[69]  In this case, there are no useable benchmarks within the state of Madhya Pradesh.  Thus, it is reasonable for Commerce to rely on an average of the two useable benchmarks from two neighboring states to Madhya Pradesh.

**Commerce's Position:**  In this investigation, Commerce considered the five land purchases on the record to measure the adequacy of remuneration for the GIDC's Provision of Land for LTAR

---

[65] *Id*. at 18 (citing *Common Alloy Aluminum Sheet from Bahrain:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 13333 (March 8, 2021) (*Aluminum Sheet from Bahrain*), and accompanying IDM at 12-13).
[66] *Id*. at 20 (citing *Wind Towers from India* IDM at 42).
[67] *Id*. at 21 (citing *Wind Towers from India* IDM at 43).
[68] *See* Petitioner's Rebuttal Brief at 8-12.
[69] *Id*. at 12 (citing *Wind Towers from India* IDM at Comment 6).

14

Barcode:4203113-02 C-533-900 INV - Investigation  -

and the SIDC's Provision of Land for LTAR.  Those benchmarks are as follows:  GFCL's two land purchases from private parties in Ranjitnagar and Mahidad, Gujarat,[70] a private auction of industrial land in Ahmedabad, Gujarat,[71] a private auction of industrial land in Mumbai, Maharashtra,[72] and a private auction of land in Indore, Madhya Pradesh.[73]

As explained in the *Preliminary Determination*, Commerce rejected using GFCL's two land purchases in Gujarat because these transactions, which involved purchases of agricultural land from farmers,[74] were not comparable to the industry-ready land that the GIDC and SIDC provide.[75]  While the deeds noted that the land parcels had either been transitioned to "non-agricultural" land[76] or that GFCL planned to use these parcels for industrial use,[77] there was no indication that these land parcels had the infrastructure or amenities in place comparable to what manufacturers would expect on GIDC or SIDC land.  Furthermore, there was no evidence that either of these land parcels had been marketed for industrial use before GFCL's purchases.

While GFCL emphasizes the consideration of the future land usage in Commerce's previous cases, GFCL misunderstands or mischaracterizes how Commerce has included future use in its decision-making.  In *HWR Pipes and Tubes from Turkey*, we stated that the past or current usage of the land parcels at issue did not undermine comparability for benchmarking purposes.[78]  Commerce further clarified, "What matters is the usage for which these parcels were being offered on the market for future use."[79]  The land parcels at issue in *HWR Pipes and Tubes from Turkey* were former agricultural plots marketed for industrial development and, for that purpose, were classified as "investment land for industrial facilities."[80]  Based on record information, we determined in that case that the land parcels possessed comparable levels of infrastructure development, pursuant to 19 CFR 351.511.

In the present case, there is no indication that GFCL's purchases of agricultural land in Gujarat were offered on the market for industrial purposes, unlike the land parcels discussed in *HWR Pipes and Tubes from Turkey*.  Furthermore, as previously stated, there is no indication that industrial infrastructure was available on the Gujarat land parcels at the time of GFCL's purchases.  For these reasons, we rejected GFCL's private land purchases from consideration in the land benchmark.

---

[70] *See* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Section III Questionnaire Response," dated May 6, 2021 (GFCL IQR) at 79 and at Exhibits 16(f) and 16(g).
[71] *See* Petitioner's Letter, "Land Benchmark Submission," dated June 1, 2021 (Petitioner's Benchmark Submission) at Exhibit 6.
[72] *See* Petitioner's Letter, "Benchmark Data Submission," dated August 11, 2021 (Petitioner's Second Benchmark Submission) at Exhibit 3.
[73] *Id*. at Exhibit 1.
[74] *See* GFCL IQR at Exhibit 16(g); *see also* GFCL's Letter, "Gujarat Fluourochemicals Limited's Second Supplemental Questionnaire Response," dated June 11, 2021 (GFCL SQR2) at Exhibit S2- 5(c).
[75] *See* GOI SQR2 at 14-16 and Exhibits 5 and 6.
[76] *See* GFCL IQR at Exhibit 16(g).
[77] *See* GFCL SQR2 at Exhibit S2-5(a)
[78] *See HWR Pipes and Tubes from Turkey* IDM at 27.
[79] *Id.*
[80] *Id.*

15

After the *Preliminary Determination*, we provided all interested parties an opportunity to submit additional land benchmark information to measure the adequacy of remuneration of IWL's land purchase from the SIDC in Madhya Pradesh.[81]  GFCL submitted recommended prices for agricultural land in the "Guiding Principles for Market Value of Agricultural Land 2014-2015," published by the state of Madhya Pradesh, along with the state's recommended method for pricing agricultural land converted to industrial land.[82]  As stated in the Post-Preliminary Analysis, we rejected using this benchmark submission because it is a government document that provides *recommended pricing methodology for agricultural land* converted to industrial land, not "actual transactions between private parties," pursuant to 19 CFR 351.511(a)(2)(i).  The petitioner submitted information on auctioned land in Indore, Madhya Pradesh, and in Mumbai, Maharashtra.[83]  We rejected using the Indore land transaction for reasons similar to those stated above for rejecting GFCL's agricultural land: the Indore land was clearly offered on the market as commercial land "possibly for its retail operations."[84]  Thus, we rejected this transaction, notwithstanding the land's proximity to IWL's land in Madhya Pradesh.[85]

After eliminating the Indore transaction and GFCL's two agricultural purchases, the remaining best available land benchmarks on the record were the auctioned land in Mumbai, Maharashtra, and in Ahmedabad, Gujarat.  While we have no clear indication on the record of what the future use of these land parcels will be, we do note that both land parcels were advertised as former textile mill land and, thus, would have a comparable level of industrial infrastructure, for benchmarking purposes pursuant to 19 CFR 351.511.  GFCL argues that previous usage of the land is irrelevant.  However, as stated in *HWR Pipes and Tubes from Turkey*, Commerce takes into account past and current usage, as well as how the land is offered on the market for future use,[86] and we determine comparability based on the specific facts of each case.

Contrary to the GOI and GFCL's arguments, no record information indicates that either of these land plots will be used for commercial or residential purposes.  In fact, we have no record information regarding the future use of these land plots at all; the record only indicates that these parcels were suitable for industrial use.  The GOI and GFCL simply point to the fact that a financial and realty firm purchased the Mumbai land to speculate that the land will be used for commercial development.  However, while that fact indicates that the land was of interest to a financial and realty firm, it does not provide evidence that the land was indeed marketed for commercial use to the exclusion of industry.  Record information only demonstrates that the land plots were previously used for industrial purposes and were advertised as such.[87]  Thus, because there are no suitable land benchmarks in Madhya Pradesh, we determined to average the Mumbai and Ahmedabad transactions to calculate a benchmark for use in the post-preliminary calculations of the SIDC's Provision of Land for LTAR, as these were the best available transactions on the record.

---

[81] *See* Memorandum, "Land Benchmark Information," dated August 4, 2021.

[82] *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's Benchmark Data Submission," dated August 11, 2021 at Exhibits 1 and 2.

[83] *See* Petitioner's Second Benchmark Submission at Exhibits 1 and 3.

[84] *Id*. at Exhibit 1.

[85] *See* Post-Preliminary Analysis at 3.

[86] *See HWR Pipes and Tubes from Turkey* IDM at 27.

[87] *See* Petitioner's Benchmark Submission at Exhibit 6; *see also* Petitioner's Second Benchmark Submission at Exhibit 3.

Barcode:4203113-02 C-533-900 INV - Investigation  -

GFCL references *Wind Towers from India* to note that Commerce rejected a Mumbai land price from the benchmark calculation for land purchased in Gujarat.[88]  However, in *Wind Towers from India*, Commerce stated that the respondents submitted contemporaneous tier-one benchmark transactions within the same district in Gujarat, while the petitioner submitted land transactions that were not contemporaneous and were located in Mumbai and Thane.[89] Therefore, Commerce rejected the Mumbai transaction on that basis.  In the case of IWL's land purchased in Madhya Pradesh, there is no alternative information on the record regarding industrial land prices in the state.  Thus, we would not be inconsistent with *Wind Towers from India* in selecting the best available information on the record for IWL's land for LTAR benefit by averaging the Mumbai and Ahmedabad land prices.

We have also reviewed GFCL's claims that Mumbai vastly differs from Madhya Pradesh in economic development such as to render the land transactions in these cities incomparable to IWL's land purchases.  In its arguments, GFCL pointed to information on the record regarding the economic situation in Madhya Pradesh.[90]  This information consists of a brief description of Madhya Pradesh that the petitioner obtained from a Wikipedia page in order to show that Indore is the capital of Madhya Pradesh.[91]  The Wikipedia article does not go into any depth regarding the state's economic status in a way that would allow Commerce to make an assessment of the land market in Madhya Pradesh relative to that of other states in India.  The article notes that of the 28 states in India, Madhya Pradesh has the tenth largest economy; that it ranks 26th in per-capita income; and that the state's GDP growth is above the national average.[92]  This is not enough information to determine where Madhya Pradesh's economy stands relative to Maharashtra or Gujarat, though there is some indication that the state is experiencing significant economic growth.  Furthermore, there is no substantive information on the record regarding the economic status of Mumbai or how Mumbai and other areas of India rank in terms of economic development.  There is only information showing that Mumbai is in a state that borders Madhya Pradesh.[93]

Therefore, absent any specific information on regional development in the Indian states and the criteria used to establish this, we do not find the information cited by GFCL to be probative in terms of establishing the levels of development of the states in question and whether the land parcels at issue are clearly not comparable for benchmarking purposes.  Furthermore, when considering factors that may speak to regional comparability, Commerce looks at, for example, the comparability of population density in the regions in question.[94]  Commerce may also

---

[88] *See Wind Towers from India* IDM at Comment 6.

[89] *Id.*

[90] *See* Petitioner's Second Benchmark Submission at Exhibit 2.

[91] *Id.*

[92] *Id.*

[93] *Id.* at Exhibit 4.

[94] *See Laminated Woven Sacks from the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances. In Part; and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 72 FR 67893, 67909 (December 3, 2007), unchanged in *Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Determination and Final Affirmative Determination, in Part, of Critical Circumstances (C-570-917)*, 73 FR 35639 (June 24, 2008).

Barcode:4203113-02 C-533-900 INV - Investigation  -

examine evidence that support differences in land pricing, such as industrial property reports, availability of data on prices, investment flows, availability of land, and industry density. The parties have not submitted these types of information on the record, and neither the GOI nor GFCL submitted any such factual information to rebut the petitioner's benchmark submission, pursuant to Commerce's regulations.[95]  Instead, GFCL submitted arguments against the petitioner's Mumbai and Indore benchmark submissions without providing any supporting documentation to the record.[96]

In conclusion, GFCL has not pointed to any information on the record that would cause Commerce to reconsider the comparability of industrial land in Mumbai to industrial land in Gujarat or Madhya Pradesh. Thus, we find no substantive support for excluding the Mumbai transaction from the benchmark, as it otherwise provides one of the two best available benchmarks on the record of this investigation.

### Comment 3:   Whether the Mumbai Benchmark Is Aberrational in Calculating SIDC's Provision of Land for LTAR Benefits

*GFCL's Case Brief:*[97]

- The CIT has previously stated that Commerce must select a reasonable benchmark that lacks distortive pricing.[98]
- Between Commerce's two chosen benchmarks, the Mumbai transaction, with a unit price of 490,075.10 INR, is four thousand times the unit cost of the Gujarat land transaction.[99]
- The Mumbai transaction is not remotely close to even the highest unit price of GFCL's reported land transactions. Therefore, Commerce cannot use the Mumbai land transaction as a benchmark.

*GOI's Case Brief:*[100]

- Commerce determined an abnormally high subsidy margin in respect to land acquired by IWL.

*Petitioner's Rebuttal Brief:*[101]

- Commerce had two sources for actual transactions concerning industrial land, neither of which was in Madhya Pradesh:  (1) the Gujarat transaction relied upon in the preliminary determination; and (2) the more recently submitted Mumbai transaction.

---

[95] *See* 19 CFR 351.301(c)(3)(iv).

[96] *See* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Rebuttal Comments to Petitioner's Benchmark Submission," dated August 23, 2021.

[97] *See* GFCL's Case Brief at 14-16.

[98] *Id*. at 14 (citing *Ozdemir Boru San. ve Tic. Ltd. v. United States*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) (*Ozdemir*) at 1252).

[99] *Id*. at 15 (citing Post-Preliminary Calculation Memo at Attachment 2).

[100] *See* GOI's Case Brief at 10.

[101] *See* Petitioner's Rebuttal Brief at 8-12.

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

- Simply showing that the Mumbai price is higher than prices from government authorities, prices for agricultural or commercial land, or prices that do not reflect actual transactions, fails to demonstrate that the Mumbai price is aberrational.
- The respondents have not pointed to anything on the record that suggests the Mumbai benchmark is unreliable or distorted, such as may be the case when a surrogate value is based on a low volume of imports.
- What GFCL does not explain is that, in the original underlying CIT decision in *Ozdemir*, the dataset of comparison prices that the CIT was looking at were 14 prices for private transactions that Commerce had already found to be suitable benchmarks.[102]  The CIT was concerned about outliers among a group of land prices when Commerce had already accepted all of the prices in the dataset as private transactions for comparable land.
- Commerce rejected alternative benchmarks because they are not private transactions, because they did not involve industrial land, or because they are not actual transactions at all.  Thus, these rejected benchmarks are inappropriate to serve as a comparison basis for determining whether the Mumbai land is an outlier.
- Unlike in *Ozdemir*, the "dataset" for the land benchmark in this case only has two data points – the Gujarat price and the Mumbai price.  One cannot identify an "outlier" by comparing the only two data points that are contained within a dataset.  Therefore, the best approach in such a situation is to average the two data points.

**Commerce's Position:**  We agree with the petitioner that there are not enough viable benchmark data on the record to reasonably determine whether or not one of them is aberrational or an outlier.  In *Ozdemir*, Commerce agreed upon remand to remove two out of 14 data points in our benchmark dataset, finding that the prices of the underlying transactions were aberrational because the overall range of prices in the dataset provided a reasonable basis for identifying clear outliers.[103]  In the present case, as discussed above, there are only two transactions on the record that satisfy our benchmark guidelines.  Based on this limited amount of data, we cannot conduct the same analysis as in the remand of *HWR Pipes and Tubes from Turkey* to determine which prices are outliers.

GFCL argues that the Mumbai transaction is an outlier compared to GFCL's purchases from the GIDC.  However, it would be inappropriate to determine whether the Mumbai prices are aberrational compared to the prices of the respondent's purchases from the government entity.[104]  GFCL also compares the Mumbai transaction to GFCL's purchases of farmland in Gujarat; but, for the reasons explained above, Commerce already determined that these purchases were not comparable to industry-ready land that is leased from the GIDC or the SIDC.

---

[102] *Id.* at 10 (citing *Ozdemir* 273 F. Supp. 3d 1225, 1251)

[103] *See Final Results of Remand Redetermination Pursuant to Court Remand*, Court No. 16-00206, dated December 11, 2017 at 2-6; *see also Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey:  Notice of Court Decision Not in Harmony with the Amended Final Determination of the Countervailing Duty Investigation*, 83 FR 11174 (February 12, 2018).

[104] *See Preamble* at 63 FR at 65377; *see also Circular Welded Carbon Steel Pipes and Tubes from Turkey:  Final Results of Countervailing Duty Administrative Review*, 77 FR 46713 (August 6, 2021), and accompanying IDM at Comment 4.

Barcode:4203113-02 C-533-900 INV - Investigation  -

Therefore, Commerce determines that the range of data is too limited to determine whether the Mumbai price is aberrational to other market-based land prices in India and that GFCL's and the GOI's claims cannot be properly assessed from the available record information.

## Comment 4:   Whether Commerce Should Correct Its Land Benefit Calculations

### *Petitioner's Case Brief*:[105]

- In the *Preliminary Determination*, Commerce chose its land benchmark based on a private land transaction in Ahmedabad, Gujarat with a unit cost of 31,700 INR per square meter.[106] However, in its preliminary calculations, Commerce used a unit cost of 115.77 INR per square meter, instead of 31,700 INR, to calculate the yearly benchmark prices for the GIDC's Provision of Land for LTAR program.[107]
- Commerce should change the benchmark for GFCL's land purchases to 31,700 INR in its final calculations in order to correctly reflect the best available benchmark for land in Gujarat on the record, the price for a private land transaction in Ahmedabad, Gujarat.[108]
- Moreover, in the Post-Preliminary Analysis, Commerce averaged a private land transaction in Maharashtra and the Gujarat benchmark from the *Preliminary Determination* to calculate a land benchmark for the SIDC's Provision of Land for LTAR program.[109]
- Commerce erred in its calculations as it once again used the incorrect benchmark from the *Preliminary Determination* as the Gujarat benchmark.  Moreover, when allocating the benefits over the average useful life (AUL) period, Commerce started with the year 2011-2012.  However, record evidence shows that IWL acquired the land in question after this date.[110]
- Therefore, for its final calculations, Commerce should correct the Gujarat benchmark to 31,700 INR and recalculate the benefit allocation starting in the first year IWL purchased the land in question.

### *GFCL's Rebuttal Brief*:[111]

- The petitioner's proposed benchmark to value GFCL's land is not a comparable private transaction, nor is there record evidence that the benchmark provided by the petitioner is a transaction at all.
- Commerce properly used the GFCL transactions in Ranjitnagar and Mahidad as comparable private land transactions in its calculation memorandum because both transactions occurred in Gujarat and involved independent sellers not in the GIDC.[112]

---

[105] *See* Petitioner's Case Brief at 2-4.
[106] *Id*. at 2 (citing *Preliminary Determination* PDM at 10-11; and Petitioner's Benchmark Submission at Exhibit 6).
[107] *Id*. at 2 (citing Preliminary Calculation Memorandum at Attachment 2).
[108] *Id*. at 2-3.
[109] *Id*. at 3 (citing Memorandum, "Post-Preliminary Analysis Calculations for Gujarat Fluorochemicals Limited," dated October 2, 2021 (Post-Preliminary Calculation Memorandum) at 3-4).
[110] The date in question is business proprietary information.  *Id*. at 3-4 (citing Post-Preliminary Calculation Memorandum at 13 and Attachment 2; and GFCL's Letter, "Inox Wind Limited's Section III Questionnaire Response (Part II)," dated May 26, 2021 (IWL IQR Part 2) at Exhibit 9(c)).
[111] *See* GFCL Rebuttal Brief at 4-9.
[112] *Id*. at 4 (citing GFCL IQR at 78-79 and Exhibits (a)-(g)).

Barcode:4203113-02 C-533-900 INV - Investigation  -

- The petitioner provided a news article describing a "staggering price" associated with a "winning bid" in Ahmedabad, which ended exponentially higher than the official evaluation of the plot of land.[113]
- There is no evidence in the Petitioner's Benchmark Submission that the Ahmedabad sale was finalized or if it ever took place, and the article acknowledges that the top bidder may still "back out."[114]  There is no proof on the record of an actual sale; thus, the proposed benchmark is defective.[115]
- There is no evidence in the Petitioner's Benchmark Submission showing that the Ahmedabad transaction is for land similar to the GIDC or SIDC land; whether the land plot is for industrial purposes or commercial purposes; or what the current state development is.  The "staggering price" paid does suggest the land will be used for commercial or retail use.
- The textile mill where the land was located was closed and liquidated in 1989, 27 years ago.[116]
- The Petitioner's Benchmark Submission shows that Ahmedabad is a large city, with the Walled City (where the old textile mill was located) accounting for only a small section of the downtown area with land clearly not suitable for industrial use.[117]
- In the Post-Preliminary Analysis, Commerce rejected a transaction in Indore, Madhya Pradesh, reported by the petitioner, because it did not consider a commercial land price to be a comparable benchmark for IWL's purchase of industrial land.  The land in Ahmedabad is commercial land and relying on this transaction results in an internally inconsistent determination.
- In previous cases, Commerce has stated that the future use of the land is important when considering comparability.[118]
- IWL does not provide an input that is primarily dedicated to the production of the downstream product under investigation, *i.e.*, the subject merchandise.  Furthermore, Commerce previously made a contrary decision regarding IWL based on almost identical facts.  Therefore, Commerce should not even be investigating whether the SIDC provided land to IWL for LTAR.
- If Commerce continues to investigate this program, it should also continue to use the rate used in its Post-Preliminary Analysis calculations (*i.e.*, 115.77 INR), not the rate proposed by the petitioner (*i.e.*, 31,700 INR).

**Commerce's Position:**  We agree with the petitioner that Commerce did not calculate the GIDC's Provision of Land for LTAR and the SIDC's Provision of Land for LTAR programs as intended.  To correct these errors, we are using the Ahmedabad, Gujarat, land benchmark with a unit cost of 31,700 INR per square meter for the Gujarati benchmark, and we are adjusting the

---

[113] *Id*. at 5 (citing Petitioner's Benchmark Submission at Exhibit 6).

[114] *Id*.

[115] *Id*. at 5 (citing *Aluminum Sheet from Bahrain* IDM at Comment 4 (citing *Certain Polyethylene Terephthalate Resin from the Sultanate of Oman:  Final Negative Countervailing Duty Determination*, 81 FR 13321 (March 14, 2016) and accompanying IDM at Comment 3)).

[116] *Id*. at 5 (citing Petitioner's Benchmark Submission at Exhibit 6).

[117] *Id*.

[118] *Id*. at 8-9 (citing *Polytetrafluoroethylene Resin from India:  Final Affirmative Countervailing Duty Determination*, 83 FR 23422 (May 21,2018) (*PTFE from India*), and accompanying IDM at Comment 11; *HWR Pipes and Tubes from Turkey* IDM at Comment 2; and *Wind Towers from India* IDM at Comment 6).

Barcode:4203113-02 C-533-900 INV - Investigation -

benefit allocation of IWL's land in Madhya Pradesh by starting with the year of purchase.[119]  For the reasons discussed in Comment 2 above, we are not using GFCL's transactions in Ranjitnagar and Mahidad.

