**2024-1268**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

GUJARAT FLUOROCHEMICALS LTD.,

*Plaintiff-Appellee,*

v.

UNITED STATES,

*Defendant,*

DAIKIN AMERICA, INC.,

*Defendant-Appellant.*

---

Appeal from The United States Court of International Trade
in Court No. 1:22-cv-00120-TCS, Judge Timothy C. Stanceu

---

## RESPONSE BRIEF OF
## PLAINTIFF-APPELLEE GUJARAT FLUOROCHEMICALS LTD.

---

Diana Dimitriuc Quaia
John M. Gurley
Jessica R. DiPietro
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC  20006
(202) 857-6000

*Counsel for Plaintiff-Appellee Gujarat
Fluorochemicals Ltd.*

March 27, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1268 |
| **Short Case Caption** | Gujarat Fluorochemicals Ltd. v. US |
| **Filing Party/Entity** | Gujarat Fluorochemicals Ltd. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/27/2024

Signature:  /s/ Diana Dimitriuc Quaia

Name:  Diana Dimitriuc Quaia

**FORM 9. Certificate of Interest**

| **1. Represented Entities.**<br>Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.**<br>Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.**<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Gujarat Fluorochemicals Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| (a) Wendy Qiu, ArentFox Schiff LLP | (b) Mario Torrico, ArentFox Schiff LLP | |
| | (b) Yun Gao, ArentFox Schiff LLP | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☒    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☒    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF RELATED CASES (RULE 47.5(a) AND 47.5(b)) .........1

II.    STATEMENT OF THE ISSUES ..................................................1

III.    STATEMENT OF THE CASE .....................................................2

    A.    Introduction .......................................................................3

    B.    GFCL and IWL Built a Record Supporting the CIT's Decision with Their Questionnaire Responses ...............................................5

    C.    Commerce's Determinations.................................................8

    D.    Court of International Trade Opinions ..............................10

IV.    SUMMARY OF THE ARGUMENT .........................................12

V.    ARGUMENT........................................................................14

    A.    Standard Of Review .......................................................14

    B.    As a Matter of Law, the CIT was Correct in Finding that Electricity Provided by IWL Cannot be Shown to be Primarily Dedicated to GFCL's Production of PTFE Resin. ..................................15

        1.    The text, Structure, History, and Purpose of the Regulation do not Support Attribution of IWL's Subsidies to GFCL. ...........16

            a.    The text of the regulation supports finding that IWL did not provide GFCL an input primarily dedicated to the production of subject merchandise. ...............................17

            b.    The structure of the regulation supports a finding that the regulation did not apply to this investigation. ................22

            c.    The history and purpose of the regulation support a finding that the regulation did not apply to this investigation....................................................................24

            d.    The broader statutory scheme supports a finding that the regulation did not apply to this investigation. ................28

        2.    The Regulation Unambiguously Forecloses Commerce's Interpretation as a Matter of Law...............................35

i

C.    The Record Before Commerce Compelled a Finding that Inputs from IWL Are Not Primarily Dedicated to the Production of the Downstream Product ................................................................40

1.    "Zone of Ambiguity" Standard .................................................41

2.    The Record Evidence Overwhelmingly Supports Upholding the CIT's Decision .........................................................................44

VI.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT ....................48

AFDOCS:199754116.3

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Auer v. Robbins,*
    519 U.S. 452 (1997)..........................................................................41

*Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.,*
    419 U.S. 281 (1974)..........................................................................15

*City of Takoma v. Richardson,*
    163 F.3d 1337 (Fed. Cir. 1998) ......................................................28

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938)..........................................................................15

*Dolan v. U.S.P.S.,*
    546 U.S. 481 (2006)..........................................................................31

*DuPont Teijin Films USA, LP v. United States,*
    407 F.3d 1211 (Fed. Cir. 2005) .......................................................15

*Gujarat Fluorochemicals Ltd. v. United States,*
    617 F. Supp. 3d 1328 (Ct. Int'l Trade 2023) ...............................*passim*

*Gujarat Fluorochemicals Ltd. v. United States,*
    662 F. Supp. 3d 1371 (Ct. Int'l Trade 2023) ....................................12

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States,*
    633 F. Supp. 3d 1276 (Ct. Int'l Trade 2023), *appeal filed*, No. 24-
    1431 (Fed. Cir. Feb. 2, 2024), *appeal docketed*, No. 24-1431 (Fed.
    Cir. Feb. 2, 2024)..............................................................................25

*King v. Burwell,*
    576 U.S. 473 (2015)..........................................................................32

*Kisor v. McDonough,*
    995 F.3d 1347 (Fed. Cir. 2021) ............................................22, 42, 43

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019).................................................16, 25, 41, 42,

AFDOCS:199754116.3

*Nan Ya Plastics Corp. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ........................................................... 14

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec' of Veterans Affs.*,
    48 F.4th 1307 (Fed. Cir. 2022) ............................................................ 42

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ..................................................... 14, 15

*NSK Corp. v. U.S. Int'l Trade Comm'n*,
    542 F. App'x 950 (Fed. Cir. 2013) ...................................................... 14

*Nucor Corp. v. United States*,
    927 F.3d 1243 (Fed. Cir. 2019) ........................................................... 33

*OMG, Inc. v. United States*,
    972 F.3d 1358 (Fed. Cir. 2020) ........................................................... 14

*Perez v. United States*,
    156 F.3d 1366 (Fed. Cir. 1998) ........................................................... 28

*Quiedan Co. v. United States*,
    927 F.3d 1328 (Fed. Cir. 2019) ........................................................... 14

*SKF U.S.A. Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ........................................................... 20

*Sunpreme Inc. v. United States*,
    946 F.3d 1300 (Fed. Cir. 2020) ........................................................... 14

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) ............................................................................. 32

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................. 15

19 U.S.C. § 1671(a) ........................................................................... 31, 32

19 U.S.C. § 1671(a)(1) .................................................................. 5, 23, 29

19 U.S.C. § 1677-1 ................................................................................. 26

19 U.S.C. § 1677-1(a)(1) ........................................................................ 27

iv

19 U.S.C. § 1677(5)(B)(i) ...................................................................29

19 U.S.C. §§ 1677(5A)(A) .................................................................29

19 U.S.C. § 3512(d) ...........................................................................33

**Regulations**

19 C.F.R. § 351.102 ...........................................................................22

19 C.F.R. § 351.525(b)(6) .....................................................................3

19 C.F.R. § 351.525(b)(6)(i) ...........................................................23, 24

19 C.F.R. § 351.525(b)(6)(ii) – (v) .....................................................30

19 C.F.R. § 351.525(b)(6)(iv) .......................................................*passim*

19 C.F.R. § 351.525(b)(6)(vi) .............................................................30

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348 (Dep't
    Commerce Nov. 25, 1998)...........................................................*passim*

**Administrative Determinations**

*Certain Cold-Rolled Steel Flat Products From Brazil*, 81 Fed. Reg.
    49940 (Dep't Commerce July 29, 2016) (final CVD affirm.
    determ.), and accompanying Issues and Decision Memorandum ......................37

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
    85 Fed. Reg. 38361 (Dep't Commerce Jun. 26, 2020) (final CVD
    results; 2017), and accompanying Issues and Decision
    Memorandum ..............................................................................45, 46

*Certain Lined Paper Products from Indonesia,* 71 Fed. Reg. 47174
    (Dep't Commerce Aug. 16, 2006) (final affirm. CVD and neg. crit.
    circum. determ.), and accompanying Issues and Decision
    Memorandum .....................................................................20, 21, 38, 45

*Certain Seamless Carbon and Alloy Steel Standard, Line, and
    Pressure Pipe from the People's Republic of China,* 75 Fed. Reg.
    57444 (Dep't Commerce Sept. 21, 2010) (final affirm. CVD and
    critical circumstances determ.), and accompanying Issues and
    Decision Memorandum ........................................................................38

v

*Granular Polytetrafluoroethylene Resin from India*, 86 Fed. Reg.
   35479 (Dep't Commerce Jul. 6, 2021) (prelim. affirm. CVD &
   critical circum. determ.), and accompanying Decision
   Memorandum ................................................................................8

*Granular Polytetrafluoroethylene Resin from India*, 87 Fed. Reg.
   3765 (Dep't Commerce Jan. 25, 2022) (final affirm. CVD &
   critical circum. determ.), and accompanying Issues & Decision
   Memorandum ...................................................................1, 9, 38, 44

*Granular Polytetrafluoroethylene Resin from India*, 87 Fed. Reg.
   14509 (Dep't Commerce Mar. 15, 2022) (CVD orders) ...................10

*Urea Ammonium Nitrate Solutions From the Republic of Trinidad and
   Tobago*, 87 Fed. Reg. 37828 (Dep't Commerce Jun. 24, 2022)
   (final CVD affirm. determ.), and accompanying Issues and
   Decision Memorandum ...................................................................45

