2024-1268

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

GUJARAT FLUOROCHEMICALS LTD.,

*Plaintiff-Appellee,*

v.

UNITED STATES,

*Defendant,*

DAIKIN AMERICA, INC.,

*Defendant-Appellant.*

Appeal from The United States Court of International Trade in
Case No. 1:22-cv-00120-TCS, Judge Timothy C. Stanceu

**REPLY OF
DEFENDANT-APPELLANT DAIKIN AMERICA, INC.**

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
Elizabeth J. Drake, Esq.
**SCHAGRIN ASSOCIATES**
900 7th Street NW #500
Washington, DC 20001
(202) 223-1700

*Counsel to Daikin America, Inc.*

Dated: April 17, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1268

**Short Case Caption:** Gujarat Fluorochemicals Ltd. v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 4,767 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/17/2024

Signature: /s/ Luke A. Meisner

Name: Luke A. Meisner

Save for Filing

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................1

II. ARGUMENT..............................................................................1

A.  Introduction ................................................................1

B.  Commerce was not required to define "downstream product" to mean "subject merchandise" ...............................4

C.  Commerce was not required to impose quantitative thresholds before applying the cross-owned input regulation.............................................................................9

D.  Commerce was not required to examine IWL's primary business activities ....................................................12

E.  The CIT erred in ruling that electricity inputs cannot, as a matter of law, be covered by the cross-owned input supplier regulation....................................................13

    1.  The plain language of the regulation permits its application to electricity inputs.........................................14

    2.  The *CVD Preamble* does not prohibit application of the regulation to electricity inputs .........................................17

    3.  The CIT erroneously concluded the regulation cannot apply to electricity inputs as a matter of law ...................20

III. CONCLUSION..........................................................................21

i

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) (appeal filed Nov. 18, 2022) ..........6

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014).12

*Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018)..................5

*Gujarat Fluorochemicals Limited v. United States*, 617 F.Supp.3d 1328 (Ct. Int'l Trade 2023)................................................................................ *passim*

*Icdas Celik Enerji Tersane v. Ulasim Sanayi A.S.*, 498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021)..................................................................................10

*NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022) .....................3

*Res-Care, Inc. v. United States*, 735 F.3d 1384 (Fed. Cir. 2013)............................5

*Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) ......................................5

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) .............................6

## Statutes

19 U.S.C. § 1671(a) ......................................................................................... 8, 12

19 U.S.C. § 1677(5A) .............................................................................................8

19 U.S.C. § 1677(5)(C).........................................................................................12

19 U.S.C. § 1677-2.................................................................................................6

## Rules

Federal Circuit Rule 28 ..........................................................................................1

Federal Rule of Appellate Procedure 28 ................................................................1

## Regulations

19 C.F.R. § 351.102 ........................................................................................ 14, 15

19 C.F.R. § 351.526 ...................................................................................... *passim*

19 C.F.R. §§ 351.106(c)(2), 351.107(a)-(c), 351.202(b)(4)-(9), 351.203(c), (e), & (f), 351.204(c) & (e), 351.206(g) & (h), 351.207(b)(2), 351.208(c)-(e)...............5

<u>**TABLE OF AUTHORITIES, cont.**</u>

**Administrative Actions and Determinations**

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ........................................................................................... *passim*

*Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce August 16, 2006) and accompanying Issues and Decision Memorandum ........................................................................ 7

*Final Affirmative Countervailing Duty Determination: Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570 (Dep't Commerce May 28, 1992) .. 7


**Other Authorities**

*Dedicated*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dedicated (last visited Feb. 15, 2024) ........................... 16

*With respect to*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/with%20respect%20to (last visited Jan. 20, 2023) ......... 8

## I.     <u>INTRODUCTION</u>

On behalf of Defendant-Appellant Daikin America, Inc. ("Defendant-Appellant" or "Daikin"), we respectfully submit this reply brief in accordance with Federal Rule of Appellate Procedure 28 and Federal Circuit Rule 28.