**Comment 5:   Whether Commerce Should Apply AFA to the Programs Under the SGOMP Industrial Promotion Act and the MEIS Program**

*GOI's Case Brief*:[120]

- With regard to the SGOMP Industrial Promotion Act, Commerce inappropriately determined that the GOI failed to provide necessary information with regard to eligibility criteria for receiving incentives under this policy and *de facto* specificity.  GOI reiterates that it has already provided requisite information.[121]  The GOI states that it responded to the queries raised by Commerce.
- Furthermore, with regard to the allegation that the GOI failed to provide information for *de facto* specificity under the SIDC's Provision of Land for LTAR program, which is regulated under the SGOMP Industrial Promotion Act, the GOI states that the program is not limited to any sector or industry, rather, the program is available to all.  Therefore, this alleged program is not specific in terms of Article 2.1 of the SCM Agreement, and Commerce should not consider it countervailable.
- With regard to MEIS, Commerce inappropriately determined that the GOI failed to provide necessary information about this program.  However, the GOI did provide the requested information.[122]  As such, the GOI fully cooperated and should be treated as a cooperative party.

*Petitioner's Rebuttal Brief*:[123]

- Commerce already set out in minute detail all of the questions regarding the specificity of the programs under the SGOMP Industrial Promotion Act that were not answered by the GOI, despite repeated opportunities.  The GOI failed to refute any of these specific facts.
- The GOI's failure to respond to Commerce's inquiries has significantly impeded Commerce's investigation of these programs, and Commerce should therefore continue to rely on AFA to find these programs specific, and therefore countervailable, in the final determination.
- The GOI did not respond to questions about MEIS in its initial questionnaire response.  Commerce issued a supplemental questionnaire again asking the GOI to complete the Standard Questions Appendix for the program and requesting additional program-specific information.  The GOI again did not answer these questions, simply asserting that GFCL had

---

[119] *See* Final Calculation Memorandum at 2.
[120] *See* GOI's Case Brief at 15-18.
[121] *Id.* at 15 (citing GOI's Letter, "Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated July 1, 2021 (GOI SQR3); and GOI's Letter, "Second Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated August 20, 2021 (GOI SQR4)).
[122] *Id.* at 17 (citing GOI's Letter, "Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated June 24, 2021 (GOI SQR2) at 14).
[123] *See* Petitioner's Rebuttal Brief at 14-15.

not benefitted from the program, despite GFCL reporting that it did receive benefits under the program in its initial questionnaire response.

- In its case brief, the GOI summarily claims it has responded to Commerce's questions regarding this program, citing to its supplementary response that merely asserts nonuse. Commerce should reject the GOI's arguments and continue to apply AFA to countervail the MEIS program.

**Commerce's Position:**  We agree with the petitioner.  As explained in the Post-Preliminary Analysis, the GOI repeatedly failed to provide certain requested, necessary information regarding the SGOMP Industrial Promotion Act and MEIS.  We issued supplemental questionnaires to the GOI to correct certain deficiencies in its initial questionnaire response.[124] In these supplemental questionnaires, we again requested information which we previously requested and that the GOI failed to provide.  This information related to program specificity and eligibility criteria for programs which fall under the SGOMP Industrial Promotion Act, namely SIDC's Provision of Land for LTAR and SGOG's Exemption from Electricity Duty,[125] and the Standard Questions Appendix in its entirety for MEIS.   This information is critical to Commerce's understanding of how the program works, how the benefit is distributed, and what the eligibility criteria are.  However, the GOI again failed to provide the necessary information requested of it in the supplemental questions pertaining to those programs.

Furthermore, regarding the programs under the SGOMP Industrial Promotion Act and MEIS,[126] the GOI claimed that GFCL had not applied or received benefits from these programs.  However, GFCL itself reported that IWL received benefits under the SIDC's Provision of Land for LTAR and SGOG's Exemption from Electricity Duty programs,[127] and that GFCL received benefits under MEIS.[128]  This information was on the record when Commerce issued its supplemental questionnaires to the GOI.  Given that such necessary program information was withheld by the GOI, Commerce's ability to investigate those programs was significantly impeded.

With regard to the GOI's assertion that the SIDC's Provision of Land for LTAR program should not be considered countervailable because the program is not limited to any sector or industry and is available broadly, we find that there is insufficient evidence on the record to allow Commerce to determine this program is not specific.[129]  As stated in the Post-Preliminary Analysis, the GOI failed to provide the requested information[130] on "ineligible industries" noted in Article 5 of the Industrial Promotion Policy – (Amended) 2018.[131]  Therefore, Commerce is unable to determine if the program is available broadly or available to a specific set of eligible industries.

---

[124] *See* Commerce's Letter, "Second Supplemental Questionnaire," dated June 8, 2021 at 6-7; *see also* Commerce's Letter, "Second Supplemental Questionnaire," dated August 2, 2021 at 4-7.
[125] *See* GOI SQR3 at 12, 16 and 28; *see also* GOI SQR4 at 19-20.
[126] *See* GOI SQR2 at 14.
[127] *See* IWL IQR Part 2 at 19 and 21.
[128] *See* GFCL IQR at 64-66.
[129] *See* sections 776(a)(1), 776(a)(2)(A) and (C) of the Act.
[130] *See* GOI SQR4 at 22.
[131] *See* GOI SQR3 at 14 and 17, and Exhibit 2.

Barcode:4203113-02 C-533-900 INV - Investigation  -

Accordingly, based on the above, we continue to find that the GOI withheld information that was requested for the SGOMP Industrial Promotion Act and MEIS, thereby significantly impeding the conduct of the investigation.  Thus, regarding the SGOMP Industrial Promotion Act, and the two programs which fall under it, SIDC's Provision of Land for LTAR and SGOG's Exemption of Electricity Duty, Commerce must rely on "facts available" in making its final determination in accordance with sections 776(a)(1), 776(a)(2)(A) and 776(a)(2)(C) of the Act.  Regarding MEIS, we continue to rely on facts available, in accordance with section 776(a)(1) and 776(a)(2)(A) of the Act.  Additionally, for both the programs under the SGOMP Industrial Promotion Act and the MEIS program, we continue to determine that the GOI failed to cooperate by not acting to the best of its ability by failing to comply with any of the multiple requests for information.  As such, an adverse inference is warranted in the application of facts available, pursuant to section 776(b) of the Act.  In drawing an adverse inference, we continue to find that the programs under the SGOMP Industrial Promotion Act are specific within the meaning of section 771(5A)(D) of the Act, and that the MEIS program constitutes a financial contribution within the meaning of section 771(5)(D) of the Act and is specific within the meaning of section 771(5A) of the Act.

## Comment 6:   Whether AAP and DDB Are Countervailable

*GOI's Case Brief*:[132]

**AAP:**

- The GOI contends that the AAP is not countervailable in terms of the SCM Agreement, which provides that exemption from indirect taxes or duties or remission of such indirect taxes or duties in amounts not in excess of those which have actually been used in the manufacture of export product, shall not be deemed to be a subsidy.  Therefore, AAP is not countervailable as long as utilization of duty exempt inputs in the production of the exported product can be verified.
- Commerce incorrectly determined that there is no effective and reasonable verification system put in place by the GOI.  In fact, the GOI has an effective control mechanism at every stage of the process.[133]
- As per the policy, GOI verifies all the instances of import and export after applicable value addition, under Advance Authorization at the time of issuance of the Export Obligation Discharge Certificate.[134]

**DDB:**

- The DDB program is not countervailable per the SCM Agreement, unless it can be shown that drawback of indirect taxes or import charges are in excess of the amount of the taxes or charges actually levied on inputs consumed in the production of the exported product. [135]

---

[132] *See* GOI's Case Brief at 17-20.
[133] *Id*. at 18 (citing GOI's Letter, "Initial Questionnaire Response to Section-II on behalf of Government of India," dated April 15, 2021 (GOI IQR) at 37).
[134] *Id*. (citing GOI IQR at 36; and GOI SQR2 at 12).
[135] *See* GOI's Case Brief at 18.

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

- Only the excess drawback can be countervailed as has been held by the WTO panel in its Panel Report, "European Union – Countervailing Measures on Certain Polyethylene Terephthalate from Pakistan" WT/DS486/R.[136]
- The Customs, Central Excise Duties & Service Tax Rules, 1995 (Drawback Rules) provide for a verification procedure under DDB.  In order to monitor the consumption of input in the production of the exported product in accordance with the Drawback Rules and the Customs Manual of 2015, GOI has maintained a verification system to ensure that the quantity of inputs for which drawback is claimed by exporters does not exceed the quantity of similar goods exported.[137]
- Commerce incorrectly determined that there is no effective and reasonable verification system put in place by the GOI.  In fact, the GOI has an effective control mechanism at every stage of the process.  Per the SCM Agreement and the WTO Appellate Body report, the DDB program is not countervailable and Commerce must reconsider its decision to countervail it.[138]

***Petitioner's Rebuttal Brief:***[139]

- In the *Preliminary Determination*, Commerce found that the GOI continues to lack a system to confirm which inputs are consumed in the production of exported merchandise and in what amounts, based on a lack of evidence from the GOI regarding the calculation of standard input-output norms, the implementation of any penalties on companies claiming excessive credits, and the availability of benefits for deemed exports.[140]
- Commerce also found that the GOI continues to employ universal drawback rates that are not related to a respondent's actual consumption, production, and waste, and thus the GOI cannot confirm whether the amounts rebated under the program are excessive.[141]
- As the GOI has not refuted any of these facts, Commerce should reject these arguments from the GOI and continue to find the AAP and DDB programs countervailable, as it has done in recent investigations.[142]

**Commerce's Position:**  We do not agree with the arguments made by the GOI that countervailing the AAP or DDB program in this case contravenes the SCM Agreement.  We are conducting this investigation pursuant to U.S. CVD law, specifically the Act and Commerce's regulations.  To the extent that the GOI is raising arguments concerning certain provisions of the SCM Agreement in this proceeding, the U.S. CVD law fully implements the United States' obligations under the SCM Agreement.  As we explained in *Steel Flanges from India*:

> {O}ur CVD laws are consistent with our WTO obligations.  Moreover, it is the Act and {Commerce's} regulations that have direct legal effect under U.S. law, and not the WTO

---

[136] *Id*. at 18-19.
[137] *Id*. at 20.
[138] *Id*. at 20 (citing GOI IQR at 53-75 and Exhibit 16; and GOI SQR2 at 13).
[139] *See* Petitioner's Rebuttal Brief at 15-16.
[140] *Id*. at 15 (citing *Preliminary Determination* PDM at 19-20).
[141] *Id*. at 15-16 (citing *Preliminary Determination* PDM at 21).
[142] *Id*. at 16 (citing *Wind Towers from India* IDM at Comment 9).

Barcode:4203113-02 C-533-900 INV - Investigation  -

Agreements or WTO reports.  In this regard, WTO reports "do not have any power to change U.S. law or to order such a change."[143]

Therefore, because our decisions here are consistent with the Act and our regulations, they are also consistent with our obligations under the SCM Agreement.  The GOI's WTO-related arguments have no merit in this regard.

Further, the GOI has not identified any record information that would contradict our findings in the *Preliminary Determination*, and in previous investigations,[144] with regard to the AAP and DDB programs.[145]  Specifically, we disagree with the GOI's claims that it maintains an adequate control or verification system in place for the AAP and DDB programs such that these programs would not be found to be providing a countervailable benefit within the meaning of 19 CFR 351.519(a)(4).  As discussed in the *Preliminary Determination,* the GOI's response lacks the documentation to support a finding that the GOI has a system in place to confirm which inputs are consumed in the production of the exported products, and in what amounts.[146]

Additionally, in regard to the GOI's specific claim that the Drawback Rules allow for verification of inputs consumed in the exported subject merchandise for the DDB, while the GOI maintains that its Drawback Rules provide for a verification procedure, the GOI has not provided record evidence that it has conducted such verifications.  To merely state or point to a system is not enough to demonstrate that such a system actually exists in practice; that system must also be implemented and supported with documentation.[147]  When asked specifically for information regarding verification procedures for GFCL and producers of granular PTFE resin under the DDB program, the GOI merely referred to a document specifying the details of duty drawback amounts issued to GFCL.[148]  However, this document contained no specific verification information.  Thus, we do not find that the GOI has a reasonable or effective system in place that implements the monitoring of the inputs consumed in the production of the exported product, a finding that is consistent with Commerce's previous determinations.

---

[143] *See Finished Carbon Steel Flanges from India:  Final Affirmative Countervailing Duty Determination*, 82 FR 29479 (June 29, 2017) (*Steel Flanges from India*), and accompanying IDM at Comment 1.

[144] *See Certain Quartz Surface Products from India:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 FR 54838 (October 11, 2019) (*QSP from India Prelim*), and accompanying PDM at 15-16, unchanged in *Certain Quartz Surface Products from India:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 FR 25398 (May 1, 2020) (*QSP from India Final*), and accompanying IDM; and *Polyester Textured Yarn from India: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 FR 19036 (May 3, 2019), and accompanying PDM at 16-17, unchanged in *Yarn from India Final* IDM at Comment 3.

[145] *See Preliminary Determination* PDM at 18-22 (explaining the countervailability of the AAP, DDB, and EPCGS programs).

[146] *See Preliminary Determination* PDM at 18-20 (discussing AAP) and 20-22 (discussing the DDB program).

[147] *See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from India:  Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 10789 (March 22, 2019) (*PET Film from India*), and accompanying IDM at Comment 4.

[148] *See* GOI SQR2 at 13 (citing GOI IQR at Exhibit 16).

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

Barcode:4203113-02 C-533-900 INV - Investigation  -

**Comment 7:   Whether RECs Provide a Financial Contribution**

*GFCL's Case Brief:*[149]

- In the *Preliminary Determination*, Commerce determined that "the REC has value at the time of bestowal…in the amount for which GFCL sells its RECs to other entities."  However, if GFCL transfers its RECs to other entities, it is a private transaction not influenced by the GOI.  Thus, the REC sales cannot qualify as a countervailable subsidy.
- The certificate itself does not have any credit value and is non-transferable.[150]  In order to get the monetary value of the REC, GFCL can sell the REC on a trading platform and cannot use it as a credit or to fulfill any other obligation to the GOI.[151]
- Although the GOI issues the RECs and maintains the program, no authority has provided a financial contribution to GFCL.

*Petitioner's Rebuttal Brief:*[152]

- GFCL claims that its sales of its RECs are private transactions not influenced by the GOI.  However, this assertion ignores the fact that no entity would purchase the RECs from GFCL if the GOI had not established the certificates in the first place, created a market for trading the certificates, and imposed a renewable energy purchase obligation on certain entities to require them to purchase the certificates.[153]
- The GOI's actions give value to the RECs, a value that would not otherwise exist.
- While the exact amount of the value is not known at the time of bestowal, this fact does not affect whether the certificates constitute a financial contribution.

**Commerce's Position:**  In our *Preliminary Determination*, we found that RECs constitute a financial contribution in the form of a direct transfer of funds, pursuant to section 771(5)(D)(i) of the Act.[154]  GFCL argues that because RECs themselves have no tradable value and that the transfer of RECs are private transactions unimpacted by the GOI, there is no financial contribution from the GOI.  However, the fact that private parties are willing to compensate GFCL for RECs indicates that those RECs have monetary value, even if the amount of that value may not be known at the time of bestowal.  We agree with the petitioner that the RECs are an instrument with monetary value and the GOI's bestowal of RECs to GFCL constitutes a financial contribution in the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act.

---

[149] *See* GFCL Case Brief at 23 – 24.
[150] *Id*. at 24 (citing GFCL IQR at 66-67).
[151] *Id*. at 24 (citing GFCL IQR at 67-68).
[152] *See* Petitioner's Rebuttal Brief at 13-14.
[153] *Id*. at 13 (citing *Preliminary Determination* PDM at 23).
[154] *See Preliminary Determination* PDM at 24.

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

Barcode:4203113-02 C-533-900 INV - Investigation -

**Comment 8:   Whether Commerce Should Correct Its Electricity Duty Exemption Calculations**

*Petitioner's Case Brief:*[155]

- In its preliminary calculations, Commerce included GFCL's electricity duty exemptions for wind power in the total benefit for the SGOG Exemption from Electricity Duty program. GFCL submitted updated electricity duty exemptions for wind power on June 11, 2021.[156] Commerce, however, continued to use the previous information in its post-preliminary calculations.[157]  Commerce should use GFCL's updated duty exemptions in its final calculations.

**Commerce's Position:**  We agree with the petitioner that we erred in not using GFCL's updated data for electricity duty exemptions for wind power.  We have revised our benefit calculations accordingly for the final determination to incorporate the updated data.[158]

## VIII.   RECOMMENDATION

We recommend approving all of the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                              ☐
_____          _____
Agree                        Disagree
                             1/18/2022

X   *Lisa W. Wang*
_____

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[155] *See* Petitioner's Case Brief at 4.
[156] *Id.* at 4 (citing GFCL SQR2 at 5 and Exhibit S2-6).
[157] *Id.* (citing Post-Preliminary Calculation Memorandum at Attachment 2).
[158] *See* Final Calculation Memorandum at 3 and Attachment 2.

Filed By: Joshua Simonidis, Filed Date: 1/19/22 4:45 PM, Submission Status: Approved

# Addendum 7

Barcode:4166777-01 C-533-900 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-533-900
Investigation
**Public Document**
E&C/VIII:  JCM/JS

October 1, 2021

**MEMORANDUM TO**:      Christian Marsh
                                    Acting Assistant Secretary
                                      for Enforcement and Compliance

**FROM**:                      Scot Fullerton
                                    Associate Deputy Assistant Secretary
                                      for Antidumping and Countervailing Duty Operations

**SUBJECT**:                 Post-Preliminary Analysis of Countervailing Duty Investigation:
                                    Granular Polytetrafluoroethylene Resin from India

---

## I.     BACKGROUND

The countervailing duty (CVD) investigation of granular polytetrafluoroethylene resin (granular PTFE resin) from India covers one mandatory company respondent, Gujarat Fluorochemicals Limited (GFCL).  The period of investigation (POI) is April 1, 2019, through December 31, 2020, reflecting the most recently completed Indian fiscal year.[1]  On July 6, 2021, Commerce published its *Preliminary Determination* of this investigation.[2]  We preliminarily calculated a subsidy rate of 4.75 percent for GFCL.

In the *Preliminary Determination*, we stated our intention to examine certain programs used by GFCL's affiliate, Inox Wind Limited (IWL), in a post-preliminary analysis:  (1) State Industrial Development (SIDC)'s Provision of Land for Less Than Adequate Remuneration (LTAR); (2) State Government of Madhya Pradesh (SGOMP) Exemption from Electricity Duty; (3) Value-Added Tax (VAT) and Central Services Tax (CST) Exemption in State of Madhya Pradesh (MP) and Himachal Pradesh (HP);[3] and (4) the usage of the Merchandise Export from India Scheme (MEIS) program by GFCL.  Moreover, IWL also reported receiving benefits under the Export Promotion of Capital Goods Scheme (EPCGS) discussed for GFCL in the *Preliminary*

---

[1] *See* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Request to Change the Period of Investigation," dated March 11, 2021; *see also* Memorandum, "Period of Investigation Change," dated March 15, 2021.
[2] *See Granular Polytetrafluoroethylene Resin from India:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 86 FR 35479 (July 6, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[3] *See* GFCL's Letter, "Inox Wind Limited's Section III Questionnaire Response (Part I)," dated May 24, 2021 at 31; *see also* GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Fourth Supplemental Questionnaire Response," dated August 13, 2021 at 5-6.  GFCL initially reported that IWL had an exemption from payment of VAT and CST on sales turnover, in the state of MP and HP, until June 30, 2017; GFCL later confirmed that it did not use this program during the POI.

INTERNATIONAL
T R A D E
ADMINISTRATION

Barcode:4166777-01 C-533-900 INV - Investigation -

*Determination*.[4]  Commerce issued supplemental questionnaires to GFCL and the Government of India (GOI) regarding these programs.[5]

## II.    SUBSIDIES VALUATION INFORMATION

Allocation Period

The allocation period or average useful life (AUL) of 15 years is unchanged from the *Preliminary Determination*.[6]

Attribution of Subsidies

Our attribution methodology is unchanged from the *Preliminary Determination*.[7]

Discount Rates

Consistent with the *Preliminary Determination*, we used, as our discount rate, the long-term interest rate that the company paid on its Indian rupee (INR)-denominated long-term borrowing.[8] For the years in which a comparable commercial loan rate obtained by GFCL was not available, in accordance with 19 CFR 351.505(a)(3)(ii), we used national average interest rates from the International Monetary Fund's International Financial Statistics as benchmark rates for INR-denominated long-term loans.  The interest rate benchmarks and discount rates used in our preliminary calculations are provided in the Post-Preliminary Calculation Memorandum for GFCL.[9]

Land Benchmark

Commerce identifies appropriate market-determined benchmarks for measuring the adequacy of remuneration for government-provided goods or services, in accordance with 19 CFR 351.511(a)(2).  This section of Commerce's regulations specifies potential benchmarks in hierarchical order by preference:  (1) market prices from actual transactions within the country under investigation (*e.g.*, actual  transactions between private parties, actual imports or actual sales from competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).  As provided at 19

---

[4] *See Preliminary Determination* PDM at 16-18.
[5] *See* Commerce's Letters, "Second Supplemental Questionnaire for Gujarat Fluorochemicals Limited and Inox Wind Limited," dated June 3, 2021; "Third Supplemental Questionnaire for Gujarat Fluorochemicals Limited and Inox Wind Limited," dated June 4, 2021; and "Fourth Supplemental Questionnaire for Gujarat Fluorochemical Limited," dated July 23, 2021; *see also* Commerce's Letters, " Second Supplemental Questionnaire," dated June 8, 2021 (GOI 2nd Supplemental Questionnaire) and "Second Supplemental Questionnaire," dated August 2, 2021 (GOI 3rd Supplemental Questionnaire).
[6] *See Preliminary Determination* PDM at 6, "Allocation Period."
[7] *Id.* at 6-8, "Attribution of Subsidies."
[8] *See Preliminary Determination* PDM at 9, "Long-Term Indian Rupee (INR)-Denominated Loans".
[9] *See* Memorandum, "Post-Preliminary Analysis Calculations for Gujarat Fluorochemicals Limited," dated concurrently with this memorandum (GFCL Post-Preliminary Calculation Memorandum).

CFR 351.511(a)(2), the preferred benchmark in the hierarchy is an observed market price from actual transactions within the country under investigation.  This is because such prices generally reflect most closely the prevailing market conditions of the purchaser under investigation.