## Other Authorities

*Uruguay Round Agreements Act, Statement of Administrative Action
   ("SAA")*, H.R. Rep. No. 103-316, at 940, *reprinted in* 1994
   U.S.C.C.A.N. 4040 ...............................................................26, 33, 34

H.R. Rep. No. 103–826(I), (1994), *reprinted in* 1994 U.S.C.C.A.N.
   3773.................................................................................................30

AFDOCS:199754116.3

## I.   STATEMENT OF RELATED CASES (RULE 47.5(a) AND 47.5(b))

Pursuant to Federal Circuit Rule 47.5, counsel for *Gujarat Fluorochemicals Ltd.* ("GFCL") makes the following statements.  First, counsel is unaware of any other appeal in or from the same civil action in the U.S. Court of International Trade ("CIT") that was previously before this Court or any other appellate court. Second, counsel for GFCL is unaware of any case to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

## II.   STATEMENT OF THE ISSUES

This appeal arises from a judgment of the Court of International Trade ("CIT") setting aside certain aspects of the final determination by the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of granular polytetrafluoroethylene ("PTFE") resin from India, which resulted in a final countervailing duty rate of 31.89 percent *ad valorem* for GFCL. *See Granular Polytetrafluoroethylene Resin From India*, 87 Fed. Reg. 3765 (Dep't Commerce Jan. 25, 2022) (final affirm. CVD & critical circum. determ.) ("*Final Determination*"), Appx01053-01055, and accompanying Issues & Decision Memorandum ("*IDM*"), Appx01058-01085.  The CVD rate calculated by Commerce for GFCL results primarily from Commerce's calculation of alleged subsidies on industrial land used by GFCL and a cross-owned company, Inox

Wind Limited ("IWL"), a producer of wind turbines.  There are two programs

involving alleged subsidies on the provision of land whose cumulative impact is a

subsidy rate of 26.62 percent *ad valorem*: (1) the provision of land to GFCL by the

Gujarat Development Industrial Corporation ("GDIC") and (2) the provision of

land to IWL by the State Industrial Development Corporation ("SIDC").  The land

subsidy found for IWL was attributed to GFCL resulting in a total rate of 31.89

percent *ad valorem* for GFCL.

The issue presented in this brief is whether Commerce's application of the

regulation at 19 C.F.R. § 351.525(b)(6)(iv) to attribute subsidies received by a

cross-owned input supplier to GFCL was contrary to law where the input cannot be

shown on the record to be primarily dedicated to GFCL's production of PTFE

resin.

## III.    STATEMENT OF THE CASE

The statutory and factual background giving rise to this appeal are set out in

the CIT's opinion and in Daikin America, Inc.'s ("Daikin") brief. *See* Corrected

Opening Brief of Defendant-Appellant Daikin America, Inc. (Feb. 16, 2024)

("Daikin Br."), ECF No. 16.  Without repeating that material, GFCL highlights

below the regulation at issue, 19 C.F.R. § 351.525(b)(6)(iv), and the facts most

relevant to the issue presented in this brief.

AFDOCS:199754116.3

## A.    Introduction

Defendant-Appellant Daikin America Ltd. ("Daikin") alleges that the CIT erred in directing Commerce to remove from GFCL's subsidy rate the amount of the subsidy conferred on GFCL's cross-owned input supplier.  The CIT made no error in directing Commerce to remove IWL's land subsidies from GFCL's subsidy rate because Commerce's determination to attribute such subsidies to GFCL was contrary to law and unsupported by the record evidence.

First, Commerce's determination that the small amount of wind energy that IWL sold to the grid from its testing of turbine prototypes was "primarily dedicated" to the production of downstream products by GFCL is contrary to law because it is based on an erroneous interpretation of Commerce's regulations at 19 C.F.R. § 351.525(b)(6).  The law unambiguously supports the CIT's holding that Commerce misconstrued its regulation when it "overlook{ed} the type of physical relationship the regulation requires between the input and the particular downstream product in the production chain, and by defining the term as satisfied because the input is not sold to persons other than the producer of the subject merchandise."  *Gujarat Fluorochemicals Ltd. v. United States*, 617 F. Supp. 3d 1328, 1338 (Ct. Int'l Trade 2023), Appx00033.

Second, the facts of this case demonstrate, and the CIT properly agreed, that the electricity provided by IWL – which was *extremely* small in quantity—is not

primarily dedicated to the production of granular PTFE resin as contemplated by the regulation and therefore IWL's transactions do not meet the criteria under 19 C.F.R. § 351.525(b)(6)(iv).

Commerce's regulations provide that "{i}f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to the production of the downstream product," Commerce "will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)." 19 C.F.R. § 351.525(b)(6)(iv).

Inherent in Commerce's regulation is a limitation on the subsidies which Commerce may attribute to the downstream producer (respondent) in a countervailing duty investigation. Commerce may *only* attribute subsidies if the cross-owned input supplier provides an input which is "primarily dedicated to the production of the downstream product." *See id.* Commerce has explained that the "main concern {it has} tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product." *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348, 65401 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*"). The alternative results in a CVD rate which is more than just remedial, but is punitive, and inconsistent with Commerce's statutory mandate. *See* 19 U.S.C.

4

§ 1671(a)(1) (providing the factors Commerce must consider prior to imposing a net countervailable subsidy).

Daikin's successful appeal would result in Commerce always attributing subsidies from a cross-owned affiliate, as long as that affiliate provided to the respondent *any* amount of a product which *could* be used by the company under investigation.  This would be absurd.  Daikin's interpretation of the regulation is erroneous because it does not consider the inconsequential value of IWL's wind electricity production to its business, or that the quantity of wind electricity GFCL purchased from IWL went to the production of multiple downstream products (subject and non-subject merchandise), and is an insignificant amount compared to GFCL's consumed electricity.

The Court of International Trade's decision that 19 C.F.R. § 351.525(b)(6)(iv) did not apply because IWL did not provide an input "primarily dedicated" to the production of GFCL's downstream product is based soundly in the law and supported by the factual evidence.

### B.     GFCL and IWL Built a Record Supporting the CIT's Decision with Their Questionnaire Responses

GFCL provided Commerce its annual reports, IWL's annual reports, and argument explaining why IWL's small electricity production is not primarily dedicated to GFCL's downstream production.  *See* GFCL's Questionnaire Response to Section III (Identifying Affiliated Companies) at Exhs. 3 and 6 (Mar.

5

26, 2021) ("GFCL IAC QR"), Appx05030-05040, Appx05095-05099; GFCL's

Supplemental Questionnaire Response to Section II Identifying Affiliated

Companies (Questions 3-7) at 4-6, Exh. S-1 (IWL's 2019-2020 Annual Report),

Exh. S-3 (Excepts from 2017 Investigation Submission), and Exh. S-8 (Extract of

IWL Annual Report F.Y. 2019-2020) (Apr. 15, 2021) ("GFCL Supp. IAC QR (Qs

3-7)"), Appx05927-05929, Appx05935-06203, Appx06449-06451.  GFCL also

included in its submissions to Commerce information relating to its relationship

with IWL.  *See id.* at Exh. S-4b, Appx06423-06433; IWL's Second Supplemental

Questionnaire Response at Exh. IWL S2-2(b) (Jun. 21, 2021) ("IWL 2nd SQR"),

Appx10567-10568.

In particular, GFCL explained that IWL is likely a cross-owned affiliate, but

that IWL did not provide any inputs primarily dedicated to the downstream product

produced by GFCL.  GFCL Supp. IAC QR (Qs 3-7) at 5-6, Exhs. S-3, S-4a, and S-

5b (providing details relating to IWL's production activities), Appx05928-05929,

Appx05935-06203, Appx06375-06422, Appx06436-06437.  GFCL explained that

IWL is a producer of wind turbines.  *Id.* at 5, Appx05928; *see also* IWL Section III

Questionnaire Response (Part I) at 4-7 (May 24, 2021) ("IWL IQR (part I)"),

Appx08823-08826; IWL's 2nd SQR at Exh. IWL S2-2(a) ("IWL 2nd SQR"),

Appx10565-10566.  Although IWL generated a small amount of electricity while

testing the wind turbines, that electricity was provided to the state distribution

6

system and the turbines were connected to certain substations.  IWL 2nd SQR at

Exh. IWL S2-2, Appx10565-10568; GFCL Supp. IAC QR (Qs 3-7) at Exh. S-4b

(showing the power is provided to the state distribution system (i.e., the grid)),

Appx06423-06433.  This power is then comingled with all other electricity on the

grid.  *See* GFCL Case Brief at 8 (Nov. 18, 2021) ("GFCL Case Br."), Appx10603.