## II.    <u>ARGUMENT</u>

### A.     Introduction

In a countervailing duty ("CVD") investigation on imports of Granular Polytetrafluoroethylene Resin ("PTFE") from India, the U.S. Department of Commerce ("Commerce") determined that the responding Indian PTFE producer, Gujarat Fluorochemicals Limited ("GFCL"), benefitted from certain countervailable subsidies. At issue in this appeal is Commerce's determination regarding a land subsidy that was provided by the Government of India's State Industrial Development Corporation ("SIDC") to GFCL's cross-owned input suppler, Inox Wind Limited ("IWL"). *See Granular Polytetrafluoroethylene Resin From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 3,765 (Dep't Commerce Jan. 25, 2022), and accompanying Issues and Decision Memorandum ("Final IDM") at Comment 1. Appx01065-01069. Commerce determined that the subsidy to IWL was attributable to GFCL pursuant to Commerce's cross-owned input supplier regulation at 19 C.F.R. § 351.525(b)(6)(iv). Commerce found that

the regulation applied to the facts of this case, because: (1) IWL and GFCL were

cross-owned; and (2) all of the electricity produced by IWL was consumed in the

production of downstream products by GFCL. *See* Final IDM at Comment 1.

Appx01065-01069.

On appeal, GFCL did not contest Commerce's basic findings that IWL

received a subsidy from the SIDC, IWL was cross-owned with GFCL, and all of

the electricity IWL produced was supplied to GFCL for the production of

downstream products. *See generally Gujarat Fluorochemicals Limited v. United

States*, 617 F.Supp.3d 1328, 1342 (Ct. Int'l Trade 2023) ("*Gujarat II*").

Appx00026-00038. The CIT thus did not find fault with any of these factual

findings. *See id*. Moreover, the CIT did not make any findings as to whether the

attribution regulation could be applied where the input in question is used to

produce multiple products by the downstream producer. *See id*. at 1336.

Instead, the CIT determined that Commerce's cross-owned input regulation

may only apply if the input in question is a "link in the overall production chain"

of the downstream product and bears a "physical relationship" with the

downstream product – requirements the CIT concluded were not met here where

the input product was electricity instead of a physical input. *Id*. at 1336-1338. The

CIT explained that electricity, "is energy, and, being of universal application, is not

remotely describable as an upstream product that is 'primarily dedicated to the

2

production of the downstream product' as is required by § 351.525(b)(6)(iv)." *Id*.
at 1337. The CIT thus concluded that Commerce's reading of its own regulation
was contrary to law, and the CIT directed Commerce to delete the subsidy from
GFCL's rate. *See id*. at 1341, 1342.

In support of the CIT's decision, plaintiff-appellee GFCL raises numerous
facts and arguments that were not addressed by the CIT and do not justify its
decision that electricity – as a matter of law – may not be considered an input
product under 19 C.F.R. § 351.525(b)(6)(iv). *See generally* GFCL Resp. (ECF No.
17). GFCL raises numerous arguments alleging that Commerce's decision that its
regulation applied to the facts of this case is unreasonable or unsupported by
substantial evidence. *See, e.g., id*. at 10, 35-36, and 44-48. But that is not what the
CIT found. And even if that were what the CIT found, the correct response would
have been a remand to Commerce to give the agency the opportunity to provide
further explanation or support for its determination. *See NEXTEEL Co., Ltd. v.
United States*, 28 F.4th 1226, 1238 (Fed. Cir. 2022).

Instead, the CIT found that Commerce's interpretation of its regulation was
contrary to law and issued a directed remand to delete the resulting subsidy rate.
*See Gujarat II* at 1341, 1342. That is the decision that is before this Court. As
Daikin demonstrated in its opening brief, that decision was in error and should be
reversed. *See generally* Daikin Opening Br. (ECF No. 16).

Below, we briefly address the extraneous issues that GFCL raises in its response. We then turn to the heart of the question in this case: As a matter of law, is Commerce precluded from treating electricity as an "input product" under 19 C.F.R. § 351.525(b)(6)(iv)? We believe the answer is no, and we respectfully ask this Court to reverse the CIT on those grounds.

### B.    Commerce was not required to define "downstream product" to mean "subject merchandise"

GFCL spends substantial portions of its brief highlighting the fact that the downstream products produced by GFCL with the electricity provided by IWL included products other than subject merchandise. GFCL Resp. at 18-22, 31-34, and 46-47. GFCL then argues that Commerce was required to consider whether the input was dedicated to the production of "the singular 'downstream product,' *i.e.*, subject merchandise." *Id*. at 18. These arguments suggest that Commerce must consider the terms "downstream product" and "subject merchandise" to be interchangeable, and that Commerce is not permitted to define "downstream product" more broadly than "subject merchandise." This argument has no merit.