Based on this hierarchy, we must first determine whether there are market prices from actual sales transactions involving buyers and sellers in India that can be used to determine whether the government authority sold land to the respondent for LTAR.  Notwithstanding the regulatory preference for the use of prices from actual transactions in the country, where Commerce finds that the government owns or controls the majority or, in certain circumstances, a substantial portion of the market for the good or service, Commerce will consider such prices to be significantly distorted and not an appropriate basis of comparison for determining whether there is a benefit.

After the *Preliminary Determination*, we requested from all interested parties benchmark information for IWL's land purchase from the government of Madhya Pradesh under the state-level Industrial Promotion Act policy.[10]

Daikin America, Inc. (the petitioner) submitted news articles regarding two private land transactions in India.[11]  The first land transaction involved commercial land purchased in auction in Indore, Madhya Pradesh, for Reliance Industries Ltd.'s retail activities.[12]  The second transaction involved "prime" land, formerly used by a textile mill, purchased in a competitive auction in Mumbai, Maharashtra.[13]

GFCL submitted prices listed in the Guiding Principles for Market Value of Agricultural Land 2014-2015, an official document published by the state of Madhya Pradesh.[14]  This document consists of recommended prices for agricultural land in various districts within the state and not actual land transactions.  GFCL also submitted the state's recommended method for pricing agricultural land converted to industrial land.  In rebuttal comments, GFCL stated that transactions involving "commercial" and "prime" land are not a proper comparison to IWL's industrial land and therefore GFCL did not provide data from actual land transactions.  GFCL also noted that the transaction in Indore, Madhya Pradesh, is not contemporaneous with IWL's land purchase.

Regarding the transaction reported by the petitioner that occurred in Madhya Pradesh, we note that we have previously rejected this particular benchmark in *India Yarn* because we did not consider a commercial land price to be a comparable benchmark for the respondent's purchase of industrial land from the state development corporation.[15]  Regarding the Mumbai transaction, we note that the land was formerly used for industrial purposes and could, therefore, be comparable

---

[10] *See* Memorandum, "Land Benchmark Information," dated August 4, 2021.
[11] *See* Petitioner's Letter, "Land Benchmark Submission," dated August 11, 2021.
[12] *Id.* at Exhibit 1.
[13] *Id.* at Exhibit 3.
[14] *See* GFCL's Letter, "Gujarat Fluorochemicals Limited's Benchmark Data Submission," dated August 11, 2021.
[15] *See Polyester Textured Yarn from India:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 84 FR 19036 (May 3, 2019), and accompanying Issues and Decision Memorandum (IDM) at 6-7, unchanged in *Polyester Textured Yarn from India: Final Affirmative Countervailing Duty Determination*, 84 FR 63848 (November 19, 2019) (*India Yarn*).

to IWL's purchase of industrial land, notwithstanding its location outside of the state of Madhya Pradesh.

GFCL's benchmark submission is a government document that provides pricing guidelines for agricultural land.  Pursuant to 19 CFR 351.511(a)(2)(i), our benchmark should be derived from "prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions."  Therefore, relying on GFCL's pricing guidelines for agricultural lands is not consistent with our regulations or practice.

Thus, we preliminarily determine that the pricing guidelines submitted by GFCL do not provide a suitable benchmark for determining the adequacy of remuneration for IWL's land purchase.  We also preliminarily determine that the Indore, Madhya Pradesh transaction is also not a suitable benchmark, pursuant to precedent.  Thus, we believe that the only transactions on the record suitable for benchmarking purposes are the transaction that occurred in Mumbai, Maharashtra, and the Gujarat transaction, which was used in the *Preliminary Determination*. Therefore, we are averaging the Mumbai benchmark and Gujarat benchmark from the *Preliminary Determination* to calculate the adequacy of remuneration for IWL's land purchase.[16]

## III.    USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

### A.  Legal Standard

Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person withholds information that has been requested; fails to provide information within the established deadlines or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; significantly impedes a proceeding; or provides information that cannot be verified, as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  When selecting an adverse facts available (AFA) rate from among the possible sources of information, Commerce's practice is to ensure that the rate is sufficiently adverse "as to effectuate the statutory purposes of the AFA rule to induce respondents to provide Commerce with complete and accurate information in a timely manner."[17]  Commerce's practice also ensures "that the party does not obtain a more favorable

---

[16] *See* GFCL Post-Preliminary Calculation Memorandum.

[17] *See, e.g., Drill Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).

4

Barcode:4166777-01 C-533-900 INV - Investigation  -

result by failing to cooperate than if it had cooperated fully."[18]  At the same time, section 776(b)(1)(B) of the Act states that Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that, while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[19]  Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.  The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.  While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[20]  The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[21] Further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[22]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."[23]  It is Commerce's practice to consider information to be corroborated if it has probative value.[24]  In analyzing whether information has probative value, it is Commerce's practice to examine the reliability and relevance of the information to be used.[25]  However, the SAA emphasizes that Commerce need not prove that the selected facts available are the best alternative information.[26]  Furthermore, Commerce is not required to corroborate any countervailing subsidy rate applied in a separate segment of the same proceeding.[27]

---

[18] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) (SAA) at 870.

[19] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*).

[20] *Id.*, 337 F.3d at 1382.

[21] *Id.*

[22] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties; Countervailing Duties:  Final Rule*, 62 FR 27296, 27340 (May 19, 1997); and *Nippon Steel*, 337 F.3d at 1382-83.

[23] *See, e.g.*, SAA at 870.

[24] *Id.* at 870.

[25] *Id.* at 869.

[26] *Id.* at 869-870.

[27] *See* section 776(c)(2) of the Act.

5

Under section 776(d) of the Act, Commerce may use any countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or if there is no same or similar program, use a CVD rate for a subsidy program from a proceeding that Commerce considers reasonable to use, including the highest of such rates.  Additionally, when selecting an AFA rate, Commerce is not required for purposes of section 776(c) of the Act, or any other purpose, to estimate what the countervailable subsidy rate would have been if the interested party had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[28]  For purposes of this preliminary determination, we are applying facts available for the circumstances outlined below.

### B.  Application of Facts Available:  Duty Rates for EPCGS

In the *Preliminary Determination*, Commerce determined that the applicable duty rate information required to calculate benefit under EPCGS was not available on the record and that the GOI failed to provide the information requested of it.[29]  However, in its responses, GFCL reported the applicable duty rates and provided supporting documentation.[30]  Accordingly, Commerce relied on "facts available" pursuant to sections 776(a)(1), 776(a)(2)(A) and (C) of the Act with no adverse inference to use GFCL's reported information in its benefit calculations.  In the *Preliminary Determination*, Commerce stated its intention to follow up with the GOI to obtain the applicable duty rates under this program, which are the government's responsibility to provide.[31]

In its supplemental questionnaire responses, the GOI provided narrative information and supporting documentation for the majority, but not all, of the applicable duty rates under EPCGS.[32]  For these rates, the information and supporting documentation provided by the GOI matches what GFCL provided in its response with regard to the same rates, and it appears that both the GOI and GFCL relied on the same underlying data.  Typically, Commerce requires financial contribution information from the government, but we have at times considered information from respondents to be adequate where such information, (*e.g.*, tax rates) is already widely available to the public.

As the GOI information largely corroborates the reported applicable duty rates provided by GFCL, Commerce determines that it will use "facts available" pursuant to sections 776(a)(1), 776(a)(2)(A) and (C) of the Act with no adverse inference and use GFCL's reported information for the remaining applicable duty rates in the benefit calculation for IWL under EPCGS.

---

[28] *See* section 776(d)(3) of the Act.

[29] *See Preliminary Determination* PDM at 12-13.

[30] *See* GFCL's Letter, "Gujarat Fluourochemicals Limited's Section III Questionnaire Response," dated May 6, 2021 (GFCL IQR) at 18-23 and Exhibits 10(h) to 10(s).

[31] *See Preliminary Determination* PDM at 13.

[32] *See* GOI's Letter, "Second Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated June 24, 2021 (GOI SQR2), at 7-13 and at Exhibits 1-3 and at Exhibit 5; *see also* GOI's Letter, "Third Supplementary Questionnaire Response to Section-II on behalf of Government of India," August 26, 2021, at Exhibit 4.

Barcode:4166777-01 C-533-900 INV - Investigation  -

### C.  Application of AFA:  MEIS Financial Contribution and Specificity

In its initial questionnaire response, GFCL reported the receipt of benefits from this program during the POI.[33]  Furthermore, GFCL claimed that this program was used only for non-subject merchandise.[34]

Because the GOI did not respond to the program-related questions in its IQR,[35] we issued a supplemental questionnaire, again requesting that the GOI respond to the Standard Questions Appendix and to questions requesting program-specific information, including the following: criteria governing the eligibility for the receipt of the duty credit scrips under this program; a copy of any relevant law, regulation or other official document detailing how the duty credit scrip rates for the subject merchandise are calculated, reviewed, and revised; which goods are included in the eligible duty credit scrips and whether these goods are consumed in the production of subject merchandise; the standard rate of duty and other import fees that are applicable for each of the imported goods for which GFCL received duty credit scrips during the POI; the duty credit scrips provided to the GFCL during the POI for inputs into the exported subject merchandise by both rate and amount; the rates are applicable to this industry; and which imported products not consumed in the production of the subject merchandise, but used to produce the subject merchandise, are eligible for the duty credit scrips.[36]

In its supplemental questionnaire response, the GOI failed to provide the requested information and simply responded, "{t}he GOI reiterates that the mandatory respondent has not availed the benefit during POI."[37]  Thus, the GOI again failed to respond to our questions, even though GFCL reported usage of this program.

Due to the GOI's refusal to respond to the Standard Questions Appendix and additional questions regarding GFCL's reported MEIS benefits, we preliminarily determine that the information necessary to analyze whether this program constitutes a financial contribution, is specific, and is tied to subject merchandise is not available on the record and that the GOC has withheld information that was requested of it.  Thus, we must rely on facts available for purposes of this preliminary determination, in accordance with section 776(a)(1) and 776(a)(2)(A) of the Act.

Moreover, we preliminarily determine that the GOI failed to cooperate by not acting to the best of its ability to comply with our request for information.  Consequently, an adverse inference is warranted in the application of facts available, pursuant to section 776(b) of the Act.  In applying the adverse inference, we find that the MEIS benefits reported by GFCL constitute financial contributions, pursuant to section 771(5)(D) of the Act, and are specific, within the meaning of section 771(5A) of the Act.

---

[33] *See* GFCL IQR at 64-66.
[34] *Id.*
[35] *See* GOI IQR at 103-104.
[36] *See* GOI 2nd Supplemental Questionnaire at 6-7.
[37] *Id.* at 14.

Barcode:4166777-01 C-533-900 INV - Investigation  -

### D. Application of Facts Available and Adverse Inference:  SGOMP Industrial Promotion Act

GFCL reported that IWL received benefits from the following two programs under the SGOMP Industrial Promotion Act:  (1) the SIDC's Provision of Land for LTAR; and (2) the SGOMP Exemption from Electricity Duty.[38]  These programs are part of a larger package of incentives under the SGOMP's Industrial Promotion Act.  In order to receive these incentives, companies must register a project proposal with the Madhya Pradesh Industrial Development Corporation (MPIDC) and receive approval for the project.[39]  In its supplemental responses, the GOI did not respond to a number of our questions concerning eligibility criteria for receiving the incentives offered by this policy, and, therefore, Commerce's ability to analyze the specificity of the policy is severely limited.

First, we requested information regarding the number of recipient companies and industries and the amount of assistance approved under this program, information that is normally used to determine *de facto* specificity.[40]  Specifically, we requested the following:  the amount of assistance approved for each mandatory respondent company; the total amount of assistance approved for all companies under the program; the total number of companies that were approved for assistance under this program; the total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under this program; and the total number of companies that applied for, but were denied, assistance under this program.[41]  The GOI initially responded that "{t}he SGMP does not maintain the information in the desired format."[42]  When we again requested this information in whatever format is available, the GOI responded that "IWL hasn't applied at MPIDC for availing assistance under the Investment Promotion Policy 2010 (amended 2012)" and that, therefore, the "below questions were not answered."[43]

Full responses to Commerce's information request allow Commerce to determine whether a program is specific as a matter of fact.  The GOI's failure to provide the requested information necessary for a full analysis regarding the *de facto* specificity of this program has significantly impeded Commerce's ability to investigate this program pursuant to section 776(a) of the Act.

We also requested information regarding whether the incentives under the Industrial Promotion Act are specific as a matter of law.  For instance, as part of our Standard Questions Appendix, we asked for a description of the application process for assistance under the program; a

---

[38] *See* GFCL's Letter, "Granular Polytetrafluoroethylene Resin from India; Inox Wind Limited's Section III Questionnaire Response (Part II)," dated May 26, 2021 (IWL IQR Part 2).

[39] *See* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India: Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated July 1, 2021 (GOI SQR3), at Exhibits 1 and 2.

[40] *See* GOI 2nd Supplemental Questionnaire at 7.

[41] *Id*.

[42] *See* GOI SQR3 at 16 and 28.

[43] *See* GOI's Letter, "Countervailing Duty (CVD) Investigation on Granular Polytetrafluoroethylene Resin (Granular PTFE Resin) from India:  Second Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated August 20, 2021 (GOI SQR4), at 22 and 26.

8

Barcode:4166777-01 C-533-900 INV - Investigation  -

description of the procedures by which an application is analyzed and eventually approved or rejected; and a copy of at least one completed application and approval package for IWL.[44]  In its initial response, the GOI simply referred us to the Industrial Promotion Act itself, which does not contain this information.[45]  When again prompted to provide this information, the GOI again referred us to the Industrial Promotion Act and stated that IWL did not apply for assistance under this policy,[46] even though GFCL reported usage of the two programs stated above[47] and the GOI previously stated that IWL received assistance under this program.[48]  Without understanding the application process or the criteria by which an application is analyzed, we do not know how the GOI decides who is eligible to receive assistance for this program.  The GOI's lack of cooperation in providing this information hinders our ability to assess whether the provision of this assistance is specific as a matter of law or practice.

We also requested the criteria governing the eligibility for and receipt of any assistance under this policy and the criteria for determining the amount of the assistance provided.[49]  While the GOI did refer to the Industrial Promotion Act itself for the criteria,[50] we noted in a subsequent supplemental questionnaire that the act did not specifically state how a project is deemed eligible or ineligible for assistance.[51]  We then requested that the GOI explain how it determines whether a project is eligible to receive assistance, and why IWL's project specifically was deemed eligible.[52]  However, the GOI simply responded that "IWL has not applied at MPIDC for assistance under Investment Promotion Policy 2014 (amended 2020)."[53]

Again, understanding the eligibility criteria for this program is key to our specificity analysis.  The law itself simply states in the "Eligibility" article that investors must register their project proposals with the MPIDC and obtain a registration number to avail incentives under this policy, as long as they are not receiving incentives sanctioned under earlier policies.[54]  However, we know that these incentives are not granted automatically based on the GOI's own statement: "{a} unit does not receive assistance automatically.  First, it has to get the approval of the State Level Empowered Committee."[55]  Furthermore, the law states that State Level Empowered Committee (SLEC) is responsible for coordinating relevant departments, monitoring and approving investment proposals, disbursing incentives, and creating customized incentive packages for large and mega scale industrial units.[56]  Therefore, a committee is involved in determining who is eligible for benefits under the SGMOP Industrial Promotion Act.  We also know that IWL was eligible to receive a customized package of incentives based on its designation as a "mega scale industrial unit," *i.e.*, a unit with an investment of at least one billion Indian rupees.[57]  However,

---

[44] *See* GOI 2nd Supplemental Questionnaire at 7.
[45] *See* GOI SQR3 at 12.
[46] *See* GOI SQR4 at 21.
[47] *See* IWL IQR Part 2 at 19 and 21.
[48] *See* GOI SQR3 at 9 and 21.
[49] *See* GOI 2nd Supplemental Questionnaire at 7
[50] *See* GOI SQR3 at 12-13.
[51] *See* GOI 3rd Supplemental Questionnaire at 7.
[52] *Id*.
[53] *See* GOI SQR4 at 21 and 25.
[54] *See* GOI SQR3 at Exhibits 1 and 2.
[55] *Id*. at 27.
[56] *Id*. at Exhibit 2.
[57] *See* GOI SQR4 at 24.

9

Barcode:4166777-01 C-533-900 INV - Investigation  -

the guidelines and criteria by which the SLEC analyzes and approves investment proposals and creates customized incentive packages are not on the record, and the GOI twice failed to provide this information when prompted.

In addition to our standard questions, we asked several questions regarding the language in the Industrial Promotion Policy. First, we noted that Article 6 of the Industrial Promotion Act states, "{t}he State Government has substantial availability of both government and private land parcels for industrial development."[58] In a supplemental questionnaire, we asked the GOI to clarify from where the GOI is acquiring land for industrial development and to provide a detailed explanation of the circumstances and legal authority under which the GOI provides private land parcels for industrial development.[59] In both cases, the GOI stated that these questions were "not applicable."[60] We asked for this information to better understand the geographic scope of this policy within the state of Madhya Pradesh, which would help us to determine whether the incentives are specific under section 771(5A)(D)(iv) of the Act. The GOI's refusal to clarify this information prevents us from analyzing the geographic specificity of the industrial promotion policy.

Second, we noted that, though the GOI stated that the program is not limited to any particular sector or industry, Article 5 of the Industrial Promotion Policy – (Amended) 2018 mentions that there are "ineligible industries."[61] We asked the GOI to explain this apparent discrepancy and provide a list of the industries that would have been considered ineligible when IWL applied for and received assistance from this program.[62] In response, the GOI stated, "The State Govt. considers the requirement of the state and the nature of the industrial activity for ascertaining the category of ineligible industries."[63] This response is insufficient, does not provide the requested list of industries that are considered ineligible for this program, and does not answer our question. As a result, ambiguity exists as to whether the incentives are offered on an industry-specific basis and, if so, what industries are considered ineligible to receive these incentives.

Therefore, as noted above, the GOI failed to provide necessary information specifically requested by Commerce and, thus, significantly impeded Commerce's ability to investigate the program. Consequently, we preliminarily determine that necessary information is not available on the record and that Commerce must rely on "facts available" in making our preliminary determination, in accordance with sections 776(a)(1), 776(a)(2)(A) and (C) of the Act.

Moreover, we preliminarily determine that the GOI failed to cooperate by not acting to the best of its ability to comply with our requests for information. Consequently, an adverse inference is warranted in the application of facts available, pursuant to section 776(b) of the Act due to the GOI's failure to respond to the best of its ability. In applying AFA, we preliminarily determine that the incentives provided by the SGOMP Industrial Promotion Act are specific within the

---

[58] See GOI SQR3 at Exhibit 2.
[59] See GOI 3rd Supplemental Questionnaire at 4.
[60] See GOI SQR4 at 19-20.
[61] See GOI SQR3 at 14 and 17 and at Exhibit 2.
[62] See GOI 3rd Supplemental Questionnaire at 5-6.
[63] See GOI SQR4 at 22.

meaning of section 771(5A)(D) of the Act.  This determination applies to the SIDC's Provision of Land for LTAR and the SGOMP Exemption from Electricity Duty.

## IV.   ANALYSIS OF PROGRAMS

Based upon our analysis and the responses to the questionnaires and supplemental questionnaires discussed above, we find the following:

### A.  Programs Preliminarily Determined To Be Countervailable

1. EPCGS

Commerce determined in the *Preliminary Determination* that this program is countervailable consistent with previous findings.[64]  Specifically, we found that EPCGS was specific within the meaning of sections 771(5A)(A) and (B) of the Act because the program is contingent upon export performance, and that EPCGS constitutes a financial contribution pursuant to section 771(5)(D)(ii) of the Act.[65]  Additionally, EPCGS provides a benefit equal to the sum of:  (1) the benefit attributable to the POI from the formally-waived duties for imports of capital equipment for which the respondent met export requirements by the end of the POI; and (2) the difference between what the recipients paid on their loans and the amount they would have paid on comparable commercial loans.  The benefit received for IWL under the EPCGS program is the interest that would have been due had the respondent borrowed the full amount of the duty reduction or exemption at the time of the importation for imports of capital equipment for which respondents had not met export requirements during the POI.  To determine the net countervailable subsidy for IWL under EPCGS, we divided the benefit received by IWL by the total export sales of IWL and GFCL during the POI.[66]

On this basis, we preliminarily determine the net countervailable subsidy provided to GFCL, inclusive of IWL, under EPCGS is 0.09 percent *ad valorem*.

2. MEIS

Under this program, exports of specific goods and products to designated markets are rewarded with a duty scrip to offset infrastructural inefficiencies and associated costs involved in the export of goods and products that are produced and manufactured in India.[67]  These scrips are freely transferrable.[68]  This program especially targets the exports of products that enhance India's export competitiveness.[69]  The values of the duty scrips are calculated based on a

---

[64] *See, e.g.*, *Notice of Final Affirmative Countervailing Duty Determination:  Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India*, 67 FR 34905 (May 16, 2002), and accompanying IDM at "EPCGS" section; *see also Certain Frozen Warmwater Shrimp from India:  Final Affirmative Countervailing Duty Determination*, 78 FR 50385 (August 19, 2013), and accompanying IDM at 14.

[65] *See* GOI's Letter, "Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated May 21, 2021, at 23; *see also* GOI SQR2 at Exhibit-4.

[66] For a more complete description of the benefit calculation, *see Preliminary Determination* PDM at 16-18.

[67] *See* GFCL IQR at 64.

[68] *Id.* at 65.

[69] *Id.* at 64.

Barcode:4166777-01 C-533-900 INV - Investigation  -

percentage of the realized free-on-board value of eligible exports.[70]  The exact percentage varies according to the exported merchandise and the country of destination.[71]

GFCL reported using this program during the POI.[72]  For the reasons stated in the "Application of AFA:  MEIS Financial Contribution and Specificity" section above, we find that the MEIS duty scrips received by GFCL constitute financial contributions, pursuant to section 771(5)(D) of the Act, and are specific, within the meaning of section 771(5A) of the Act.