With these submissions, GFCL provided factual information supporting its

statements that IWL-generated power was not primarily dedicated to the

production of the downstream product:

- IWL is a wind turbine producer.  As a test for a wind turbine to be sold to GFCL, IWL produced a miniscule amount of electricity, which it then sold to GFCL. *See* IWL 2nd SQR at Exh. IWL S2-2, Appx10565-10568; GFCL Supp. IAC QR (Qs 3-7) at Exh. S-4b, Appx06423-06433.

- IWL supplied power to the grid, i.*e.,* not directly to GFCL, which goes into a common power pool, from where GFCL draws power used to produce all merchandise manufactured at its Dahej unit.  *See* GFCL Case Br. at 8-10, Appx10603-10605.

- Power supplied by IWL comprises only 0.20 to 0.52% of the direct cost of production, in the current investigation and in a prior investigation on a very similar product, respectively.  *See* GFCL Case Br. at 7, Appx10602; GFCL Supp. IAC QR (Qs 3-7) at Exh. S-3 (p. 7), Appx06384.

- IWL's total revenue from its sale of power to GFCL is only 0.54% of its consolidated turnover.  *See* GFCL IAC QR at 7-8, Appx05012-05013; *see also* GFCL Case Br. at 7, Appx10602.

- Compared to all of the power GFCL pulls from the common pool of electricity, during the period of investigation IWL supplied only

0.60% of GFCL's total power consumption.  IWL's Section III Questionnaire Response (Part I) at 6 (May 24, 2021) ("IWL IQR (Part I)"), Appx08825; *see also* GFCL Case Br. at 7-8, Appx10602-10603.

### C.    Commerce's Determinations

Commerce initiated this CVD investigation of granular polytetrafluoroethylene ("PTFE") resin from India in February 2021 and selected GFCL as the sole mandatory respondent.  *See Granular Polytetrafluoroethylene Resin from India*, 86 Fed. Reg. 35479 (Dep't Commerce Jul. 6, 2021) (prelim. affirm. CVD & critical circum. determ.) ("*Preliminary Determination*"), Appx01004-01006, and accompanying Decision Memorandum at 2 ("*PDM*"), Appx01008.  In its PDM, Commerce explained that GFCL reported for its affiliate, IWL, but that because of "time constraints," Commerce was "unable to consider the responses … for the preliminary determination" and, instead, would "do so in a post-preliminary analysis and the final determination.  *PDM* at 2, Appx01008. Commerce "preliminarily determine{d} that the electricity input from IWL is primarily dedicated to the production of downstream products produced by GFCL."  *Id.* at 8, Appx01014.  Commerce further explained that it planned to "attribute subsidies received by IWL to the combined sales of the input and downstream products produced by IWL and GFCL, in accordance with 19 CFR 351.525(b)(6)(iv)." *Id.*

Then, Commerce investigated GFCL's affiliate, IWL, in its Post-Preliminary

Determination, analyzing certain alleged subsidy programs, including a provision

of land for less than adequate remuneration to IWL, with the intent to attribute any

subsidies to GFCL.  *See* Memorandum from S. Fullerton to C. Marsh, Re: Post-

Preliminary Analysis of Countervailing Duty Investigation at 3-4 (Oct. 1, 2021)

("Post-PDM"), Appx01040-01041.

In the *Final Determination*, Commerce continued to investigate IWL,

finding that "IWL's production of wind energy was primarily dedicated to GFCL's

downstream production and that Commerce should continue to countervail

subsidies received by IWL," *IDM* at 12, Appx01069, despite evidence showing

otherwise.  *See* GFCL Supp. IAC QR (Qs 3-7) at Exh. S-4b, Appx06423-06433;

IWL 2nd SQR at Exh. IWL S2-2(b), Appx10568.

Commerce specifically relied on "power purchase agreements demonstrating

that IWL agreed to supply power to GFCL." *IDM* at 12, Appx01069.  Yet

Commerce overlooked evidence on the record showing that the power generated

by IWL is provided to the state distribution system and that the turbines were

connected to certain substations.  IWL 2nd SQR at Exh. IWL S2-2, Appx10565-

10568; GFCL Supp. IAC QR (Qs 3-7) at Exh. S-4b (showing the power is

provided to the state distribution system (*i.e.,* the grid)), Appx06423-06433.  This

AFDOCS:199754116.3

power is then comingled with all other electricity on the grid. *See* GFCL Case Br. at 8, Appx10603.

In the *Final Determination*, Commerce failed to consider all of these facts on the record, including IWL's primary business (wind turbine production), the nature of the input at issue (electricity), and where and how GFCL used that electricity. Nor did Commerce consider the amount of electricity sold to GFCL – an extremely minor amount.

Commerce issued the CVD order on March 15, 2022. *Granular Polytetrafluoroethylene Resin from India*, 87 Fed. Reg. 14509 (Dep't Commerce Mar. 15, 2022) (CVD orders) ("*Order*"), Appx01086-01088.

### D.    Court of International Trade Opinions

GFCL appealed Commerce's final decision to the CIT arguing, among other issues, that Commerce erroneously determined that a small amount of wind energy sold by IWL to GFCL is "primarily dedicated" to GFCL's downstream production. GFCL argued that Commerce's interpretation of the input supplier attribution rule under 19 C.F.R. § 351.525(b)(6)(iv) is inconsistent with its past practice and the intent of the regulations. GFCL also argued that Commerce improperly countervailed certain provisions of land to GFCL, and that Commerce relied on benchmarks which were contrary to law and not based on substantial evidence.

10

Although the CIT did not reach some of the issues appealed by GFCL, the CIT ruled that Commerce's *Final Determination* was inconsistent with the law with respect to the threshold issue:  whether IWL provided GFCL an input primarily dedicated to the production of the downstream product. The CIT stated that the issue in this case was whether Commerce had correctly interpreted 19 C.F.R. § 351.525(b)(6)(iv) to find that the condition precedent for invoking the procedure was sufficiently met. *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1335, Appx00031. First, the CIT explained that the use of the particularized singular reference to "downstream product" calls into question Commerce's interpretation. *Id.* at 1336, Appx00031-000032. However, the CIT explained that it is unnecessary for the court to decide whether the term "downstream product" should apply to a group of all downstream products because even if it were assumed that the term was interpreted broadly, the CIT would still not agree with Commerce's notion that the primarily dedicated standard was satisfied. *Id.* Second, the CIT further explained that the *CVD Preamble* provides three examples that illustrate that *primarily dedicated* "pertains to the role the input performed, in the physical sense, in the production of the downstream product rather than whether the input was provided 'primarily' to the producer of that product." *Id.*, Appx00032. In regard to those three examples, the CIT highlighted how the downstream product is a specific and individually-identified product. *Id.* at 1337, Appx00032-00033. At no

11

point do those examples use the issue of whether the producer is the primary

purchaser of the upstream product as a factor in determining satisfaction of the

*primarily dedicated* standard. *Id.* Furthermore, the CIT explained that the

electricity used to power GFCL's entire manufacturing facilities may be an input

but that its role in the actual manufacturing of GFCL's finished products cannot

"fairly be characterized as merely a link in the overall production chain of the

finished products that are made there." *Id.*, Appx00033 (internal quotations

omitted) (citation omitted). The CIT found that Commerce had applied the

regulation in a way that was contrary to the intent of the regulation and remanded

the determination to Commerce. *Id.* at 1338, 1342-43, Appx00033.  On October

13, 2023, the CIT affirmed Commerce's remand and entered judgment.  *Gujarat*

*Fluorochemicals Ltd. v. United States*, 662 F. Supp. 3d 1371, 1377 (Ct. Int'l Trade

2023), Appx00007-00008.  Daikin appealed the CIT's judgment to this Court.

## IV.    SUMMARY OF THE ARGUMENT

The CIT was correct in finding that Commerce's regulation at 19 C.F.R.

§ 351.525(b)(6)(iv) is not applicable because the electricity provided by IWL

cannot be shown to be primarily dedicated to GFCL's production of PTFE resin.

First, the text, structure, history, and purpose of Section 351.525(b)(6)(iv)

unambiguously support the conclusion that electricity provided to GFCL from

IWL was not primarily dedicated to the production of subject merchandise.

AFDOCS:199754116.3

Second, the regulation unambiguously forecloses Commerce's interpretation as a

matter of law. Section 351.525(b)(6)(iv) provides an answer from both the text of

the regulation and through the supplemental *CVD Preamble.*  The examples

offered in the *CVD Preamble* are instructive to the facts in this case. Additionally,

the factual record compels that Commerce find that inputs from IWL are not

primarily dedicated to the production of the downstream product and as a result of

this, the regulation is inapplicable to the wind electricity provided by IWL to

GFCL. Both the regulation itself and the *CVD Preamble* support a finding that

wind generated electricity from IWL is not primarily dedicated to GFCL's

production of PTFE resin. Because Commerce's application of the regulation was

contrary to law, it does not fall within the necessary zone of ambiguity for

Commerce to be awarded the deference Defendants argue for. The record evidence

also overwhelmingly supports upholding the CIT's decision. IWL's production of

wind turbine generators and any small amount of electricity generated in *testing*

those turbines cannot be primarily dedicated to the production of PTFE resin.