As a preliminary matter, the CIT below explicitly declined to address this issue. *See Gujarat II* at 1335-1336. In addition, Commerce below explained that the regulations "do not specify whether the downstream product must be subject or non-subject merchandise." Final IDM at 11. Appx01068. Moreover, basic rules of interpretation and common sense dictate that Commerce is not required to interpret

4

the term "downstream product" to be equivalent to, and no broader than, "subject merchandise."

A well-accepted canon of construction is the presumption that Congress's use of different terms within related statutes generally implies that different meanings were intended. *See Res-Care, Inc. v. United States*, 735 F.3d 1384, 1389 (Fed. Cir. 2013). Applying this canon to the regulation at issue,[1] the term "downstream product" in the dependent clause of the cross-owned input suppler regulation cannot be automatically equated to the different term "subject merchandise," as GFCL urges. When Commerce has meant to say "subject merchandise" when promulgating its regulations, it has done so. *See, e.g.*, 19 C.F.R. §§ 351.106(c)(2), 351.107(a)-(c), 351.202(b)(4)-(9), 351.203(c), (e), & (f), 351.204(c) & (e), 351.206(g) & (h), 351.207(b)(2), 351.208(c)-(e). The fact that Commerce did not use the term "subject merchandise" when promulgating 19 C.F.R. § 351.525(b)(6)(iv) supports a determination that the term "downstream product" has a different meaning than "subject merchandise." While the "downstream product" may be "subject merchandise" based on the facts of some cases, it may be defined more broadly than "subject merchandise" in others.

_____

[1] "When construing an agency regulation as a matter of law," the Court must use "the same rules as {it} would use in construing a statute …." *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1344 (Fed. Cir. 2018) (quoting *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006)).

Indeed, deliberate use of a different term indicates that Commerce did not mean to limit the definition of "downstream product" to mean solely "subject merchandise" in all cases.

Similarly, the fact that the term "downstream product" is singular in the dependent clause of the regulation does not dictate how broadly or narrowly that term may be interpreted. In a similar context, this Court has noted that "{t}he use of the modifier 'a' tells us nothing about what is included within the term 'foreign like product.'" *SKF USA Inc. v. United States*, 263 F.3d 1369, 1380, n.13 (Fed. Cir. 2001) (citing 1 U.S.C. § 1). In the context of attributing subsidies bestowed on prior stage raw agricultural products to latter stage processed agricultural products under 19 U.S.C. § 1677-2, the CIT has upheld Commerce's determination to define the "latter stage product" (singular) as table olives in general and not just the ripe olives that constituted subject merchandise. *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) (appeal filed Nov. 18, 2022). Similarly, Commerce has explained that the singular word "product" "does not have a standard meaning that indicates exactly how similar goods must be to fall under the definition of a product," citing as examples of a "product" motor vehicles, cars, Ford cars, and specific models of Ford cars. *Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Lined Paper Products*

*from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce August 16, 2006) and

accompanying Issues and Decision Memorandum ("*Lined Paper IDM*") at

Comment 3.

In addition, as noted in Daikin's opening brief, the illustrative examples in

the *CVD Preamble* upon which GFCL and the CIT rely so heavily are themselves

cases in which Commerce defined the "downstream product" to include both

subject and non-subject merchandise. Daikin Opening Br. at 23-24 (citing

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce

Nov. 25, 1998) ("*CVD Preamble*")). In the *Softwood Lumber* case cited in the *CVD*

*Preamble*, *see CVD Preamble*, 63 Fed. Reg. at 65,401, Commerce explained that

stumpage subsidies were "not tied to specific products produced during the lumber

production process," which included not only timber but also "chips or other by-

products." *Final Affirmative Countervailing Duty Determination: Certain*

*Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,576 (Dep't

Commerce May 28, 1992). Commerce explained that "all products produced

during the lumber production process receive the benefit" of the stumpage

subsidies. *Id*. Thus, Commerce therefore included in the denominator not just

lumber sales but sales of "commercial products produced by mills other than

lumber, including chips, sawdust, and shavings." *Id*. Indeed, timber is also capable

of being used in making many additional products besides lumber, such as pulp for papermaking. *See, e.g.*, *Lined Paper IDM* at Comment 3.