This program provides a recurring benefit because, unlike the Status Holders Incentive Scrip scheme, the scrips provided under this program are not tied to capital assets.  Furthermore, pursuant to 19 CFR 351.524(c)(2)(i), the benefits under this program are recurring because recipients can expect to receive additional subsidies under this same program on an ongoing basis from year to year.  Consistent with precedent, we calculated the benefit to GFCL to be the total value of scrips granted (*i.e.*, the MEIS license value) during the POI.[73]  Normally, in cases where the benefits are granted based on a percentage value of a shipment, Commerce calculates the benefit as having been received as of the date of exportation;[74] however, because the MEIS benefit (*i.e.*, the scrip) amount is not automatic and is not known to the exporter until well after the exports are made, the MEIS licenses, which contain the date of validity and the duty exemption amount as issued by the GOI, are the best method to determine and account for when the benefit is received.[75]  We then divided the total POI exemption amount by the total sales of IWL and GFCL.

On this basis, we preliminarily determine that the net countervailable subsidy provided to GFCL under the MEIS to be 0.46 percent *ad valorem*.

   3.   SIDC's Provision of Land for LTAR

This program was established under the Industrial Promotion Act of 2010, as amended in 2014 and 2018.[76]  This policy's objective is to achieve economic growth through sustainable industrialization, employment generation, skill set enhancement, balanced regional development, ease of doing business, and environment friendly practices in enterprise development.[77]

The SGOMP, which has access to both government and private land parcels for industrial development, offers the following incentives regarding the provision of land under this industrial

---

[70] *Id.* at 65.

[71] *Id.* at 64-65.

[72] *Id.* at 64; *see also* GFCL's Letter, "Gujarat Fluourochemicals Limited's First Supplemental Questionnaire Response," dated June 11, 2021 at 11-14 and at Exhibit S1-11(c).

[73] *See Fine Denier Polyester Staple Fiber from India:  Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 26903 (May 18, 2021), and accompanying PDM at 19-20, unchanged in *Fine Denier Polyester Staple Fiber from India:  Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 50047 (September 7, 2021).

[74] *See* 19 CFR 351.519(b)(1).

[75] *See, e.g., Steel Threaded Rod from India:  Final Affirmative Countervailing Duty Determination and Partial Final Affirmative Determination of Critical Circumstances*, 79 FR 40712 (July 14, 2014), and accompanying IDM at VI.A.5., page 17.

[76] *See* GOI SQR3 at 7.

[77] *Id.*

Barcode:4166777-01 C-533-900 INV - Investigation    -

promotion policy: (1) the provision of developed industrial land at competitive prices; (2) a concession on the premium land rate if the investor intends to set up a project on raw (undeveloped) government land; (3) the provision of 50 percent assistance, up to a maximum of ten million Indian rupees, to medium, large and mega scale industrial units for developing power, water and road infrastructure, if the investor acquires private land or gets undeveloped government land for setting up a project; and (4) the simplification of land allocation rules to expedite the allocation process.[78] According to the GOI, the land owned by the SGOMP is leased to the MPIDC for the creation of industrial units, and the MPIDC collects yearly lease rent on behalf of the SGOMP.

GFCL reported that in 2014, IWL purchased a 30-year lease for a land parcel in the Industrial Area Relwa Khurd (Khjuri) in Madhya Pradesh under the Industrial Promotion Act of 2014 to manufacture components for wind turbine generators.[79] GFCL also reported that IWL received a one-time rebate on the land rate.[80] We preliminarily determine that IWL's land purchase confers a financial contribution as a provision of a good under section 771(5)(D)(iii) of the Act. For the reasons stated above in the "Application of Facts Available and Adverse Inference: Industrial Promotion Act of State Government of Madhya Pradesh (SGOMP)" section above, we also preliminarily find, as AFA, that this benefit is specific under section 771(5A)(D) of the Act.

To calculate the benefit, we compared the private land transaction benchmark with the prices at which IWL leased land from the MPIDC. We then added the difference between the purchase price and the benchmark price described above to the value of the one-time rebate to calculate the total benefit IWL received in the year of the land purchase. We conducted the "0.5 percent test," as instructed by 19 CFR 351.524(b)(2), for the year of the relevant IWL lease by dividing the total unallocated benefit for the tract of land for the corresponding year by the appropriate sales denominator. We found that the benefits were greater than 0.5 percent of the relevant sales for that particular year; therefore, we allocated these benefits over the AUL to determine the amount attributable to the POI.

On this basis, we preliminarily determine the net countervailable subsidy provided to GFCL under this program to be 22.53 percent *ad valorem*.

### B. Programs Preliminarily Determined Not to Have Conferred a Measurable Benefit during the POI

1. SGOMP Exemption from Electricity Duty

This program was also established under the Industrial Promotion Act of 2010, amended in 2014 and 2018.[81] Under the industrial promotion policy, all eligible units having "high tension (HT)" connection by any distribution company in the state by March 3, 2019, shall be exempted from electricity duty.[82] IWL qualified for this exemption by installing a 33 kilovolt (KV) line

---

[78] *Id.* at 7-8 and at Exhibits 1 and 2.
[79] *See* IWL IQR Part 2 at 20 and at Exhibits 9 (a) – (c).
[80] *Id.* at 21.
[81] *See* GOI SQR3 at 19 and at Exhibits 1 and 2.
[82] *Id.*

Filed By: Janae Martin, Filed Date: 10/4/21 8:42 AM, Submission Status: Approved

Barcode:4166777-01 C-533-900 INV - Investigation -

connection to manufacture wind turbine generators and by executing an agreement for an HT load of 1500 KVA on a 33 KV line with Madhya Pradesh Pashchim Kshetra Vidhyut Vitran Company Limited.[83]

We preliminarily determine that these electricity duty exemptions confer a financial contribution in the form of revenue forgone, in accordance with section 771(5)(D)(ii) of the Act. For the reasons explained in the "Application of Facts Available and Adverse Inference: Industrial Promotion Act of State Government of Madhya Pradesh (SGOMP)" section above, we preliminarily determine that these exemptions are specific under section 771(5A)(D) of the Act.

To calculate the benefit, we first calculated the uncollected (*i.e.*, not paid by IWL during the POI) electricity duty by multiplying the total amount of energy charges and fuel cost adjustment by the applicable tax rate. We then divided this amount by the combined total sales of IWL and GFCL during the POI.[84]

On this basis, we preliminarily determine that this program did not confer a measurable benefit of at least 0.005 percent to GFCL during the POI.

### C. Programs Preliminarily Determined Not to Have Been Used during the POI by GFCL or IWL

1. Duty Free Import Authorization
2. Income Tax Exemption for Infrastructure Development Scheme
3. Provision of Coal for LTAR

Subsidies for Export-Oriented Units

4. Duty-Free Import of Goods, Including Capital Goods and Raw Materials
5. Reimbursement of CST Paid on Goods Manufactured in India
6. Exemption from Payment of Central Excise Duty on Goods Manufactured in India and Procured from a Domestic Tariff Area

GOI and State Government of Gujarat (SGOG) Benefits to Companies Located within Special Economic Zones (SEZs)

7. Duty Free Importation of Capital Goods and Raw Materials, Components, Consumables, Intermediates, Spare Parts and Packing Materials
8. Exemption from Payment of CST on Purchases of Capital Goods and Raw Materials, Components, Consumables, Intermediates, Spare Parts, and Packing Material
9. Exemption from Electricity Duty and Cess on the Sale or Supply of Electricity to the SEZ Unit
10. SEZ Income Tax Exemption Provision (Section 10AA)
11. SEZ Act: Service Tax Exemption
12. Exemption from Payment of State Government Taxes and Duties

---

[83] *See* IWL IQR Part 2 at 23.
[84] *See* GFCL Post-Preliminary Calculation Memorandum.

Filed By: Janae Martin, Filed Date: 10/4/21 8:42 AM, Submission Status: Approved

Barcode:4166777-01 C-533-900 INV - Investigation -

SGOG Subsidy Programs

    13. SGOG Provision of Fluorspar for LTAR
    14. Assistance for Common Environment Infrastructure Scheme

SGOMP Subsidy Programs

    15. Industry Investment Promotion Assistance
    16. VAT and CST Exemption in State of MP and HP

## V.    RECOMMENDATION

We recommend that you approve the positions presented above.

☒          ☐
_____    _____
Agree         Disagree

10/1/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

Filed By: Janae Martin, Filed Date: 10/4/21 8:42 AM, Submission Status: Approved

# Addendum 8

Barcode:4138232-01 C-533-900 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

C-533-900
Investigation
**Public Document**
E&C/OVIII: JS/JCM

June 28, 2021

**MEMORANDUM TO:**   Christian Marsh
 Acting Assistant Secretary
   for Enforcement and Compliance

**FROM:**   James Maeder
 Deputy Assistant Secretary
   for Antidumping and Countervailing Duty Operations

**SUBJECT:**   Decision Memorandum for the Preliminary Determination of the
 Countervailing Duty Investigation of Granular
 Polytetrafluoroethylene Resin from India

---

## I.   SUMMARY

The Department of Commerce (Commerce) preliminarily determines that countervailable subsidies are being provided to producers and exporters of granular polytetrafluoroethylene resin (granular PTFE resin), as provided in section 703 of the Tariff Act of 1930, as amended (the Act).

## II.   BACKGROUND

A.   *Case History*

On January 27, 2021, Commerce received a countervailing duty (CVD) petition concerning imports of granular PTFE resin from India, filed in proper form on behalf of Daikin America, Inc. (the petitioner).[1]  We describe the supplements to the Petition and written comments received in place of a consultation meeting in the Initiation Checklist.[2]  On February 23, 2021, we published the initiation of a CVD investigation of granular PTFE resin from India.[3]

In the *Initiation Notice*, we stated that, in the event Commerce determines that the number of Indian producers/exporters of granular PTFE resin is large and it cannot individually examine each company based upon Commerce's resources, Commerce intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports of granular PTFE resin from India during the period of investigation (POI) under the appropriate Harmonized

---

[1] *See* Petition.
[2] *See* Initiation Checklist.
[3] *See Initiation Notice.*

Barcode:4138232-01 C-533-900 INV - Investigation  -

Tariff Schedule of the United States numbers.[4]  On February 12, 2021, Commerce released CBP entry data, and provided interested parties until September 19, 2021, to submit comments on the data.[5]  On March 9, 2021, Commerce selected Gujarat Fluorochemicals Limited (GFCL), the exporter/producer that accounts for the largest volume of subject merchandise during the POI, for individual examination as the mandatory respondent in this investigation.[6]

On March 9, 2021, Commerce issued its initial questionnaire to the Government of India (GOI) requesting information on programs used by GFCL.[7]  For a list of questionnaire responses and comments submitted by interested parties, *see* Appendix.

B.  *Issues for Post-Preliminary Analysis*

On May 24, 2021, GFCL reported that its affiliate, Inox Wind Limited (IWL), received benefits from additional programs, including the following:  (1) State Industrial Development's (SIDC's) Provision of Land for Less Than Adequate Remuneration (LTAR), (2) State Government of Madhya Pradesh (SGOMP) Exemption from Electricity Duty, and (3) Value-Added Tax (VAT) and Central Services Tax (CST) Exemption in State of Madhya Pradesh (MP) and Himachal Pradesh (HP).[8]  Commerce issued supplemental questionnaires to GFCL regarding these programs.[9]  We also issued a supplemental questionnaire to the GOI to collect more information on how these programs are administered.[10]  Furthermore, Commerce also requested from the GOI additional information on the Merchandise Export from India Scheme (MEIS) program, which GFCL claims is tied to non-subject merchandise.[11]  Due to time constraints, we were unable to consider the responses to these supplemental questionnaires for the preliminary determination; however, we will do so in a post-preliminary analysis and the final determination.

C.  *Postponement of Preliminary Determination*

On March 9, 2021, the petitioner requested that Commerce postpone the deadline for the preliminary determination.[12]  Commerce granted the petitioner's request and, on March 19, 2021, published the notification of postponement of the preliminary determination, until June 28, 2021,

---

[4] *See Initiation Notice* at 10933.
[5] *See* Commerce's Letter, "Release of Customs Data from U.S. Customs and Border Protection," dated February 12, 2021.
[6] *See* Memorandum, "Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India: Respondent Selection," dated March 9, 2021.
[7] *See* Initial Questionnaire.
[8] *See* IWL IQR Part 1 at 17-31.
[9] *See* Commerce's Letters, "Countervailing Duty Investigation of Granular Polytetrafluoroethylene (PTFE) Resin from India:  Second Supplemental Questionnaire for Gujarat Fluuorochemicals {sic} Limited and Inox Wind Limited," dated June 3, 2021; and "Countervailing Duty Investigation of Granular Polytetrafluoroethylene (PTFE) Resin from India:  Third Supplemental Questionnaire for Gujarat Fluourochemicals {sic} Limited and Inox Wind Limited," dated June 4, 2021.
[10] *See* Second GOI Supplemental Questionnaire.
[11] *Id*. at 4-6.
[12] *See* Petitioner's Letter, "Granular Polytetrafluoroethylene (PTFE) Resin from India and Russia:  Request to Extend Preliminary Determinations," dated March 9, 2021.

Barcode:4138232-01 C-533-900 INV - Investigation  -

in the *Federal Register*, in accordance with section 703(c)(1)(A) of the Act and 19 CFR 351.205(b)(2).[13]

D.  *Period of Investigation*

The POI was originally defined as January 1, 2020, through December 31, 2020.  We received comments from GFCL requesting that Commerce alter the POI to correspond with the most recently completed Indian fiscal year, April 1, 2019, through March 31, 2020, rather than the calendar year.[14]  No other parties submitted comments regarding the POI.  We found that this request is consistent with 19 CFR 351.204(b)(2), and consequently changed the POI to April 1, 2019, through March 31, 2020, reflecting the most recently completed Indian fiscal year.[15]

## III.    INJURY TEST

Because India is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, the U.S. International Trade Commission (ITC) is required to determine whether imports of the subject merchandise from India materially injure, or threaten material injury to, a U.S. industry.  On March 15, 2021, the ITC preliminarily determined that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of granular PTFE resin from India.[16]

## IV.    PRELIMINARY DETERMINATION OF CRITICAL CIRCUMSTANCES

The petitioner submitted information alleging that, pursuant to section 703(e)(1) of the Act, and 19 CFR 351.206(c)(1), critical circumstances exist with respect to imports of subject merchandise from India.[17]  The petitioner subsequently supplemented its allegation with additional U.S. import data.[18]  On June 9, 2021, Commerce requested from GFCL monthly shipment data of subject merchandise to the United States for the period November 2020 through April 2021.[19] GFCL timely provided the requested information.[20]  In accordance with 19 CFR 351.206(c)(2)(i), because the petitioner submitted a critical circumstances allegation more than 20 days before the scheduled date of the preliminary determination, Commerce must issue a preliminary critical circumstances determination not later than the date of the preliminary

---

[13] *See Granular Polytetrafluoroethylene Resin from India and the Russian Federation:  Postponement of Preliminary Determinations in the Countervailing Duty Investigations*, 86 FR 14871 (March 19, 2021).
[14] *See* GFCL's Letter, "Granular Polytetrafluoroethylene Resin from India; Gujarat Fluourochemicals {sic} Limited's
Request to Change the Period of Investigation," dated March 11, 2021.
[15] *See* POI Revision Memo.
[16] *See Granular Polytetrafluoroethylene Resin from India and Russia Investigation Nos. 701-TA-663-664 and 731-TA-1555-1556 (Preliminary)*, March 2021 (ITC Publication 5017); *see also Granular Polytetrafluoroethylene Resin from India and Russia; Determinations*, 86 FR 14957 (March 19, 2021).
[17] *See* Critical Circumstances Allegation.
[18] *See* Critical Circumstances Addendum at 2.
[19] *See* Commerce's Letter, "Request for Monthly Quantity and Value Shipment Data," dated June 9, 2021.
[20] *See* GFCL's Q&V.

determination.[21]

Section 703(e)(1) of the Act provides that Commerce will determine that critical circumstances exist in CVD investigations if there is a reasonable basis to believe or suspect:  (A) that "the alleged countervailable subsidy" is inconsistent with the Agreement on Subsidies and Countervailing Measures (SCM Agreement) of the World Trade Organization, and (B) that "there have been massive imports of the subject merchandise over a relatively short period."

In determining whether there are "massive imports" over a "relatively short period," pursuant to section 703(e)(1)(B) of the Act, Commerce normally compares the import volumes of the subject merchandise for at least three months immediately preceding the filing of the petition (*i.e.*, the "base period") to a comparable period of at least three months following the same date (*i.e.*, the "comparison period").  Commerce's regulations provide that, generally, imports must increase by at least 15 percent during the "comparison period" to be considered "massive."[22] Additionally, Commerce's regulations state that, in determining whether imports of the subject merchandise have been massive under section 735(a)(3)(B) of the Act, the Secretary normally will examine:  (i) the volume and value of the imports; (ii) seasonal trends; and (iii) the share of domestic consumption accounted for by the imports.[23]

*GFCL*

As discussed in the "Analysis of Programs" section below, Commerce has preliminarily determined that GFCL has received countervailable benefits under several programs that are prohibited subsidies under the SCM Agreement, specifically:  Export Promotion of Capital Goods Scheme (EPCGS), Advance Authorization Program (AAP), Duty Drawback (DDB) Program and Status Holders Incentive Scrip (SHIS).  Therefore, we preliminarily determine that there is a reasonable basis to believe or suspect that certain programs in this investigation are inconsistent with the SCM Agreement.  In determining whether there were massive imports from GFCL, we analyzed its respective monthly shipment data for the period of November 2020 through January 2021, compared to February 2021 through April 2021.[24]  Additionally, in GFCL's Q&V, the respondent argued that Commerce should consider the impact of seasonal trends and the COVID-19 pandemic on imports of subject merchandise from India.  However, we preliminarily find that the information submitted by GFCL fails to demonstrate why granular PTFE resin is a product for which the demand varies seasonally and, furthermore, GFCL provided no data for the comparison and base periods beyond one additional year prior to the POI with which Commerce could adequately determine seasonal impacts on demand or the impact COVID-19 had on imports of subject merchandise.  In short, GFCL failed to provide sufficient data or evidence to support its seasonality claim.  Accordingly, for purposes of our "massive import" determination, Commerce based its analysis of GFCL's data without taking the purported seasonal trends into account.  We preliminarily find that GFCL's shipments did

---

[21] *See, e.g.*, *Policy Bulletin 98/4 Regarding Timing of Issuance of Critical Circumstances Determinations*, 63 FR 55364 (October 15, 1998).
[22] *See* 19 CFR 351.206(h)-(i).
[23] *See* 19 CFR 351.206(h)(1).
[24] *See* Critical Circumstances Memorandum.

increase by more than 15 percent over a "relatively short period."[25]  Therefore, we preliminarily determine that the requirements of section 703(e)(1)(B) of the Act have been satisfied, and that critical circumstances exist for GFCL.

*All-Other Exporters of Producers*

With regard to whether imports of subject merchandise by "all other" exporters or producers of subject merchandise from India were massive, we preliminarily determine that because there is evidence of the existence of countervailable subsidies that are inconsistent with the SCM Agreement (*i.e.*, EPCGS, AAP, DDB and SHIS), an analysis is warranted as to whether there was a massive increase in shipments by the "all other" companies, in accordance with section 703(e)(1)(B) of the Act and 19 CFR 351.206(h).  Therefore, we analyzed, in accordance with 19 CFR 351.206(i), monthly shipment data for the period November 2020 through January 2021 (*i.e.*, base period), compared to February 2021, through April 2021 (*i.e.*, comparison period), using shipment data from the Global Trade Atlas (GTA).[26]  Per our practice, we subtracted the shipment data reported by GFCL from the GTA import data.  Based upon our analysis of the resulting data for the "all other" exporters or producers, without taking such seasonal trends into account, we preliminarily find that the data indicate an increase in shipments between the base and comparison period of greater than 15 percent.[27]  Accordingly, Commerce preliminarily finds that critical circumstances exist with regard to imports of subject merchandise by "all other" exporters or producers of subject merchandise from India.  This is consistent with Commerce's past practice and with section 777A(e) of the Act.[28]

As a result of an affirmative preliminary determination of critical circumstances with regard to GFCL and all other exporters or producers of granular PTFE resin from India, in accordance with section 703(e)(2)(A) of the Act, we are directing CBP to suspend liquidation of any unliquidated entries of the subject merchandise from India entered, or withdrawn from warehouse for consumption, 90 days prior to the date of publication of the preliminary determination in the *Federal Register*.

## V.    DIVERSIFICATION OF INDIA'S ECONOMY

On April 2, 2021, we placed the following excerpt from the India Statistical Yearbook from the Government of India's Ministry of Statistics and Program Implementation (MSPI) on the record of this investigation:  Table 17.1(A) – Companies at Work by Industrial Activity (Number and Paid-Up Capital.[29]  This information reflects a wide diversification of economic activities in India.  The MSPI data show a total of 1,082,029 establishments operating in the primary (agricultural), secondary (manufacturing) and tertiary (services) sectors of the Indian economy that span ten industry groupings with no extreme concentration apparent in any one grouping, indicating the diversification of India's economy.

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *See, e.g.*, *CWP from China* Issues and Decision Memorandum (IDM) at Comment 10-11; *see also Solar Cells from China Final* IDM at 10.
[29] *See* Memorandum, "Placing Information on the Record," dated April 2, 2021 at Attachment.

Barcode:4138232-01 C-533-900 INV - Investigation  -

## VI.    SUBSIDIES VALUATION

A.    *Allocation Period*

Commerce normally allocates the benefits from non-recurring subsidies over the average useful life (AUL) of renewable physical assets used in the production of subject merchandise. Commerce finds the AUL in this proceeding to be 9.5 years, pursuant to 19 CFR 351.524(d)(2) and the U.S. Internal Revenue Service's 1977 Class Life Asset Depreciation Range System.[30]

We note that, consistent with past practice,[31] in order to measure appropriately any allocated subsidies, Commerce has requested and used a ten-year AUL in this investigation.[32]  No party in this proceeding has disputed the allocation period.  Thus, the AUL period for this investigation is April 1, 2010, through March 31, 2020.

Furthermore, for non-recurring subsidies, we have applied the "0.5 percent test," as described in 19 CFR 351.524(b)(2).  Under this test, we divide the amount of subsidies approved under a given program in a particular year by the relevant sales value (*e.g.*, total sales or export sales) for the same year.  If the amount of the subsidies is less than 0.5 percent of the relevant sales value, then the benefits are allocated to the year of receipt, rather than across the AUL.