Commerce incorrectly assigned the term *primarily dedicated* a meaning that is

contrary to the intent of the regulation.

AFDOCS:199754116.3

## V.    ARGUMENT

### A.    Standard of Review

This Court will review the CIT's decision *de novo*, "applying the same standard used by the CIT in considering Commerce's determination." *OMG, Inc. v. United States,* 972 F.3d 1358, 1363 (Fed. Cir. 2020). However, contrary to Daikin's suggestion, the Court's review of the lower court's opinion takes into account the CIT's informed view.  Indeed, courts will offer "'great weight' to the informed view of the CIT." *Id. (quoting Quiedan Co. v. United States,* 927 F.3d 1328, 1330 (Fed. Cir. 2019); *Nan Ya Plastics Corp. v. United States,* 810 F.3d 1333, 1341 (Fed. Cir. 2016). While the Court's review does repeat much of the work of the CIT, the Court does not ignore the CIT's informed judgement. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020); *see also NSK Corp. v. U.S. Int'l Trade Comm'n*, 542 F. App'x 950, 959 (Fed. Cir. 2013) (acknowledging the "CIT's recognized expertise in international trade.").  This Court has also acknowledged that it applies such deference because the "judges of the Court of International Trade are experts in such cases, which form most of their docket{.}" *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006).

This Court rejects any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole, or is "otherwise

AFDOCS:199754116.3

not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing

whether Commerce's actions are unsupported by substantial evidence, the Court

assesses whether the agency action is "unreasonable" given the record as a whole.

*Nippon Steel Corp.*, 458 F.3d at 1351. Substantial evidence represents "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215

(Fed. Cir. 2005), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

In sum, Commerce's determinations must "articulate a rational connection

between the facts found and the choice made." *Bowman Transp., Inc. v. Ark.-Best

Freight System, Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted)

(citation omitted).

**B.    As a Matter of Law, the CIT was Correct in Finding that
Electricity Provided by IWL Cannot be Shown to be Primarily
Dedicated to GFCL's Production of PTFE Resin.**

Daikin argues that the CIT erred in its interpretation of the facts and law, and

that "Commerce's cross-owned input regulation requires Commerce to attribute

subsidies conferred on a cross-owned input supplier to the combined sales of the

input and downstream products." Daikin Br. at 8. Daikin argues in support of

Commerce's final determination that "the regulation applied because: (1) IWL and

GFCL were cross-owned; (2) IWL produced electricity, which was 'the input

product;' (3) the electricity IWL produced was used to produce goods produced by

AFDOCS:199754116.3

GFCL, which were 'the downstream product;' and (4) all of IWL's electricity was used exclusively to produce the downstream product by GFCL, and it was thus 'primarily dedicated' to production of the downstream product." *Id.* at 9. Daikin ignores record evidence and legal precedent which demonstrate otherwise.

> **1.     The Text, Structure, History, and Purpose of the Regulation do not Support Attribution of IWL's Subsidies to GFCL.**

The text, structure, history, and purpose of the regulation demonstrate that Commerce unlawfully applied section 351.525(b)(6)(iv) to determine that IWL provided GFCL a "primarily dedicated" input such that IWL's land subsidies should be attributed to GFCL in this investigation.  As described below, Daikin's arguments to the contrary are not supported by the law.

In *Kisor v. Wilkie,* the Supreme Court explained that a court "must 'carefully consider{}' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." 139 S. Ct. 2400, 2415 (2019) (citation omitted) (alteration in the original). Even if the Court concludes that there is ambiguity, the agency's reading must be reasonable, falling within the zone of ambiguity the Court deems appropriate after employing all interpretive tools. *Id.* at 2415-16.

        a.      **The text of the regulation supports finding that IWL did not provide GFCL an input primarily dedicated to the production of subject merchandise.**

Commerce's regulations at section 525(b)(6)(iv) provide that "{i}f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to the production of the downstream product," Commerce "will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)." 19 C.F.R. § 351.525(b)(6)(iv).

Under the regulation, two criteria must be met for the regulation to apply: (1) there must be cross-ownership between an input supplier and a downstream producer and (2) the production of the input must be *primarily dedicated* to production of the downstream *product*.

Daikin argues that the terms "downstream product" and "downstream products" should be used interchangeably. *See* Daikin Br. at 15. However, the regulation uses the singular and the plural form of "downstream product" intentionally. "The reference in the regulation to 'the downstream product' is not only singular, it is also a reference to a *specific* product." *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1340 (emphasis in original), Appx00035. In other words, "input *product*" is specifically tied to the "downstream *product*" in

17

the singular while the attribution of subsidies is linked to the "downstream *products*" in the plural.  *See* 19 C.F.R. § 351.525(b)(6)(iv) ("{if} production of the input *product* is primarily dedicated to production of the downstream *product*, {then} the Secretary will attribute subsidies received by the input producer to the *combined sales of the input and downstream products* produced by both corporations.") (emphasis added).

The first part of the regulation requires that Commerce consider whether the input at issue is dedicated to the production of the singular "downstream product," *i.e.,* subject merchandise.  With respect to the reference to "downstream products" in the latter part of the regulation, the word "products" references how Commerce will allocate the subsidies, *i.e.*, what comparison Commerce will use to determine the subsidy rate ("the combined sales of the input and downstream products produced by both corporations"). *Id.* While the regulation clearly uses the singular (downstream product), Daikin erroneously argues that this language should also be read to find that the input at issue here – power – is primarily dedicated to all of GFCL's downstream products (plural).

The use of the plural in the latter part of the sentence (downstream products) is required because it refers to one denominator consisting of *sales* (plural) from two entities.

18

There are also many flaws with Daikin's argument concerning its interpretation of *primarily dedicated*. First, Daikin once again uses the plural form of "downstream products" to support its argument because otherwise, it would be impossible for Daikin to argue that wind electricity is primarily dedicated for only one product, PTFE resin, and not any other of the many products made by GFCL. *See* Daikin Br. at 18 (claiming that "electricity produced by IWL" is primarily dedicated because it "was fully devoted to the purpose of producing downstream products by GFCL."). However, one sentence earlier, Daikin argues that "an input is 'primarily dedicated' to production of the downstream product where that input is chiefly devoted or given over to the purpose of producing the downstream product." *Id.* at 17. The electricity provided by IWL could not be chiefly devoted to any one product. The wind electricity used at the plant is not "primarily" dedicated for PTFE resin because it is used at the plant equally to produce everything that plant makes using electricity and there is no way to channel the IWL electricity to PTFE resin. Second, the wind electricity cannot be primarily "dedicated" because electricity is fungible - the same electricity is used to produce all the products at Dahej. There is not a specific type of electricity dedicated only to PTFE while other types of electricity are designated for the other products. Although Daikin argues that there are different ways to interpret the text of the statute, suggesting one type of electricity could be dedicated only to a singular,

19

certain product, while another type of electricity is dedicated elsewhere strains reason. *See id.* at 17-18 (asserting that electricity from IWL was "fully devoted to the purpose of producing downstream products by GFCL.").

Daikin attempts to support its argument that the "text of the regulation does not impose any limits" on whether "product" is singular or plural, *see* Daikin Br. at 15, by citing to precedent where this Court and Commerce have previously found the singular word "product" to encompass multiple products in the plural. *See id.* at 16 (citing *SKF U.S.A. Inc. v. United States*, 263 F.3d 1369, 1380 n.13 (Fed. Cir. 2001)). The cases cited are not applicable to the factual scenario currently before the Court. First, *SKF* is an appeal of Commerce's calculations in an antidumping proceeding. *SKF*, 263 F.3d at 1372. *SKF* concerns a discussion of the foreign like product, *i.e.*, the comparable product to the subject merchandise. *Id.* at 1376-80. That situation is not relevant to the facts here – whether an input is primarily dedicated to *any* product or *the downstream product* under consideration in a CVD proceeding. Daikin also relies on *Certain Lined Paper Products from Indonesia* to support its argument that "product" is the same as "products." *See* Daikin Br. at 16. While that case also discussed "product" in the context of the downstream product, Commerce clearly indicated that its decision was a factual one. *See Certain Lined Paper Products from Indonesia,* 71 Fed. Reg. 47174 (Dep't Commerce Aug. 16, 2006) (final affirm. CVD and neg. crit. circum. determ.), and accompanying Issues

and Decision Memorandum at 30-31 (Comment 3) ("*Lined Paper IDM*")

(describing the connection between pulp logs and paper).  In the *Lined Paper IDM*,

Commerce explains that "{p}ulp logs are used to make pulp which, in turn, is used

to make paper.  The two upstream products have one purpose – as inputs to paper."