Finally, contrary to GFCL's claims, the fact that the CVD statute requires Commerce to countervail subsidies provided "with respect to" subject merchandise in no way dictates that the term "downstream product" must be defined coextensively with subject merchandise. *See* GFCL Br. at 28-34 (citing, <u>inter alia</u>, 19 U.S.C. § 1671(a)(1)). The reference to subsidies provided "with respect to … subject merchandise" only means that subject merchandise must be among the products benefitting from the subsidy in question. There is no requirement that the entire benefit be conferred solely on subject merchandise, and such a requirement would be absurd and contrary to decades of CVD practice and precedent.

Merriam-Webster defines "with respect to" as "with reference to : in relation to." *With respect to*, Merriam-Webster.com, <u>https://www.merriam-webster.com/dictionary/with%20respect%20to</u> (last visited Apr. 17, 2024). A subsidy that benefits subject merchandise is being provided "with respect to," "with reference to," and "in relation to" subject merchandise, regardless of whether other products also benefit from the subsidy in question.[2] Indeed, the common factual scenario in which a subsidy is provided to an entire firm, benefitting both

---

[2] This is a separate question from whether or not a subsidy is specific under 19 U.S.C. § 1677(5A).

subject merchandise produced by that firm and other, non-subject merchandise produced by that firm, is explicitly recognized by Commerce's attribution regulations. *See* 19 C.F.R. § 351.525(b)(3).

In short, nothing in the statute or regulations requires Commerce to define the term "downstream product" to mean "subject merchandise." The CIT declined to make such a finding below, *Gujarat II* at 1335-1336, and the issue is not properly on appeal here. GFCL's arguments about Commerce's inclusion of non-subject merchandise within the term "downstream product" in the case below should thus be rejected.

### C.     Commerce was not required to impose quantitative thresholds before applying the cross-owned input regulation

GFCL repeatedly argues that, even though all of the electricity produced by IWL was provided to GFCL, the amount of electricity IWL produced was small. GFCL Resp. at 3, 6-8, 10, 13, 22-23, 38-39, and 46. Yet GFCL points to nothing in the statute or regulations that requires the amount of the input being supplied to exceed some quantitative threshold in order for the regulation to apply. The CIT also did not base its determination on the quantity of electricity provided. *See generally Gujarat II*. GFCL's arguments in this regard are thus unavailing and should be rejected.

In the case below, Commerce rightly determined that the quantity of electricity provided by IWL did not prevent application of the cross-owned input

supplier regulation. In another CIT case, the trade court had already rejected a

similar argument:

> While the final quantity {of the input} may be low, the
> regulations do not obligate Commerce to measure the
> impact of an input supplier's contributions when
> weighing whether to attribute its subsidies to the
> downstream producer. Rather, viewed in light of the *CVD
> Preamble*, 19 C.F.R. § 351.525(b)(6)(iv) looks only at
> the purpose of the subsidy at the time of bestowal.
> Therefore, the quantity of the scrap provided …, while
> low, is not sufficient to persuade the court that
> Commerce acted without substantial evidence or contrary
> to law.

*Icdas Celik Enerji Tersane v. Ulasim Sanayi A.S.*, 498 F. Supp. 3d 1345, 1364 (Ct.

Int'l Trade 2021) (citation omitted). Commerce cited this case in its preliminary

determination here, denying GFCL's request not to include the subsidy to IWL in

the underlying proceeding on this basis. *See Granular Polytetrafluoroethylene

Resin From India: Preliminary Affirmative Countervailing Duty Determination,

Preliminary Affirmative Critical Circumstances Determination, and Alignment of

Final Determination With Final Antidumping Duty Determination*, 86 Fed. Reg.

35,479 (Dep't Commerce July 6, 2021), and accompanying Preliminary Decision

Memorandum ("PDM") at 8. Appx01014. In its final determination, Commerce

again explained as follows:

> While GFCL reported that the wind energy supplied by
> IWL is a small amount of GFCL's cost of production and
> total power consumption, the evidence on the record
> demonstrates that IWL did not have any other energy

10

> customers and that all wind power generated at IWL's
> wind farm was to be used in GFCL's production facilities
> in Dahej. Furthermore, notwithstanding GFCL's
> arguments that IWL's wind energy was sent to an
> electrical grid and not directly to GFCL's manufacturing
> facilities, IWL's power purchase agreement was made
> with GFCL, not the administrator of the power grid. This
> fact indicates that IWL's production of this wind energy,
> the "input product" at issue, was primarily dedicated to
> GFCL's downstream production during the POI.