B.    *Attribution of Subsidies*

According to 19 CFR 351.525(b)(6)(vi), "cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets."  This standard will normally "be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations."[33]  The preamble to Commerce's regulations further clarifies Commerce's cross-ownership standard.  According to the *CVD Preamble*, relationships captured by the cross-ownership definition include those where:

> {T}he interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same way it can use its own assets (or subsidy benefits) . . . Cross-ownership does not require one corporation to own 100 percent of the other corporation.  Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.  In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership.[34]

---

[30] *See* U.S. Internal Revenue Service Publication 946 (201), "How to Depreciate Property," at Table B-2: Table of Class Lives and Recovery Periods.

[31] *See, e.g.*, *Final Results of Countervailing Duty Administrative Reviews:  Low Enriched Uranium from Germany, the Netherlands, and the United Kingdom*, 70 FR 40000 (July 12, 2005), and accompanying IDM at Comment 4; *see also Certain PET Resin from India Final Determination*, and accompanying IDM at 4.

[32] *See* POI Revision Memo.

[33] *See, e.g.*, *CVD Preamble*.

[34] *See CVD Preamble*.

Barcode:4138232-01 C-533-900 INV - Investigation -

Thus, Commerce's regulations make clear that the agency must look at the facts presented in each case to determine whether cross-ownership exists. The U.S. Court of International Trade upheld Commerce's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[35]

In accordance with 19 CFR 351.525(b)(6)(i), Commerce normally attributes a subsidy to the products produced by the company that received the subsidy. However, 19 CFR 351.525(b)(6)(ii)-(v) provides additional rules for the attribution of subsidies received by respondents with cross-owned affiliates. Subsidies to the following types of cross-owned affiliates are covered in these additional attribution rules: (ii) producers of the subject merchandise; (iii) holding companies or parent companies; (iv) producers of an input that is primarily dedicated to the production of the downstream product; or (v) an affiliate producing non-subject merchandise that otherwise transfers a subsidy to a respondent. Further, 19 CFR 351.525(c) provides that benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm producing the subject merchandise that is sold through the trading company, regardless of affiliation.

*GFCL*

GFCL responded to Commerce's questionnaire on behalf of itself and its holding company Inox Leasing and Finance Limited (ILFL), and also provided information regarding certain subsidiaries for Commerce's consideration.[36] GFCL reported that among the companies in its corporate group, it is the sole producer of the subject merchandise.[37] Accordingly, we preliminarily will attribute GFCL's subsidies to the products produced by GFCL, consistent with 19 CFR 351.525(b)(6)(i). We also preliminarily find that no attribution under 19 CFR 351.525(b)(6)(ii) is applicable, as GFCL is the sole producer of subject merchandise.[38]

GFCL reported that ILFL holds a 52.58 percent stake in GFCL; therefore, we preliminarily determine that ILFL is GFCL's cross-owned parent company within the meaning of 19 CFR 351.525(b)(6)(vi).[39] Further, GFCL reported that ILFL did not manufacture or export subject merchandise, nor did it receive any subsidies over the AUL.[40] Consequently, we preliminarily find no subsidy benefits with regard to ILFL are attributable pursuant to the parent company attribution rule under 19 CFR 351.525(b)(6)(iii).

GFCL identified certain subsidiaries that GFCL reports are not involved in the production or sale of subject merchandise, but that supply GFCL with certain materials or services. Regarding input suppliers, the *CVD Preamble* explains that "{t}he main concern we have tried to address is

---

[35] *See Fabrique de Fer de Charleroi, SA v. United States*, 166 F. Supp. 2d 593, 600 (Ct. Int'l Trade 2001).

[36] *See* GFCL IQR; *see also* ILFL IQR.

[37] *See* GFCL AQR at 5 and Exhibit 1.

[38] *Id*.

[39] *See* GFCL AQR at 3 and Exhibit 10.

[40] *Id*. at 6.

the situation where a subsidy is provided to an input supplier whose production is dedicated almost exclusively to the production of a higher value added product – the type of input product that is merely a link in the overall production chain."[41]

GFCL noted that it purchased two windmills from, and electricity generated by, its affiliate, Inox Wind Limited (IWL); operation and maintenance services from Inox Wind Infrastructure Services Limited (IWISL); and small amounts of materials from Inox Air Products Pvt Ltd (IAPP).[42]  Record evidence shows that the entirety of the energy generated by IWL is sold to GFCL.[43]  In *Icadas. v. United States*, the Court of International Trade (CIT) stated, the following:

> "While the final quantity may be low, the regulations do not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream product.  Rather, in light of the CVD Preamble, {the regulation} looks only at the purpose of the subsidy at the time of bestowal.  Therefore, the quantity of the scrap provided by the {affiliate} while low, is not sufficient to persuade the court that Commerce acted without substantial evidence or contrary to law."[44]

The CIT's decision on this matter establishes that Commerce's primary concern is whether the purpose of the cross-owned affiliate providing the input to the producer/exporter of subject merchandise is to produce downstream product.  In this instance, all of IWL's wind power is supplied to GFCL through a common energy pool, specifically for GFCL's use.[45]  Furthermore, GFCL reported that it paid IWL to generate a certain amount of wind power.[46]  Thus, we preliminarily determine that the electricity input from IWL is primarily dedicated to the production of downstream products produced by GFCL.  Accordingly, we will attribute subsidies received by IWL to the combined sales of the input and downstream products produced by IWL and GFCL, in accordance with 19 CFR 351.525(b)(6)(iv).

With regard to the provisions of services and materials from IWISL and IAPP, we preliminarily determine that these are not primarily dedicated to the production of downstream products but are instead related to general administration and maintenance.[47]  Therefore, we preliminarily find that the attribution rule under 19 CFR 351.525(b)(6)(iv) does not apply with regard to IWISL and IAPP.[48]

---

[41] *See CVD Preamble*, 63 FR at 65401.

[42] *See* GFCL AQR at 7-12 and Exhibits 4(a), 4(b), 5(a) and 6(b).  The specific materials that IAPP provides to GFCL is proprietary information.

[43] *Id.*; *see also* GFCL SAQR at 5-6 and Exhibits S-4a and S-5b.

[44] *See Icadas v. United States*.

[45] *See* IWL IQR Part 1 at 4-7.

[46] *Id.* at 5; *see also* GFCL ASQR at Exhibit S-6.

[47] *See* 19 CFR 351.525(b)(6)(iv).

[48] While Commerce finds that IWL is a cross-owned affiliate of GFCL as part of this preliminary determination, as noted above, it is still currently collecting information regarding programs used by IWL.

Barcode:4138232-01 C-533-900 INV - Investigation  -

C.    *Denominators*

In accordance with 19 CFR 351.525(b)(1)-(5), Commerce considers the basis for a respondent's receipt of benefits under each program when attributing subsidies, *e.g.*, to the respondent's export or total sales.  We have identified the denominator we used to calculate the countervailable subsidy rate for each program, as discussed below and in the calculation memorandum prepared for this preliminary determination.[49]

## VII.    BENCHMARKS AND INTEREST RATES

Commerce is investigating non-recurring, allocable subsidies and input subsidies received by GFCL.[50]  The derivation of the benchmark and discount rates used to value these subsidies is discussed below.

A.    *Long-Term Indian Rupee (INR)-Denominated Loans*

Section 771(5)(E)(ii) of the Act provides that the benefit for loans is the "difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market," indicating that a benchmark must be a market-based rate.  In addition, 19 CFR 351.505(a)(3)(i) stipulates that, when selecting a comparable commercial loan that the recipient "could actually obtain on the market," Commerce will normally rely on actual loans obtained by the firm.  However, when there are no comparable commercial loans during the period, Commerce "may use a national average interest rate for comparable commercial loans," pursuant to 19 CFR 351.505(a)(3)(ii).  In addition, 19 CFR 351.505(a)(2)(ii) states that Commerce will not consider a loan provided by a government-owned special-purpose bank for purposes of calculating benchmark rates.[51]  In the absence of reported long-term loan interest rates, we use the interest rates discussed below as discount rates for purposes of allocating non-recurring benefits over time pursuant to 19 CFR 351.524(d)(3)(i)(B).

GFCL reported INR-denominated long-term loans that it received from commercial lenders.[52]  Where applicable, we relied on the interest rate that the company paid on its INR-denominated long-term borrowing as benchmark interest rates.  For years in which a company-specific rate was not available, in accordance with 19 CFR 351.505(a)(3)(ii), we used national average interest rates from the International Monetary Fund's International Financial Statistics as benchmark rates for INR-denominated long-term loans.

B.    *Interest Rate Benchmarks*

Consistent with 19 CFR 351.524(d)(3)(i)(A), we have used the discount rates described above for the year in which the government agreed to provide the subsidy, for allocating the benefit from non-recurring grants received by GFCL.  The interest-rate benchmarks used in our

---

[49] *See* Preliminary Calculation Memorandum.
[50] *See* 19 CFR 351.524(b)(1).
[51] *See, e.g.*, *Shrimp from India Final Determination* IDM at "Benchmark and Discount Rates" section.
[52] *See* GFCL IQR at 28-31 and Exhibit 10(v); *see also* GFCL SQR3 at Exhibit S3-1.

9

Barcode:4138232-01 C-533-900 INV - Investigation  -

preliminary calculations are provided in the Preliminary Calculation Memorandum.

C.    *Land Benchmark*

We selected benchmarks for determining the benefit from the provision of land for LTAR in accordance with 19 CFR 351.511.  Section 351.511(a)(2) sets forth the basis for identifying comparative benchmarks for determining whether a government good or service is provided for LTAR.  These potential benchmarks are listed in hierarchical order by preference:  (1) market prices from actual transactions within the country under investigation (*e.g.*, actual transactions between private parties, actual imports, or actual sales from competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).

Regarding land purchases from the Gujarat Development Industrial Corporation (GIDC), both the petitioner and GFCL submitted tier-one benchmark information.  In its questionnaire response, GFCL reported two land purchases from private parties in Ranjitnagar and Mahidad, as well as land purchased from the GIDC by another entity.[53]  Because the land purchased from the GIDC is not a private transaction, we have not included it in the benchmark.  While the Ranjitnagar and Mahidad land transactions did involve private sellers, upon examination of the deeds and purchase documents, we found that these land parcels were not comparable to the industry-ready land that the GIDC provides.[54]  Therefore, we also have excluded these transactions from the benchmark.  In its benchmark submission, the petitioner provided information on a private auction of industrial land in Ahmedabad, Gujarat.[55]

Both GFCL and the petitioner provided market value rates for land determined by the Stamp Duty Valuation Organization (SDVO) and the Superintendent of Stamps and Valuation Department (SSVD) in Gujarat, both of which are government organizations.[56]  GFCL further noted that "valuation of land to determine collection of revenue is carried out by state governments."[57]  However, these land value rates were not generated by an independent third party and are not transaction-specific.  Furthermore, the land rates determined by the SDVO and the SSVD are not actual transactions but, rather a price valuation of the land based on zoning, building structures, purpose for the land, and any amenities.  As a result, for this preliminarily determination, we find that we cannot rely on these rates to determine whether land was provided for LTAR.  This determination is consistent with our practice.[58]

As noted above, it is Commerce's preference to use a transaction-specific, or tier one, benchmark derived from the country under investigation.  Therefore, based upon the record evidence, we preliminarily determine that the private land transaction in Ahmedabad, Gujarat, represents the

---

[53] *See* GFCL IQR at 79 and at Exhibits 16(f) and 16(g).
[54] *Id*. at Exhibit 16(g); *see also* GFCL SQR2 at Exhibits S2-5(b) and (e).
[55] *See* Petitioner's Benchmark Submission at Exhibit 6.
[56] *See* Petitioner's Benchmark Submission at Exhibit 6; *see also* GFCL's Benchmark Submission at Exhibits 1 and 2.
[57] *See* GFCL's Benchmark Submission at 2.
[58] *See PTFE Resin from India Preliminary Determination* Preliminary Decision Memorandum (PDM) at 20-21, unchanged in *PTFE Resin from India Final Determination*, 83 FR 23422 (May 21, 2018).

10

best comparable land value on the record to use as a benchmark.  This transaction has a rate for industry-ready land obtained within India (*i.e.*, in the state of Gujarat) and is, therefore, comparable, geographically proximate, and privately purchased.

## VIII.  USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

### A.  Legal Standard

Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person withholds information that has been requested; fails to provide information within the established deadlines or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; significantly impedes a proceeding; or provides information that cannot be verified, as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  When selecting an adverse facts available (AFA) rate from among the possible sources of information, Commerce's practice is to ensure that the rate is sufficiently adverse "as to effectuate the statutory purposes of the AFA rule to induce respondents to provide Commerce with complete and accurate information in a timely manner."[59]  Commerce's practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[60]  At the same time, section 776(b)(1)(B) of the Act states that Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that, while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[61]  Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.  The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.  While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate

---

[59] *See, e.g.*, *Drill Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).

[60] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA), H.R. Doc. 103-316, vol 1 (1994) at 870.

[61] *See Nippon Steel*.

Barcode:4138232-01 C-533-900 INV - Investigation  -

record keeping.[62]  The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[63]  Further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[64]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."[65]  It is Commerce's practice to consider information to be corroborated if it has probative value.[66]  In analyzing whether information has probative value, it is Commerce's practice to examine the reliability and relevance of the information to be used.[67]  However, the SAA emphasizes that Commerce need not prove that the selected facts available are the best alternative information.[68]  Furthermore, Commerce is not required to corroborate any countervailing subsidy rate applied in a separate segment of the same proceeding.[69]

Under section 776(d) of the Act, Commerce may use any countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a CVD rate for a subsidy program from a proceeding that Commerce considers reasonable to use, including the highest of such rates.  Additionally, when selecting an AFA rate, Commerce is not required for purposes of section 776(c) of the Act, or any other purpose, to estimate what the countervailable subsidy rate would have been if the interested party had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[70]  For purposes of this preliminary determination, we are applying facts available for the circumstances outlined below.

### B.  Application of Facts Available:  Duty Rates for EPCGS

In our initial questionnaire, Commerce requested that the GOI provide information on the applicable duty rates for this program.[71]  Specifically, in the Tax Program Appendix, we asked the GOI to provide the tax rate that was paid under the program and the duty rate that would

---

[62] *Id.*, 337 F.3d at 1382.

[63] *Id.*

[64] *See*, *e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties; Countervailing Duties:  Final Rule*, 62 FR 27296, 27340 (May 19, 1997); and *Nippon Steel*, 337 F.3d at 1382-83.

[65] *See*, *e.g.*, SAA at 870.

[66] *Id.* at 870.

[67] *Id.* at 869.

[68] *Id.* at 869-870.

[69] *See* section 776(c)(2) of the Act.

[70] *See* section 776(d)(3) of the Act.

[71] *See* Initial Questionnaire, Section II, at Tax Program Appendix.

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

have applied in the absence of the program.[72]  In its initial questionnaire response, the GOI simply responded that the question was "{n}ot applicable."[73]  In a supplemental questionnaire, Commerce once again requested that the GOI provide this information.[74]  In a second response, the GOI once again replied that the question was "{n}ot applicable."[75]

Because the basis of the benefit calculation for this program is the amount of duties waived, *i.e.*, the calculated duties payable, less the duties actually paid at the time of import, net of required application fees, in accordance with section 771(6) of the Act, it is important for us to know what the duties payable are.  The GOI failed to provide this necessary information in response to questions regarding the calculation of the benefit.  Given that the necessary information has been withheld by the GOI, Commerce's ability to investigate those programs is significantly impeded.

On this basis, we preliminarily determine that the necessary duty rate information is not available on the record and that the GOI did not provide information that was requested of it.  Further, the fact that the GOI did not cooperate to the best of its ability significantly impeded the investigation.  Thus, Commerce must rely on "facts available" in making our preliminary determination, in accordance with sections 776(a)(1), 776(a)(2)(A) and (C) of the Act.  In its responses, GFCL reported the applicable duty rates and provided supporting documentation.[76] Therefore, we are preliminarily relying on the respondent's reported information to calculate the benefit, within the meaning of section 771(5)(E) of the Act. However, as the information at issue is the government's responsibility to provide, we intend to follow up with the GOI after the preliminary determination to obtain the requisite information, and may revisit our benefit calculation for this program in the final determination if the GOI fails to provide it.

## C. Application of Facts Available and Adverse Inference:  Benefit for GIDC's Preferential Water Rates

In our initial questionnaire, we requested that the GOI respond to both the Standard Questions Appendix and the Provision of Goods/Services Appendix.[77]  While the GOI responded to certain questions in the Standard Questions Appendix and provided a copy of the GIDC Water Supply Regulation 1991, it did not respond to the Provision of Goods/Services Appendix.[78]  In response to our supplemental questionnaire, the GOI again refused to respond to this appendix and stated: "Not Applicable, hence not answered."[79]

The Provision of Goods/Services Appendix requests information pertaining to the market and pricing structure of the country's water supply including the following:  the quantity and value of the good/service provided to the respondent during the POI and the price charged by the government; copies of any price lists or rate sheets applicable to the good/service being

---

[72] *Id.*

[73] *See* GOI IQR at 32.

[74] *See* Commerce's Letter, "Countervailing Duty Investigation of Granular Polytetrafluoroethylene (PTFE) Resin from India: Initial Questionnaire Response Supplemental Questionnaire," dated May 4, 2021, at 6.

[75] *See* GOI SQR1 at 24.

[76] *See* GFCL IQR at 18-23 and Exhibits 10(h) to 10(s).

[77] *See* Initial Questionnaire, Section II, at II-14.

[78] *See* GOI IQR at 151-154.

[79] *See* GOI SQR1 at 39.

Barcode:4138232-01 C-533-900 INV - Investigation  -

provided; the number of producers and distributors of the good/service and the nature of their relationship to the government, including government ownership, control, and regulation; the percentage of total domestic consumption of the good/service that is provided by the government; the percentage of consumption of the good/service by the industry producing the subject merchandise that is provided by the government; and the overall pricing policy of the government provider and a comparison with the pricing policy of commercial suppliers.[80]  Full responses to these questions allow us to determine whether a market is distorted, whether the government implements market-oriented pricing policies when supplying the relevant good or service, and what potential tier-one benchmarks are available.

Therefore, as noted above, the GOI failed to provide necessary information specifically requested by Commerce and thus significantly impeded Commerce's ability to investigate the program.  Consequently, we preliminarily determine that necessary information is not available on the record and that Commerce must rely on "facts available" in making our preliminary determination, in accordance with sections 776(a)(1), 776(a)(2)(A) and (C) of the Act.

Moreover, we preliminarily determine that the GOI failed to cooperate by not acting to the best of its ability to comply with our request for information.  Consequently, an adverse inference is warranted in the application of facts available, pursuant to section 776(b) of the Act.  In applying AFA, we preliminarily determine that the water market in India is distorted and thus we cannot use tier-one benchmark information (*i.e.*, market prices from actual transactions within India) in order to calculate a benefit for this program, consistent with our past practice.[81]  We also preliminarily find that tier-two world market prices are neither available on the record nor appropriate for the type of input being provided.  Moreover, in applying AFA for the GOI's failure to respond to the Provision of Goods/Services Appendix, we also preliminarily determine that the government price for the water is not consistent with market principles within the meaning of 19 CFR 351.511(a)(2)(iii) and, moreover, that the GOI has precluded the ability of Commerce to determine a tier-three benchmark.

Given the lack of appropriate benchmarks, Commerce relies on secondary information to assess a benefit for this program.  Under section 776(d) of the Act, Commerce may use, as AFA, a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, a CVD rate for a subsidy program from a proceeding that the administering authority considers reasonable to use, including the highest of such rates.  Additionally, when selecting an AFA rate, Commerce is not required for purposes of section 776(c) of the Act, or any other purpose, to estimate what the countervailable subsidy rate would have been if the non-cooperating interested party had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[82]

---

[80] *See* Initial Questionnaire, Section II, at Provision of Goods/Services Appendix.

[81] *See, e.g.*, *Laminated Woven Sacks from the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 72 FR 67893, 67906-08 (December 3, 2007), unchanged in *Sacks from China*.

[82] *See* section 776(d)(3) of the Act.

Barcode:4138232-01 C-533-900 INV - Investigation -

Consistent with section 776(d) of the Act and our established practice, we selected the highest calculated rate for the same or similar program as AFA.[83]  For this program we are using an AFA rate of 0.60 percent *ad valorem*, the highest rate determined for a similar program in the *PTFE Resin* proceeding, as the rate for the respondents.[84]

### D.  Application of Facts Available and Adverse Inference:  Specificity for State Government of Gujarat (SGOG) Exemption from Electricity Duty

In our initial questionnaire, we requested that the GOI provide information that would allow us to determine *de facto* specificity.[85]  Specifically, in the Standard Questions Appendix, we requested the following information:  the amount of assistance approved for each mandatory respondent company, including all cross-owned companies and trading companies that sell the subject merchandise to the United States; the total amount of assistance approved for all companies under the program.; the total number of companies that were approved for assistance under this program; the total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under this program; the relevant classification guidelines, and  a list of industrial classifications; the industry in which the companies under investigation are classified; and the total number of companies that applied for, but were denied, assistance under this program.[86]

In its initial questionnaire response, the GOI refused to provide this information, stating that the question was "not applicable."[87]  In a supplemental questionnaire response, the GOI again did not provide the requested information.[88]

Full responses to this request allow Commerce to determine whether a program is specific as a matter of fact.  The GOI's failure to provide the requested information necessary for a full analysis regarding the specificity of this program has significantly impeded Commerce's ability to investigate this program.

On this basis, we preliminarily determine that necessary information is not available on the record and that Commerce must therefore rely on "facts available" in making our preliminary determination, in accordance with sections 776(a)(1), 776(a)(2)(A) and (C) of the Act.  Moreover, we preliminarily determine that the GOI failed to cooperate by not acting to the best of its ability to comply with our request for information.  Consequently, an adverse inference is warranted in the application of facts available, pursuant to section 776(b) of the Act.  In applying AFA, we find that the electricity duty exemptions under this program are specific within the meaning of section 771(5A)(D)(iii) of the Act.

---

[83] *See, e.g., Shrimp from China* IDM at 13; *see also Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-1374 (Fed. Cir. 2014) (upholding "hierarchical methodology for selecting an AFA rate").
[84] *See PTFE Resin from India Final Determination* IDM at  7.
[85] *See* Initial Questionnaire, Section II, at Standard Questions Appendix.
[86] *Id.*
[87] *See* GOI IQR at 164-165.
[88] *See* GOI SQR1 at 40.