*Id.* at 31.  Commerce was reviewing an entirely different factual scenario in this

case:  whether a miniscule amount of electricity, produced by a wind turbine

producer as a test, which accounted for a total of 0.54 percent of IWL's total

turnover and went to GFCL's common power pool supplying electricity for both

subject and non-subject merchandise.  *See* IWL 2nd SQR at Exh. IWL S2-2,

Appx10565-10568; GFCL Supp. IAC QR (Qs 3-7) at 6 and Exh. S-4b,

Appx05929, Appx06423-06433 (showing the power is provided to the state

distribution system (i.e., the grid); GFCL IAC QR at 8, Appx05013 (showing the

total turnover).  "{O}nly 0.07% of the electricity IWL provided was used in

producing the subject merchandise, granular PTFE resin, which was only one of a

number of products" produced by GFCL.  *Gujarat Fluorochemicals*, 617 F. Supp.

3d at 1335, Appx00031.  Therefore, Daikin's argument is not applicable to the

issue presented in this case regarding the language of § 351.525(b)(6)(iv).

Furthermore, the CIT explained in the event there is ambiguity or any concern

regarding the interpretation of how downstream product(s) is referred to, they still

could not agree to Commerce's conclusion that the *primarily dedicated* standard is satisfied here. *Id.* at 1336, Appx00031.

>    **b.    The structure of the regulation supports a finding that the regulation did not apply to this investigation.**

The structure of the regulation further supports the conclusion that the regulation should not apply in this investigation.

First, inclusion of the term "energy" in Section 351.102(b)(12) does not automatically result in a determination that IWL's provision of wind electricity to GFCL is primarily dedicated to the downstream product. *See* Daikin Br. at 18-19. Section 102 of Commerce's regulations, 19 C.F.R. § 351.102, provides general definitions, separate from the regulation at issue here. That the term "energy" appears in Commerce's general definitions does not in and of itself support the conclusion Daikin is trying to draw here. General definitions are regularly provided in statutory text to help with the interpretation of a statute but are not necessarily applicable to all aspects of the regulations. *Kisor v. McDonough*, 995 F.3d 1347, 1348 (Fed. Cir. 2021) (explaining that at the top of the Supreme Court's hierarchy of interpretative tools is the text of a statute). However, as discussed above, energy is a fungible input and is not primarily dedicated to any particular product made at Dahej, particularly where the factual record demonstrates that IWL is primarily a wind turbine producer and the electricity produced amounted to a small amount of the electricity GFCL consumed for subject and non-subject

AFDOCS:199754116.3

merchandise. Energy can be both an input and not primarily dedicated under Commerce's regulations.

Second and similarly, Daikin's contention that reading "downstream product" in the plural is an erroneous interpretation of the structure of the regulation.  *See* Daikin Br. at 19. Any subsidy is provided to the company producing the input and therefore it is allocated to all the products of that company, but that is a different question than whether an input is primarily dedicated to a downstream product.

Last, Daikin's concerns about a "mismatch between the group of products benefitting from the subsidy" and all of the downstream products are misplaced. *Id.* at 20.  There is no "mismatch."  The law requires that Commerce calculate countervailing duties based upon the net countervailable subsidy provided directly or indirectly "with respect to the manufacture, production, or export of a class or kind of merchandise imported … into the United States." 19 U.S.C. § 1671(a)(1). Commerce will normally "attribute a subsidy to the products produced" by the entity "that received the subsidy." 19 C.F.R. § 351.525(b)(6)(i).  Contrary to Daikin's suggestion, the subsidy at issue here (a provision of land) is not bestowed on the input (electricity) but to the input supplier.  Thus, there is no dilution of benefits provided to GFCL, the producer of the class or kind of merchandise under consideration.

The input supplier rule is an exception to the general attribution rule in Section 525(b)(6)(i) and, as such, should be interpreted narrowly and in line with the text of the regulation.  As succinctly put by the CIT, "{t}he point is, 'the downstream product' has to be 'defined' by Commerce in some way so that the 'link in the overall production chain' analysis directed by the *CVD Preamble* can be performed." *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1340, Appx00035.

> **c.**    **The history and purpose of the regulation support a finding that the regulation did not apply to this investigation.**

The history and purpose of the regulation demonstrate that Daikin's arguments miss the mark.  Daikin argues that application of the regulation in this case "serves the anti-circumvention purpose of the cross-owned input supplier regulation to apply it in any situation in which the attribution regulation for input subsidies within the same company would otherwise apply, as long as the input is dedicated 'almost exclusively' to the production of downstream products."  Daikin Br. at 22.  This interpretation is inconsistent with Commerce's explanation of its regulations.  The *CVD Preamble*, the statute, and the legislative history clearly provide that to attribute the subsidies related to an input it must be used to produce subject merchandise.  *See* 63 Fed. Reg. at 65401.

Any "{a}mbiguity concerning the intended meaning of the term 'primarily dedicated to the production of the downstream product' is resolved by the detailed

discussion in the Preamble, which as a statement of general applicability must be regarded as the interpretation that is 'the agency's authoritative or official position.'" *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1340 (quoting *Wilkie,* 139 S. Ct. at 2406), Appx00035. The *CVD Preamble* demonstrates the intent of the term *primarily dedicated to the production of the downstream product*. *See CVD Preamble,* 63 Fed. Reg. at 65401 (indicating that Commerce's concerns are related to an "input product that is merely a link in the overall production chain" of the "higher value added product"); *see also Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 633 F. Supp. 3d 1276, 1280 (Ct. Int'l Trade 2023), *appeal filed*, No. 24-1431 (Fed. Cir. Feb. 2, 2024), *appeal docketed*, No. 24-1431 (Fed. Cir. Feb. 2, 2024) ("The interpretations given in the *CVD Preamble* should be given deference as an official regulatory interpretation that expresses authoritative departmental position to an interpretation of its underlying regulation") (citing *Wilkie*, 139 S. Ct. at 2416).

The *CVD Preamble* directs Commerce to consider whether the purpose of subsidies provided to a cross-owned input supplier is to benefit the production of both the input and downstream products. As also explained in the *CVD Preamble*, if the input supplier and the respondent are not crossed-owned, then any subsidies on inputs used to produce the downstream product are to be investigated in a separate upstream subsidy investigation:

AFDOCS:199754116.3

Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product. For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles. *Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer*. Moreover, we believe that the upstream subsidy provision is still applicable when dealing with lower levels of affiliation. Therefore, if the relationship between the input and downstream producers meets the affiliation standard but falls short of cross-ownership, even if the input product is primarily dedicated to the downstream product, we will only consider subsidies to the input producer in the context of an upstream subsidy investigation.

*CVD Preamble*, 63 Fed. Reg. at 65401 (emphasis added).

The two provisions regarding subsidies on inputs used in the production of subject merchandise, the primarily dedicated input regulation and the upstream subsidy statutory provision are clearly related, but they apply in different scenarios. A review of the upstream subsidy provision in the statute is therefore instructive.

By way of comparison, the statute defines an upstream subsidy as "a subsidy bestowed on an input which is passed through to a downstream *product*." *Uruguay Round Agreements Act, Statement of Administrative Action ("SAA")*, H.R. Rep. No. 103-316, at 940, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4250 (emphasis added); *see also* 19 U.S.C. § 1677-1. Commerce treats upstream subsidy allegations seriously, analyzing thoroughly whether the subsidy is "bestowed by an

26

authority … with respect to a product" (*i.e.*, "an 'input product') that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding." 19 U.S.C. § 1677-1(a)(1). Again, for a similar type of subsidy to one "primarily dedicated to the production of the downstream product," 19 C.F.R. § 351.525(b)(6)(iv), Commerce considers whether the input product is used in the manufacture or production of subject merchandise.

In addition, contrary to Daikin's arguments, "the illustrative examples" in the *CVD Preamble* preclude application of the regulation in this case. Daikin Br. at 23. Commerce has explained that the "main concern {it} has tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product." *CVD Preamble*, 63 Fed. Reg. at 65401. Where Commerce is "dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product." *Id.* Commerce's example relating to a plastics company and an automobile company, as quoted above, to illustrate when an input *is not* "primarily dedicated" to the downstream products is very instructive. *Id.*

AFDOCS:199754116.3

As the CIT further explained, "{b}y overlooking the type of physical relationship the regulation requires between the input and the particular downstream product in the production chain, and by defining the term as satisfied because the input is not sold to persons other than the producer of the subject merchandise, Commerce assigned the term a different meaning and purpose{.}" *Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1338, Appx00033.  However, Defendants failed to address the basic issue that "electricity cannot plausibly be said to have been 'primarily dedicated to the production of the downstream product' in the sense in which Commerce intended that term to be interpreted when promulgating the regulation." *Id*.