Final IDM at 12. Appx01069.

Indeed, Commerce's refusal to impose any sort of arbitrary threshold on the

quantity of an input that must be provided in order for the regulation to apply was

fully supported by the statutory scheme. The statute and regulations do not afford

Commerce the discretion to not apply its attribution regulations based on the

quantity or value of the input concerned. Commerce's regulations state that, in

attributing a subsidy to one or more products, Commerce "<u>will</u> apply the <u>rules</u> set

forth in paragraphs (b)(2) and (b)(7)" of the attribution regulation. 19 C.F.R.

§ 351.525(b)(1) (emphasis added). The cross-owned input supplier regulation also

states that where the primary dedication standard is met Commerce "<u>will</u> attribute

subsidies" to the combined sales of the input and downstream products (excluding

intercompany sales). 19 C.F.R. § 351.525(b)(6)(iv) (emphasis added).

This is consistent with the CVD statute, which mandates that Commerce

countervail subsidies regardless of whether those subsidies are provided directly or

indirectly and without regard to the effects of those subsidies. *See* 19 U.S.C.

§§ 1671(a) and 1677(5)(C). *See also Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (explaining that the CVD statute is remedial in nature and application of duties is mandatory when the statutory criteria are met). Thus, once a subsidy was found to exist, Commerce was required by law to include it in the subsidy rate regardless of the quantity of the input concerned. Commerce complied with this duty, and GFCL's arguments to the contrary are without merit.

### D.     Commerce was not required to examine IWL's primary business activities

GFCL also claims that Commerce's determination was inappropriate because the provision of electricity was not IWL's primary business activity. *See* GFCL Resp. at 10 and 44 – 45. Again, this factor played no role in the CIT's decision that is on appeal here. *See generally Gujarat II*. Thus, it provides no grounds for this Court to affirm that decision.

These arguments should also be dismissed because they are without merit. A plain reading of 19 C.F.R. § 351.525(b)(6)(iv) provides no indication that subsidies to an input supplier are not attributable to a downstream producer if the input supplier also produces other goods or services. The regulation requires "production of the input product to be primarily dedicated to production of the downstream product," the regulation does not require the <u>upstream producer's business activities to also</u> be primarily dedicated to production of the input product that is in

turn primarily dedicated to production of the downstream product. 19 C.F.R.

§ 351.525(b)(6)(iv). The fact that Commerce may have considered the input

supplier's business activities in other cases does not render this factor a required

consideration under the statute or regulations in this case. The Court should

therefore reject these arguments.

> ### E.  The CIT erred in ruling that electricity inputs cannot, as a matter of law, be covered by the cross-owned input supplier regulation

As reviewed in Daikin's opening brief, the CIT decision below was in error,

because the cross-owned input supplier regulation either unambiguously applies to

electricity, or, at a minimum, was reasonably interpreted by Commerce to apply to

electricity. The regulations provide as follows:

> (b) *Attribution of subsidies*—(1) *In general*. In attributing a subsidy to one or more products, the Secretary will apply the rules set forth in paragraphs (b)(2) through (b)(7) of this section.
>
> \*       \*       \*
>
> (6) *Corporations with cross-ownership*.
>
> \*       \*       \*
>
> (iv) *Input suppliers*. If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv).

      1.    <u>The plain language of the regulation permits its application to electricity inputs</u>

As a preliminary matter, there should be no controversy that the term "input product" includes electricity and the term "downstream product" includes products, such as chemicals, that are made with electricity. The CIT conceded that electricity could be described as an "input." *Gujarat II* at 1337. Indeed, Commerce's own regulations regarding the definition of inputs consumed in the production process states as follows: "Inputs 'consumed in the production process' are inputs physically incorporated, energy, fuels and oil used in the production process and catalysts which are consumed in the course of their use to obtain the product." 19 C.F.R. § 351.102(b)(12).