Barcode:4138232-01 C-533-900 INV - Investigation -

## IX.    ANALYSIS OF PROGRAMS

Based upon our analysis of the record and the responses to our questionnaires, we preliminarily determine the following:

*A.  Programs Preliminarily Determined to Be Countervailable*

1.  EPCGS

The GOI reported that EPCGS allows import of capital goods for pre-production, production and post-production at reduced customs duty rates.[89]  Under this program, producers are granted the reduced duty rates on imported capital goods in return for a commitment to earn convertible foreign currency equal to a multiple of the duty saved within a certain number of years.[90]  If the company fails to meet the export obligation, the company is subject to payment of all or part of the duty reduction, depending on the extent of the shortfall in foreign currency earnings, in addition to an interest penalty.[91]

Commerce has previously determined that import duty reductions or exemptions provided under EPCGS are countervailable export subsidies because the scheme:  (1) provides a financial contribution pursuant to section 771(5)(D)(ii) of the Act; (2) provides two different benefits under section 771(5)(E) of the Act; and (3) is specific pursuant to sections 771(5A)(A) and (B) of the Act because the program is contingent upon export performance.[92]  The record of this investigation with regard to this program is consistent with those previous findings.  Thus, we preliminarily determine that this program is countervailable.[93]

Under EPCGS, the reduced or exempted import duties become payable to the GOI if the accompanying export obligations are not met.[94]  Pursuant to 19 CFR 351.505(d)(1), Commerce treats any balance on an unpaid liability that may be waived in the future contingent on subsequent events as a contingent-liability interest-free loan.[95]  We find that the amount of duties the respondent would have paid during the POI, had it borrowed the full amount of the duty reduction or exemption at the time of importation, constitutes the first benefit under EPCGS.  Further, a second benefit arises based on the amount of duty finally waived by the GOI on imports of capital equipment covered by those EPCGS licenses for which the export requirement had already been met.  With regards to licenses for which GFCL has completed its export obligation, we treat the waived import duties as grants received in the year in which the GOI granted the final waiver pursuant to 19 CFR 351.505(d)(2).  GFCL has reported that it has completed the export obligation for some of its capital goods imports under the program, while the required export obligations remain outstanding on other such imports.  Accordingly, we

---

[89] *See* GOI IQR at 12.
[90] *Id*. at Exhibit 3.
[91] *See* GOI SQR at 23; *see also* GFCL IQR at Exhibit 10(b).
[92] *See, e.g.*, *PET Film from India Final Determination* IDM at "EPCGS" section; *see also Shrimp from India Final Determination* IDM at 14.
[93] *See* GOI IQR at Exhibit 3*; see also* GFCL IQR at Exhibit 10(b).
[94] *See* GFCL IQR at Exhibit 10(b).
[95] *See Steel Flanges from India Preliminary Determination* PDM at 4-5, unchanged in *Steel Flanges from India Final Determination*.

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation  -

preliminarily find GFCL received both types of benefits (*i.e.*, interest-free loans and grants) under this program.[96]

Import duty exemptions under this program are approved for the purchase of capital equipment. The *CVD Preamble* states that, if a government provides an import duty exemption tied to major equipment purchases, "it may be reasonable to conclude that, because these duty exemptions are tied to capital assets, the benefits from such duty exemptions should be considered nonrecurring…"[97] Therefore, in accordance with 19 CFR 351.524(c)(2)(iii) and past practice, we are treating these final import duty exemptions on capital equipment as conferring non-recurring benefits.

Based on the information and the documentation that GFCL submitted,[98] we cannot reliably determine that the EPCGS licenses are tied to the production of a particular product within the meaning of 19 CFR 351.525(b)(5). As such, we preliminarily find that all of GFCL's EPCGS licenses benefit all of the company's exports.[99]

To calculate the benefit received from the GOI's formal waiver of import duties on capital equipment imports where its export obligations were met prior to the end of the POI, we considered the total amount of duties waived, *i.e.*, the calculated duties payable, less the duties actually paid at the time of import, net of required application fees, in accordance with section 771(6) of the Act, to be the benefit and treated these amounts as grants pursuant to 19 CFR 351.504. As previously mentioned in the "Application of Facts Available: Duty Rates for EPCGS" section above, the GOI failed to provide the applicable duty rates for this program. Accordingly, Commerce has preliminarily applied facts available and used the duty rates that GFCL reported in its responses as the applicable rates in calculating the benefit.[100]

Further, consistent with the approach followed in previous investigations, we preliminarily determine the year of receipt of the benefit to be the year in which the GOI formally waived GFCL's outstanding import duties.[101] Next, we performed the "0.5 percent test," as prescribed under 19 CFR 351.524(b)(2), for the total value of duties waived for each year in which the GOI granted GFCL an import duty waiver. For each year of the AUL, the duties for which GFCL was granted final waiver had values of less than 0.5 percent of GFCL's total export sales and, therefore, the benefits were expensed in the year of receipt.

As noted above, liability to the company for the import duties reduced or exempted on the imports of capital equipment for which GFCL had not yet met export obligations remains outstanding until those obligations are met. Consistent with our practice and prior determinations, we are treating the unpaid import duty liability as an interest-free loan.[102]

---

[96] *See* GFCL SQR1 at Exhibits S1-6 Parts 1-2.
[97] *See CVD Preamble*, 63 FR at 65393.
[98] *See* GFCL SQR1 at Exhibits S1-6 Parts 1-2.
[99] *Id.*
[100] *See* GFCL IQR at 18-23 and Exhibit 10(h) – 10(s). As previously noted, we intend to further seek the relevant official government information and documentation from the GOI with regard to these rates.
[101] *See PET Film from India Final Determination* IDM at Comment 5.
[102] *See, e.g., Steel Flanges from India Preliminary Determination* PDM at 15, unchanged in *Steel Flanges from India Final Determination*.

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

The amount of unpaid duty liabilities to be treated as an interest-free loan is the amount of import duty reduction or exemption on GFCL's capital goods imports, which has not been officially waived by the GOI as of the end of the POI. Accordingly, we find the benefit to be the interest that the respondent would have paid during the POI had it borrowed the full amount of the duty reduction or exemption at the time of importation.

As discussed above, the time period for fulfilling the export requirement expires a certain number of years after importation of the capital good. As such, pursuant to 19 CFR 351.505(d)(1), the benchmark for measuring the benefit is a long-term interest rate, because the event upon which repayment of duties depends (*i.e.*, the date of expiration of the time period to fulfill the export commitment), occurs at a point in time that is more than one year after the date of importation of the capital goods. As the benchmark interest rate, we used the long-term interest rate as discussed in the "Benchmarks and Interest Rates" section, above. We then multiplied the total amount of unpaid duties under each license by the long-term benchmark interest rate for the year in which the capital good was imported; we summed these amounts to determine the total benefit. For EPCGS licenses with duty-free imports made during the POI, we calculated the relevant interest based on the number of days the loan was outstanding during the POI.

The benefit received under EPCGS is the sum of: (1) the benefit attributable to the POI from the duties formally waived by the government for imports of capital goods under the program for which GFCL had met the export requirements by the end of the POI; and (2) the interest that would have been due had the respondent borrowed the full amount of the duty reduction or exemption at the time of the importation for imports of capital goods for which the export requirements under the program remained unmet during the POI. We divided the total benefit received by GFCL under EPCGS by the total export sales of GFCL during the POI, as described above.

On this basis, we preliminarily determine a countervailable subsidy rate of 0.08 percent *ad valorem* for GFCL.[103]

  2. <u>AAP</u>

Under the AAP, exporters may import, duty-free, specified quantities of materials required to manufacture products that are subsequently exported.[104] The exporting companies, however, remain liable for the unpaid duties if they fail to utilize the imported inputs in exported products.[105] The quantities of imported materials and exported finished products are linked through standard input-output norms (SIONs) established by the GOI.[106] During the POI, GFCL used advance licenses to import certain materials duty-free under the program.[107]

---

[103] *See* Preliminary Calculation Memorandum.
[104] *See* GOI IQR at Exhibit 9.
[105] *See* GFCL IQR at 43.
[106] *See* GOI IQR at 13 and Exhibit 13.
[107] *See* GFCL's SQR2 at Exhibit S2-1.

18

Barcode:4138232-01 C-533-900 INV - Investigation  -

Import duty exemptions on consumable inputs for exported products are not countervailable so long as the exemption extends only to inputs consumed in the production of the exported product, making normal allowances for waste.[108]  However, the government in question must have in place and apply a system to confirm which inputs are consumed in the production of the exported products, and in what amounts.[109]  This system must be reasonable, effective for the purposes intended, and based on generally accepted commercial practices in the country of export.[110]  If such a system does not exist, or if it is not applied effectively, and the government in question does not carry out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, the entire amount of any exemption, deferral, remission, or drawback is countervailable.[111]

In the 2005 administrative review of the CVD order *on Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India*, the GOI indicated that it had revised its Foreign Trade Policy and Handbook of Procedures for the AAP during 2005.  Commerce acknowledged that certain improvements to the AAP system were made.  However, based on the information submitted by the GOI and examined during previous reviews of that proceeding, and with no information having been submitted in that review demonstrating that the GOI had revised its laws or procedures governing this program since those earlier reviews, Commerce found that systemic issues continued to exist in the AAP system during that period of review.[112]

Specifically, in the 2005 administrative review, Commerce stated that it continued to find the AAP countervailable based on:

> {T}he GOI's lack of a system or procedure to confirm which inputs are consumed in the production of the exported products and in what amounts that is reasonable and effective for the purposes intended, as required under 19 CFR 351.519.  Specifically, we still have concerns with regard to several aspects of the {AAP} including (1) the GOI's inability to provide the SION calculations that reflect the production experience of the PET Film industry as a whole; (2) the lack of evidence regarding the implementation of penalties for companies not meeting the export requirements under the ALP or for claiming excessive credits; and, (3) the availability of {AAP} benefits for a broad category of "deemed" exports.[113]

Since that *2005 Review of PET Film from India*, Commerce has, in several other proceedings, made determinations consistent with this treatment of the AAP.[114]  In this investigation, record evidence does not demonstrate[115] any change to the AAP and therefore we preliminarily find that the program confers a countervailable subsidy because:  (1) a financial contribution within the

---

[108] *See* 19 CFR 351.519(a)(1)(ii).

[109] *See, e.g., Shrimp from India Final Determination* IDM at "Duty Drawback (DDB)."

[110] *Id.*

[111] *See* 19 CFR 351.519(a)(4)(i)-(ii).

[112] *See 2005 Review of PET Film from India*, and accompanying IDM at Comment 3.

[113] *Id.*

[114] *See, e.g., Oil Country Tubular Goods from India Final*, and accompanying IDM; see also *Certain Lined Paper Products from India: Final Results of Countervailing Duty Administrative Review; Calendar Year 2012*, 80 FR 19637 (April 13, 2015), and accompanying IDM.

[115] *See* GOI SQR at 8-24.

Barcode:4138232-01 C-533-900 INV - Investigation  -

meaning of section 771(5)(D)(ii) of the Act is provided under the program, as the GOI exempts the respondent from payment of import duties that would otherwise be due; (2) the program is specific under section 771(5A)(B) of the Act because it is contingent upon exportation; and (3) the GOI does not have in place, and does not apply, a system in accordance with 19 CFR 351.519(a)(4) that is reasonable and effective for the purposes intended to confirm which inputs, and in what amounts, are consumed in the production of the exported product, making normal allowance for waste, nor did the GOI carry out an examination of the actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts, and thus the entire amount of the import duty deferral or exemption constitutes a benefit to the respondent under section 771(5)(E) of the Act.[116]

Pursuant to 19 CFR 351.524(c)(1), the exemption of import duties on raw material inputs normally provides a recurring benefit.[117]  During the POI, GFCL imported duty-free inputs under the AAP for the production of subject merchandise and non-subject merchandise.[118]  In response to Commerce's questionnaire, GFCL provided supporting documentation regarding its AAP licenses.[119]  The information provided demonstrates that at the point of bestowal, the licenses provided to GFCL were tied, within the meaning of 19 CFR 351.525(b)(5), to the production and export of specific merchandise, both subject merchandise and non-subject merchandise.[120]  Thus, to calculate the benefit for GFCL, we first determined the total value of import duties  exempted during the POI for GFCL under AAP licenses tied to subject merchandise only.  To calculate the subsidy rate, we divided the resulting benefit by the value of GFCL's POI export sales of subject merchandise.

On this basis, we preliminarily determine a countervailable subsidy rate of 2.76 percent *ad valorem* for GFCL.[121]

3.  <u>DDB Program</u>

The DDB program grants rebate of duty or tax chargeable on any imported or excisable materials and input services used in the manufacture of export goods.[122]  Specifically, the duties and tax "neutralized" under the program are the (i) Customs and Union Excise Duties for inputs and (ii) Service Tax for services.[123]  The amount of the duty drawback is generally fixed as a percentage of the free on board (FOB) price of the exported product.[124]

Import duty exemptions on inputs for exported products are not countervailable so long as the exemption extends only to inputs consumed in the production of the exported product, making normal allowances for waste.[125]  However, the government in question must have in place and

---

[116] *See* GFCL IQR at 31-38 and Exhibits 11(a) and 11(b); *see also* GOI SQR at 20-21.
[117] *See, e.g., Oil Country Tubular Goods from India Final* IDM.
[118] *See* GFCL IQR at Exhibit 11(f).
[119] *See* GFCL SQR2 at Exhibit S2-1.
[120] *Id.*
[121] *See* Preliminary Calculation Memorandum
[122] *See* GOI IQR at 57.
[123] *Id.*
[124] *Id.* at 72.
[125] *See* 19 CFR 351.519(a)(1)(ii).

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation  -

apply a system to confirm which inputs are consumed in the production of the exported products and in what amounts.[126]  The system must be reasonable, effective for the purposes intended, and based on generally accepted commercial practices in the country of export.[127]  If such a system does not exist, or if it is not applied effectively, and the government in question does not examine the actual inputs involved to confirm which inputs are consumed in the production of the exported product, the entire amount of any exemption, deferral, or remission of drawback is countervailable.[128]

Consistent with previous proceedings,[129] the record of this investigation indicates that the GOI continues to employ universal rates based on aggregate data collected from various sources, rather than attempting to determine the respondent's actual consumption, production, and waste.[130]  With regard to the drawback rate available on the export of subject merchandise, the GOI states that the "{rates} are worked out by the committee based on factors such as average prices of inputs, their import-indigenous ration, duty rates average FOB value of export goods, etc. as provided by the Export Promotion Councils, Trade and Industry Association, etc. for certain export items, the committee provides a residuary rate which are *broad assessment* of unrebated incidence (direct and embedded) of the duties."[131] (Emphasis added.)  The GOI further provides a table that shows the drawback rate by tariff item, indicating that rates for subject merchandise are calculated on an industry basis, and, therefore, are not calculated based on the respondents' actual consumption, production, and waste of manufacturing inputs for subject merchandise.[132]

We preliminarily determine that a financial contribution, pursuant to section 771(5)(D)(ii) of the Act, is provided under the DDB program because the rebated duties represent revenue forgone by the GOI.  Because the program is available only to exporters, we preliminarily determine that the DDB program is specific under sections 771(5A)(A) and (B) of the Act.  As explained above, under 19 CFR 351.519(a)(4), in the absence of an adequate drawback system, the entire amount of customs and excise duties and service taxes rebated during the POI constitutes a benefit.  Drawbacks under the program are provided as a percentage of the value of the exported merchandise on a shipment-by-shipment basis.  As such, it is at the time of exportation that recipients know the exact amount of the benefit (*i.e.*, the value of the drawback).  Therefore, pursuant to 19 CFR 351.519(b)(1), we find that the benefits from the DDB program are conferred on the dates of exportation of the shipments for which the pertinent drawbacks were earned.[133]

GFCL reported its benefits from this program on a transaction-specific basis.[134]  In accordance with 19 CFR 351.525(b)(4) and (5), when a subsidy is tied to a certain product or market, we

---

[126] *See Shrimp from India Final Determination* IDM at 12-14.
[127] *Id*.
[128] *See* 19 CFR 351.519(a)(4)(i)-(ii).
[129] *See Shrimp from India Final Determination* IDM at 12-14.
[130] *See* GOI IQR at 73.
[131] *Id.*
[132] *Id*. at Exhibit 20.
[133] *See, e.g.*, *Final Affirmative Countervailing Duty Determination:  Certain Cut-To-Length Carbon Quality Steel Plate from India*, 64 FR 73131, 73140 (December 29, 1999).
[134] *See* GFCL IQR at 45 and at Exhibit 12(f).

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation  -

will attribute that subsidy to only that product or market.[135]  We preliminarily determine that GFCL received benefits under this program only on the basis of its exports of subject merchandise to the United States.[136]  Therefore, we divided the total amount of duty drawback GFCL received on exports of subject merchandise to the United States during the POI by GFCL's exports of subject merchandise to the United States.

On this basis, we preliminarily determine a countervailable subsidy rate of 0.17 percent *ad valorem* for GFCL.[137]

4.  <u>SHIS</u>

The SHIS was introduced in 2009 with the objective of promoting investment in upgrading technology in specific sectors.[138]  "Status Holders" under the GOI's listing of specified exported products receive incentive scrip (or credit) equal to one percent of the FOB value of the exports; this SHIS license scrip can be used to offset duties on imports of capital goods,[139] and can also be transferred to another Status Holder who may also use it to offset duties on imports of capital goods.[140]

This program provides a financial contribution in the form of revenue forgone under section 771(5)(D)(ii) of the Act because the duty-free import of goods represents revenue forgone by the GOI.[141]  Further, it is specific under sections 771(5A)(A) and (B) of the Act because it is limited to exporters.[142]  A benefit is also provided under the SHIS program under section 771(5)(E) of the Act and 19 CFR 351.519 in the amount of the scrip granted to the recipient.[143]

Record information states that import duty exemptions under this program are provided for the purchase of capital equipment.[144]  The *CVD Preamble* states that, if a government provides an import duty exemption tied to major equipment purchases, "it may be reasonable to conclude that, because these duty exemptions are tied to capital assets, the benefits from such duty exemptions should be considered non-recurring…."[145]  In accordance with 19 CFR 351.524(c)(2)(iii) and past practice, we are treating these import duty exemptions on capital equipment as non-recurring benefits.[146]

GFCL reported that it received SHIS license scrips to import capital goods duty free during the AUL.[147]  Information provided by GFCL indicates that its SHIS license scrips were issued for

---

[135] *Id*. at 45.
[136] *Id*. at 45 and Exhibit 12(f).
[137] *See* Preliminary Calculation Memorandum.
[138] *See* GOI IQR at 87.
[139] *Id* at 87-88 and Exhibit 23.
[140] *Id*. at 88 and Exhibit 23
[141] *Id*.
[142] *Id.*
[143] *See Steel Flanges from India Preliminary Determination* PDM at 18 (citing *Steel Threaded Rod from India* IDM at "Status Holder Incentive Scrip").
[144] *See* GFCL's IQR at Exhibits 13(a) and 13(b).
[145] *See CVD Preamble* at 65393.
[146] *See Steel Threaded Rod from India* IDM at "Status Holder Incentive Scrip."
[147] *See* GFCL's IQR at 61 and Exhibit 13(e).

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation  -

the purchase of capital goods used for the production of exported goods, and thus we are attributing the SHIS benefits received by GFCL to its total exports.[148]

The SHIS scrip confers a non-recurring benefit that is not automatically received, and the amount of said benefit is not known to the recipient at the time of receipt of the scrip.[149] Although Commerce's regulations stipulate that we will normally consider the benefit as having been received as of the date of exportation,[150] because the SHIS benefit amount is not automatic and is not known to the exporter until well after the exports are made, the SHIS licenses as issued by the GOI, which contain the date of validity and the duty exemption amount, are the best method to determine and account for when the benefit is received.[151]

We performed the "0.5 percent test," as prescribed under 19 CFR 351.524(b)(2), for the total value of the exempted customs duties for the years in which GFCL received such SHIS licenses and determined to allocate the benefits across the AUL.  GFCL's licenses had values greater than 0.5 percent of its total export sales in years prior to the POI, and were, therefore, allocated over the AUL period.  To calculate the subsidy rate, we divided the resulting benefit by the value of GFCL's POI export sales.

On this basis, we preliminarily determine a countervailable subsidy rate of 0.07 percent *ad valorem* for GFCL.[152]

5. Renewable Energy Certificate

The GOI describes Renewable Energy Certificates (RECs) as a market-based mechanism created in 2010 to bridge the gap between the availability and use of renewable energy.[153]  The RECs are also meant to encourage the increase of renewable energy capacity in states where there is potential for renewable energy generation by creating a national level market for such renewable energy generators to recover their cost.[154]  Distributors, producers, and consumers of conventional fossil fuel energy above a designated threshold are required by the Central Electricity Regulatory Commission (CERC) to meet a renewable purchase obligation (RPO).[155]

RECs are tradable credits that RPO-obligated entities can use to satisfy their RPO for the fiscal year.  To receive RECs from the GOI, an energy producer must be accredited by CERC and apply within six months of the corresponding energy generation.[156]  CERC will review the application and issue one REC for each megawatt hour of electricity generated from renewable sources and injected into the grid.[157]  In addition to being able to meet an entity's RPO, RECs are

---

[148] *Id.*
[149] *See Steel Threaded Rod from India* IDM at "Status Holder Incentive Scrip."
[150] *See* 19 CFR 351.519(b)(1).
[151] *See PET Film Final Results 2012 Review* IDM at 21 and Comment 3.
[152] *See* Preliminary Calculation Memorandum.
[153] *See* GOI IQR at 104.
[154] *Id.* at 110.
[155] *See* GOI SQR at Exhibit 11.
[156] *Id.*
[157] *Id.*

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation -

also tradable, with the price floor set by CERC on the basis of renewable energy cost, capacity, and usage targets.[158]

GFCL reported that it received non-solar RECs based on its wind power generation activities during the POI.[159]  As RECs are tradable between entities, the RECs have value to GFCL because the company can sell them to other companies seeking to avoid penalties for failure to meet their RPOs.  Commerce preliminarily determines that RECs are *de jure* specific, pursuant to section 771(5A)(D)(i) of the Act because they are expressly limited to producers of renewable energy.