Thus, both Commerce and Daikin incorrectly assigned the term *primarily dedicated* a different meaning and purpose than intended by the regulation. *Id.* Electricity is not primarily dedicated to GFCL's PTFE resin or to the production of any of the other products that are made at GFCL's facilities.

<ol type="d" start="4"><li>**The broader statutory scheme supports a finding that the regulation did not apply to this investigation.**</li></ol>

The first step in construing a statute is to look first at the statutory language. *See Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998). The Court must try to read the statute as a whole, to give effect to all of its parts, and to avoid, if possible, rendering language superfluous. *See id*.; *City of Takoma v. Richardson*, 163 F.3d 1337, 1340-1341 (Fed. Cir. 1998).  While Daikin argues that "there is no

28

latitude in the statute or regulations for Commerce to exempt GFCL from countervailing duties once the required elements of a countervailable subsidy and attributable benefit have been found," the statutory scheme and the facts here dictate there were no subsidies provided to IWL to attribute to GFCL.  *See* Daikin Br. at 30.

Before imposing a net countervailable subsidy which would be remedial, the statute provides that Commerce must consider whether the authority (government) "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States." 19 U.S.C. § 1671(a)(1) (emphasis added).

Section 1677 of the Tariff Act of 1930, as amended ("the Act"), defines "countervailable subsidy" as a subsidy "in which an authority … provides a financial contribution," which confers a benefit to the recipient, and which is specific. 19 U.S.C. §§ 1677(5)(B)(i) and (5A)(A).

The legislative history of the Act confirms that with the 1994 amendments Congress did not intend to expand the subsidies conferred to a recipient so as to cover subsidies to any input suppliers:

> Section 771(5)(E) of the Act provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy. It states that "a benefit shall normally be treated as

29

conferred where there is a benefit to the recipient," providing examples of how a benefit is to be established under various types of subsidy instruments. Thus, subparagraph (E) reflects the "benefit-to-the-recipient" standard which long has been a fundamental basis for identifying and measuring subsidies under U.S. CVD practice, and which is expressly endorsed by Article 14 of the Subsidies Agreement. In using the word "normally" in this subparagraph, the Committee intends only to indicate that in the case of certain types of subsidy programs, such as export insurance schemes, the use of the benefit-to-the-recipient standard may not be appropriate. The use of "normally" should not be construed as suggesting that, in addition to identifying the benefit to the recipient, Commerce should or must consider the effect of the subsidy; section 771(5)(C) already makes this clear. However, neither section 771(5)(C) nor section 771(5)(E) detract from the existing requirements of section 771A(a) (2) and (3) for determining when an upstream subsidy is "passed through" to a downstream producer.

See H.R. Rep. No. 103–826(I), at 109 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3882.

The legislative history also appears to contemplate limited exceptions from this general rule. Indeed, Commerce's regulations at 19 C.F.R. § 351.525(b)(6)(ii) – (v) provide for few exceptions to this general rule, where, in certain instances, Commerce may attribute subsidies received by one company to another company, in the case of cross-owned corporations. However, Section 351.525(b)(6)(iv) states that not all input suppliers that are cross-owned with the respondent are required to report subsidies. The requirement is limited to input suppliers where the production of the input is "primarily dedicated to the production of the downstream product." 19 C.F.R. § 351.525(b)(6)(iv).

30

The clear text of this exception read in conjunction with 19 U.S.C. §1671(a) does not permit an expansive read of the term "downstream product" to encompass products outside the class or kind of merchandise.  *See Dolan v. U.S.P.S.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").

Stated differently, subsidies conferred on an input supplier whose production of that input is primarily dedicated to the production of the class of kind or merchandise are countervailable, pursuant to 19 U.S.C. § 1671(a) and 19 C.F.R. § 351.525(b)(6)(iv).  Any benefits bestowed on such input supplier are appropriately included in Commerce's calculations.  On the other hand, if the input is not primarily dedicated to the production of the subject merchandise, because, for example, it is used for non-subject merchandise, the regulation does not apply and the subsidies to the input supplier are not countervailable.

Daikin's reading of the regulation is at odds with the broader statutory scheme.  The only way that section 351.525(b)(6)(iv) can be interpreted harmoniously with the statute is to read "downstream product" as referring to subject merchandise.

The text and structure of section 1671(a) and the Act's CVD provisions are clear that the determination of a subsidy is to be made with respect to the

31

manufacture of the class or kind of merchandise at issue.  Prior to imposing a CVD duty, the statute also requires a corresponding finding of material injury, again, with respect to "that merchandise" or "those imports," *i.e.*, imports of subject merchandise.  Despite this clear language, Daikin continues to argue that because Commerce's regulation at 19 C.F.R. § 351.525(b)(6)(iv), applies to inputs that are primarily-dedicated and does not use the term "subject merchandise" but the term "downstream product," it cannot possibly be referencing only subject merchandise. *See* Daikin Br. at 16-17.  However, for the regulation to be consistent with the statutory scheme, any subsidy on inputs primarily dedicated to the downstream product must be read to refer to subject merchandise. It would be illogical for the regulation to apply to inputs used primarily to produce non-subject merchandise because such an interpretation would create a broader subsidy than provided by the statute, 19 U.S.C. § 1671(a).  In other words, applying this regulation to attribute a subsidy "with respect to" the manufacture of non-subject merchandise would be in violation of the statute.  Therefore, the text of section 351.525(b)(6)(iv) must be read to apply with respect to inputs primarily dedicated to the manufacture of subject merchandise.  *See King v. Burwell*, 576 U.S. 473, 492-98 (2015) (declining to adopt interpretation of statutory provision that would undermine broader statutory scheme); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in

AFDOCS:199754116.3

isolation is often clarified by the remainder of the statutory scheme … because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

The *Statement of Administrative Action* ("*SAA*") also provides authoritative and interpretative guidance. *See* 19 U.S.C. § 3512(d); *see also Nucor Corp. v. United States*, 927 F.3d 1243, 1252 (Fed. Cir. 2019). The *SAA* explains that "{c}ountervailing duty petitions must also include information concerning the nature and amount of any subsidy provided *with respect to the merchandise*." H.R. Rep. No. 103-316, at 861, *reprinted in* 1994 U.S.C.C.A.N. at 4192 (emphasis added). Put another way, Commerce cannot even contemplate a countervailing duty investigation without a baseline of information regarding subsidies on the "merchandise to be investigated." *Id*. Further explained, Commerce "has found a countervailable subsidy to exist where the government took or imposed … a formal, enforceable measure which directly led to a discernable benefit being provided to the industry *under investigation*." *Id.* at 926, 1994 U.S.C.C.A.N. at 4239 (emphasis added). There is no mention of subsidies on products or merchandise unrelated to the merchandise under investigation ("subject merchandise"). The statute requires subsidies be related to the subject merchandise. Here, the subject merchandise is PTFE Resin and Commerce must consider whether the investigated subsidies, *i.e.*, those related to a land purchase by

IWL, a wind turbine producer, benefit the production of PTFE Resin.

The *SAA* also provides that "Commerce will issue regulations setting forth the details of the methodologies used to identify and measure the benefit of a subsidy." *Id.* at 928, 1994 U.S.C.C.A.N. at 4241. Thus, we look to the language of Commerce's regulations for guidance regarding cross-owned entities and whether countervailable subsidies provided to cross-owned entities should impact the net countervailable subsidy rate of the company under investigation.

Daikin's claim that Commerce is not required to analyze the effects of a subsidy is an inaccurate interpretation of the broader statutory scheme. Daikin cites to the *Softwood Lumber from Canada* decision to explain that Commerce would not have to consider or analyze the effect of a government action on the price or out of the class or kind of merchandise under investigation - this is not the intention of the statute. *See* Daikin Br. at 23. With this argument, Daikin alleges that if GFCL purchased even one cent ($0.01) of wind power from IWL then *all* of IWL's alleged subsidies become GFCL's subsidies. The absurdity of such a result should not be countenanced by this Court. These considerations must be considered when Commerce is tasked with determining if the regulation should be used in an investigation.

AFDOCS:199754116.3

**2.   The Regulation Unambiguously Forecloses Commerce's Interpretation as a Matter of Law.**

Daikin contends that the text and structure of "the regulation did not unambiguously foreclose Commerce's interpretation as a matter of law." Daikin Br. at 31. Daikin's approach would result in application of the cross-owned input supplier regulation in any situation, no matter how insignificant the input, as long as all of that input is sold to the producer of the downstream product. Daikin's interpretation does not allow for any engagement with the facts on the record. Daikin's overly broad interpretation creates absurd results and is inconsistent with even the plain text of the regulation. The regulation unambiguously requires that an input be primarily dedicated to a singular, specific downstream product. *See Gujarat Fluorochemicals*, 617 F. Supp. 3d at 1340, Appx00035; *see also* 19 C.F.R. § 351.525(b)(6)(iv). In the event that there is any ambiguity presented by the regulation itself, the *CVD Preamble* clearly demonstrates the intent of the regulation.