GFCL seeks to minimize this regulatory definition by claiming that 19 C.F.R. § 351.102 only provides "general definitions, separate from the regulation here." GFCL Resp. at 22. But that is the entire point of the definitions section of the regulations – to guide interpretation of the other sections in the same Part of the regulations. The introduction to the definition section states as follows:

> (a) *Introduction*. The Act contains many technical terms applicable to antidumping and countervailing duty proceedings. In the case of terms that are not defined in this section or other sections of this part, readers should refer to the relevant provisions of the Act. This section:

14

(1) Defines terms that appear in the Act but are not defined in the Act;
(2) Defines terms that appear in this Part but do not appear in the Act; and
(3) Elaborates on the meaning of certain terms that are defined in the Act.

19 C.F.R. § 351.102. GFCL's suggestion that the definitions in this section are irrelevant to the interpretation of other sections in the same Part of the regulation, such as 19 C.F.R. § 351.525(b)(6)(iv), simply makes no sense and contradicts the plain language of the definitions section and its entire purpose.

The reason the CIT concluded that electricity could not, as a matter of law, be an input covered by the cross-owned input supplier regulation had nothing to do with a textual interpretation of the term "input product." Instead, the CIT ruled that electricity is an input of "universal application," and thus cannot be "primarily dedicated to the production of the downstream product." *Gujarat II* at 1337. This was based on the CIT's conclusion that the "primarily dedicated" criterion of the regulation requires the input to have "a close physical relationship" to the downstream product, and the requirement cannot be satisfied merely because the input is "provided 'primarily' to the producer of that {downstream} product." *Id*. at 1336-1337.

GFCL also hangs its hat on the term "primarily dedicated" to argue that the regulation cannot apply to electricity inputs. GFCL claims that the "primarily dedicated" criteria cannot be satisfied by how the input is actually used – *i.e.*,

whether all of the upstream affiliate's input production is actually used to produce downstream product – but instead can only be satisfied if the input in question is physically incapable of being used to produce products other than the downstream product. GFCL Resp. at 43 ("Primarily dedicated does not mean used …" (emphasis removed)).

The plain language of the regulation does not foreclose a reading in which the "primarily dedicated" to downstream production prong may be satisfied if the input is in fact "primarily used" or "primarily provided" to produce the downstream product. Definitions of "dedicated" include "devoted to a cause, ideal, or purpose" and "given over to a particular purpose." *Dedicated*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dedicated (last visited Apr. 17, 2024). An input may be "devoted to" or "given over to" downstream production based either on inherent properties that limit its possible downstream uses or based on the fact that the input in the case in question was actually primarily "devoted" or "given over" to downstream production.

By its plain terms, the "primarily dedicated" requirement, in and of itself, can be satisfied if the input is in fact not being provided for any alternative uses between the upstream and downstream suppliers in question. The term "primarily dedicated" does not dictate that alternative uses must also be theoretically impossible. For example, one can "primarily dedicate" one's time, energy, or

attention to a particular matter even though there are many alternative matters to which that energy could otherwise be directed. Similarly, electricity can be "primarily dedicated" to production of a downstream product when all of that electricity is in fact used to make that product, even if, in theory, electricity could have also been used to make other products.

The plain language of the regulation thus does not prohibit its application to electricity inputs.

2.     The *CVD Preamble* does not prohibit application of the regulation to electricity inputs

As reviewed above, the CIT's overly constrictive reading of "primarily dedicated" is not based on the plain language of the regulation itself. Instead of probing into the plain meaning of the term "primarily dedicated" based on the text of the regulation, the CIT highlights explanatory language in the *CVD Preamble* stating that Commerce's "main concern" in promulgating the regulations was:

> … the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain.

*Gujarat II* at 1336 (citing *CVD Preamble*, 63 Fed. Reg. at 65,401).

As a preliminary matter, Commerce only stated this was its "main concern" in promulgating the regulation, not that the regulation could not apply to different factual scenarios. Indeed, as reviewed in more detail below, Commerce was careful

17

to explicitly state that it would not allow the new rules to be circumvented merely because new factual scenarios had not been anticipated at the time the rules were promulgated. Regardless, it is far from clear that this language always requires the kind of close "physical relationship" between the input and downstream product that the CIT presumes. To the contrary, where all of the electricity a supplier produces is used to produce the downstream product, that electricity is indeed "dedicated … exclusively to the production of a higher value added product," and it is also "merely a link in the overall production chain."