By virtue of imposing an RPO on certain entities and creating this mechanism by which entities can use or trade RECs, the GOI is providing a fiscal allowance or certificate that has value at the time of bestowal.  Therefore, we preliminarily determine that the GOI is providing a financial contribution in the form of a direct transfer of funds, pursuant to section 771(5)(D)(i) of the Act.

As noted above, the REC has value at the time of bestowal, though the exact amount of value is not yet known.  The exact value of the REC in this instance, and therefore the benefit received by GFCL, can be measured in the amount for which GFCL sells its RECs to other entities.  This program provides a recurring benefit, as RECs are not tied to capital assets and recipients can expect to receive additional subsidies under this same program from year to year, consistent with 19 CFR 351.524(c)(2)(i).  We calculated the benefit to GFCL as the value of RECs GFCL sold during the POI.[160]  On this basis, Commerce has preliminarily determined the countervailable subsidy rate of 0.41 percent *ad valorem* for GFCL.[161]

### 6.   GIDC's Preferential Water Rates

The GIDC is the agency created by the SGOG for facilitating industrial development in the state of Gujarat and establishing industry-ready land with basic infrastructure, which is then allotted (*i.e.*, leased) to manufacturers.[162]  The GIDC was established under the Gujarat Industrial Development Act 1962.[163]

Under GIDC Water Supply Regulation 1991, all companies which are located in GIDC industrial estates have to pay for using water supply, including the cost of pipes, water connections, and operations and maintenance.[164]  The GOI claims that the GIDC determines water rates for the financial year on the basis of actual expenditure incurred by the GIDC in the previous year and that the GIDC revises these rates every year.[165]  In order to receive this water supply, enterprises must submit an application to establish operations on GIDC land.[166]

---

[158] *Id.*
[159] *See* GFCL IQR at 66.
[160] *Id.* at Exhibit 15(d).
[161] *See* Preliminary Calculation Memorandum.
[162] *See* GOI IQR at 140 and at Exhibit 28.
[163] *Id.* at 140.
[164] *Id.*
[165] *Id.*
[166] *Id.* at 145-146.

Barcode:4138232-01 C-533-900 INV - Investigation  -

For the reasons explained in the "Use of Facts Otherwise Available and Adverse Inferences" section above, we are basing our determination regarding this program, in part, on AFA. GFCL reported that it has an active production facility in a GIDC industrial estate that uses GIDC water.[167] Because GIDC operates as the dispensing agency for funds appropriated by the SGOG for the development of industrial estates, builds estates in locations as directed by the SGOG, and administers them according to directives and policies set by the SGOG, the jurisdiction of the authority providing the subsidy is the entire state of Gujarat. The rates set by the GIDC apply only to those enterprises located within its estates. Information provided by the GOI indicates that the GIDC industrial estates are a designated area under the jurisdiction of the SGOG, and that the provision of water at a preferential rate is limited by law to enterprises or industries within a designated geographical region within the jurisdiction of the authority providing the subsidy.[168] Therefore, we preliminarily find that this program is regionally specific, in accordance with section 771(5A)(D)(iv) of the Act and confers a financial contribution in the form of revenue forgone, in accordance with section 771(5)(D)(ii) of the Act and our past practice.[169]

As explained above in the "Use of Facts Otherwise Available and Adverse Inferences" section, to calculate the benefit, we selected the highest calculated rate for the same or similar program as AFA. For this program we are using an AFA rate of 0.60 percent *ad valorem*, the highest rate determined for a similar program in the *PTFE Resin from India* proceeding.[170]

### 7. State Government of Gujarat (SGOG) Exemption from Electricity Duty

Under the Gujarat Electricity Duty Exemption Scheme (GEDES), which is established by the Gujarat Electricity Duty Act of 1958 and 1962, an entity that establishes a new or additional unit of an industrial undertaking in Gujarat is entitled to an exemption from the electricity duty under the program for energy consumed for industrial purposes.[171] This exemption is available for up to five years after the start of the industrial undertaking, and the entity must make an application within 90 days from the date of manufacturing or production of goods for the first time.[172] GFCL has reported that it has received these exemptions at its Dahej manufacturing unit for establishing additional units for the new industrial undertaking and for its captive wind power generation.[173] Specifically, GFCL reported duty exemptions for energy consumed by "additional units" for the new industrial undertaking with in GFCL's Dahej manufacturing plant; a concession duty rate for energy consumed by electrochemical, electrolytical, or electro-metallurgical process carried on by an industrial undertaking; and electricity generated from GFCL's captive wind turbine generators.[174]

---

[167] *See* GFCL IQR at 82.
[168] *See* GOI IQR at Exhibit 28.
[169] *See* *PTFE Resin from India Preliminary Determination* PDM at 17-18, unchanged in *PTFE Resin from India Final Determination*.
[170] *See* *PTFE Resin from India Final Determination* IDM at 7.
[171] *See* GOI IQR at 155 and at Exhibit 31.
[172] *Id*. at 157 and at Exhibit 31.
[173] *See* GFCL IQR at 89-98.
[174] *Id.*

Barcode:4138232-01 C-533-900 INV - Investigation -

We preliminarily determine that these electricity duty exemptions confer a financial contribution in the form of revenue forgone, in accordance with section 771(5)(D)(ii) of the Act.  For the reasons explained in the "Use of Facts Otherwise Available and Adverse Inferences" section above, we preliminarily determine that these exemptions are *de facto* specific under section 771(5A)(D)(iii) of the Act.

To calculate the benefit, we first calculated the uncollected (*i.e.*, not paid by GFCL during the POI) electricity duty and cess by multiplying the total amount of captively-generated and purchased electricity by the applicable tax rates.  We then divided this amount by GFCL's total sales during the POI to calculate a countervailable subsidy of 0.66 percent *ad valorem*.[175]

B. *Programs Preliminarily Determined Not to Have Conferred a Measurable Benefit during the POI*

We preliminarily determined that the following program did not confer a measurable benefit during the POI.  Therefore, we do not reach a preliminary determination as to whether there is financial contribution or specificity for this program:

1. GIDC's Provision of Land for LTAR

C. *Programs Preliminarily Determined Not Used during the POI*

We preliminarily determine that GFCL did not apply for, or receive, benefits during the POI under the programs listed below:

1. Duty Free Import Authorization (DFIA)
2. Income Tax Exemption for Infrastructure Development Scheme
3. Provision of Coal for LTAR

Subsidies for Export-Oriented Units

4. Duty-Free Import of Goods, Including Capital Goods and Raw Materials
5. Reimbursement of Central Sales Tax (CST) Paid on Goods Manufactured in India
6. Exemption from Payment of Central Excise Duty (CED) on Goods Manufactured in India and Procured from a Domestic Tariff Area (DTA)

GOI and State Government of Gujarat (SGOG) Benefits to Companies Located within Special Economic Zones (SEZs)

7. Duty Free Importation of Capital Goods and Raw Materials, Components, Consumables, Intermediates, Spare Parts and Packing Materials
8. Exemption from Payment of CST on Purchases of Capital Goods and Raw Materials, Components, Consumables, Intermediates, Spare Parts, And Packing Material
9. Exemption from Electricity Duty and Cess on the Sale or Supply of Electricity to the SEZ Unit

---

[175] *See* Preliminary Calculation Memorandum.

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation  -

10. SEZ Income Tax Exemption Provision (Section 10AA)
11. SEZ Act:  Service Tax Exemption
12. Exemption from Payment of State Government Taxes and Duties

SGOG Subsidy Programs
13. SGOG Provision of Fluorspar for LTAR
14. Assistance for Common Environment Infrastructure Scheme (ACEIS)

D. *Programs for Which Additional Information is Necessary*

1. MEIS
2. SIDC's Provision of Land for LTAR
3. SGOMP Exemption from Electricity Duty
4. VAT and CST Exemption in State of Madhya Pradesh and Himachal Pradesh

## X.    RECOMMENDATION

We recommend that you approve the preliminary findings described above.

☒                    ☐
_____          _____
Agree                Disagree

6/28/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
   for Enforcement and Compliance

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation  -

# APPENDIX

## Short Citations

| Questionnaires and Questionnaire Responses | |
|---|---|
| Short Citations | Complete Document Titles |
| GFCL AQR | GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Questionnaire Response to Section III (Identifying Affiliated Companies)," dated March 26, 2021. |
| GFCL IQR | GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Section III Questionnaire Response," dated May 6, 2021. |
| GFCL SAQR | GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Supplemental Questionnaire Response to Section III Identifying Affiliated Companies (Questions 3-7)," dated April 15, 2021. |
| GFCL SQR1 | GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's First Supplemental Questionnaire Response," dated June 14, 2021. |
| GFCL SQR2 | GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Second Supplemental Questionnaire Response," dated June 14, 2021. |
| GFCL SQR3 | GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Third Supplemental Questionnaire Response," dated June 14, 2021. |
| GOI IQR | GOI's Letter, "Initial Questionnaire Response to Section-II on behalf of Government of India," dated April 15, 2021. |
| GOI SQR | GOI's Letter, "Supplementary Questionnaire Response to Section-II on behalf of Government of India," dated May 21, 2021. |
| ILFL IQR | GFCL's Letter, "Inox Leasing and Finance Limited's Section III Questionnaire Response," dated May 6, 2021. |
| Initial Questionnaire | Commerce's Letter, "Granular Polytetrafluoroethylene Resin from India: Countervailing Duty Questionnaire," dated March 9, 2021. |

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

| | |
|---|---|
| IWL IQR Part 1 | GFCL's Letter, "Granular Polytetrafluoroethylene Resin from India; Inox Wind Limited's Section III Questionnaire Response (Part I)," dated May 24, 2021. |
| Second GOI Supplemental Questionnaire | Commerce's Letter to the GOI, "Countervailing Duty Investigation of Granular Polytetrafluoroethylene (PTFE) Resin from India: Second Supplemental Questionnaire," dated June 8, 2021. |

| Comments from Interested Parties | |
|---|---|
| Short Citations | Complete Document Titles |
| Critical Circumstances Addendum | Petitioner's Letter, "Critical Circumstances Addendum," dated June 16, 2021. |
| Critical Circumstances Allegation | Petitioner's Letter, "Allegation of the Existence of Critical Circumstances," dated June 8, 2021. |
| GFCL's Benchmark Submission | GFCL's Letter, "Granular Polytetrafluoroethylene Resin from India; Gujarat Fluorochemicals Limited's Benchmark Submission," dated June 4, 2021. |
| GFCL's Q&V | GFCL's Letter, "Gujarat Fluourochemicals {sic} Limited's Quantity and Value Questionnaire Response," dated June 15, 2021. |
| Petitioner's Benchmark Submission | Petitioner's Letter, "Granular Polytetrafluoroethylene Resin from India: Benchmark Data Submission," dated June 1, 2021. |

| Court Cases and Precedents | |
|---|---|
| Short Citations | Complete Document Titles |
| *2005 Review of PET Film from India* | *Final Results of Countervailing Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from India*, 73 FR 7708 (February 11, 2008). |
| *Certain PET Resin from India Final Determination* | *Countervailing Duty Investigation of Certain Polyethylene Terephthalate Resin from India: Final Affirmative Determination and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 13334 (March 14, 2016). |

Barcode:4138232-01 C-533-900 INV - Investigation  -

| | |
|---|---|
| *CVD Preamble* | *Countervailing Duties; Final Rule*, 63 FR 65348, 65401 (November 25, 1998). |
| *CWP from China* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008). |
| *Icadas v. United States* | *Icadas Celik Enerji Tersane ve Ulsaim Sanayi A.S. v. United States*, 498 F. Supp.3d 1345 (2021). |
| *Nippon Steel* | *Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003)* |
| *Oil Country Tubular Goods from India Final* | *Certain Oil Country Tubular Goods from India: Final Affirmative Countervailing Duty Determination and Partial Final Affirmative Determination of Critical Circumstances*, 79 FR 41967 (July 18, 2014). |
| *PET Film Final Results 2012 Review* | *Polyethylene Terephthalate Film, Sheet, and Strip from India: Final Results of Countervailing Duty Administrative Review; 2012*, 80 FR 11163, (March 2, 2015). |
| *PET Film from India Final Determination* | *Notice of Final Affirmative Countervailing Duty Determination: Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India*, 67 FR 34905 (May 16, 2002). |
| *PTFE Resin from India Final Determination* | *Polytetrafluoroethylene Resin from India: Final Affirmative Countervailing Duty Determination, 83 FR 23422 (May 21, 2018).* |
| *PTFE Resin from India Preliminary Determination* | *Polytetrafluoroethylene Resin from India: Preliminary Affirmative Countervailing Duty Determination, 83 FR 9842 (March 8, 2018).* |
| *Sacks from China* | *Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances, 73 FR 35639 (June 24, 2008).* |
| *Shrimp from India Final Determination* | *Certain Frozen Warmwater Shrimp from India: Final Affirmative Countervailing Duty Determination*, 78 FR 50385 (August 19, 2013). |
| *Solar Cells from China Final* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final* |

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

Barcode:4138232-01 C-533-900 INV - Investigation  -

| | *Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012). |
|---|---|
| *Steel Flanges from India Final Determination* | *Finished Carbon Steel Flanges from India: Final Determination of Sales at Less Than Fair Value*, 82 FR 29483 (June 29, 2017). |
| *Steel Flanges from India Preliminary Determination* | *Finished Carbon Steel Flanges from India: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 82 FR 9719 (February 8, 2017). |
| *Steel Threaded Rod from India* | *Steel Threaded Rod from India: Final Affirmative Countervailing Duty Determination and Partial Final Affirmative Determination of Critical Circumstances*, 79 FR 40712 (July 14, 2014). |

| Commerce Memoranda and Publications | |
|---|---|
| Short Citations | Complete Document Titles |
| Critical Circumstances Memorandum | Memorandum, "Monthly Shipment Quantity and Value Analysis for Critical Circumstances," dated concurrently with this memorandum. |
| Initiation Checklist | Initiation Checklist, dated February 16, 2021. |
| *Initiation Notice* | *Granular Polytetrafluoroethylene Resin from India and the Russian Federation: Initiation of Countervailing Duty Investigations*, 86 FR 10931 (February 23, 2021). |
| Petition | Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Granular Polytetrafluoroethylene Resin from India and Russia," dated January 27, 2021 (Petition). |
| POI Revision Memo | Memorandum, "Countervailing Duty Investigation of Granular Polytetrafluoroethylene Resin from India: Period of Investigation Change," dated March 15, 2021. |
| Preliminary Calculation Memorandum | Memorandum, "GFCL Calculations for the Preliminary Determination," dated concurrently with this memorandum. |

Filed By: Joshua Simonidis, Filed Date: 6/29/21 12:39 PM, Submission Status: Approved

# Addendum 9

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| GUJARAT FLUOROCHEMICALS LIMITED, <br>        Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br> and <br><br> DAIKIN AMERICA INC., <br><br>        Defendant-Intervenor. | Court No. 22-00120 <br><br> Hon. Timothy C. Stanceu <br> Judge |

**NOTICE OF APPEAL**

Notice is hereby given that Daikin America Inc., Defendant-Intervenor in the above named case, appeals to the United States Court of Appeals for the Federal Circuit from the decision, order, and judgment of the U.S. Court of International Trade entered in this action, *Gujarat Fluorochemicals Limited v. United States*, Ct. No. 22-00120, slip op. 23-151 (Ct. Int'l Trade Oct. 13, 2023), ECF No. 74, and Judgment Order (Ct. Int'l Trade Oct. 13, 2023), ECF No. 75.

Respectfully submitted,

/s/ Luke M. Meisner
Luke M. Meisner
Elizabeth J. Drake
SCHAGRIN ASSOCIATES
900 Seventh Street NW, Suite 500
Washington, DC  20001
202-223-1700
lmeisner@schagrinassociates.com
*Counsel to Daikin America Inc.*

December 12, 2023

# Addendum 10

## U.S. Court of International Trade
## LIVE Database (New York)
### CIT DOCKET FOR CASE #: 1:22-cv-00120-TCS

Gujarat Fluorochemicals Limited v. United States
**Assigned to:** Timothy C. Stanceu
**Lead Docket:**

| | |
|---|---|
| **Jurisdiction:** | **Date Filed:** 04/12/2022 |
| 28USC § 1581(c) Antidumping or Countervailing Duty Determination(s) | **Jury Demand:** No |

**Category:**
Final Affirmative Determinations: Investigations 19USC § 1516a(a)(2)(B)(i)

**Date Terminated:** 10/13/2023

**Date Reopened:**

**Agency:**
U.S. Department of Commerce

**Does this action raise an issue of constitutionality?:** N

**Product Description:**
Granular Polytetrafluoroethylene (PTFE) Resin

**Export Country:**
India

**Plaintiff**

**Gujarat Fluorochemicals Limited**                  represented by  **John Marshall Gurley**
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6301
Fax: (202) 857-6395
Email: john.gurley@afslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Diana Dimitriuc-Quaia**
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Jessica R. DiPietro**
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
(202) 350-3622
Fax: (202) 857-6395
Email: jessica.dipietro@afslaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Matthew Mosher Nolan**
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006-5344
(202) 857-6013
Fax: (202) 857-6395

**Appx00047**

Email: matthew.nolan@afslaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Wendy Qiu**
ArentFox Schiff LLP
555 West Fifth Street
48th Floor
Los Angeles, CA 90013
(213) 443-7582
Email: wendy.qiu@afslaw.com
***TERMINATED: 01/02/2024***
*Bar Status: ACTIVE*

**Defendant**

**United States**    represented by  **Collin T. Mathias**
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-0315
Email: collin.t.mathias@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Daniel Francis Roland**
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-0514
Fax: (202) 307-0972
Email: daniel.f.roland@usdoj.gov
***TERMINATED: 01/09/2024***
*Bar Status: ACTIVE*

**Paul K. Keith**
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and
Compliance
1401 Constitution Avenue, NW.
Suite 3623
Washington, DC 20230
(202) 482-1767
Fax: (202) 482-4912
Email: paul.keith@trade.gov
***TERMINATED: 09/08/2023***
*Bar Status: ACTIVE*

**Defendant-Intervenor**

**Daikin America, Inc.**    represented by  **Luke Anthony Meisner**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: lmeisner@schagrinassociates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Benjamin Jacob Bay**
Schagrin Associates
900 Seventh Street, NW.
Suite 500

Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: bbay@schagrinassociates.com
*TERMINATED: 06/28/2023*
**Bar Status: ACTIVE**

**Christopher Todd Cloutier**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: ccloutier@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**Elizabeth Jackson Drake**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: edrake@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**Jeffrey David Gerrish**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Email: jgerrish@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**Joseph A. Laroski , Jr.**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 763-7769
Email: jlaroski@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
**Bar Status: ACTIVE**

**Justin M. Neuman**
Schagrin Associates
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: jneuman@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**Kelsey Marie Rule**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: krule@schagrinassociates.com

**Appx00049**

*TERMINATED: 05/08/2023*
*Bar Status: ACTIVE*

**Michelle Rose Avrutin**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 516-5213
Fax: (202) 429-2522
Email: mavrutin@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Nicholas Joel Birch**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Email: nbirch@SchagrinAssociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Roger Brian Schagrin**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: rschagrin@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Saad Younus Chalchal**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: schalchal@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**William A. Fennell**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: wfennell@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

| Date Filed | # | Select all / clear | Docket Text |
|---|---|---|---|
| 04/12/2022 | 1 (89.9 KB) | ☐ | Summons . Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 04/12/2022) |
| 04/12/2022 | 2 (32.8 KB) | ☐ | Form 5 Information Statement . Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 04/12/2022) |
| 04/12/2022 | 3 (52.7 KB) | ☐ | Form 13 Corporate Disclosure Statement . Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 04/12/2022) |