In GFCL's case, the input provided by IWL to the grid is wind electricity from wind-power and the 15 downstream product (i.e. the "higher value added product") is granular PTFE resin, along with the various other chemical products produced at GFCL's Dahej unit's multiple plants. GFCL Supp. IAC QR (Qs 3-7) at 6 and Exhs. S-5(a) - S-5(b), Appx05929, Appx06434-06437 (providing two charts

showing (1) raw material inputs and merchandise produced at GFCL's Dahej

plants; and (2) a summary of power generation and distribution to each of the

plants at the Dahej unit). Notably, IWL is a wind turbine manufacturer and GFCL

is a manufacturer of PTFE resin and other chemical products. Attributing subsidies

received by IWL for this purpose – production of wind turbine generators – does

not address the concern that an input producer is passing along subsidies to the

producer of the subject merchandise.  *See CVD Preamble*, 63 Fed. Reg. at 65401

(using examples such as timber primarily dedicated to lumber production and

semolina primarily dedicated to pasta production).  The position of IWL with

respect to GFCL's production of granular PTFE resin is much closer to the

example of the plastic manufacturer mentioned in the *CVD Preamble*.  IWL is a

producer of wind turbines and the fact that it supplied a minor amount of

electricity, an incidental product, to GFCL does not make it an input supplier under

19 C.F.R. § 351.525(b)(6)(iv).

This fact pattern does not track the purpose of Commerce's regulation or the

examples provided in the *CVD Preamble*, which describe products that are merely

a link in the overall production chain (*e.g.*, harvested standing timber that is

processed into lumber or semolina that is processed into pasta).  *See Gujarat

Fluorochemicals Ltd.*, 617 F. Supp. 3d at 1336-37, Appx00032; *CVD Preamble*, 63

Fed. Reg. at 65401. To the contrary, this is an attribution scenario much closer to

the "plastics v. appliances and automobiles" example in the *CVD Preamble*:
manufacturing of wind turbines is as irrelevant to production of PTFE and other
chemicals as manufacturing of plastics is to appliances and automobiles. The *CVD
Preamble* directed Commerce to consider whether the purpose of subsidies
provided to a cross-owned input supplier is to benefit the production of both the
input and downstream products. Once again, the input producer's operations, as
well as the nature of the input and the downstream products are highly relevant in
this analysis. For example, in *Certain Cold-Rolled Steel Flat Products From
Brazil*, Commerce found that steelmaking equipment and services are primarily
dedicated to the downstream production of steel. 81 Fed. Reg. 49940 (Dep't
Commerce July 29, 2016) (final CVD affirm. determ.), and accompanying Issues
and Decision Memorandum at 55. In contrast, here, it is not plausible to conclude
that the purpose of any subsidies given to a wind turbine manufacturer such as
IWL would be to benefit downstream production of PTFE resin because wind
electricity is not a link in the production of PTFE resin. Applying the logic of the
*CVD Preamble*, the wind electricity supplied by IWL is not in any way critical to
GFCL's production of granular PTFE resin, as timber is to lumber or steel making
equipment is to production of steel or semolina to pasta. Rather, wind electricity is
a general manufacturing input and not "intricately linked" to production of PTFE
resin.

AFDOCS:199754116.3

In a similar vein, as described above, in *Certain Lined Paper Products from Indonesia,* Commerce found that "{p}ulp logs are used to make pulp which, in turn, is used to make paper" and that "{t}he two upstream products {(*i.e.,* pulp logs and pulp)} have one purpose – as inputs to paper." *Lined Paper IDM* at 31. *See also Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China,* 75 Fed. Reg. 57444 (Dep't Commerce Sept. 21, 2010) (final affirm. CVD and critical circumstances determ.) ("*Seamless Pipe from China*"), and accompanying Issues and Decision Memorandum at 99 (finding that "{c}oke and coking coal are inputs to the production of steel rounds, which is primarily dedicated to the production of {subject merchandise}.") ("*Seamless Pipe from China IDM*").

Here, Commerce stated that "{t}he issue of whether production of the input product is primarily dedicated to production of the downstream product depends on the specific factual situations presented to Commerce *because the nature of input and downstream products and production processes vary among case*s." *IDM* at 11, Appx01068. While that may be true, it is also true that the guidance of the *CVD Preamble* and Commerce's past practice applies regardless of the nature of the input and the downstream products. In this case, the evidence on the record demonstrates that the IWL-generated power – which was *extremely* small in quantity—is not primarily dedicated to the production of granular PTFE resin and

38

therefore IWL's transactions do not meet the criteria under 19 C.F.R. § 351.525(b)(6)(iv).

The CIT's holding further supported this notion. The CIT states that "in all three examples the 'downstream product' is a specific, individually-identified product, and nowhere in the three examples does Commerce mention, as a pertinent factor in determining whether the input is 'primarily dedicated,' whether the producer is the sole or primary purchaser of the upstream product." *Gujarat Fluorochemicals Ltd.*, 617 F. Supp. 3d at 1337, Appx00032. While the electricity used to power GFCL's manufacturing facilities may be considered an input, its role in the overall manufacturing process of the finished products is not analogous to the examples provided in the *CVD Preamble;* the electricity used in the facilities is neither analogous to the role of timber in producing lumber nor semolina in pasta making. *See id.*, Appx00032-00033. Electricity that is used to power an entire production plant cannot be described merely a link in the overall production chain; as a result, electricity would not be categorized as an upstream product that under §351.525(b)(6)(iv) would be "primarily dedicated to the production of the downstream product." *Id.* at 1337, Appx00032.

The examples in the *CVD Preamble* are consistent, they are of examples of inputs that are specific to that industry or group of products. Electricity is unlike any of these examples, as it is fungible. Under Defendant-Intervenor's reading,

electricity is primarily dedicated to all the products in the *CVD Preamble*, and

beyond, which is absurd. Furthermore, Daikin alleges that the attribution rules are

consistent with the concept of benefit, but the application here leads to absurd

results.  GFCL receives a margin of 26.5% for a minor purchase of electricity from

IWL that accounts for 0.54% of IWL's total turnover and 0.07% of all electricity

used to produce the subject merchandise, which amounts to 0.60% of GFCL's total

power consumption.  *See* GFCL Case Br. at 7-8, Appx10602-Appx10603; *see also*

*Gujarat Fluorochemicals Ltd.*, 617 F. Supp. 3d at 1335, Appx00031.  Taken to its

logical conclusion, in Daikin's interpretation, a $.01 purchase from IWL would

automatically result in all subsidies received by IWL being attributed to GFCL.

This is not only an inaccurate interpretation regarding the intent of the regulation,

as defined in the *CVD Preamble,* but it would lead to absurd results and

applications. In addition to this erroneous application of the statute, Daikin

discusses circumvention concerns but as the facts here show, the mechanistic

application of the regulation clearly leads to punitive results.

### C.    The Record Before Commerce Compelled a Finding that Inputs from IWL Are Not Primarily Dedicated to the Production of the Downstream Product

Commerce's final administrative determination was not based on substantial

evidence and was unreasonable.  Daikin argues (1) Commerce's decision and

"interpretation of its own regulation" was within the "character and context in

which the interpretation was issued." Daikin Br. at 41; and (2) "Commerce's interpretation of the regulation as applying in this case was reasonable and within the zone of whatever ambiguity existed, and therefore its interpretation should have been upheld." *Id.* at 44. Like Commerce, Daikin does not properly grapple with the record evidence which demonstrates that Commerce's decision was not based on substantial evidence and was, therefore, not within the zone of ambiguity which would allow controlling weight.

### 1.     "Zone of Ambiguity" Standard

In *Kisor v. Wilkie,* the Supreme Court explains that for *Auer* deference to be applied, courts must consider the text, structure, history, and purpose of a regulation and conclude that the regulation is genuinely ambiguous. 139 S. Ct. at 2415; *see also id.* at 2408 ("This Court has often deferred to agencies' reasonable readings of genuinely ambiguous regulations. We call that practice Auer deference, or sometimes Seminole Rock deference, after two cases in which we employed it.") (citing *Auer v. Robbins*, 519 U.S. 452 (1997)). Then, the court must determine that the agency's interpretation is reasonable and that their decision falls within the "zone of ambiguity" that the court identifies only after employing all its interpretative tools. *Id.* at 2415-16. Finally, a court must make an independent inquiry into whether the actual character and context of that agency's interpretation would entitle it to controlling weight. Specifically, the Supreme Court limits *Auer*

41

deference by explaining, "{I}f the law gives an answer – if there is only one

reasonable construction of a regulation – then a court has no business deferring to

any other reading, no matter how much the agency insists it would make more

sense. *Id.* at 2415 ("Deference in that circumstance would 'permit the agency,

under the guise of interpreting a regulation, to create *de facto* a new regulation."'