Thus, it is only once the CIT turns to the illustrative examples in the *CVD Preamble* that it finds the examples in question "clarify" that the regulation pertains to the role the input performs "in the physical sense," requiring a "close physical relationship," and prohibiting application of the regulation to electricity inputs. *Gujarat II* at 1336-1337. It is these examples that the CIT relies on most heavily to support its conclusion that a close physical relationship is required between an upstream input and the downstream product. *Id*. GFCL also gives great weight to these examples, going so far as state that the input needs to be not just primarily dedicated to the downstream product but "intricately linked" to that product. GFCL Resp. at 37. But these examples are a very slender reed for the CIT and GFCL to base their reasoning upon.

Importantly, the illustrative examples in the *CVD Preamble* are just that: illustrative, not exhaustive. As reviewed in Daikin's opening brief, the illustrative examples in the *CVD Preamble* do not define the outer limits of the rule's application. Instead, Commerce explicitly recognized that there may be factual scenarios that do not fit within the same confines. Daikin Opening Br. at 33 – 35 (citing *CVD Preamble*, 63 Fed. Reg. at 65,399-65,400). And, if such unforeseen factual scenarios arose, Commerce pledged to "examine all tying claims closely to ensure that attribution rules are not manipulated to reduce countervailing duties." *CVD Preamble*, 63 Fed. Reg. at 65,400 (emphasis added). This is consistent with the core purpose of the cross-owned input supplier regulation, which is to avoid creating a "loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input." *Id*. at 65,401.

Unfortunately, by forcing Commerce to limit the application of its rule to the precise factual scenarios highlighted in two cases from more than 25 years ago, the CIT has defeated the purpose of the attribution regulations. By narrowly reading two illustrative examples concerning material inputs to definitively foreclose the application of the rule to energy inputs, the CIT has allowed the attribution rule to be "manipulated to reduce countervailing duties," merely because the scenario concerning energy inputs had not yet presented itself to Commerce when the rule

19

was promulgated. Thus, the loophole Commerce sought to close has been re-opened. Even if the input is in fact primarily dedicated to the manufacture of the downstream product – indeed, even if it is used exclusively by the two cross-owned companies concerned to produce the downstream product – the production of that input may be spun off to another corporate entity to avoid countervailing duty liability as long as the input could theoretically be used in other downstream products.

       3.    <u>The CIT erroneously concluded the regulation cannot apply to electricity inputs as a matter of law</u>

In short, the result the CIT reached is inconsistent with the text, structure, history, and purpose of the attribution regulation as well as the remedial purpose and mandatory nature of the CVD statute. Nothing in the plain meaning of the words "input product," "primarily," "dedicated," or "downstream product" justifies a <u>per se</u> rule barring application of the rule, as a matter of law, to electricity inputs. Yet the CIT substituted its own preferred reading of the regulation for Commerce's interpretation. In so doing, the CIT based its own narrow interpretation almost entirely on illustrative examples in the *CVD Preamble* to circumscribe the language of the regulation itself, contrary to the plain intent of Commerce when promulgating the regulation.

For all of these reasons, the CIT's determination was in error and should be reversed.

20

## III.  **CONCLUSION**

For the foregoing reasons, Defendant-Appellant requests that this Court reverse the judgment of the CIT that prohibited Commerce from applying its cross-owned input regulation to electricity inputs. Contrary to GFCL's arguments, this case is not about substantial evidence. It is not about the types of products included in the "downstream product," the amount of input IWL provided, or the range of IWL's business activities. Instead, this case is about a CIT ruling that Commerce is prohibited by law from ever applying its cross-owned input supplier regulation to electricity inputs. In reaching this conclusion, the CIT impermissibly substituted the CIT's judgment for agency's own, contradicting the regulation's text, structure, purpose, and history as well as the remedial purpose of the statutory scheme. This Court should thus reverse the CIT and hold that Commerce's interpretation of its rule was allowed.

Respectfully submitted,

*/s/* Luke A. Meisner, Esq.
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
Elizabeth J. Drake, Esq.
**SCHAGRIN ASSOCIATES**
900 7th Street NW #500
Washington, DC 20001
(202) 223-1700

*Counsel to Daikin America, Inc.*

Dated: April 17, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 24-1268

**Short Case Caption:** Gujarat Fluorochemicals Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 4,767 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/17/2024

Signature: /s/ Luke A. Meisner

Name: Luke A. Meisner

Save for Filing