Appx00050

| 04/12/2022 | 4 | ☐ 79.7 KB | Form 11 Notice of Appearance *for J. Gurley, D. Dimitriuc Quaia, M. Nolan & J. DiPietro.* Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited.(Gurley, John) (Entered: 04/12/2022) |
|---|---|---|---|
| 04/12/2022 | 5 | ☐ 83.0 KB | Form 17 Business Proprietary Information Certification filed on behalf of J. Gurley, D. Dimitriuc Quaia, M. Nolan & J. DiPietro as Attorney/Consultant(s) . Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 04/12/2022) |
| 04/12/2022 | 6 | ☐ 146.9 KB | Complaint against United States. Administrative Record due by 5/23/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 04/12/2022) |
| 04/12/2022 | 7 | ☐ 55.4 KB | Certificate of service *for summons, complaint, form 5, form 11s, form 13 & form 17s* (related document(s) 4 , 6 , 5 , 3 , 1 , 2 ). Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 04/12/2022) |
| 04/13/2022 | 8 | | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Benbow, Troy) (Entered: 04/13/2022) |
| 04/13/2022 | 9 | ☐ 79.3 MB | Confidential Application/Motion for preliminary injunction , *Draft Order & Memorandum in Support.* Responses due by 5/4/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Attachments: # 1 Exhibits 1-15, # 2 Exhibits 16-27, # 3 Motion & Draft Order) (Gurley, John) (Entered: 04/13/2022) |
| 04/13/2022 | 10 | ☐ 30.8 MB | Public Application/Motion for preliminary injunction , *Draft Order & Memorandum in Support.* Responses due by 5/4/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Attachments: # 1 Motion)(Gurley, John) (Entered: 04/13/2022) |
| 04/15/2022 | 11 | ☐ 52.6 KB | Form 11 Notice of Appearance . Filed by Daniel Francis Roland of U.S Department of Justice on behalf of All Defendants.(Roland, Daniel) (Entered: 04/15/2022) |
| 04/26/2022 | 12 | ☐ 70.9 KB | Form 11 Notice of Appearance . Filed by Paul Kent Keith of U.S. Department of Commerce on behalf of United States. (Keith, Paul) (Entered: 04/26/2022) |
| 05/04/2022 | 13 | ☐ 359.0 KB | Public Response to motion *for a preliminary injunction* (related document(s) 9 , 10 ). Filed by Daniel Francis Roland of U.S Department of Justice on behalf of United States.(Roland, Daniel) (Entered: 05/04/2022) |
| 05/05/2022 | 14 | ☐ 683.8 KB | Confidential Response to motion *for a preliminary injunction* (related document(s) 9 , 10 ). Filed by Daniel Francis Roland of U.S. Department of Justice on behalf of United States.(Roland, Daniel) (Entered: 05/05/2022) |
| 05/09/2022 | 15 | ☐ 151.4 KB | Consent Motion for protective order *and Judicial Protective Order.* Responses due by 5/31/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited.(Gurley, John) (Terminated-Revised Motion Filed ECF #31) (Entered: 05/09/2022) |
| 05/11/2022 | 16 | ☐ 98.8 KB | Consent Motion to Intervene as defendant intervenor . Responses due by 6/1/2022. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc..(Meisner, Luke) (Entered: 05/11/2022) |
| 05/11/2022 | 17 | ☐ 131.3 KB | Form 13 Corporate Disclosure Statement . Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) (Entered: 05/11/2022) |
| 05/11/2022 | 18 | ☐ 114.1 KB | Form 11 Notice of Appearance *Luke A. Meisner, Roger B. Schagrin, Christopher T. Cloutier, Elizabeth J. Drake, Jeffrey D. Gerrish, William A. Fennell, Nicholas J. Birch, Joseph A. Laroski Jr., Benjamin Jacob Bay, Kelsey M. Rule, Michelle R. Avrutin, and Saad Y. Chalchal..* Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc..(Meisner, Luke) (Entered: 05/11/2022) |
| 05/11/2022 | 19 | ☐ 98.8 KB | **[ENTERED IN ERROR.]** Consent Motion to Intervene as defendant intervenor . Responses due by 6/1/2022. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc..(Meisner, Luke) Modified on 5/11/2022 (Chien, Jason). (Entered: 05/11/2022) |
| 05/11/2022 | 20 | ☐ 131.3 KB | **[ENTERED IN ERROR.]** Form 13 Corporate Disclosure Statement . Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) Modified on 5/11/2022 (Chien, Jason). (Entered: 05/11/2022) |
| 05/11/2022 | 21 | ☐ 114.1 KB | **[ENTERED IN ERROR.]** Form 11 Notice of Appearance *Luke A. Meisner, Roger B. Schagrin, Christopher T. Cloutier, Elizabeth J. Drake, Jeffrey D. Gerrish, William A. Fennell, Nicholas J. Birch, Joseph A. Laroski Jr., Benjamin Jacob Bay, Kelsey M. Rule, Michelle R. Avrutin, and Saad Y. Chalcha.* Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc..(Meisner, Luke) Modified on 5/11/2022 (Chien, Jason). (Entered: 05/11/2022) |
| 05/11/2022 | 22 | ☐ 174.1 KB | Form 17 Business Proprietary Information Certification filed on behalf of Luke A. Meisner, Roger B. Schagrin, Christopher T. Cloutier, Elizabeth J. Drake, Jeffrey D. Gerrish, William A. Fennell, Nicholas J. Birch, Joseph A. Laroski Jr., Benjamin Jacob Bay, Kelsey M. Rule, Michelle R. Avrutin, and Saad Y. Chalchal and Michael Panfeld, David De Prest and Rui Fan as Attorney/Consultant(s) . Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) (Entered: 05/11/2022) |
| 05/11/2022 | 23 | ☐ 102.7 KB | Order entered on 5/11/2022 granting Consent Motion to Intervene. ORDERED that Applicant's motion to intervene is GRANTED. (Related Doc # 16 ). (Chien, Jason) (Entered: 05/11/2022) |
| 05/12/2022 | 24 | ☐ 75.0 KB | Order entered on 5/12/2022 assigning action to Judge Timothy C. Stanceu.(Love, Cynthia) (Entered: 05/12/2022) |
| 05/16/2022 | 25 | ☐ 96.4 KB | Form 11 Notice of Appearance *for Wendy Qiu.* Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 05/16/2022) |

Appx00051

| 05/16/2022 | 26<br>☐<br>96.8 KB | Form 17 Business Proprietary Information Certification filed on behalf of Wendy Qiu as Attorney/Consultant(s) . Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 05/16/2022) |
|---|---|---|
| 05/23/2022 | 27<br>☐<br>1.7 MB | Administrative record for U.S. Department of Commerce filed . Filed by Paul Kent Keith of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 FR Notice, # 2 IDM, # 3 Public CRI, # 4 BPI CRI, # 5 Analyst Declaration)(Keith, Paul) (Entered: 05/23/2022) |
| 06/09/2022 | 28<br>☐<br>527.6 KB | Order entered on 6/9/2022, Slip opinion: 22-63. ORDERED that plaintiff's motion for a preliminary injunction directed to the cash deposit rate be, and hereby is, denied; it is further ORDERED that plaintiff's motion for an injunction under 19 U.S.C. § 1516a(c)(2) is denied without prejudice for plaintiff's failure to provide the court a draft order in a satisfactory form; it is further ORDERED that plaintiff shall have 30 days from the date of this Opinion and Order in which to renew its motion for an injunction under 19 U.S.C. § 1516a(c)(2) and inform the court whether plaintiff consents to an injunction under 19 U.S.C. § 1516a(c)(2) in the form of defendants draft order (May 4, 2022), ECF Nos. 13 (public), 14 (conf.), and if it does not so consent, to submit its own draft order and the reasons for its objections to defendant's draft order; and it is further ORDERED that defendant-intervenor, should it so choose, may submit comments to the court on defendant's draft order within 30 days of the date of this Opinion and Order. (related document(s) 9 , 10 ) Response to Court Request/Order due by 7/11/2022.(Love, Cynthia) (Entered: 06/09/2022) |
| 06/09/2022 | 29<br>☐<br>155.3 KB | *Rule 16 notice. Parties are to confer to develop a proposed schedule that will achieve the purposes of Rules 16 and 56.2. In accordance with Rule 56.2, plaintiff's attorney is directed to file with the Clerk of the Court and serve on the other parties on or before August 8, 2022 the following: (1)a proposed scheduling order that is in substantial compliance with Rule 56.2 and agreed to by all parties; or (2)in the event an agreement cannot be reached by the respective parties concerning proposed dates in the scheduling order, a proposed scheduling order, by each party, that is in substantial compliance with Rule 56.2. If counsel have any questions concerning the scheduling order, please contact Ms. Cynthia Love, my Case Manager, on (212) 264-2923 no later than August 8, 2022...* (Love, Cynthia) (Entered: 06/09/2022) |
| 06/10/2022 | 30<br>☐<br>118.4 KB | Letter *withdrawing Motion for Protective Order (ECF No. 15)*. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 06/10/2022) |
| 06/10/2022 | 31<br>☐<br>118.1 KB | Revised Consent Motion for protective order . Responses due by 7/1/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited.(Gurley, John) (Love, Cynthia). Modified on 6/10/2022 (Entered: 06/10/2022) |
| 06/10/2022 | 32<br>☐<br>120.0 KB | Order entered on 6/10/2022 granting Motion for protective order. (Related Doc # 31 ). (Love, Cynthia) (Entered: 06/10/2022) |
| 06/29/2022 | 33<br>☐<br>91.5 KB | Joint status report and proposed briefing schedule. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 06/29/2022) |
| 07/05/2022 | 34<br>☐<br>191.0 KB | Scheduling Order entered on 7/5/2022. Plaintiff's Rule 56.2 Motion due by 7/21/2022. Word Limit - 14,000 words. Defendant and Defendant-Intervenor's Responses to Dispositive Motion due by 9/23/2022. Word Limit - 14,000 words. Plaintiff's Reply due by 10/7/2022. Word Limit - 7,000 words. Joint Appendix due by 10/14/2022. Any motion for oral argument due by 10/21/2022. (Love, Cynthia) (Entered: 07/05/2022) |
| 07/05/2022 | 35<br>☐<br>201.5 KB | Unopposed Motion for Statutory Injunction *(Renewed)* (related document(s) 9 , 28 , 14 , 10 , 13 ). Responses due by 7/26/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Attachments: # 1 Proposed Order) (Gurley, John) (Entered: 07/05/2022) |
| 07/06/2022 | 36<br>☐<br>460.7 KB | Order entered on 7/6/2022 granting Plaintiff's Motion for preliminary injunction. (Related Doc # 35 ). (Love, Cynthia) (Entered: 07/06/2022) |
| 07/21/2022 | 37<br>☐<br>2.0 MB | Confidential Motion for judgment on agency record 56.2 *and Proposed Order*. Response to 56.2 Motion due by 9/23/2022. Filed by Diana Dimitriuc-Quaia of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Attachments: # 1 Brief Memorandum of Law in Support of 56.2 Motion ODL BPI)(Dimitriuc-Quaia, Diana) Modified on 7/22/2022 (Love, Cynthia). Modified on 1/24/2023 (Hugh, Lewis). (Entered: 07/21/2022) |
| 07/22/2022 | 38<br>☐<br>1.2 MB | Confidential Final Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 9/23/2022. Filed by Diana Dimitriuc-Quaia of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Attachments: # 1 Brief Memorandum of Law in Support of 56.2 Motion FINAL BPI)(Dimitriuc-Quaia, Diana) Modified on 7/22/2022 (Chien, Jason). Modified on 1/24/2023 (Hugh, Lewis). (Entered: 07/22/2022) |
| 07/22/2022 | 39<br>☐<br>1.7 MB | Public Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 9/23/2022. Filed by Diana Dimitriuc-Quaia of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Attachments: # 1 Brief Memorandum of Law in Support of 56.2 Motion PUBLIC)(Dimitriuc-Quaia, Diana) Modified on 7/22/2022 (Chien, Jason). (Entered: 07/22/2022) |
| 09/07/2022 | 40<br>☐<br>128.6 KB | Form 11 Notice of Appearance *Justin Neuman*. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc..(Meisner, Luke) (Entered: 09/07/2022) |
| 09/07/2022 | 41<br>☐<br>142.9 KB | Form 17 Business Proprietary Information Certification filed on behalf of Justin Neuman as Attorney/Consultant(s) *Attorney*. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) (Entered: 09/07/2022) |
| 09/15/2022 | 42<br>☐<br>205.6 KB | Consent Motion for extension of time until 9/30/2022 to file response brief (related document(s) 38 ). Responses due by 10/6/2022. Filed by Daniel Francis Roland of U.S. Department of Justice on behalf of United States.(Roland, Daniel) (Entered: 09/15/2022) |

| 09/19/2022 | 43<br>166.6 KB | ☐ | Order entered on 9/19/2022 granting Consent Motion for Extension of Time. ORDERED that defendant's motion is granted; and it is further ORDERED that defendant and defendant-intervenor shall file their response briefs by Friday, September 30, 2022; and it is further ORDERED that plaintiff shall file its reply brief by Friday, October 14, 2022; and it is further ORDERED that plaintiff shall file the joint appendix by Friday, October 21, 2022; and it is further ORDERED that motions for oral argument, if any, shall be filed by Friday, October 28, 2022. SO ORDERED. (related document(s) 42 ) (Chien, Jason) (Entered: 09/19/2022) |
|---|---|---|---|
| 09/30/2022 | 44<br>291.5 KB | ☐ | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 47]** Confidential Response *Opposition* to motion *56.2* (related document(s) 38 ). Reply due by 10/14/2022. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) Modified on 10/16/2022 (Chien, Jason) (Entered: 09/30/2022) |
| 09/30/2022 | 45<br>295.2 KB | ☐ | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 48]** Response *Opposition* to motion *56.2* (related document(s) 39 ). Reply due by 10/14/2022. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) Modified on 10/16/2022 (Chien, Jason) (Entered: 09/30/2022) |
| 09/30/2022 | 46<br>630.5 KB | ☐ | Response to motion *for judgment on the agency record* (related document(s) 38 ). Reply due by 10/14/2022. Filed by Daniel Francis Roland of U.S. Department of Justice on behalf of United States.(Roland, Daniel) Modified on 9/30/2022 (Chien, Jason) (Entered: 09/30/2022) |
| 10/03/2022 | 47<br>289.9 KB | ☐ | Confidential Response *Corrected Response Brief. (Caption on motion corrected* to motion (related document(s) 38 ). Reply due by 10/14/2022. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) Modified on 10/3/2022 (Cheevers, Casey). (Entered: 10/03/2022) |
| 10/03/2022 | 48<br>275.4 KB | ☐ | Response *Corrected Response Brief* to motion Caption on motion corrected (related document(s) 39 ). Reply due by 10/14/2022. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc..(Meisner, Luke) Modified on 10/3/2022 (Cheevers, Casey). (Entered: 10/03/2022) |
| 10/07/2022 | 49<br>81.5 KB | ☐ | Consent Motion for extension of time until 10/28/2022 to *file Reply Brief and Draft Order* (related document(s) 46 , 43 , 45 , 48 , 47 , 44 ). Responses due by 10/28/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited.(Gurley, John) (Entered: 10/07/2022) |
| 10/11/2022 | 50<br>169.2 KB | ☐ | Order entered on 10/11/2022, granting consent Motion for extension of time. ORDERED that: 1. Plaintiff shall file its reply brief on or before October 28, 2022. 2. Parties' joint appendix shall be filed on or before November 4, 2022. 3. Any motion for oral argument shall be filed on or before November 11, 2022. This Amended Scheduling Order shall apply to all parties in this action. (Related Doc # 49 ). (Taronji, Steve) (Entered: 10/11/2022) |
| 10/28/2022 | 51<br>179.8 KB | ☐ | Reply *Brief* (related document(s) 46 , 48 ). Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited.(Gurley, John) (Entered: 10/28/2022) |
| 11/04/2022 | 52<br>44.6 MB | ☐ | Confidential Joint Appendix (related document(s) 46 , 48 , 38 , 47 , 51 , 39 ). Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 11/04/2022) |
| 11/04/2022 | 53<br>40.0 MB | ☐ | Joint Appendix *(Non-Confidential Version)* (related document(s) 46 , 48 , 38 , 47 , 51 ). Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 11/04/2022) |
| 11/10/2022 | 54<br>80.1 KB | ☐ | Unopposed Motion for oral argument on 56.2 Briefing (related document(s) 46 , 48 , 38 , 47 , 51 , 39 ). Responses due by 12/1/2022. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 11/10/2022) |
| 11/28/2022 | 55<br>84.1 KB | ☐ | Order entered on 11/28/2022 granting Motion for oral argument (Related Doc # 54 ). An oral argument is scheduled for 1/11/2023 11:00 AM in Courtroom No. 2 before Timothy C. Stanceu. (Hugh, Lewis) (Entered: 11/29/2022) |
| 01/10/2023 | 56<br>174.9 KB | ☐ | Letter issued by The Honorable Timothy C. Stanceu concerning *questions for oral argument*. (Hugh, Lewis) (Entered: 01/10/2023) |
| 01/11/2023 | 57<br>93.8 KB | ☐ | Oral Argument held on 1/11/2023 at 11:00am in Courtroom 2. *Simultaneous supplemental briefs on the interpretation of Regulation 351.525(b)(6)(iv) due January 20, 2023 from all parties*. (Hugh, Lewis) (Entered: 01/11/2023) |
| 01/20/2023 | 58<br>219.2 KB | ☐ | Response to Court's Request/Order *invitation at oral argument*. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc.. (Meisner, Luke) (Entered: 01/20/2023) |
| 01/20/2023 | 59<br>344.6 KB | ☐ | Supplemental response to motion *on the interpretation of 19 C.F.R. § 351.525(b)(6)(iv)* (related document(s) 38 ). Filed by Daniel Francis Roland of U.S. Department of Justice on behalf of United States.(Roland, Daniel) (Additional attachment(s) added on 1/23/2023: # 1 Certificate of Compliance) (Hugh, Lewis). (Entered: 01/20/2023) |
| 01/20/2023 | 60<br>183.0 KB | ☐ | Response to Court's Request/Order *to File Supplemental Brief, re: Interpretation of Regulation 351.525(b)(6)(iv)*. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 01/20/2023) |
| 01/24/2023 | 61<br>556.6 KB | ☐ | Order entered on 1/24/2023, Slip-Op. 23-9: Remanding to the issuing agency a determination in a countervailing duty investigation on granular polytetrafluoroethylene from India. ORDERED that plaintiff's Rule 56.2 motion for judgment on the agency record be, and hereby is, granted; it is further ORDERED that the Final Determination be, and hereby is, ruled to be contrary to law with respect to the inclusion of a 26.50% estimated subsidy rate for the provision of land by the SIDC; it is further ORDERED that Commerce shall submit a new determination (the "Remand Redetermination") consistent with this Opinion and Order within 30 days of the date of issuance of this Opinion and Order; it is further ORDERED that in the Remand Redetermination Commerce shall delete from the overall rate the 26.50% estimated subsidy rate for the provision of land by the SIDC; it is further ORDERED that Commerce shall reconsider its |

| | | | |
|---|---|---|---|
| | | | inclusion of an estimated 0.12% subsidy rate for the provision of land by the GIDC; it is further ORDERED that plaintiff and defendant-intervenor may submit comments on the Remand Redetermination within 14 days of the filing of the Remand Redetermination; and it is further ORDERED that defendant may file a response to the comments on the Remand Redetermination within 7 days of the filing of the last comment submission. (related document(s) 46 , 59 , 60 , 48 , 38 , 58 , 47 , 37 , 51 , 39 ).(Hugh, Lewis) (Entered: 01/24/2023) |
| 02/21/2023 | 62 | ☐ 384.7 KB | Transcript of Oral Argument held on 1/11/2023 filed with court. Pursuant to Administrative Order 08-01 re: the redaction of personal data identifiers. Notice of Intent to Redact Deadline due 2/28/2023. Redaction Request due 3/14/2023. Redacted Transcript Deadline set for 3/24/2023. Release of Transcript Restriction set for 5/22/2023. (Hugh, Lewis) (Entered: 02/21/2023) |
| 02/23/2023 | 63 | ☐ 389.3 KB | Remand results filed by U.S. Department of Commerce . Filed by Paul Kent Keith of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Remand Results)(Keith, Paul) (Entered: 02/23/2023) |
| 03/09/2023 | 64 | ☐ 175.6 KB | Public Comments on remand results . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Daikin America, Inc.. (Schagrin, Roger) (Entered: 03/09/2023) |
| 03/09/2023 | 65 | ☐ 364.0 KB | Administrative record for U.S. Department of Commerce filed *regarding remand results*. Filed by Paul Kent Keith of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Public CRI, # 2 Declaration)(Keith, Paul) (Entered: 03/09/2023) |
| 03/09/2023 | 66 | ☐ 187.2 KB | Comments on remand results *and proposed draft order* (related document(s) 63 ). Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 03/09/2023) |
| 03/16/2023 | 67 | ☐ 150.8 KB | Reply to comments on remand results (related document(s) 66 , 64 ). Filed by Daniel Francis Roland of U.S. Department of Justice on behalf of United States. (Roland, Daniel) (Entered: 03/16/2023) |
| 03/28/2023 | 68 | ☐ 25.1 MB | Confidential Joint Appendix *on Comments & Reply Comments on Remand Results* (related document(s) 66 , 63 , 64 , 67 ). Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 03/28/2023) |
| 03/28/2023 | 69 | ☐ 18.4 MB | Public Appendix *(Joint) on Comments & Reply Comments on Remand Results* (related document(s) 66 , 64 , 68 , 67 ). Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 03/28/2023) |
| 05/08/2023 | 70 | ☐ 109.0 KB | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Kelsey M. Rule*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of All Plaintiffs (Schagrin, Roger) (Entered: 05/08/2023) |
| 06/28/2023 | 71 | ☐ 146.1 KB | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Benjamin J. Bay*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Daikin America, Inc. (Schagrin, Roger) Modified on 6/29/2023 (Hugh, Lewis). (Entered: 06/28/2023) |
| 07/07/2023 | 72 | ☐ 598.5 KB | Letter *to The Court Providing Status Update Related to Ongoing First Administrative Review*. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 07/07/2023) |
| 09/08/2023 | 73 | ☐ 124.0 KB | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of *Paul Kent Keith*. Filed by Paul Kent Keith of U.S. Department of Commerce on behalf of All Defendants (Keith, Paul) (Entered: 09/08/2023) |
| 10/13/2023 | 74 | ☐ 513.7 KB | Order entered on 10/13/2023 Slip Op. 23-151: Sustaining an agency decision submitted in response to court order. For the foregoing reasons, the court finds Daikin's and Gujarat Fluorochemicals's new arguments unavailing and will enter judgment sustaining the Remand Redetermination. (related document(s) 69 , 66 , 63 , 65 , 64 , 68 , 67 ) (Hugh, Lewis) (Entered: 10/13/2023) |
| 10/13/2023 | 75 | ☐ 457.6 KB | Judgment entered on 10/13/2023. Upon consideration of the Remand Redetermination, all filings and proceedings had herein, in conformance with the Opinion issued this day, and upon due deliberation, it is hereby ORDERED that the Remand Redetermination be, and hereby is, sustained. (related document(s) 74 ) (Hugh, Lewis) (Entered: 10/13/2023) |
| 12/12/2023 | 76 | ☐ 88.4 KB | Notice of Appeal of Judgment/Order 10/13/2023 filed. (related document(s) 75 , 74 ). Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Daikin America, Inc..(Meisner, Luke) (Entered: 12/12/2023) |
| 12/18/2023 | 77 | ☐ 270.5 KB | *Defendant-Intervenor Daikin America, Inc.'s* Appeal of *Slip Op. 23-151 and Judgment* docketed on 12/18/2023 by the CAFC as appeal no. 2024-1268 (related document(s) 76 ) (Hugh, Lewis) (Entered: 12/18/2023) |
| 01/02/2024 | 78 | ☐ 27.8 KB | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *W. Qiu*. Filed by John Marshall Gurley of ArentFox Schiff LLP on behalf of Gujarat Fluorochemicals Limited. (Gurley, John) (Entered: 01/02/2024) |
| 01/09/2024 | 79 | ☐ 132.8 KB | Form 12 Substitution of Attorney filed by *Collin T. Mathias* to appear in place of *Daniel Roland*. Filed by Collin T. Mathias of U.S. Department of Justice on behalf of United States.(Mathias, Collin) (Entered: 01/09/2024) |

[View Selected]
or
[Download Selected]

Total filesize of selected documents (MB): [ 0 ]
Maximum filesize allowed: 60 MB

---

**PACER Service Center**

**Transaction Receipt**

## Appx00054

| 01/11/2024 17:12:46 | | | |
|---|---|---|---|
| **PACER Login:** | sc7753_2018 | **Client Code:** | 102 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00120-TCS |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

**Appx00055**