*Id.* (citation omitted). Additionally, this Court has further explained in *National*

*Organization of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs*, 48

F.4th 1307, 1314-1315 (Fed. Cir. 2022), when there is an agency interpretation, it

should not be receiving *Auer* deference when deference conflicts with a prior

interpretation or creates unfair surprise. This notion is further illustrated in *Kisor v.*

*McDonough*, explaining that a court "cannot waive the ambiguity flag just because

it found the regulation impenetrable on first read. Rather, hard interpretative

conundrums, even relating to complex rules, can often be solved." 995 F.3d at

1358-59 (citation omitted) (internal quotations omitted).

The regulation here is not genuinely ambiguous. After employing the

interpretative tools, the Court should find that the text, structure, history, and

purpose of Section 351.525(b)(6)(iv) are clear and unambiguous. The regulation

itself provides an answer here both from the text of the regulation and through the

supplemental *CVD Preamble.* In conjunction with each other, the regulation itself

and the *CVD Preamble* support a finding that wind generated electricity from IWL

is not primarily dedicated to GFCL's production of PTFE Resin. What Daikin is attempting to do here is exactly what the Court in *National Organization of Veterans' Advocates, Inc.* warns against; this regulation is not ambiguous and therefore Commerce's inconsistent interpretation should be afforded no deference.

Daikin fails to consider that even if a statute is silent on an issue or considered genuinely ambiguous, the Court is then tasked with determining whether a reasonable interpretation was promulgated by the agency, and thus, whether that decision is owed deference. *McDonough*, 995 F.3d at 1360. No deference is warranted here to Commerce where its interpretation is unreasonable and not aligned with the intent of the regulation as set forth in the *CVD Preamble*. First, Commerce's interpretation was not reasonable since electricity was not analogous with any of the other examples provided in the *CVD Preamble.* As mentioned in previous sections, electricity is unlike the other examples provided in the *CVD Preamble* in that it can be equally used to make any product in any industry as it highly fungible. Second, Commerce's interpretation is not reasonable because it erroneously equates *use* of all the input purchased from a cross-owned party consumed to produce the downstream product with the characterization that the input is *primarily dedicated.* These terms are not synonymous in any sense, as Daikin seems to suggest. *Primarily dedicated* does not mean *used* and, as a result, this argument remains unconvincing.

43

## 2.    The Record Evidence Overwhelmingly Supports Upholding the CIT's Decision

The record evidence supports upholding the CIT's decision in this case. IWL's core business is the production of wind turbines.  IWL is a manufacturer of wind turbines, operating in the Madhya Pradesh region of India.  IWL sold two wind turbines to GFCL in March 2020.  Prior to March 2020, IWL sold the electricity generated from the same turbines to GFCL.  This allowed both IWL and GFCL to test the wind turbines.  As succinctly stated in Commerce's *Final Determination*, "IWL did not have any other energy customers and that all wind power generated at IWL's wind farm was to be used in GFCL's production facilities in Dahej." *IDM* at 12, Appx01069.  Notably, IWL does not operate a wind farm as its primary business.  The overwhelming majority of IWL's sales were to companies other than GFCL because IWL is not in the business of selling wind power, as demonstrated by IWL's audited financial statements. *See* GFCL Case Br. at 7, Appx10602.  This is part of IWL's production of *wind turbine generators*, which are not an input to GFCL's production of granular PTFE resin or any other downstream product. *See* IWL 2nd SQR at Exh. IWL-S2-2(a), Appx10566.

The nature of IWL's business and the inconsequential value of its wind electricity production, while overlooked by Commerce, are relevant to the determination under 19 C.F.R. § 351.525(b)(6)(iv).  When determining whether an

44

input is primarily dedicated to the production of subject merchandise within the

meaning of 19 C.F.R. § 351.525(b)(6)(iv), Commerce's practice has been to

consider the affiliates' business activities, "the overall quantities of the inputs

produced and sold by the affiliates, as well as the role of those inputs in the

production of different products and their consumption by {the respondent.}" *See*

*e.g. Urea Ammonium Nitrate Solutions From the Republic of Trinidad and*

*Tobago*, 87 Fed. Reg. 37828 (Dep't Commerce Jun. 24, 2022) (final CVD affirm.

determ.), and accompanying Issues and Decision Memorandum at 19; *see also*

*Lined Paper IDM* at 26.

For example, in *Certain Cold-Rolled Steel Flat Products from the Republic*

*of Korea*, Commerce determined that POSCO Plantec did not provide an input

primarily dedicated to POSCO's steel production, where, among other factors,

POSCO Plantec had a very different production business:

> If the record shows the sole purpose of POSCO Plantec's production
> activities is to provide inputs to POSCO's steel production, one might
> reasonably conclude that the purpose of a subsidy to POSCO Plantec is
> to benefit POSCO's steel production. However, on the contrary, the
> record shows that POSCO Plantec's productions include construction
> of a refinery, a cargo terminal in Taiwan, a storage tank in an LNG
> terminal in Korea, and a luggage processing facility in Korea, *etc.*

85 Fed. Reg. 38361 (Dep't Commerce Jun. 26, 2020) (final CVD results; 2017),

and accompanying Issues and Decision Memorandum at 30.

Commerce also explained that "similar to the plastic to automobile example

AFDOCS:199754116.3

set out in the *CVD Preamble,* inputs that POSCO Plantec provided to POSCO are used in a typical manufacturing process and not in a way that they are primarily and/or exclusively dedicated to the production of the downstream product." *Id.* This logic, when applied to the facts of IWL and GFCL compels the same determination.

IWL's production of wind turbine generators and any small amount of electricity generated in *testing* those turbines cannot be dedicated almost exclusively to the production of PTFE products under the rationale of the *CVD Preamble*, 63 Fed. Reg. at 65401 (using examples such as timber primarily dedicated to lumber production and semolina primarily dedicated to pasta production as inputs that are considered "primarily dedicated" to downstream production). IWL's total revenue from its sale of power to GFCL is 0.54 % of its consolidated turnover. GFCL Case Br. at 7, Appx10602. Attributing to GFCL *any* alleged subsidies received by IWL for its core business, *i.e.,* production of wind turbine generators, does not address the regulatory concern that an input producer is passing along subsidies to the producer of the subject merchandise. *See CVD Preamble*, 63 Fed. Reg. at 65401.

To the extent GFCL could trace the exact source of its power consumption at the Dahej Unit, it is relevant to note that GFCL's Dahej Unit produces both subject and non-subject merchandise. Of the multiple plants operating at the Dahej Unit,

only one plant has a product line dedicated to PTFE, with the other plants

producing various other chemical products. GFCL Supp. IAC QR (Qs 3-7) at 6 and

Exhs. S-5(a) - S-5(b), Appx05929, Appx06434-06437. GFCL estimates that the

amount of electricity used during PTFE production is only about 7.5% of the total

energy in the common pool, which is used to power all of the various plants and

production lines at the Dahej unit. *Id.* at 6 and Exh. S-5(b), Appx05929,

Appx06437. Thus, the power provided by IWL cannot be primarily dedicated to

the subject merchandise, where nearly all of the merchandise produced using the

power provided by IWL is not subject merchandise.

Commerce seems to be saying that if GFCL purchased even one cent ($0.01)

of wind power from IWL then *all* of IWL's alleged subsidies become GFCL's

subsidies, such that GFCL's CVD rate for provision of land at LTAR jumps from

0% to 26.50%. The absurdity of such a result should not be countenanced by this

Court. Commerce's decision to investigate IWL, a company which provided at

most 0.60% of GFCL's total power consumption and 0.54% of IWL's turnover is

case determinative, as it resulted in an increase in GFCL's subsidy rate of 26.5%.

*See id.* at 6, Appx05929.

This absurd result only occurred because of Commerce's threshold

determination that IWL provides an input to GFCL that is primarily dedicated to

the production of granular PTFE resin. The CIT's analysis was correct, holding

that "the problem is that electricity cannot be shown on this record to be 'primarily

dedicated' either to Gujarat Fluorochemicals's PTFE resin or to the production of

any of the other (unidentified) products made at GFCL's facilities, when the term

'primarily dedicated' is given its correct meaning." *Gujarat Fluorochemicals*, 617

F. Supp. 3d at 1340, Appx00035.

## VI.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons stated above, we respectfully request that this Court sustain

the decision and judgment of the Court of International Trade.

Respectfully submitted,

**/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia
John M. Gurley
Jessica R. DiPietro
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC  20006
(202) 857-6000

*Counsel for Gujarat Fluorochemicals Limited.*

March 27, 2024

AFDOCS:199754116.3

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1268

**Short Case Caption:** Gujarat Fluorochemicals Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  10,985  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/27/2024

Signature: /s/ Diana Dimitriuc Quaia

Name: Diana Dimitriuc Quaia

Save for Filing